UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

BREANNA RENTERIA, et al.,

     *Appellants,*

v.                               Case No. 23-2123

NEW MEXICO OFFICE OF THE
SUPERINTENDENT OF INSURANCE, et al.,

     *Appellees,*

On Appeal from the United States District Court
for the District of New Mexico
No. 1:23-CV-00276-MLG-KK
The Honorable United States Chief District Judge Matthew L. Garcia

**APPELLANTS' APPENDIX
VOLUME I of V**

Respectfully submitted,

*/s/ Nicholas T. Hart*

Carter B. Harrison IV
Nicholas T. Hart
**HARRISON & HART, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 295-3261
nick@harrisonhartlaw.com

*Counsel for Appellants*

## <u>APPENDIX – VOLUME I of V, Pages 0001 to 0201</u>

| Tab | Date | Description | Doc. No. | Appendix Page No. |
|---|---|---|---|---|
| 1 | | Civil Docket Sheet | | 0001 – 0009 |
| 2 | 03/31/23 | Complaint | 1 | 0010 – 0201 |

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE</u>

I HEREBY CERTIFY the following:

1.      No privacy redactions were required to be made;

2.      One hard copy of Appellant's Appendix was submitted in digital form through the Court's CM/ECF filing system and this document is an exact copy of the document filed with the Clerk;

3.      Through the Court's CM/ECF filing system, one copy of the foregoing Appellants' Appendix was served by electronic means, on each counsel of record as more fully reflected on the Notice of Docket Activity;

4.      One hard copy of Appellant's Appendix Volume I of V was sent via Federal Express overnight delivery to Christopher M. Wolpert, Clerk of the Tenth Circuit, United States Court of Appeals for the Tenth Circuit, The Byron White U.S. Courthouse, 1823 Stout Street, Denver, Colorado 80257; and

5.      The digital submission of this document has been scanned for viruses using the most recent version of a commercial virus scanning program and is free of viruses.

Dated this 13th day of December, 2023.

<u>/s/ Nicholas T. Hart</u>
Nicholas T. Hart

APPEAL

# U.S. District Court
# United States District Court - District of New Mexico (Albuquerque)
# CIVIL DOCKET FOR CASE #: 1:23-cv-00276-MLG-KK

Gospel Light Mennonite Church Medical Aid Plan et al v. New
Mexico Office of the Superintendent of Insurance et al
Assigned to: District Judge Matthew L. Garcia
Referred to: Magistrate Judge Kirtan Khalsa
Case in other court:  Tenth Circuit, 23-02123
Cause: 42:1983 Civil Rights Act

Date Filed: 03/31/2023
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Gospel Light Mennonite Church Medical
Aid Plan**
*doing business as*
Liberty HealthShare

represented by **J. Michael Sharman**
Commonwealth Law Offices, P.C.
246 E. Davis Street, Suite 200
Culpeper, VA 22701
540-727-1007
Email: mikesharman@verizon.net
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carter B. Harrison , IV**
Harrison & Hart, LLC
924 Park Avenue SW
Suite E
Albuquerque, NM 87102
505-295-3261
Fax: 505-341-9340
Email: carter@harrisonhartlaw.com
*ATTORNEY TO BE NOTICED*

**Daniel J. Gallegos , Jr**
Harrison, Hart & Davis, LLC
924 Park Ave. SW
Suite E
Albuquerque, NM 87102
505-295-3261
Email: daniel@harrisonhartlaw.com
*ATTORNEY TO BE NOTICED*

**Nicholas Thomas Hart**
Harrison & Hart, LLC
924 Park Ave SW, Suite E
Albuquerque, NM 87102
505-295-3261
Email: nick@harrisonhartlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

APPENDIX 0001

District NextGen v1.7.1.2 LIVE DB

**Breanna Renteria**                                 represented by **J. Michael Sharman**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Carter B. Harrison , IV**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Daniel J. Gallegos , Jr**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Nicholas Thomas Hart**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Laura Smith**                                      represented by **J. Michael Sharman**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Carter B. Harrison , IV**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Daniel J. Gallegos , Jr**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Nicholas Thomas Hart**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tammy Waters**                                     represented by **J. Michael Sharman**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Carter B. Harrison , IV**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Daniel J. Gallegos , Jr**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Nicholas Thomas Hart**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**New Mexico Office of the Superintendent of Insurance**                        represented by        **Eucaris Tatiana Perez Valero**
Office of the Superintendent of Insurance
1120 Paseo de Peralta
Ste # 4
Santa Fe, NM 87501
505-231-1417
Email: Tatiana.Perez@osi.nm.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence M Marcus**
New Mexico Office of Superintendent of Insurance
6200 Uptown Blvd. N.E.
Suite 400
NM
Albuquerque, NM 87110
505-709-8405
Email: larry.marcus@osi.nm.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen P. Thies**
Stephen P. Thies
1120 Paseo de Peralta
Santa Fe, NM 88310
505-470-7366
Email: stephen.thies@osi.nm.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Alice T. Kane**
*Interim Superintendent of Insurance, in her official capacity*                        represented by        **Eucaris Tatiana Perez Valero**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence M Marcus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen P. Thies**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

APPENDIX 0003

**Amicus**

| | |
|---|---|
| **The Alliance of Health Care Sharing Ministries** | represented by **Michael Murray**<br>Paul Hastings LLP<br>2050 M Street NW<br>Washington, DC 20036<br>202-551-1730<br>Email: michaelmurray@paulhastings.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**Miscellaneous**

**New Mexico Attorney General's Office**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/31/2023 | 1 | COMPLAINT against All Defendants ( Filing Fee - Online Payment), filed by Smith Laura, Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare, Waters Tammy, Liberty HealthShare, Renteria Breanna. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O)(Hart, Nicholas) (Entered: 03/31/2023) |
| 03/31/2023 | | Filing and Administrative Fees Received: $ 402 receipt number ANMDC-8756080 re 1 Complaint,, filed by Waters Tammy, Renteria Breanna, Liberty HealthShare, Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare, Smith Laura (Payment made via Pay.gov)(Hart, Nicholas) (Entered: 03/31/2023) |
| 03/31/2023 | | United States Magistrate Judge Steven C. Yarbrough and United States Magistrate Judge Kirtan Khalsa assigned. (dr) (Entered: 03/31/2023) |
| 03/31/2023 | 2 | PLEASE TAKE NOTICE that this case has been randomly assigned to United States Magistrate Judge Steven C. Yarbrough to conduct dispositive proceedings in this matter, including motions and trial. Appeal from a judgment entered by a Magistrate Judge will be to the United States Court of Appeals for the Tenth Circuit. **It is the responsibility of the case filer to serve a copy of this Notice upon all parties with the summons and complaint.** *Consent is strictly voluntary, and a party is free to withhold consent without adverse consequences. Should a party choose to consent, notice should be made no later than 21 days after entry of the Order setting the Rule 16 Initial Scheduling Conference.* For e-filers, visit our Web site at www.nmd.uscourts.gov for more information and instructions. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (dr) (Entered: 03/31/2023) |
| 03/31/2023 | 3 | MOTION for Preliminary Injunction by Renteria Breanna, Gospel Light Mennonite Church Medical Aid Plan, Smith Laura, Waters Tammy. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23) (Hart, Nicholas) (Entered: 03/31/2023) |
| 04/03/2023 | 4 | PLEASE TAKE NOTICE that this case has been reassigned to United States District Judge Matthew L. Garcia as the trial judge. |

APPENDIX 0004

| | | |
|---|---|---|
| | | Under D.N.M.LR-Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges. **_Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document._ Kindly reflect this change in your filings.** United States Magistrate Judge Steven C. Yarbrough no longer assigned to this case. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jg) (Entered: 04/03/2023) |
| 04/03/2023 | | Summons Issued as to Jennifer A. Catechis, New Mexico Office of the Superintendent of Insurance, New Mexico Attorney General's Office. (jg) (Entered: 04/03/2023) |
| 04/03/2023 | 5 | SUMMONS Returned Executed by Laura Smith, Gospel Light Mennonite Church Medical Aid Plan, Tammy Waters, Breanna Renteria. New Mexico Office of the Superintendent of Insurance served on 4/3/2023, answer due 4/24/2023. (Hart, Nicholas) (Entered: 04/03/2023) |
| 04/03/2023 | 6 | SUMMONS Returned Executed by Laura Smith, Gospel Light Mennonite Church Medical Aid Plan, Tammy Waters, Breanna Renteria. Jennifer A. Catechis served on 4/3/2023, answer due 4/24/2023. (Hart, Nicholas) (Entered: 04/03/2023) |
| 04/03/2023 | 7 | SUMMONS Returned Executed by Laura Smith, Gospel Light Mennonite Church Medical Aid Plan, Tammy Waters, Breanna Renteria. New Mexico Attorney General's Office served on 4/3/2023, answer due 06/02/2023. (Hart, Nicholas) Modified answer date to reflect 60 days for a United States Agency on 4/4/2023 (arp). (Entered: 04/03/2023) |
| 04/25/2023 | 8 | MOTION to Dismiss _In Lieu of Answer_ by New Mexico Office of the Superintendent of Insurance. (Thies, Stephen) (Entered: 04/25/2023) |
| 04/25/2023 | 9 | NOTICE of Briefing Complete by All Plaintiffs re 3 MOTION for Preliminary Injunction filed by Tammy Waters, Breanna Renteria, Laura Smith, Gospel Light Mennonite Church Medical Aid Plan (Harrison, Carter) (Entered: 04/25/2023) |
| 04/27/2023 | 10 | ORDER FINDING GOOD CAUSE TO DELAY SCHEDULING ORDER by Magistrate Judge Kirtan Khalsa. Pursuant to Federal Rule of Civil Procedure 16(b)(2), the Court FINDS good cause to delay entering a Rule 16 scheduling order in this case until resolution of the pending Motion to Dismiss (Doc. 8 ). [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (nlb) (Entered: 04/27/2023) |
| 04/27/2023 | 11 | NOTICE of Hearing: Status Conference set for 4/28/2023 at 03:00 PM in Albuquerque - 520 Gila Courtroom before District Judge Matthew L. Garcia. (emr) [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 04/27/2023) |
| 05/02/2023 | 12 | MOTION to Extend (other) _Motion to Serve Response and Motion Out-of-Time_ by Jennifer A. Catechis. (Thies, Stephen) (Entered: 05/02/2023) |
| 05/04/2023 | 13 | RESPONSE to Motion re 12 MOTION to Extend (other) _Motion to Serve Response and Motion Out-of-Time_ filed by Gospel Light Mennonite Church Medical Aid Plan. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Harrison, Carter) (Entered: 05/04/2023) |
| 05/05/2023 | 14 | RESPONSE to Motion re 3 MOTION for Preliminary Injunction _Response to Motion for Preliminary Injunction_ filed by Jennifer A. Catechis. (Thies, Stephen) (Entered: 05/05/2023) |
| 05/09/2023 | 15 | RESPONSE in Opposition re 8 MOTION to Dismiss _In Lieu of Answer_ filed by Gospel |

| | | |
|---|---|---|
| | | Light Mennonite Church Medical Aid Plan. (Hart, Nicholas) (Entered: 05/09/2023) |
| 05/18/2023 | 16 | NOTICE of Hearing on Motions: 3 MOTION for Preliminary Injunction and 8 MOTION to Dismiss *In Lieu of Answer* set for 6/2/2023 at 09:00 AM in Albuquerque - 520 Gila Courtroom before District Judge Matthew L. Garcia. (emr) (Entered: 05/18/2023) |
| 05/19/2023 | 17 | REPLY to Response to Motion re 3 MOTION for Preliminary Injunction filed by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters. (Attachments: # 1 Exhibit 1 (Notice of Hrg. on Mtn. to Stay in State-Court Appeal (1 page)), # 2 Exhibit 2 (Consent Decree in Maryland Ins. Admin. v. Gospel Light (7 pages))) (Harrison, Carter) (Entered: 05/19/2023) |
| 05/23/2023 | 18 | REPLY to Response to Motion re 8 MOTION to Dismiss *In Lieu of Answer Defendants' Reply to Plaintiffs' Response to Motion to Dismiss* filed by Jennifer A. Catechis. (Thies, Stephen) (Entered: 05/23/2023) |
| 05/30/2023 | 19 | NOTICE of Appearance by Stephen P. Thies on behalf of Jennifer A. Catechis (Thies, Stephen) (Entered: 05/30/2023) |
| 05/30/2023 | 20 | ASSOCIATION of Attorney Licensed Outside the District for Plaintiffs Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters by Nicholas Thomas Hart on behalf of: J. Michael Sharman Commonwealth Law Offices, P.C. 246 E. Davis Street, Suite 200 Culpeper, Virginia 22701 (540) 727-1007 Fax (540) 727-7917 mikesharman@verizon.net<br><br>(Association Dues - Online Payment) (Hart, Nicholas) [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 05/30/2023) |
| 05/30/2023 | | Association Dues Received: $ 100 receipt number ANMDC-8846838 re: # 20 Association of Attorney Licensed Outside the District,, filed by Tammy Waters, Breanna Renteria, Laura Smith, Gospel Light Mennonite Church Medical Aid Plan (Payment made via Pay.gov)(Hart, Nicholas) (Entered: 05/30/2023) |
| 05/30/2023 | 21 | NOTICE by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters re 20 Association of Attorney Licensed Outside the District,, *Notice of Certification that Associated Attorney Licensed Outside of the District is an Attorney in Good Standing* (Hart, Nicholas) (Entered: 05/30/2023) |
| 05/30/2023 | 22 | Witness List by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters. (Attachments: # 1 Exhibit 1 (CV of Kevin McCarty (6 pages))) (Harrison, Carter) (Entered: 05/30/2023) |
| 06/02/2023 | 23 | Clerk's Minutes for proceedings held before District Judge Matthew L. Garcia: Motion Hearing held on 6/2/2023 re 3 MOTION for Preliminary Injunction filed by Tammy Waters, Breanna Renteria, Laura Smith, Gospel Light Mennonite Church Medical Aid Plan, 8 MOTION to Dismiss *In Lieu of Answer* filed by New Mexico Office of the Superintendent of Insurance, 12 MOTION to Extend (other) *Motion to Serve Response and Motion Out-of-Time* filed by Jennifer A. Catechis. (Court Reporter Paul Baca) (fs) (Entered: 06/07/2023) |
| 06/08/2023 | 24 | INITIAL SCHEDULING ORDER by Magistrate Judge Kirtan Khalsa. Counsel are to meet and confer by 6/15/2023. The parties' Joint Status Report and Provisional Discovery Plan |

APPENDIX 0006

| | | |
|---|---|---|
| | | is due by 6/22/2023. A Telephonic Rule 16 Initial Scheduling Conference is set for 6/29/2023 at 01:30 PM before Judge Khalsa. Counsel are to call the Court's AT&T conference line at (877) 848-7030 and enter the code 7324132 to connect to the proceedings. (kmt) (Entered: 06/08/2023) |
| 06/12/2023 | 25 | MOTION to File Amicus Brief by The Alliance of Health Care Sharing Ministries. (Attachments: # 1 Exhibit) (Murray, Michael) (Entered: 06/12/2023) |
| 06/12/2023 | 26 | NOTICE of Appearance by Michael Murray on behalf of The Alliance of Health Care Sharing Ministries (Murray, Michael) (Entered: 06/12/2023) |
| 06/12/2023 | 27 | BRIEF *Preliminary Injunction Post Hearing Brief* by New Mexico Office of the Superintendent of Insurance (Thies, Stephen) (Entered: 06/12/2023) |
| 06/12/2023 | 28 | BRIEF *(Post-Preliminary-Injunction Hearing)* by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters (Harrison, Carter) (Entered: 06/13/2023) |
| 06/14/2023 | 29 | ORDER by District Judge Matthew L. Garcia GRANTING 25 Motion for Leave to File Amicus Brief (fs) (Entered: 06/14/2023) |
| 06/16/2023 | 30 | ORDER by District Judge Matthew L. Garcia GRANTING 12 Motion to Serve Response and Motion Out-of-Time (arp) (Entered: 06/16/2023) |
| 06/23/2023 | 31 | Joint Status Report *and Provisional Discovery Plaan* by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters (Hart, Nicholas) (Entered: 06/23/2023) |
| 06/28/2023 | 32 | CERTIFICATE OF SERVICE by New Mexico Office of the Superintendent of Insurance *Defendants' Initial Disclosures* (Thies, Stephen) (Entered: 06/28/2023) |
| 06/28/2023 | 33 | CERTIFICATE OF SERVICE by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters *Plaintiffs' Initial Disclosures* (Hart, Nicholas) Modified text on 6/29/2023 (arp). (Entered: 06/28/2023) |
| 06/29/2023 | 34 | Minutes for proceedings held before Magistrate Judge Kirtan Khalsa: Scheduling Conference held on 6/29/2023. (nlb) (Entered: 06/29/2023) |
| 06/29/2023 | 35 | ORDER ADOPTING JOINT STATUS REPORT AND PROVISIONAL DISCOVERY PLAN WITH CHANGES AND SETTING CASE MANAGEMENT DEADLINES by Magistrate Judge Kirtan Khalsa. Plaintiffs to seek leave to join and amend by **July 21, 2023**. Defendants to seek leave to join and amend by **30-days** after a ruling on the pending motion to dismiss, if necessary. Plaintiffs' expert disclosures due by **September 15, 2023**. Defendants' expert disclosures due by **October 16, 2023**. Discovery due by **December 15, 2023**. Discovery motions due by **January 4, 2024**. Pretrial motions due by **January 16, 2024**. (nlb) (Entered: 06/29/2023) |
| 07/03/2023 | 36 | NOTICE by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters *of Supplemental Authority* (Attachments: # 1 Exhibit Supplemental Authority) (Gallegos, Daniel) (Entered: 07/03/2023) |
| 07/14/2023 | 37 | TRANSCRIPT of Proceedings, Motions Hearing, held on June 2, 2023, before District Judge Matthew L. Garcia. Court Reporter/Transcriber Paul Baca, Telephone number (505) 508-6694. Transcript may be viewed at the Clerk's Office public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.

**PLEASE TAKE NOTICE that each party now has seven (7) calendar days to file a Notice of Intent to Request Redaction of any personal** |

APPENDIX 0007

12/11/23, 9:58 AM                                District NextGen v1.7.1.2 LIVE DB

**identifiers from this transcript. If no notice is filed during this seven-day period, the court will assume that redaction of personal data is not necessary and will make the transcript electronically available, as is, to the public after 90 days. For additional guidance, PLEASE REVIEW the complete policy, located in the CM/ECF Administrative Procedures Manual at https://www.nmd.uscourts.gov.**

Notice of Intent to Request Redaction set for 7/21/2023. Redaction Request due 8/4/2023. Redacted Transcript Deadline set for 8/14/2023. Release of Transcript Restriction set for 10/12/2023.(dse) (Entered: 07/14/2023)

| 07/14/2023 | 38 | MEMORANDUM OPINION AND ORDER by District Judge Matthew L. Garcia GRANTING IN PART AND DENYING IN PART 8 MOTION to Dismiss *In Lieu of Answer*, and DENYING 3 MOTION for Preliminary Injunction. See Order for details. (fs) (Entered: 07/14/2023) |
|---|---|---|
| 07/26/2023 | 39 | *Defendant's* ANSWER to 1 Complaint,, *Defendant's Answer to Plaintiffs' Complaint* by New Mexico Office of the Superintendent of Insurance. Related document: 1 Complaint,, filed by Tammy Waters, Breanna Renteria, Liberty HealthShare, Laura Smith, Gospel Light Mennonite Church Medical Aid Plan.(Thies, Stephen) (Entered: 07/26/2023) |
| 07/27/2023 | 40 | ORDER by District Judge Matthew L. Garcia.<br><br>By operation of Federal Rule of Civil Procedure 25(d), Alice T. Kane is automatically substituted for Defendant Jennifer A. Catechis. The parties should reflect this change in future filings.<br><br>[THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (emr) (Entered: 07/27/2023) |
| 08/04/2023 | 41 | NOTICE OF APPEAL as to 38 Memorandum Opinion and Order by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters. (Filing Fee - Online Payment) (Harrison, Carter) (Entered: 08/04/2023) |
| 08/04/2023 | | Filing Fee Received: $ 505 receipt number ANMDC-8945289 re 41 Notice of Appeal filed by Tammy Waters, Breanna Renteria, Laura Smith, Gospel Light Mennonite Church Medical Aid Plan (Payment made via Pay.gov)(Harrison, Carter) (Entered: 08/04/2023) |
| 08/07/2023 | 42 | Transmission of Preliminary Record to US Court of Appeals re 41 Notice of Appeal (Attachments: # 1 Preliminary Documents) (arp) (Entered: 08/07/2023) |
| 08/08/2023 | 43 | USCA Information Letter with Case Number 23-2123 for 41 Notice of Appeal filed by Tammy Waters, Breanna Renteria, Laura Smith, Gospel Light Mennonite Church Medical Aid Plan. (cmm) (Entered: 08/08/2023) |
| 08/09/2023 | 44 | Emergency MOTION for Reconsideration re 38 Memorandum Opinion and Order *Motion ot Reconsider Memorandum Order Denying Motion for Preliminary Injunction* by Gospel Light Mennonite Church Medical Aid Plan. (Hart, Nicholas) (Entered: 08/09/2023) |
| 08/09/2023 | 45 | ORDER by District Judge Matthew L. Garcia re 44 Emergency MOTION for Reconsideration re 38 Memorandum Opinion and Order *Motion ot Reconsider Memorandum Order Denying Motion for Preliminary Injunction* filed by Gospel Light Mennonite Church Medical Aid Plan (arp) (Entered: 08/09/2023) |
| 08/17/2023 | 46 | RESPONSE to Motion re 44 Emergency MOTION for Reconsideration re 38 Memorandum Opinion and Order *Motion ot Reconsider Memorandum Order Denying Motion for Preliminary Injunction Response to Emergency Motion to Reconsider* |

| | | |
|---|---|---|
| | | *Memorandum Order Denying Preliminary Injunction* filed by New Mexico Office of the Superintendent of Insurance. (Thies, Stephen) (Entered: 08/17/2023) |
| 08/23/2023 | 47 | TRANSCRIPT ORDER FORM by Breanna Renteria, Laura Smith, Tammy Waters for the 41 Notice of Appeal (arp) (Entered: 08/23/2023) |
| 08/23/2023 | 48 | Minute order filed - Notice due that record is complete by 08/30/2023 for Mitchell R. Elfers, Clerk of Court (oclk). (Text Only - No Attachment) [23-2123] (arp) (Entered: 08/23/2023) |
| 08/23/2023 | 49 | NOTICE TO USCA that Record is Complete re 41 Notice of Appeal. (arp) (Entered: 08/23/2023) |
| 08/24/2023 | 50 | LETTER from USCA to Counsel re 41 Notice of Appeal. Filed notice record is complete. Served on 08/23/2023. Appellant brief and appendix due on 10/02/2023 for Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith and Tammy Waters. (arp) (Entered: 08/24/2023) |
| 08/24/2023 | 51 | REPLY to Response to Motion re 44 Emergency MOTION for Reconsideration re 38 Memorandum Opinion and Order *Motion ot Reconsider Memorandum Order Denying Motion for Preliminary Injunction* filed by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Hart, Nicholas) (Entered: 08/24/2023) |
| 08/24/2023 | 52 | NOTICE of Briefing Complete by Gospel Light Mennonite Church Medical Aid Plan, Breanna Renteria, Laura Smith, Tammy Waters re 44 Emergency MOTION for Reconsideration re 38 Memorandum Opinion and Order *Motion ot Reconsider Memorandum Order Denying Motion for Preliminary Injunction* filed by Gospel Light Mennonite Church Medical Aid Plan (Hart, Nicholas) (Entered: 08/24/2023) |
| 08/30/2023 | 53 | ORDER OF USCA ABATING as to 41 Notice of Appeal filed by Tammy Waters, Breanna Renteria, Laura Smith, Gospel Light Mennonite Church Medical Aid Plan. Status report due 09/29/2023 by Breanna Renteria, Laura Smith and Tammy Waters. See order for details. When the order disposing of the Motion to Reconsider is entered by the district court, the clerk of the district court is directed to supplement the preliminary record in accordance with 10th Cir. R. 3.2(B). (arp) (Entered: 08/30/2023) |
| 10/12/2023 | 54 | MEMORANDUM OPINION AND ORDER by District Judge Matthew L. Garcia GRANTING IN PART AND DENYING IN PART 44 Emergency MOTION for Reconsideration re 38 Memorandum Opinion and Order *Motion ot Reconsider Memorandum Order Denying Motion for Preliminary Injunction*. See Order for details. (gr) (Entered: 10/12/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/11/2023 09:58:29 | | |
| **PACER Login:** | nickthart | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-00276-MLG-KK |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GOSPEL LIGHT MENNONITE
CHURCH MEDICAL AID PLAN,                    Case No. 1:23-cv-276
DBA LIBERTY HEALTHSHARE,
BREANNA RENTERIA,
LAURA SMITH, and
TAMMY WATERS.

              *Plaintiffs*,

                                            COMPLAINT FOR INJUNCTIVE
                                            AND DECLARATORY RELIEF


                                            JURY TRIAL DEMANDED

v.

NEW MEXICO OFFICE OF THE
SUPERINTENDENT OF INSURANCE, and
JENNIFER A. CATECHIS,
Interim Superintendent of Insurance,
in her official capacity,

              *Defendants*.


## **COMPLAINT**

The Plaintiffs, Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare

and three of its members in New Mexico, namely, Breanna Renteria, Laura Smith, and Tammy

Waters, by counsel,  file this lawsuit against Defendants New Mexico Office of the Superintendent

of Insurance ("OSI") and Jennifer A. Catechis, Interim Superintendent of Insurance, in her official

capacity as leader of OSI, alleging that Defendants violated the United States Constitution, the

New Mexico Constitution, and New Mexico state law when Defendants prohibited Plaintiffs from

engaging in the sharing of their health care costs according to their religious beliefs and practices.

**OVERVIEW**

Plaintiff Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare is a health care sharing ministry ("HCSM"). An HCSM is not insurance. It is a religious ministry grounded in Biblical teaching and is the method by which religiously like-minded members voluntarily share each other's health care costs. Indeed, Gospel Light Mennonite Church Medical Aid Plan—a recognized HCSM under federal law—merely facilitates this voluntary sharing among its members; it does not, however, indemnify any of its members against risk. And yet, Defendants—whose jurisdiction is limited by the New Mexico Constitution and state statute— have targeted Gospel Light Mennonite Church Medical Aid Plan in an effort to drive out all health care sharing ministries from New Mexico under the guise of regulating the transaction of insurance within the state.

Defendants took this recent tack despite the fact that Gospel Light Mennonite Church Medical Aid Plan has operated in New Mexico since 2014 without even the slightest hint that Defendants considered HCSMs to be unauthorized until, at earliest, March 26, 2020, when OSI, through the previous Superintendent Russell Toal, first indicated through a press release its position that an HCSM is "an unauthorized insurance product."[1] And even then, OSI did not issue its cease-and-desist order to Gospel Light Mennonite Church Medical Aid Plan until November 23, 2021.

Following a hearing—prosecuted by an OSI attorney before an OSI-employed hearing officer, depending largely on the testimony of OSI employees—the very entity that publicly and

---

[1] As a matter of fact, in a December 3, 2019, press release, then-Superintendent of Insurance John Franchini essentially took the opposite view, stating: "A few health care sharing ministries (also known as health care sharing organizations) operate in New Mexico. These organizations *do not offer insurance*, but may present plans in a way that look and feel similar to a health insurance plan. Members of these organizations 'share' health costs on a voluntary basis. Consumers should be aware that these plans have *no obligation to pay* for any medical services and have *no requirement to cover* any particular categories of health care services, such as preventive care." *See* Exhibit F at 1-2 (emphasis added).

APPENDIX 0011

matter-of-factly proclaimed that an HCSM is an unauthorized insurance product, not surprisingly, determined that Gospel Light Mennonite Church Medical Aid Plan was engaged in the transaction of insurance without a valid certificate. Defendants OSI and Catechis ordered that Gospel Light Mennonite Church Medical Aid Plan cease its operations in New Mexico unless and until it obtains a certificate from the Superintendent of Insurance to transact the business of insurance in New Mexico and to pay a fine in the amount of $2,510,000.

If successful, Defendants' targeted campaign to push health care sharing ministries out of New Mexico will not only deprive Gospel Light Mennonite Church Medical Aid Plan and Plaintiffs Renteria, Smith, and Waters, of their constitutional rights to free exercise of religion and to free association, but the campaign will similarly impact Gospel Light Mennonite Church Medical Aid Plan's approximately 490 New Mexico members. This all-out-attack on a 26 U.S.C. §501(c)(3) religious ministry that meets all requirements for—and has indeed been granted—a religious exemption under the federal Affordable Care Act, *see* 26 U.S.C. § 5000A(d)(2)(B), demands the strictest scrutiny, which Defendants' actions cannot survive.

## EXHIBITS

The following exhibits are offered in support of this Complaint.[2]

A.   2014-03-31 – Centers for Medicare & Medicaid Services ("CMS") Recognition Letter for Gospel Light Mennonite Church Medical Aid Plan HCSM
B.   2014-06-03 – Articles of Incorporation, Gospel Light Mennonite Church Medical Aid Plan
C.   2014-10-14 – Bylaws, Gospel Light Mennonite Church Medical Aid Plan, as signed and attached to 501(c)(3) Filing.
D.   2015-04-16 – IRS Letter of Exemption for the incorporated Gospel Light Mennonite Church Medical Aid Plan
E.   2015-05-22 – (Amended) Bylaws of Gospel Light Mennonite Church Medical Aid Plan
F.   2019-12-03 – Press Release, Office of the Superintendent of Insurance, December 3, 2019.

---

[2] Exhibits are numbered in their logical/chronological order, not the order of appearance herein.

G.  2020-03-26 – Press Release, Office of the Superintendent of Insurance, NM OFFICE OF SUPERINTENDENT OF INSURANCE CAUTIONS CONSUMERS ABOUT HEALTH CARE SHARING MINISTRIES, March 26, 2020.

H.  2020-03-26 – Email from Russell Toal Superintendent of Insurance to OSI-Employees, Subject: FYI, being released this afternoon, March 26, 2020 3:24:58.

I.  2022-09-01 – Liberty HealthShare Sharing Guidelines (Effective September 1, 2022).

J.  2023-02-22 – FINAL ORDER, Office of the Superintendent of Insurance.

K.  One Another Verse List.

L.  HCSM Tracker – Confirmed, prepared by CMS.

M.  2014-12-09 – Letter to CMS expanding new sharing limits.

N.  2021-03-00 – Consumer Advisory March 2021.

O.  NM-Trinity HealthShare Order filed November 19, 2020.

## PARTIES

### Organizational Plaintiff

1.  **Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare**

is a Christian ministry that recruits, evangelizes, and serves a distinct religious body whose members share directly in one another's spiritual, emotional, and financial needs (arising from disease and injury) via monthly solicitations and communications among the ministry and its member households. It is one of the largest HCSMs in the country. The ministry is motivated by the Scriptural Purpose stated in its Bylaws:

4

In Galatians 6:2 the Apostle Paul instructs believers to, "Bear one another's burdens, and so fulfill the law of Christ." II Corinthians 8:14 further explains, "At the present time your plenty will supply what they need, so that in turn their plenty will supply what you need."

**The purpose** for the formation of this Corporation is to enable followers of Christ to bear one another's burdens and:

**1.    To associate** within the community of the Christian faith for discipleship, medical-sharing, physical needs-sharing, financial stewardship, and evangelical purposes and in accordance with the Bylaws of this organization and the laws of the state or states wherein this Corporation may be doing business.

**2.    To promote** the biblical concept of mutual aid sharing, historically practiced among Christians as it relates to the socio-economic and spiritual needs of its members.

**3.    To create funds** from its activities and to maintain and invest its funds; and to disburse and apply its funds among the aged, disabled or sick among its members and among the widows and orphans or dependents of deceased members and in accordance with the laws of the state or states wherein this Corporation may be doing business.

(Ex. C, Article 2, Sections 1-3).

2.    The ministry and its members are governed by their Sharing Guidelines (Ex. I), which says the members are to "Observe Christian Standards" (Ex. I, Sharing Guidelines, Article III, Section A), and to "Maintain a Christian Lifestyle" (Ex. I, Sharing Guidelines, Article III, Section C).

3.    Stated in its most succinct form, Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare has a clear, Biblically-based function: "Our purpose is to preserve the Christian tradition of health care sharing and to enable followers of Christ to bear one another's burdens …" (Ex. C, Bylaws, Article 2, Section 2.)

4.    The corporate directors and officers of Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare are bound by the following Doctrinal Positions:

5

We believe the Bible alone is the inspired Word of God; therefore it is the final and only source of absolute spiritual authority.

We believe in the triune God of the Bible.  He is one God who is revealed in three distinct Persons – God, the Father; God, the Son; and God, the Holy Spirit.

We believe Jesus Christ was God in the flesh – fully God and fully man. He was born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins, was bodily resurrected on the third day, and now is seated in the heavens at the right hand of God, the Father.

We believe that all people are born with a sinful nature and can be saved from eternal death only by grace alone, through faith alone, trusting only in Christ's atoning death and resurrection to save us from our sins and give us eternal life.

We believe in the bodily resurrection of all who have put their faith in Jesus Christ.

All we believe and do is for the glory of God alone.

Ex. C, Bylaws, Article 2, Section 2(4).

5.      As the very first of those doctrines declares, "We believe the Bible alone is the inspired Word of God; therefore, it is the final and only source of absolute spiritual authority." For Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare, the Bible is the Truth, and it governs all things.

6.      The Guidelines for the members makes this declaration, "As a community of people, we try our best to live out Jesus Christ's mandates." (Ex. I, Sharing Guidelines, Article III, Section C).

7.      Thus, "[E]very member of Liberty HealthShare is expected to: Strive to live in accordance with biblical principles; Honor the biblical teaching to 'share one another's burdens' (Gal. 6:2); Participate regularly in worship or prayer." (Ex. I, Sharing Guidelines, Article III, Section A).

8.      As is the case with other groups that assemble and coordinate for their mutual benefit, such as homeowners' associations, trade associations, trade unions, and professional associations, Liberty HealthShare's members can lose membership or benefits by failing to pay

APPENDIX 0015

their dues or otherwise neglect their membership requirements and responsibilities. (Ex. I, Sharing Guidelines, Article III, Section I).

**Individual Plaintiffs**

9.      **Breanna Renteria** lives in Santa Teresa, New Mexico, which is just at the border with Texas. She describes herself as a "stay-at-home mom" who works on the side as an artist, illustrating children's books. She joined Gospel Light Mennonite Church Medical Aid Plan in January 2019 because it fit her fairly long checklist: it supported her growing family; it worked for her family's national and international traveling; and most importantly, it enabled her to live out her Christian faith in a real and practical way through financial sharing and prayer. She has stayed with Gospel Light Mennonite Church Medical Aid Plan while living in four different states. When Breanna joined, she signed a statement of beliefs through which she "agree[d] to share [healthcare expenses] in accordance with the . . . Statement of Christian Beliefs." She practices and lives by the principles Gospel Light Mennonite Church Medical Aid Plan requires and she attends a small church called Revolución Emanuel Ministries in El Paso, Texas.

10.      **Laura Smith** lives in Farmington, New Mexico. The faith aspect of Gospel Light Mennonite Church Medical Aid Plan is very important to her. When she joined Gospel Light Mennonite Church Medical Aid Plan in 2017, like each of the members, she signed a Statement of Beliefs that began with this statement: "I believe that my personal rights and liberties originate from God and are bestowed on me by God, and are not concessions granted to me by governments or men." She practices and lives by the principles Gospel Light Mennonite Church Medical Aid Plan requires and she attends Hills Church in Farmington.

7

11.     **Tammy Waters** lives in Clovis, New Mexico. As with Ms. Renteria and Ms. Smith, her faith is very dear to her and is one of the big reasons why she joined Gospel Light Mennonite Church Medical Aid Plan in 2017. She practices and lives by the principles Gospel Light Mennonite Church Medical Aid Plan requires and although she does not attend a specific church on a regular basis, she is a Christian and has attended Baptist, Methodist, and Non-Denominational churches.

## Defendants

12.     **Defendant New Mexico Office of the Superintendent of Insurance** is the state agency tasked with enforcing New Mexico law on insurance matters. It is located at 1120 Paseo de Peralta in Santa Fe, New Mexico and 6200 Uptown Boulevard NE #400 in Albuquerque, New Mexico. Defendant New Mexico Superintendent of Insurance is a "public body" as defined under the New Mexico Civil Rights Act and is being sued in that capacity. *See* NMSA 1978, § 41-4A-2. It is also a government agency according to the New Mexico Religious Freedom Restoration Act. NMSA 1978, § 28-22-2(B) (defining government agency as "the state or any of its political subdivisions, institutions, departments, agencies, commissions, committees, boards, councils, bureaus or authorities").

13.     Defendant **Jennifer A. Catechis** is the Interim Superintendent of Insurance of the State of New Mexico, having replaced former Superintendent Russell Toal on January 21, 2023.

14.     In her capacity as the Interim Superintendent of Insurance, Defendant Catechis leads the Office of Superintendent of Insurance and is the proper official to enjoin in this case.

15.     Defendant Catechis is sued here in her official capacity only.

APPENDIX 0017

## JURISDICTION AND VENUE

16.     This action is brought according to 42 U.S.C. §§ 1983 and 1988 and alleges claims brought under the United States Constitution, including the First and Fourteenth Amendments, as well as other state constitutional provisions and state law.

17.     This court has subject matter jurisdiction over Plaintiffs' § 1983 and § 1988 claims according to 28 U.S.C. § 1331 because those claims present a federal question.

18.     This court has subject matter jurisdiction over Plaintiffs' remaining claims according to 28 U.S.C. § 1367(a) because those remaining claims are so related to Plaintiffs' federal claims as to form part of the same case or controversy.

19.     Venue is appropriate in the District of New Mexico according to 28 U.S.C. § 1391(b)(1) because this is the judicial district where Defendant is located, § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of New Mexico, and § 1391(b)(3) because there would be no personal jurisdiction over Defendant Catechis were these claims brought in any other judicial district.

## FACTUAL ALLEGATIONS

### I.     Overview of Health Care Sharing as Ministry

20.     The originators of health care sharing ministries, the Amish, Mennonites, and other "Anabaptists" or "Plain People," can trace their origins all the way back to Martin Luther and the Reformation in Europe in the sixteenth century.

21.     The Anabaptists' "origin story" helps to inform the reason for their consistent adherence to the literal Word of the Bible and their steadfast resistance through the centuries to governments' attempt to re-define for them their obligations to their church communities.

APPENDIX 0018

22.     Martin Luther began the German reformation movement in 1517 by nailing his ninety-five theses to the door of the Castle Church of Wittenberg. This Reformation challenged the hierarchies and doctrines of the official state church in that era.

23.     As the Reformation progressed and expanded, several student ministers in the Reformation began studying the Scriptures for themselves and began to develop their own religious convictions. They became dissatisfied with the Reformation movement, but they also objected to the nature and hierarchy of the official state church. They particularly denounced the state church practice of infant baptism, and they began the practice of rebaptism for Christians who wished to publicly express their faith after becoming adults. This group of Christians later became known as "Anabaptists" because of that practice of rebaptism. Mennonites derive their name from an influential leader of the Anabaptist movement in Europe during the sixteenth century. The Anabaptist leader's name was Menno Simons (1496-1561). Today, the term "Mennonite" is used interchangeably with the term "Anabaptist."

24.     The official state church viewed the Anabaptist/Mennonite movement as a theological and political threat to its existence, and it began persecuting and killing Mennonites for their faith.

25.     During persecution, Mennonites literally went "underground" and lived in catacombs beneath the earth that looked like tunnel mazes. They held church services in secret, clinging to their ethical and religious beliefs to the death. For some, it meant burning at the stake. It was in this closely-knit circle of believers that the concept of caring for one another was transfused into the lifeblood of the Mennonite faith.

APPENDIX 0019

26.    Those early Mennonites believed in a literal interpretation of the Bible and as they read and studied the Scriptures, they developed staunch ethical and religious convictions, embracing as one of their core beliefs that they should care for one another.

27.    Like other Mennonite churches, Gospel Light Mennonite Church declares itself to be neither Protestant nor Catholic, and it has never had a church hierarchy like the official state churches of the sixteenth century.

28.    The particular Mennonite tradition and fellowship that Gospel Light belongs to is the Beachy-Amish Mennonites.[3] It is independent of any other church leadership, and it quietly adheres to many timeless Anabaptist traditions, including sharing one other's burdens, the need for which was learned in the harsh lessons of centuries of persecution.

29.    Even after five centuries of this faith tradition, the members of Gospel Light Mennonite Church still believe in a literal interpretation of the Bible. They also still believe that caring for one another can and should include sharing health care expenses. One scriptural expression of their belief is found in Galatians 6:2, which says believers are to, "Bear one another's burdens, and so fulfil the law of Christ." When Jesus said to "Love your neighbor as yourself," members of Gospel Light Mennonite Church believe that Jesus was commanding them to care for one another in their own home church and also to the larger interdenominational Body of Christ, and the Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthCare is a practical expression of that religious belief.

---

[3] "As the Amish faced innovations of the twentieth century, they grappled with what to allow and what to forbid. The Beachy Amish-Mennonites were those Amish, a minority at the time, that were more (though not entirely) open to modern innovations like the telephone, automobile, farm tractor, and electricity, though not radio or television." *The Beachy-Amish Mennonites: General Information,* BeachyAM.org--General information, viewed March 22, 2023.

APPENDIX 0020

30.     The members of the Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare believe they are following the teachings of Jesus in sharing and "bearing" one another's healthcare costs. (*See* Ex. K, "One Another Verse List.") The Mennonites of long ago bore one another's burdens in the catacombs of Europe in the sixteenth century, and their spiritual descendants are still bearing one another's burdens. They have never stopped.

31.     Citing this faith tradition, *Bethel Conservative Mennonite Church v. Com'r*, 746 F.2d 388, 392 (7th Cir. 1984) upheld §501(c)(3) status for a Mennonite church, stating:

> [W]e are fully convinced that the Medical Aid Plan was simply another form of the various mutual aid plans established and used by the Mennonites in general to further their strongly held religious belief that they must "bear one another's burdens."

32.     Health care sharing ministries, based on supporting Scriptures such as Galatians 6:2 and Hebrews 13:6, are common and not unique to Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare. At least 108 of these HCSMs have been recognized by the Centers for Medicare & Medicaid Services ("CMS") as meeting the Affordable Care Act's definition of "Health Care Sharing Ministries" under Internal Revenue Code (IRC) §5000A(d)(2)(B). An obvious indication of their commonality is that forty-five of those CMS-recognized HCSMs have the term "Medical Aid Plan" as part of their name.[4] (Ex. L, HCSM Tracker – Confirmed)

---

[4] Health care ministries have been central to Christianity, and for two thousand years the Church has ministered to the faithful and their neighbors through health care. That is why many hospitals in New Mexico bear Christian names or have Christian heritages:

    CHRISTUS ST. VINCENT REGIONAL MEDICAL CENTER
    CHRISTUS ST. VINCENT PHYSICIANS MEDICAL CENTER
    HOLY CROSS HOSPITAL
    PRESBYTERIAN KASEMAN HOSPITAL
    PRESBYTERIAN RUST MEDICAL CENTER
    PRESBYTERIAN ESPANOLA HOSPITAL
    PRESBYTERIAN HOSPITAL
    REHOBOTH MCKINLEY CHRISTIAN HEALTH CARE SERVICES

APPENDIX 0021

33.     In 2014, the leadership of Gospel Light Mennonite Church Medical Aid Plan saw the need for the Body of Christ to have a Biblically-based medical sharing program beyond the traditional Mennonite groups. Accordingly, they sent a written notice to Benjamin L. Walker, who was at that time the Director of the Eligibility Policy and Operations Branch of CMS, advising him that:

> [T]he leadership of the Gospel Light Mennonite Church Medical Aid Plan has decided to describe the limitation for inclusion of sharing within the Gospel Light Mennonite Church Medical Aid Plan that the sharing would be for the glory of God, by those who are called by His name, and for no purpose that would advance Satan's agenda rather than God's kingdom.

> (Ex. M, 2014-12-09- Letter to CMS expanding new sharing limits)

34.     Today, whether a Christian is Amish or Zion Baptist, they can come under the Scriptural mantle and health care costs support group of Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare. The members of Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare simply wish to continue the centuries-old Christian tradition of caring for one other and to "so fulfill the law of Christ."

**II.     The Reason for Plaintiff's Names: *Gospel Light* and *Liberty*.**

35.     The reason why Plaintiff has the legal and dba names it does is found "in the ring where name and image meet."[5] They were chosen for specific Biblical purposes.

36.     The explanation for the name Gospel Light begins in Matthew, Chapter 11. When questioned as to the authenticity of His identity as the Messiah, Jesus answered with His evidence list that had been observed by hundreds and thousands of eyewitnesses: "The blind see and the

---

[5] Poetically, W.H. Auden located the deepest type of love, agape-love, "Love, the interest itself," in the human heart, "in the ring where name and image meet." Kirsch, Arthur. *Auden and Christianity*. Yale University Press, 2008.

13

lame walk; the lepers are cleansed and the deaf hear; the dead are raised up and the poor have the **gospel** preached to them.'" Matthew 11:5 (NJKV) (bold added).[6]

37.     The word He used to describe what was preached, the "gospel," was simply the Greek word for "good news."

38.     The illuminating aspect of the good news is that "it is the God who commanded **light** to shine out of darkness, who has shone in our hearts to give the **light** of the knowledge of the glory of God in the face of Jesus Christ." 2 Corinthians 4:6 (bold added).

39.     The name Liberty HealthShare was likewise purposely sourced from Scripture (bold added):

- Leviticus 25:10 (King James) – "proclaim **liberty** throughout all the land unto all the inhabitants thereof"[7]

- Isaiah 61:1 (NKJV) – "The Spirit of the Lord God is upon Me, Because the Lord has anointed Me To preach good tidings to the poor; He has sent Me to heal the brokenhearted, To proclaim **liberty** to the captives, And the opening of the prison to those who are bound"

- Luke 4:18 (NKJV) – "'The Spirit of the LORD *is* upon Me, Because He has anointed Me To preach the gospel to *the* poor; He has sent Me to heal the brokenhearted, To proclaim **liberty** to *the* captives And recovery of sight to *the* blind, *To* set at **liberty** those who are oppressed'"

- 2 Corinthians 3:17 (NKJV) – "Now the Lord is the Spirit; and where the Spirit of the Lord is, there is **liberty**."

---

[6] For more on the evidences of the divinity and historicity of Jesus Christ, see, Simon Greenleaf, *The Testimony of the Evangelists Examined by The Rules of Evidence Administered in Courts of Justice*, reprint of the 1874 edition, (Grand Rapids: Baker Book House, 1984).
[7] This verse and its citation to Leviticus 25:10 are the inscriptions on the Liberty Bell, and, of course, are the source of the bell's name.

- Galatians 5:1 (NKJV) – "Stand fast therefore in the **liberty** by which Christ has made us free, and do not be entangled again with a yoke of bondage."

40.    The choice of the word "liberty" in Liberty HealthShare's name also harkens back to the powerful text of our Declaration of Independence, which in turn references the Creator as the ultimate source of authority:

> We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, **Liberty** and the pursuit of Happiness.--That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, --That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.

> THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) (bold added).

### III.    The Reason Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare Exists.

41.    The function, motivation, and purpose of Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare is expressed in the Vision and Mission statements published on its website[8]:

> **Our Vision**: To build a healthcare sharing community which exemplifies Jesus Christ and empowers like-minded people to manage their health care journey.

> **Our Mission:** Shepherd the Christian tradition of healthcare sharing through prayer, education, personal responsibility, and stewardship of the community's resources.

---

[8] Leading Healthcare Sharing Programs | Liberty HealthShare, https://www.libertyhealthshare.org/about-us. viewed March 22, 2023.

15

IV.    **The Reason the New Mexico Office of the Superintendent Insurance Exists.**

42.    The Office of Superintendent of Insurance was created by a constitutional amendment that passed on November 6, 2012, with 330,873 votes for the amendment (50.00%), and 321,055 votes against the amendment (49.00%).[9]

43.    The new constitutional amendment provided for a relatively finite range of authority: "The office of 'superintendent of insurance' is created as of July 1, 2013. The superintendent of insurance shall regulate insurance companies and others engaged in risk assumption in such manner as provided by law."[10]

44.     The legislature's follow-on codification appears to go beyond the reach of the constitutional amendment: "All powers relating to state supervision of insurance, insurance rates and rate practices, together with collection of insurance licenses, taxes or fees, and all records pertaining to such supervision are under control of the office of superintendent of insurance." NMSA 1978, § 59A-2-1(B).

45.    The function, motivation, and purpose of the Office of Superintendent of Insurance is expressed even more expansively in the statements made in its 2022 Annual Report published on its website:

> **MISSION:** The mission of the Office of Superintendent of Insurance is to provide consumers with convenient access to reliable insurance products that are underwritten by dependable and financially sound companies.[11]

> **AGENCY DESCRIPTION**: The paramount role of the OSI is to make sure the insurance industry is operating in the best interests of New Mexicans.

---

[9] Kilpatric, Moore, *Insurance Regulation in New Mexico: A New Approach*, Federation Of Regulatory Counsel Journal: Vol. 25 Edition 2 - Summer 2014, pp.3-4.
[10] NM Const art XI § 20.
[11] *2022 Annual Report, Mission*, page 2, https://a.storyblok.com/f/132761/x/f1d5ef8cdc/nm-osi-annual-report-fy22.pdf, viewed March 21, 2023.

46.     Thus, to regulate "insurance" is the only reason Defendants' offices exist and the only role Defendants Catechis and OSI serve. That is their mandate and their jurisdictional limitation under governing law.

**V.     Regulation of HCSMs**

47.     Precisely to protect HCSMs, Congress created a safe-harbor "Religious Exemption[]" from the ACA's shared responsibility payment (individual mandate) for any member of a "Health Care Sharing Ministry." 26 U.S.C. §5000A(d)(2)(B). This religious exemption provision in the ACA was one of the many compromises that facilitated its passage.

48.     To enable members of HCSMs to obtain the benefits of the ACA religious exemption, CMS adopted regulations and an application process to determine which ministries met the exemption's requirements. As a result, 108 ministries were determined ACA-Compliant "Health Care Sharing Ministries" under 26 U.S.C. §5000A(d)(2)(B). *See* ACA-Certified HCSM List (Ex. L). Gospel Light Mennonite Church Medical Aid Plan is number 6 on this list.

49.     To be clear, this federal ACA religious exemption in §5000A(d)(2)(B), like comparable state safe harbors,[12] protects both HCSMs and their members *by exempting the members* from penalties for failing to have or maintain "insurance" coverage.

50.     Thirty-one states, including all four states bordering New Mexico, have gone further via safe harbors for the HCSMs themselves, making these ministries "safe" from state insurance codes and commissioners.[13]

---

[12] Such exemptions for HCSM members also exist in state law. *See* Cal. Gov't Code §100705(c)(2); D.C. Code Mun. Regs. tit. 26-A § 8901.1(f); 956 Mass. Code Regs. 5.03(3)(d); N.J. Stat. § 54A:11-2; R.I. Gen. Laws §44-30-101(a)(1); and Vt. Stat. Ann. tit. 33, § 1805(8)).

[13] *See* Ala. Code §22-6A-3; Alaska Stat. §21.03.021; Ariz. Rev. Stat. §20-122; Ark. Code §23- 60-104(a)(3)&(b)(2); Fla. Stat. §624.1265; Ga. Code §33-1-20; Idaho Code §41-121; 215 Ill. Comp. Stat. 5/4(b); Ind. Code §27-1-2.1-1; Iowa Code §505.22; Kan. Stat. §40-202(j); Ky. Rev. Stat. §304.1-120; La. Rev. Stat. Ann. §22:318-19; Me. Rev. Stat. tit. 24-A, §704(3); Md. Code Ins. §1-202(a)(4); Mich. Comp. Laws Serv. §550.1861-69; Miss. Code §83-77-1; Mo. Rev. Stat. §376.1750; Mont. Code §§33-1-102(16), 1-201(5)-(6), §50-4-111; Neb. Rev. Stat. §44-311; N.H. Rev. Stat. §126-V:1; N.C. Gen. Stat. §58-49-12; Okla. Stat. tit. 36, §110(11); 40 Pa. Stat. §23(b); S.D.

51.     New Mexico's authority to regulate "insurance" is not unlimited.

52.     One important limitation on New Mexico's authority to regulate insurance is a federal law known as the McCarran-Ferguson Act of 1945, 15 U.S.C. §§1011 et seq. ("MFA").

53.     The MFA helps reserve insurance regulation to the states by protecting such regulation from "federal preemption." *See SEC v. Variable Annuity Life Ins.*, 359 U.S. 65, 67-72 (1959).  Only regulations of "insurance" as defined by the MFA qualify for this protection.

54.     Because the MFA is a federal law, its use of the word "'insurance' [is a] federal term[]" and its "meaning [is] a federal question." *Id*. at 69. Thus, to qualify for MFA protection, states must define "insurance" consistently with federal cases.[14]

55.     The U.S. Supreme Court has been clear on several requirements of "insurance."

56.     Insurance requires assumption of "true risk." *Id*. at 70-71. "We deal with a more conventional concept of risk-bearing when we speak of insurance. For … insurance involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts. The companies that issue these annuities take the risk of failure. But they guarantee nothing[.] There is not true underwriting of risks, the one [real] earmark of insurance[.]" *Id.* at 71-73.

57.     "[If risk] is not shifted [to] others, there can be neither insurance nor indemnity. Insurance also…involves distribution of the risk, but distribution without assumption hardly can be held to be insurance. These are elemental conceptions and controlling ones."[15]

---

Code §58-1-3.3; Tex. Ins. Code §1681.001; Utah Code §31A-1-103(3); Va. Code §38.2- 6300-01; Wash. Rev. Code §48.43.009; Wis. Stat. §600.01(b)(9); Wyo. Stat. §26-1-104(a)(v).

[14] *See Air Evac EMS, Inc. v. Dodrill*, 523 F.Supp.3d 859, 871 (S.D.W.Va. 2021) (membership group analogous to Gospel Light Mennonite Church Medical Aid Plan), aff'd on other grounds, *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89 (4th Cir. 2022). The insurance commissioner's "enforcement threat against the Membership Program" was held not to "involve regulation of the business of insurance" as defined by the MFA. *Dodrill*, 523 F.Supp.3d at 872-73. "Air Evac is likely to prevail in demonstrating that its Membership Program is not insurance, and therefore that any state regulation of it is preempted[.]" *Id.* Key to the court's "no insurance" ruling was its finding of "no indemnification." *Id*.

[15] *Jordan v. Grp. Health Ass'n,* 107 F.2d 239, 245 (D.C. Cir. 1939) (citations omitted).

18

58.    Hallmarks of insurance have always included the related concepts of indemnity, promise to pay, and assumption of risk.[16]

59.    In short, a contract for insurance always requires a *legally enforceable* promise or "obligation to indemnify the insured."[17]

60.    Wherever New Mexico law defining insurance disagrees with federal law defining insurance, New Mexico law must give way and is subject to preemption or nullification.

61.    It is not unlikely that the drafters of the 2012 constitutional amendment creating OSI recognized that OSI must come within the U.S. Supreme Court's definition of insurance, and so made the assumption of risk a required aspect of those entities that would come within the purview of the new agency.[18]

62.    Further, Defendants must act circumspectly in dealing with HCSMs, because the First Amendment guarantees "special solicitude to the rights of religious organizations."[19]

## VI.    Gospel Light Mennonite Church Medical Aid Plan Sharing Model

63.    Gospel Light Mennonite Church Medical Aid Plan has long operated in all 50 states and the District of Columbia.

64.    Gospel Light Mennonite Church Medical Aid Plan has received two relevant legal determinations from the United States government under provisions of the ACA and the Internal Revenue Code ("IRC").  Both provisions are codified in the IRC.

---

[16] *See, e.g., Kinkaid v. John Morrell & Co.*, 321 F.Supp.2d 1090, 1098 (N.D.Iowa 2004).

[17] *Jones v. Liberty Mutual*, 385 F.3d 820, 827 (4th Cir. 2004) (Md. law) ("obligation to indemnify [arises from] legal obligation to pay"); *see Travelers Indem. v. Dammann & Co.*, 594 F.3d 238, 258 (3d Cir. 2010) (same); *Stewart v. E.M.J. Corp.*, 2005 U.S. App. LEXIS 2050, at *14-15 (10th Cir. 2005) ("only [one] compelled to pay another party due to a legal obligation is eligible to seek indemnification"); *Equal Rights Ctr. v. Archstone Smith Tr.*, 603 F.Supp.2d 814, 824 (D.Md. 2009) (to "'shift [the] entire responsibility …' is exactly what indemnity means").

[18] "The superintendent of insurance shall regulate insurance companies and others *engaged in risk assumption* in such manner as provided by law." NM Const art XI § 20 (emphasis added)

[19] *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012) (unanimous) ("special solicitude to the rights of religious organizations") ("*Hosanna*").

APPENDIX 0028

65.    First, Gospel Light Mennonite Church Medical Aid Plan received its federal tax-exempt status under IRC §501(c)(3) effective as of June 24, 2014. *See* IRS Det. Ltr (Ex. D). Second, Gospel Light Mennonite Church Medical Aid Plan received its federal HCSM status under 26 U.S.C. §5000A on March 31, 2014. *See* CMS Det. Ltr (Ex. A) and ACA-Certified HCSM List (Ex. L).  These federal determinations are discussed further below.

66.    Gospel Light Mennonite Church Medical Aid Plan's religious burden-sharing model bears little resemblance to insurance.

67.    Gospel Light Mennonite Church Medical Aid Plan "suggests" to its members "voluntary" contributions with "no assumption of risk or promise to pay."

68.    Further, Gospel Light Mennonite Church Medical Aid Plan everywhere expressly disclaims any assumption of risk, promise to pay and other hallmarks of insurance, and all of its materials clearly state that the members remain responsible for their own medical bills.

69.    That language is abundant in Gospel Light Mennonite Church Medical Aid Plan materials starting from the "Program Overview" section of its Sharing Guidelines to the four pages of legal notices that accompany each of the Sharing Guidelines, Decision Guide, and Enrollment Application.

70.    For example, the three individual Plaintiffs in this case, together with all of Gospel Light Mennonite Church Medical Aid Plan's other New Mexico members, signed a Sharing Member Enrollment Application stating:

> PROGRAM NOT INSURANCE. I acknowledge that I am enrolling in Liberty HealthShare, a healthcare sharing ministry of Gospel Light Mennonite Church Medical Aid Plan, Inc., that is voluntary and cooperative and not insurance. I have read and understand any disclaimers to this effect and understand that there are no representations, promises or guarantees that my medical expenses will be paid. I also understand that any funds that I may receive for medical expenses do not come from an insurance plan, but are voluntary donations by the members.

APPENDIX 0029

71.     In short, Gospel Light Mennonite Church Medical Aid Plan expressly, consistently, and persistently disclaims any assumption of risk, promise to pay, and other customary legal incidents of insurance.

72.     Gospel Light Mennonite Church Medical Aid Plan's members share their health needs and costs among themselves, voluntarily giving their contributions, as suggested and coordinated by the ministry. No sharing is guaranteed. No member is legally obligated to contribute funds. And all members always remain legally responsible for their own medical bills.

73.     OSI exists only to regulate "insurance."  Thus, the threshold inquiry in this case is whether Gospel Light Mennonite Church Medical Aid Plan is "insurance."

74.     Gospel Light Mennonite Church Medical Aid Plan has freely operated in all 51 jurisdictions as "not insurance" until now. It has never been found in any binding legal decision to be insurance.

75.     The only reason Gospel Light Mennonite Church lacks good standing in New Mexico is that Defendants have engaged in this biased and illegal enforcement action, premised on targeting religious ministries that qualify not only for IRC §501(c)(3) status, but are also federally recognized HCSMs for purpose of a religious exemption under the ACA.

**VII.    Defendants' History with HCSMs.**

76.     New Mexico has only a recent history of questioning the "validity" of HCSMs.

77.     On March 26, 2020, the NM OSI issued a press release that "Cautions Consumers about Health Care Sharing Ministries." That same day, the NM OSI issued a Cease-and-Desist Order against the counterfeit HCSM Trinity HealthShare, Inc., claiming that it was transacting the business of insurance in New Mexico without a certificate of authority from the Superintendent.

21

Notably, Trinity HealthShare, Inc. did not have a valid CMS recognition letter and did not fit the ACA's definition of an HCSM nor the definition in any of the states' safe harbor laws.

78.    Trinity HealthShare, Inc. requested a hearing before the OSI.  The hearing was held on July 8, 2020. On November 17, 2020, OSI Hearing Officer R. Alfred Walker determined that Trinity HealthShare, Inc. was "transacting the business of insurance in [New Mexico]" without a "certificate of authority from the Superintendent." The Hearing Officer's decision was not based in any way on the fact that Trinity HealthShare, Inc. lacked recognition by CMS as a health care sharing ministry and did not fit any state HCSM safe-harbor laws.

79.    On January 13, 2021, less than three months after Hearing Officer Walker's decision, OSI issued a Cease-and-Desist Order against another HCSM, OneShare Health, LLC, claiming that it was transacting the business of insurance in New Mexico without a certificate of authority from the Superintendent.

80.    Rather than challenge the Superintendent's Cease and Desist Order, OneShare Health, LLC, even though it is a valid healthcare sharing ministry under the IRC with a valid CMS determination letter, decided to enter a Consent Order that rescinded the Cease-and-Desist Order. Under the Consent Order, OneShare Health, LLC, had to pay the Superintendent a $125,000.00 fine and cease offering memberships in its HCSM in New Mexico. This Consent Order was entered into on March 17, 2021.

81.    On November 23, 2021, just eight months after entering into the Consent Order with OneShare, LLC, OSI issued a Cease-and-Desist Order against Gospel Light Mennonite Church Medical Aid Plan claiming that it was transacting the business of insurance in New Mexico without a certificate of authority from the Superintendent.

22

82.     Gospel Light Mennonite Church Medical Aid Plan requested a hearing before the OSI. The hearing began on March 8, 2022, before Hearing Officer Richard B. Word. Upon agreement of the parties, the hearing was recessed. Hearing Officer Word set the recommencement of the Hearing for September 14, 2022. On September 9, 2022, the parties were notified that due to his upcoming retirement Hearing Officer Word had recused himself from the hearing and that Hearing Officer R. Alfred Walker would be conducting the remainder of the hearing and issuing the decision.

83.     On January 20, 2023, Hearing Officer Walker determined, as he had previously done in the Trinity HealthShare matter, that Gospel Light Mennonite Church Medical Aid Plan was "transacting the business of insurance in [New Mexico]" without a "certificate of authority from the Superintendent." He made absolutely no distinction in his two decisions that Trinity HealthShare, Inc. lacked recognition by CMS as a healthcare sharing ministry and that Gospel Light Mennonite Church Medical Aid Plan was recognized by CMS as a legitimate healthcare sharing ministry.

84.     On February 22, 2023, Defendant Catechis adopted Hearing Officer Walker's Findings of Fact, Conclusions of Law, and Recommendations as her own. Gospel Light Mennonite Church Medical Aid Plan was ordered to Cease and Desist from offering its HCSM programs in New Mexico and to pay a fine in the amount of $2,510,000.

85.     Yet, prior to March 26, 2020, it appears as if OSI did not consider HCSMs to be transacting the business of insurance. In fact, as late as December 3, 2019, then-Superintendent of Insurance John Franchini put out a press release stating that:

> [a] few health care sharing ministries (also known as health care sharing organizations) operate in New Mexico. These organizations *do not offer insurance*, but may present plans in a way that look and feel similar to a health insurance plan. Members of these organizations 'share' health costs on a voluntary basis.

APPENDIX 0032

Consumers should be aware that these plans have no obligation to pay for any medical services and have no requirement to cover any particular categories of health care services, such as preventive care.  See Ex. F (emphasis added).

86.     By taking no action against HCSMs until 2020, OSI effectively staked out the position, as Superintendent Franchini stated as late as December 2019, that Gospel Light Mennonite Church Medical Aid Plan and other HCSMs were not offering "insurance" within the meaning of the Insurance Code.

87.     To be sure, prior to March 26, 2020, OSI had never challenged an HCSM as transacting the business of insurance in New Mexico without a certificate of authority from the Superintendent even though HCSMs had freely and openly been operating in New Mexico for decades prior. Then, after appropriately attacking the counterfeit HCSM, Trinity HealthShare, OSI issued Cease and Desist Orders against two valid, legitimate HCSMs in rapid succession.

88.     It defies logic that the legality of a valid HCSM should turn on the whims of the policy determinations of the Superintendent of Insurance who happens to be in power at any particular time. Interpretation of the law must be consistent in order for individuals and corporations to order their affairs. For the individuals who joined HCSMs prior to Superintendent Toal taking the reins at OSI in early 2020, they had absolutely no indication that HCSMs were "unauthorized," either in the eyes of the law or in the minds of state administrators.  Likewise, the valid, legitimate HCSMs had no reason to believe they were operating in an "unauthorized" fashion.

89.     The inaction of OSI against HCSMs prior to 2020 was consistent with the logic of the decisions of legislatures and courts nationwide during this same period.

90.     Most state governments and the federal government enacted safe harbors for HCSMs during 1995 to 2020.[20] Three state supreme courts issued published decisions on HCSMs.

91.     In *Barberton Rescue Mission v. Ins. Div.*, 586 N.W.2d 352 (Iowa 1998), Iowa's Supreme Court ruled unanimously that the HCSM was "not insurance." The Court concluded that there was no "assumption of risk," a "key element of insurance."

92.     In *Com. v. Reinhold*, 325 S.W.3d 272 (Ky. 2010), the Kentucky Supreme Court issued a divided opinion against an HCSM. The majority ruled that the HCSM was ineligible for the state's safe harbor which required direct sharing among members. The Kentucky legislature responded swiftly by repealing this direct-sharing requirement, effectively overruling the Court's majority opinion.

93.     In *Altrua HealthShare v. Deal*, 154 Idaho 390, 299 P.3d 197 (2013), which is the only post-ACA appellate court case on HCSMs, the Idaho Supreme Court ruled unanimously that the HCSM was not offering insurance. The Court stated that "[The HCSM] must assume some of the risk of paying its members' claims for its membership contract to be one undertaking to indemnify its members…[the HCSM] may have an obligation … despite its disclaimers, to pay certain member claims so long as funds are available, but there is no evidence in the record that [the HCSM] has guaranteed or assured payment of members' claims. Therefore, the Hearing Officer's conclusion that [the HCSM's] membership contract is an insurance contract because [the HCSM] assumes some risk of its members' claims is clearly erroneous." *Id*. at 395.

94.     As a concurring justice explained: "This is a prime example of an administrative agency exceeding its statutory powers in an attempt to protect citizens from themselves.  Although

---

[20] *See* FN 12 and 13, *supra*.

this [case] clearly did not involve health insurance, the Department ignored the terms of the contract[.]" *Id.* (Eismann, J.).

94. 95.     The same is true of Defendants in this case.

96.     In addition to these state supreme courts, a few state trial courts also reviewed

HCSMs before the ACA was passed:

**Christian Brotherhood Newsletter v. Office of the Insurance Commissioner, State of Washington, Superior Court of Washington, Thurston County, Case No. 92-2-03294-2 (September 22, 1993).**
There is no direct evidence in the record specifically addressing the elements of risk shifting, risk distribution or the realistic expectations in the minds of the subscribers. Instead, one must draw reasonable inferences from the undisputed evidence to arrive at those findings.
I have reviewed the evidence in this record as a whole, and from that review conclude that there is not substantial evidence to conclude that the CBN plan contains the element of risk shifting. I conclude that the element of risk distribution is supported by substantial evidence. Finally, I conclude that there is no evidence in the record at all, and certainly not substantial evidence, to support a finding of fact by inference that the CBN plan creates a realistic expectation of full performance in the minds of its subscribers.

**Commonwealth of Kentucky v. Barberton Rescue Mission, Case No. 92-CI-00640, Franklin Co. District Court (June 2, 1995).**
A necessary element of any agreement which is alleged to constitute insurance is risk-shifting. …Plaintiffs merely make the conclusory statement that "Christian Brotherhood Newsletter is a mechanism by which the risk of incurring health care expenses is transferred from individual subscribers to Christian Brotherhood Newsletter as a whole." From the documents provided by both plaintiffs and defendants, it is apparent that there has been no risk-shifting. The subscription agreement and the guidelines specifically state that there is no indemnification, the risk remains with the subscriber, and there is no promise or guarantee that payment will be forthcoming from any other subscriber to the plan. The risk of incurring medical charge under the documents, remains with the subscriber. As there is no shifting of risk, the defendants' agreement cannot be considered "insurance." Therefore, the provisions of KRS regulating the doing of an insurance business, assessment, cooperative, or otherwise, would not apply to defendants.

**Barberton Rescue Mission, Inc. dba Christian Brotherhood Newsletter v. The Insurance Division of the Iowa Department of Commerce, Case No. AA 2653, Polk Co. District Ct (November 25, 1996)**
Respondent clearly did not ask itself the determinative question in this case--would a member have a cause of action against Petitioner if that member's published "need" were to remain unsatisfied in whole or in part? If the answer to this question is "no" Petitioner could not have contractually assumed the risk of loss in return for payment and, therefore, could not have been engaged in the practice of insurance.

26

After reviewing the administrative record, the Court believes that the only reasonable answer to the question posed above is in fact "no."

97.     Other state officials have similarly found that these HCSMs are not insurance. *See, e.g.*:

**Letter from Fletcher Bell, Commissioner of Insurance, Kansas Insurance Department, (March 16, 1989).** Upon review of your newsletter and the description of how your program operates, it would appear that Brother's Keeper Program is not assuming a risk and, therefore, is not transacting the business of insurance in this State.

**Letter from James J. Browder, III, Department Liaison, State of Ohio Department of Insurance, (June 21, 1989).** The Brotherhood program is not insurance. It is a mail order form of what eighty or more years ago was called a "Welfare Society."

**In the Matter of Christian Brotherhood Newsletter, Alabama Insurance Department, Case No. C-90-170EB (January 16, 1991).** After an explanation of the Christian Brotherhood Newsletter by its representatives, it appears the Christian Brotherhood Newsletter may not be insurance.

**Letter from Patrick Wood, Oregon Department of Insurance and Finance (August 1, 1991).** Thank you for your cooperation during our investigation of the Christian Brotherhood. This Division has determined that we have no jurisdiction to apply under the current Oregon insurance law towards the regulation of the newsletter in Oregon.

**Letter from Steven T. Foster, Commissioner of Insurance, Commonwealth of Virginia, (March 5, 1993)**. As a result of our review, we do not believe at this time that the Christian Brotherhood Newsletter and its related health care arrangements are subject to regulation by the Virginia State Corporation Commission Bureau of Insurance.

**Letter from Cathy J. Weatherford, Insurance Commissioner, Oklahoma, (July 29, 1993)**. The subscription form clearly states that Christian Brotherhood newsletter does not assume any risk nor does it indemnify upon determinable contingencies. After handling a plethora of written and oral communication with Oklahoma subscribers, the Department believes these consumers understand the risk they are assuming. While the Department is still concerned about Christian Brotherhood's actuarial uncertainty, it appears Christian Brotherhood Newsletter does not meet the definition of insurance found at 36 O.S. § 102. … Further, we would encourage you to lobby to the Legislature to carve out a precise exception for Christian Brotherhood Newsletter. The reason we ask your assistance in obtaining legislation is the Department's concern about "Copy Cat" operations with less honorable intentions.

**1999 La. AG LEXIS 14, \*6, La Atty. Gen. Op. No. 1998-471.** Because the necessary mutuality of obligation … between the parties is lacking, the Office of the Attorney General is of the opinion that the [HCSM] does not provide 'insurance' as that term is defined by" Louisiana law.

27

## VIII.   Defendants' Interpretation of New Mexico Insurance Law Considers ALL HCSMs to be a "Health Insurance Carrier"

98.    NMSA 1978, Section 59A-16-21.2(C)(2) defines a "health insurance carrier" as "an entity subject to the insurance laws and regulations of this state … that contracts or offers to contract, or enters into agreements to provide, deliver, arrange for, pay for or reimburse any costs of health care services, or that provides, offers or administers health benefits plans in this state."

99.    Under Defendants' view, Gospel Light Mennonite Church Medical Aid Plan "is an entity that enters into agreements to provide, deliver, arrange for, pay or reimburse any costs of health care services," and therefore is, "an entity subject to the insurance laws and regulation of this state."

100.    Such an interpretation destroys any possibility of any kind of religious "sharing ministry" since any HCSM requires the mutual commitment of members to "bear one another's burdens" to "fulfill the law of Christ." *See* Galatians 6:2.

101.    That is, the goal of each HCSM is to facilitate its members' sharing of costs for health care services as a pure example of religious expression by its members. OSI's interpretation of New Mexico's Insurance Code usurps the religious doctrinal authority of Gospel Light Mennonite Church Medical Aid Plan and its members.

102.    HCSMs are founded to facilitate the mutual burden sharing as required by the Bible. That is the reason Gospel Light Mennonite Church Medical Aid Plan and other HCSMs exist and every one of its members (including the individual Plaintiffs) certify their agreement to it.

103.    OSI's interpretation of New Mexico insurance law also flatly contradicts OSI's own enforcement history that allowed HCSMs to operate freely and openly until its March 26, 2020, public warning that HCSMs are "unauthorized insurance" (and in the specific case of Gospel Light

28

Mennonite Church Medical Aid Plan, until the Cease-and-Desist Order was issued on November 23, 2021)

104.    Importantly, such an interpretation of New Mexico insurance law also falls outside the federal McCarran-Ferguson Act ("MFA"), the law that preserves New Mexico's authority to regulate "insurance" at all.

105.    Defendants' interpretation of Gospel Light Mennonite Church Medical Aid Plan as a "health insurance carrier" defies controlling federal precedent under the MFA defining the meaning of the "business of insurance" that Congress reserved to New Mexico in the first place.

106.    New Mexico's interpretation of "insurance" contrary to the MFA results in loss of its anti-preemption benefits, subjecting New Mexico to implied preemption by federal law when its interpretation of its insurance laws makes simultaneous compliance with both federal and state regulations impossible ("impossibility preemption"), a form of "conflict preemption."[21]

107.    New Mexico's interpretation of "insurance" contrary to the MFA results in loss of its anti-preemption benefits, subjecting New Mexico to implied preemption when its interpretation of its insurance law poses an obstacle to the accomplishment of federal goals ("obstacle preemption"), another form of "conflict preemption."[22]

108.    New Mexico's interpretation also fatally conflicts with the ACA's safe harbor—its "Religious Exemption" for "Health Care Sharing Ministries" in IRC §5000A(d)(2)(B).

---

[21] *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 707 (4th Cir. 2015) (federal law preempted a state tort duty that would obstruct a wireless carrier's ability to provide coverage and impede the FCC's authority). "Conflict preemption applies to state law 'when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id*. at 707.

[22] See *Johnson*, 781 F.3d at 707; *Columbia Venture v. Dewberry & Davis*, 604 F.3d 824 (4th Cir. 2010). "Obstacle preemption is a type of conflict preemption authorized by the Supremacy Clause. It applies 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id*. at 829-30 (citations omitted).

109.    That is, as part of the ACA in 2010, Congress enacted the HCSM religious exemption in IRC §5000A(d)(2)(B). Apparently understanding the importance of such an arrangement to people of faith, Congress exempted individuals enrolled in an HCSM from the ACA's mandate requiring individuals to maintain minimum essential insurance coverage and ensured that Americans would have access to HCSMs in every state.

110.    In 2014, CMS, which then was authorized to recognize HCSMs that met §5000A(d)(2)(B), officially recognized Gospel Light Mennonite Church Medical Aid Plan's federal HCSM status under that ACA provision, entitling all Gospel Light Mennonite Church Medical Aid Plan members nationwide to its benefits.

111.    Defendants' interpretation of New Mexico law fatally contradicts federal law in at least three ways.

112.    First, by preventing Gospel Light Mennonite Church Medical Aid Plan from serving its New Mexico members, Defendants effectively prevent Gospel Light Mennonite Church Medical Aid Plan from complying with federal law to treat all its members equally, nationally, "without regard to the State in which a member resides or its employed." §5000A(d)(2)(B)(ii)(II).

113.    This violation of the ACA's safe harbor has both an organizational component (affecting Gospel Light Mennonite Church Medical Aid Plan) and an individual component (affecting its members).

114.    By preventing Gospel Light Mennonite Church Medical Aid Plan as an organization from treating its New Mexico members equally with Gospel Light Mennonite Church Medical Aid Plan members in other states (*i.e.*, its members in any and all other states), New Mexico would obstruct Gospel Light Mennonite Church Medical Aid Plan's compliance with the ACA's religious exemption law.

30

115.    This interpretation of state law by Defendants would make Gospel Light Mennonite Church Medical Aid Plan's "compliance with both federal and state regulations" impossible, requiring that Defendants' view be preempted.[23]

116.    Defendants also would make Gospel Light Mennonite Church Medical Aid Plan noncompliant with the ACA by depriving members of Gospel Light Mennonite Church Medical Aid Plan (and all other HCSMs) in the other 49 states of equal treatment by preventing Gospel Light Mennonite Church Medical Aid Plan (and all HCSMs) from serving any member, like Plaintiff Renteria, who *moves* to New Mexico.

117.    Defendants' exclusion of all HCSMs—making New Mexico an HCSM-free zone— also would deprive all New Mexicans, as individual members of Gospel Light Mennonite Church Medical Aid Plan and beneficiaries of the ACA safe-harbor, of the benefits of that religious exemption to which they are entitled by federal law.

118.    Viewed in any of these ways, state law, as interpreted by Defendants, would make "compliance with both federal and state regulations" impossible, requiring preemption.[24]

119.    Second, Defendant's interpretation renders the federal religious exemption meaningless.

120.    In enacting the ACA, including §5000A, Congress necessarily defined HCSM membership as "not insurance." That is why (and the only reason why) members of HCSMs are exempt from penalties imposed by the ACA for not having insurance.[25]  If Gospel Light Mennonite Church Medical Aid Plan's programs *were* insurance, they would satisfy the ACA without any need for the §5000A safe harbor. The federal religious exemption would be meaningless.

---

[23] *See, e.g., Johnson*, 781 F.3d at 707.
[24] *Johnson*, 781 F.3d at 707.
[25] Congress "zeroed out" such penalties in 2018. But Congress can reimpose them at any time.

APPENDIX 0040

121.    By interpreting state law to be "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in §5000A of the ACA—including its intent to treat HCSMs as "not insurance"—Defendants assure that New Mexico law is preempted by §5000A.[26]

122.    By interpreting state law to "interfere[] with the *methods* by which [§5000A] was designed to reach [its] goal"—including its intent to make HCSMs available to Americans nationwide—Defendants assure that New Mexico law is preempted by §5000A.[27]

123.    Third, by interpreting its insurance law to create an irreconcilable conflict with §5000A, and gutting the determination of CMS that Gospel Light Mennonite Church Medical Aid Plan qualified for the federal safe harbor so that all of its members in New Mexico qualified for the religious exemption's benefits, Defendants have acted to "impede the [CMS's] authority, and thus New Mexico's interpretation is preempted.[28]

124.    Specifically, the IRS ruled in 2014 that Gospel Light Mennonite Church Medical Aid Plan qualifies for federal tax-exempt status under IRC §501(c)(3) even though IRC §501(m)(1) strictly prohibits such status for any entity that even "substantially" provides any kind of "commercial insurance."

125.    Federal law is clear that IRC §501(c)(3) status is forbidden to any sort of insurer.

---

[26] *Columbia*, 604 F.3d at 829-30 ("Obstacle preemption … applies 'where state law stands as an obstacle [to] accomplishment and execution of the full purposes and objectives of Congress.'")
[27] *Id*. ("Obstacle preemption … occurs where state law 'interferes with the methods by which the federal statute was designed to reach [its] goal.'") (citations omitted; emphasis in original).
[28] *Johnson*, 781 F.3d at 706.

APPENDIX 0041

126.    The IRS may recognize the IRC §501(c)(3) status of an entity "*only if no substantial part* of its activities consists of providing *commercial-type insurance*." IRC §501(m)(1) (emphasis added).  "Congress intended a broad definition of the term 'commercial-type insurance.'"[29]

127.    This federal definition was intended to capture anything even like insurance. Gospel Light Mennonite Church Medical Aid Plan clearly is not "insurance" within the meaning of this definition, as the IRS has recognized Gospel Light Mennonite Church Medical Aid Plan's §501(c)(3) status continually since first formally recognizing it in 2014.

128.    In this way, Defendant's interpretation of New Mexico insurance law is preempted by §501(m)(1) and the IRS determination of Gospel Light Mennonite Church Medical Aid Plan's tax-exempt status for all the same reasons that it is preempted by IRC §5000A and the CMS determination of Gospel Light Mennonite Church Medical Aid Plan's HCSM status.

129.    Thus, Defendants' unlawful interpretation of its insurance law ruptures the otherwise reasonably uniform national regulatory environment—led by the ACA religious exemption for qualifying HCSMs—that allows Gospel Light Mennonite Church Medical Aid Plan to operate freely as "not insurance" nationwide. It renders New Mexico the lone, hostile outlier, a sharp departure from its own regulatory policy prior to March 26, 2020.

130.    Finally, Defendants are insisting on the impossible. Even if Gospel Light Mennonite Church Medical Aid Plan were willing to be licensed as an insurer in New Mexico, Gospel Light Mennonite Church Medical Aid Plan is prohibited by law in several ways.

---

[29] *Paratransit Insurance Corp. v. Tax Com'r*, 102 T.C. 745, 752 (1994). Because it "provides commercial-type insurance under the meaning of 26 U.S.C. §501(m)(1)," the IRS "appropriately determined that FICURMA is not eligible for exemption." *FICURMA v. U.S.*, 850 F.Supp.2d 125, 132 (D.D.C. 2012) (relying on *Paratransit*).

APPENDIX 0042

131.    First, as explained above, Gospel Light Mennonite Church Medical Aid Plan's §501(c)(3) status precludes it from being or acting, even "substantially," as a commercial insurer, "broadly" defined.

132.    Second, Gospel Light Mennonite Church Medical Aid Plan's exclusively religious membership precludes compliance with antidiscrimination law, as detailed below.

133.    Third, attempted compliance with NM OSI's antidiscrimination requirements would preclude compliance with the "common … religious beliefs" requirements of §5000A.

134.    For example, the federal religious exemption requires HCSMs to "share medical expenses among members in accordance with [their common] beliefs." §5000A(d)(2)(B)(ii)(II). This cannot be done if Gospel Light Mennonite Church Medical Aid Plan members are forced to support heath care treatments that violate their Biblical beliefs on issues such as life, marriage, and sexuality.

135.    Nor could Gospel Light Mennonite Church Medical Aid Plan comply with §5000A(d)(2)(B)(ii)(II)'s requirement of national uniformity in the treatment of its members ("without regard to the State in which a member resides") if it must sacrifice the deeply held beliefs of its New Mexico members.

136.    Nor could it do so without relinquishing its own rights, and sacrificing the rights of its members, that are guaranteed by the Federal and New Mexico Constitutions.

**IX.    Defendants' Campaign Against HCSMs is Biased and Prejudged.**

137.    Defendant's aggressive pursuit of Gospel Light Mennonite Church Medical Aid Plan—a religious ministry that is insulated by the laws throughout the United States, has freely and openly operated in all jurisdictions, including New Mexico, for decades and looks nothing like insurance—provides strong evidence of prejudgment and bias.

34

138.    As mentioned, Superintendent Toal first announced that OSI considered HCSMs "an unauthorized insurance product" in a press release issued on March 26, 2020, and then over the next 18 months, issued Cease and Desist Orders to two valid HCSMs.

139.    Defendants inflexibly pursued this enforcement action against the HCSMs from the beginning knowing full well their prejudged outcome.

140.    Further, after the Superintendent issued Gospel Light Mennonite Church Medical Aid Plan a Cease-and-Desist Order, it requested a fair and impartial hearing. Plaintiff began its hearing under Hearing Officer Richard Word before he granted a recess in the hearing. Just three business days prior to the recommencement of Gospel Light Mennonite Church Medical Aid Plan's hearing, Plaintiff was informed that Hearing Officer Word would not conclude the hearing and render a decision, rather R. Alfred Walker, the Hearing Officer who rendered the decision determining that the counterfeit HCSM Trinity HealthShare, Inc. was an unauthorized insurer, would be concluding Gospel Light Mennonite Church Medical Aid Plan's hearing and rendering the decision.

141.    Gospel Light Mennonite Church Medical Aid Plan attempted to call Superintendent Toal to testify at its Hearing to show evidence of his bias against HCSMs, but his subordinate employee, Hearing Officer Walker, ruled against allowing this testimony to be taken. Then in his decision against Plaintiff, Hearing Officer Walker concluded that Plaintiff had not presented sufficient evidence of Superintendent Toal's bias.

142.    Upon information and belief, Defendants had already adopted an interpretation of New Mexico insurance law which would doom all HCSMs, including Gospel Light Mennonite Church Medical Aid Plan, and the hearing afforded to Gospel Light Mennonite Church Medical Aid Plan was just a formality. Regardless of facts, testimony, documentation, and all honest

APPENDIX 0044

inquiry, Defendants had made their decision before the hearing ever began. This was a predetermined outcome.

143.    Notably, Defendants ignored the statutory source of their authority, the constitutional limits on their authority, and the evidence presented by Plaintiffs.

144.    Defendants did all of this presumably to respond to a *de minimis* number of consumer complaints (which had already been resolved prior to the Cease and Desist) and to protect the interests of the state's insurance industry and the policymakers who disdain any perceived competition to plans offered on BeWellNM.  *See, e.g.,* Ex. N (Consumer Advisory in which then-Superintendent of Insurance Russell Toal warns against HCSMs as scams and encourages New Mexicans to use the New Mexico insurance exchange, beWellnm); Ex. O (Final Order issued against Trinity HealthShare in which then-Superintendent Toal ordered Trinity HealthShare to inform each of its members of all possible options for obtaining major medical coverage, "specifically including enrollment through beWellnm.com").

145.    Even without a fair hearing, Gospel Light Mennonite Church Medical Aid Plan was able to present substantial evidence of Defendants' crusade to shut down the HCSM community in New Mexico.

### X.    Defendants' Campaign Against HCSMs is Unconstitutional.

146.    Such an application of New Mexico insurance law violates fundamental rights guaranteed by the United States Constitution. These include the rights of free religious exercise, expressive association, equal protection of the law and due process of law.

147.    "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'"[30] "This applies to *administrative agencies which adjudicate as well as to courts*. Not

---

[30] *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009); accord *William Jefferson & Co. v. Bd. of Ass'mt*, 695 F.3d 960, 963-64 (9th Cir. 2012) (applying *Caperton* to local agency process).

36

only is a biased decisionmaker constitutionally unacceptable but 'our system of laws has always endeavored to prevent *even the probability of unfairness*.'"[31]

148.    The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process."[32] Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a greater concern about bias."[33] "Even the most minimal of procedural due process require that the decision be issued by 'a neutral and detached hearing body[.]'"[34]

149.    In short, Plaintiffs in any governmental tribunal must have a "fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."[35]

150.    Due process requires judicial-like process, especially in a case like this where Gospel Light Mennonite Church Medical Aid Plan faces a $2,510,000.00 fine and expulsion from the state.

151.    OSI and its Hearing Officer cannot be viewed as a "neutral and detached" tribunal here. Defendants effectively serve as prosecutor, judge, jury, and executioner all at once and the "overlap between prosecutorial and adjudicative functions" "raises a greater concern about bias." That combination of powers, together with the evidence of prejudgment and protectionism discussed above demonstrate clearly and convincingly the appearance or probability of unfairness.

152.    HCSMs like Gospel Light Mennonite Church Medical Aid Plan simply cannot survive Defendants' regulation.

---

[31] *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citations omitted; emphasis added); *accord Cox v. Com'r,* 514 F.3d 1119, 1126 (10th Cir. 2008); *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).
[32] *Harline v. DEA*, 148 F.3d 1199, 1205 (10th Cir. 1998).
[33] *William Jefferson & Co.*, 695 F.3d at 965.
[34] *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).
[35] *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); accord *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 799 (6th Cir. 2018) (applying *Hamdi* to administrative agency adjudication).

153.    Even if Plaintiff could survive the financial, reputational, and other burdens of regulatory compliance, the attendant religious antidiscrimination and other state-imposed legal requirements would compel such fundamental changes in its membership policies and internal values and cultures that it—as it defines itself—would cease to exist.

154.    Gospel Light Mennonite Church Medical Aid Plan would face two intolerable choices: (1) enroll everyone who applies and facilitate payment for all medical and therapeutic treatments, or (2) close down.

155.    As discussed above, Gospel Light Mennonite Church Medical Aid Plan is a Christian ministry like many others and its members' shared faith is based on applicable Scripture from the Holy Bible.

156.    Gospel Light Mennonite Church Medical Aid Plan members do not simply share their medical expenses. They do so as an expression of love and obedience to God and each other, to and through God's Word (Jesus Christ) and the Body of Christ (all Christians), including specific Scriptural commands, such as to love "neighbor" as self (Matt. 22:39; Luke 10:27), to do good "especially to those who belong to the family of believers" (Gal. 6:10), and to "bear" one another's "burdens" (Gal 6:2).

157.    Such ministries date from the 16th Century Protestant Reformation and its modern practice has occurred continually for at least the last 100 years. *See Bethel Mennonite*, 746 F.2d at 392. It is Gospel Light Mennonite Church Medical Aid Plan's sole Mission and the way it executes its only reason to exist.

158.    This kind of Christian ministry is not new. It is done out of a profound sense of Christian commitment and love, and it has profound benefits for member wellbeing— physically, mentally, and spiritually.

38

159.     The ministry of Gospel Light Mennonite Church Medical Aid Plan is of immense importance to its members, including those in New Mexico, and including the three named individual Plaintiffs.

160.     By attempting to halt Gospel Light Mennonite Church Medical Aid Plan's operations in New Mexico, Defendant threatens to punish every current Gospel Light Mennonite Church Medical Aid Plan member (and prevent every future member) in New Mexico.

161.     For some of these members, such an action is equivalent to barring them from attending Sunday worship service or Bible studies.

162.     Thus, subjection to New Mexico regulations would not just infringe the First and Fourteenth Amendment rights of Gospel Light Mennonite Church Medical Aid Plan and its members; it would terminate the ministry (at least as it now exists) in New Mexico and might deal it a death sentence nationwide.

163.     Such a prejudged outcome defies the law and is contrary to the notions of Freedom of Religion and Freedom of Association that this country was founded upon.

**XI.     Applicable Constitutional Standards: Strict Scrutiny and Absolute Protection.**

164.     *Strict Scrutiny (Balancing Test)*. The default test to protect most individual rights under the First and Fourteenth Amendments is strict scrutiny. In its most common formulation, it requires the state to prove that its challenged action was the "least restrictive means of achieving some compelling state interest."[36] Under this test, "only those interests of the highest order [can] overbalance legitimate claims to the free exercise of religion."[37] This two-part balancing test "is

---

[36] *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981).
[37] *Id*. (quoting *Wisc. v. Yoder*, 406 U.S. 205, 215 (1972)).

APPENDIX 0048

the most demanding test known to constitutional law."[38] Defendants must prove that they satisfy this test.

165.    *Absolute Protection (Categorical Approach: No Balancing)*. Some constitutional rights may not be infringed at all. Certain state actions are categorically barred as intolerable and never justifiable, no matter what the state's interests or means may be. For example, the state must never punish belief.[39] It must never discriminate among religions under the Establishment Clause.[40] Two other examples are critical here. First, the state must never act out of invidious intent (animus) against religion.[41] Second, the state must never "interfere" with the "autonomy" of religious groups "to define their own *doctrine*, *membership*, organization, and *internal requirements*."[42] Defendants cannot do either as both kinds of state action are flatly barred.

166.    Defendants have violated the Free Speech and Assembly Clauses of the First Amendment, and the rights of Plaintiffs guaranteed thereunder, by violating neutrality principles enshrined therein.

167.    Defendants' enforcement policy and action here amount to non-neutral content and viewpoint restrictions of Plaintiffs' Free Speech rights.[43]

---

[38] *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

[39] "The First Amendment obviously excludes all 'governmental regulation of religious beliefs as such.'" *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990). *Smith* lists many other examples.

[40] It is "usually flatly forbidden without reference to" strict scrutiny. *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008) (McConnell, J.) (citing cases, including *Larson v. Valente*, 456 U.S. 228 (1982)) ("Colo. Christian").

[41] "To be sure, where [states] discriminate out of 'animus' against particular religions, such decisions are plainly unconstitutional." *Jesus Christ is the Answer Ministries v. Baltimore Cty.*, 915 F.3d 256, 262 n.3 (4th Cir. 2019) ("*Jesus Christ is the Answer*"). "Religious animus is not a permissible government interest, much less a compelling one." *Id*.

[42] *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 975 (7th Cir. 2021) (*en banc*) (citation to McConnell omitted; emphasis added) (collecting Supreme Court cases) ("*Demkovich*").

[43] See *Shurtleff v. City of Boston*, 142 S.Ct. 1583 (2022); *Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).

40

168.    Defendants also destroy the "associational" and "expressive association" rights of Plaintiffs guaranteed by the First Amendment.[44]

169.    This freedom to associate prohibits "intrusion into the internal structure or affairs of an association,"[45] and "plainly presupposes a freedom not to associate."[46]

170.    This freedom "applies with special force [to] religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals."[47]

171.    "[T]here is [no] doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity [such as] the right 'to engage in association for the advancement of beliefs and ideas.'"[48] That is precisely the sort of "orderly group activity" and "association for the advancement of beliefs and ideas" in which Gospel Light Mennonite Church Medical Aid Plan and its members engage.

172.    Such activity by Gospel Light Mennonite Church Medical Aid Plan represents precisely the "modes of expression and association protected by the [U.S. Constitution] which [New Mexico] may not prohibit, under its power to regulate the [insurance] profession, as improper solicitation of [insurance] business."[49]

173.    To be sure, "a State may not, under the guise of prohibiting professional misconduct, ignore Constitutional rights."[50]

---

[44] "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others.'" *Americans for Prosperity v. Bonta*, 141 S.Ct. 2373, 2382 (2021) (quoting Roberts v. U.S. Jaycees, 468 U.S. 609 (1984)); see also *Boy Scouts v. Dale*, 530 U.S. 640 (2000); *Hurley v. Irish-American Gay, Lesbian, & Bisexual*, 515 U.S. 557 (1995).

[45] *Roberts*, 468 U.S. at 623.

[46] *Roberts*, 468 U.S. at 623. Courts defer to a group's explanation of the "nature of its expression [and its] view of what would impair its expression." *Dale*, 530 U.S. at 653.

[47] *Hosanna*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring) ("Alito/Kagan").

[48] *NAACP v. Button*, 371 U.S. 415, 430 (1963) (citation omitted).

[49] 371 U.S. at 428-29 ("We hold that the activities of the NAACP, its affiliates and legal staff shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not prohibit, under its power to regulate the legal profession, as improper solicitation of legal business[.]").

[50] *Id*. at 439 (citations omitted).

41

174.    Nor may a State "foreclose the exercise of constitutional rights by mere labels."[51]

175.    Fundamentally, that is exactly what Defendants have done to Gospel Light Mennonite Church Medical Aid Plan: they have mislabeled Gospel Light Mennonite Church Medical Aid Plan's sharing programs as "insurance."

176.    Nor may a State infringe on First Amendment rights of charitable organizations, especially religious ministries, to engage in solicitation of financial and spiritual contributions.[52]

177.    It is well established since at least 1980 that the First Amendment protects [the] right to solicit charitable contributions."[53]

178.    Defendants would take over Gospel Light Mennonite Church Medical Aid Plan's management of its own membership rolls by dictating who could be admitted, excluded, and expelled. They would also subject Gospel Light Mennonite Church Medical Aid Plan and its members to antidiscrimination requirements and prevailing social policy anathema to Gospel Light Mennonite Church Medical Aid Plan and its members forcing Gospel Light Mennonite Church Medical Aid Plan into one of two equally unacceptable alternatives: (1) to secularize or (2) to shut down.[54]

179.    All such rights of free speech, assembly, and expressive association are protected by strict or heightened scrutiny. And any invidious discrimination is categorically barred.

180.    To protect against such meddling or even hijacking of a religious group's internal affairs, the First Amendment offers extra protection. Plaintiffs are entitled not just to "special

---

[51] *Id*. at 429.
[52] *Amers. for Prosperity v. Bonta*, 141 S.Ct. 2373 (2021) (analyzing cases before invalidating state regulations that limited certain rights of charitable entities soliciting funds in California).
[53] *Id*. at 2389 (quoting *Vill. of Schaumburg v. Cits. for Better Env't*, 444 U.S. 620, 633 (1980)).
[54] The First Amendment outlaws regulations that might (a) "affect the way an organization carried out what it understood to be its religious mission," *Amos*, 483 U.S. at 336; (b) prevent it from "defin[ing] itself" by limiting its staff to "those committed to [its] mission," *Id*. at 342 (Brennan, J., concurring); or (c) cause it "as it currently identifies itself to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006); *FCA*, 46 F.4th at 1099 (without relief, the club "may continue to dwindle" until it "cease[s] to exist").

42

solicitude,"[55] but to "double" First Amendment protection, since its core activity is expressive association and "religious observance doubly protected by the Free Exercise and Free Speech Clauses."[56] As with other non-neutral treatment under either of these Clauses, Defendants' interference with the internal must survive the strictest possible scrutiny, a rare feat.

181.    As noted above, the state must never "interfere" with the "autonomy" of religious groups "to define their own *doctrine*, *membership*, organization, and *internal requirements*."[57] "[T]he Religion Clauses protect religious institutions [in] matters 'of faith and doctrine' [and "internal management decisions" against] government intrusion. State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute [an] establishment of religion. The First Amendment outlaws such intrusion."[58] All such state action is categorically barred.[59]

182.    Defendants have interfered with the autonomy of Gospel Light Mennonite Church Medical Aid Plan and its members to define their own *doctrine*, *membership*, and *internal requirements*. Defendants have done so by imposing the cost on Gospel Light Mennonite Church Medical Aid Plan of defending against the Cease-and-Desist Order. They have also levied a fine of $2,510,000.00 against Gospel Light Mennonite Church Medical Aid Plan.

183.    All such OSI actions interfere with Gospel Light Mennonite Church Medical Aid Plan's internal requirements, all of which originate in the Biblical doctrine held by Gospel Light Mennonite Church Medical Aid Plan and its members as they understand and define it. This includes the mutual Biblical responsibility, obedience, and love of members and the supernatural

---

[55] *Hosanna*, 565 U.S. at 189.
[56] *Kennedy v. Bremerton Sch. Dist*., 142 S.Ct. 2407, 2433 (2022).
[57] *Demkovich*, 3 F.4th at 975 (en banc) (citation to McConnell omitted; emphasis added).
[58] *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020) ("OLG").
[59] The Supreme Court always bars, never balances, such action. *See, e.g., OLG* and *Hosanna*.

APPENDIX 0052

power of Christ, the Divine Healer, that it unleashes. The Defendants' enforcement action, including the eventual subjection of Gospel Light Mennonite Church Medical Aid Plan to anti-discrimination and other state social policies—such as coalescing around the "landmark" reforms of the ACA—is accelerating, irreparable, and categorically barred.

184.    For separate but similar reasons, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment, and the rights of Gospel Light Mennonite Church Medical Aid Plan and its members guaranteed thereunder, by violating antidiscrimination principles enshrined therein. The same "intent to treat differently" that violates the Free Exercise Clause violates the Equal Protection Clause, because it either harms a "suspect class" or burdens a "fundamental right." Defendants have done both. "Unquestionably, the free exercise of religion is a fundamental constitutional right."[60]

185.    Additionally, "Religion is a suspect class."[61] So, differential treatment due to "religious beliefs and practices would result in classifying them based on membership in a suspect class and would violate the Equal Protection Clause unless the classification satisfies strict scrutiny."[62] Defendants may attempt to satisfy strict scrutiny (a very tall order) only if their actions were free from animus. But if motivated by animus, they are flagrantly unconstitutional and flatly prohibited.

186.    For reasons explained above, Defendants have violated the Due Process Clause of the Fourteenth Amendment, and the rights of Gospel Light Mennonite Church Medical Aid Plan and its members guaranteed thereunder. The OSI Hearing procedures failed to provide Plaintiffs with a fair and impartial forum where their case could be heard and ultimately resulted in a biased

---

[60] *Jesus Christ is the Answer*, 915 F.3d at 265 (4th Cir.) (quoting Supreme Court precedent).
[61] *Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022).
[62] *Saud v. Days*, 50 F.4th at 710.

44

and prejudged proceeding that ended with a $2,510,000 fine and expulsion from the state. Together, Defendants have acted as the police, prosecutor, judge, and executioner in an action that resulted in what is tantamount to a death sentence for Gospel Light Mennonite Church Medical Aid Plan's ministry in New Mexico. Such an action by Defendants could possibly have spillover effects nationwide; the adverse publicity from a Cease-and-Desist Order is likely to result in loss of members, insurance agency actions in other states, and detrimental rulings in private lawsuits. All of these ills have accompanied similar enforcement actions against HCSMs.[63] As a tribunal, OSI is neither adequate (particularly to adjudicate complex Constitutional rights) nor fair (particularly in view of evidence of prejudgment and protectionism). OSI has demonstrated hostility to the HCSM community which OSI clearly intends to shut down. There is nothing fair or neutral about Defendants' hearing process.

187.    Plaintiffs are entitled not just to "special solicitude,"[64] but to "double" First Amendment protection, since its core activity is "religious observance doubly protected by the Free Exercise and Free Speech Clauses."[65] Defendants' action injures the religious freedom of both ministry and members. Each day it continues, it harms and threatens their "doubly protected" "First Amendment freedoms," whose loss, "for even minimal periods of time, unquestionably constitutes irreparable injury."[66] Defendants' Cease and Desist Order should be enjoined by this Court.

188.    The loss of these doubly protected First Amendment rights will extend beyond the Cease-and-Desist Order enforcement. If Defendants are allowed to exercise authority over

---

[63] See *OneShare v. Com'r Kreidler*, Case 3:20-cv-06207 (W.D.Wash., filed Dec. 15, 2020) (docket filings). Such follow-on results can even be intended by a commissioner. See *id*.
[64] *Hosanna*, 565 U.S. at 189.
[65] *Kennedy*, 142 S.Ct. 2407, 2433 (2022).
[66] *RCD*, 141 S.Ct. at 67.

APPENDIX 0054

Plaintiffs, the ministry will be compelled to comply with antidiscrimination and other regulations that will violate their sincere, shared religious beliefs. Such regulations might, for example, compel Gospel Light Mennonite Church Medical Aid Plan to conform to prevailing social policies on issues such as life, marriage, and sexuality.[67]

189.    The evidence thus far suggests the need for closer scrutiny of Defendants' motives. It appears they sought to achieve social policy—whether securing ACA reforms, protecting domestic insurance providers, stabilizing the domestic insurance market, or expanding the reach of antidiscrimination policy to conscientious objectors like Gospel Light Mennonite Church Medical Aid Plan, or all of these—at the expense of individual rights enshrined in the Federal and New Mexico Constitutions and under state law. This they had no authority to do.

190.    This lawsuit seeks a permanent injunction against the Defendants' enforcement action, as well as a declaratory judgment that Defendants' actions violate the United States Constitution, the New Mexico Constitution, and New Mexico state law.

### CLAIM 1
### Violation of the Free Exercise Clause According to 42 U.S.C. § 1983
### Non-Neutral Treatment

191.    Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

192.    State action must be "neutral toward religion," *see Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018), as required by three separate clauses of the United States Constitution: The Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause. The analysis under these three clauses is interrelated, but the commands of each are independent and distinct.

---

[67] "As an initial matter, it is plain that [Defendants'] actions [will] have burdened [Gospel Light Mennonite Church Medical Aid Plan's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs." *Fulton*, 141 S.Ct. at 1876.

APPENDIX 0055

193.    Under the non-neutrality aspect of the Free Exercise Clause, this Court must determine "whether the burden [OSI] has placed on the religious exercise of [Plaintiffs] is constitutionally permissible." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).

194.    "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorable than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original).

195.    OSI's actions toward the Gospel Light Mennonite Church Medical Aid Plan and other HCSMs have not been accidental, incidental, or merely negligent toward religion or its exercise. These actions have been intentional and aimed expressly at religious health care sharing ministries.

196.    For purposes of the federal safe-harbor law, an HCSM must not just claim a particular religious status but must meet a specific religious definition. This HCSM sector targeted by OSI was and remains an expressly and exclusively religious sector. Thus, OSI's conduct has not been neutral toward religion.

197.    Defendant Catechis directly, and in concert with other state officials, targeted these ministries for OSI's collective enforcement actions and related public warning campaign.

198.    Defendant Catechis relied upon the religious safe harbor law—designed to accommodate religious exercise by exempting these ministries from their enforcement power—to support and justify their enforcement power over these religious ministries.

199.    Defendant Catechis failed to understand the sharing model of the Gospel Light Mennonite Church Medical Aid Plan, or to properly analyze and determine the threshold insurance inquiry necessary to proceed against the Gospel Light Mennonite Church Medical Aid Plan.

APPENDIX 0056

200.    Defendant Catechis applied the New Mexico Insurance Code to create a new source of power arming her to issue more than $2 million in fines and to order the expulsion of the Gospel Light Mennonite Church Medical Aid Plan from New Mexico.

201.    Each of these intentional acts were directed exclusively at a thoroughly religious ministry, composed of a thoroughly religious membership, which qualified for a facially religious exemption under federal law. Accordingly, none of these acts were neutral toward religion.

202.    Defendant Catechis, and her predecessors, have repeatedly shown actual hostility toward HCSMs, the least acceptable form of state action under the neutrality doctrine.

203.    Any form of official "hostility [i]s inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Masterpiece Cakeshop*, 138 S. Ct. at 1732.

204.    OSI and Defendant Catechis have applied disparaging and demeaning descriptions to health care sharing ministries in general. *See* Ex. N (Consumer Advisory from then-Superintendent of Insurance Russell Toal effectively calling HCSMs a "scam[]," "low quality," and "bad plans); *see also* Ex. G (Press Release in which then-Superintendent of Insurance Toal warns against HCSMs, in part, because members of HCSMs "may also be subject to religious or moral restrictions from the sharing ministry, which may leave members responsible for the full costs of health care that result from an activity the ministry does not agree with."). Such actions are not neutral toward religion, and demonstrate animus toward the religious nature of HCSMs.

205.    OSI and Defendant Catechis' actions to exclude the Gospel Light Mennonite Church Medical Aid Plan from New Mexico are not neutral toward religion.

206.    OSI's public campaign against HCSMs and OSI's present enforcement campaign against HCSMs are not neutral towards religion.

48

207.    After years of nonenforcement against HCSMs, Defendant Catechis, and her predecessors, suddenly began to interpret and apply New Mexico insurance law to determine that Plaintiff Gospel Light Mennonite Church's religious health care sharing ministry constitute insurance. This sudden change is not neutral toward religion.

208.    To accomplish their goal of expelling HCSMs, Defendant Catechis, and her predecessors, alongside OSI, have had to manipulate the law and its own enforcement policies and practices, resulting in a vicious cycle of nonsensical contradictions between state and federal law.

209.    This chaotic approach has resulted from OSI's predetermined goal to target a specific religious sector. That predetermined goal and result are not neutral toward religion.

210.    Defendant Catechis's actions are also not neutral toward religion because kicking the Gospel Light Mennonite Church Medical Aid Plan out of New Mexico permanently deprives its entire New Mexico membership of their chosen religious ministry.

211.    Defendant Catechis cannot prove that her actions, and the actions of OSI, are the least restrictive means of achieving some compelling state interest.

212.    Defendant Catechis's, her predecessors', and OSI's asserted state interests are not sufficient to satisfy strict scrutiny.

213.    Defendant Catechis's and OSI's actions are not the least restrictive means to achieve their interests in regulating the Gospel Light Mennonite Church Medical Aid Plan and its members.

214.    Defendant Catechis does not even have a rational basis for her actions in this case and thus cannot survive any form or sort of judicial scrutiny.

215.    Defendant' actions, undertaken under color of state law, constitute a violation of Plaintiffs' civil rights according to 42 U.S.C. § 1983.

216.    Absent injunctive and declaratory relief against Defendant Catechis, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

217.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

218.    As a result, Plaintiffs seek injunctive and declaratory relief against Defendants to stop their unlawful actions that violate the United States Constitution's guarantee of the free exercise of religion.

### Claim 2
### Violation of the Free Exercise Clause According to 42 U.S.C. § 1983
### Non-Generally Applicable Treatment

219.    Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

220.    "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original) (citation omitted).

221.    Unlike the neutrality standard, general applicability does not focus on religion or intent; instead, it focuses on mechanisms and process.

222.    While a law may appear to be generally applicable on its face, it may not be in practice where it includes a mechanism that invites or results in an uneven application of the law in a way that burdens or has a disparate impact on religion.

223.    The evidence in this case demonstrates that Defendants do not apply the New Mexico Insurance Code generally to similarly situated persons, but rather operates in a manner that results in an uneven application of the law that burdens or has a disparate impact on religion.

50

224.    Notably, Defendants allow nonreligious organizations that actually provide insurance or insurance-like products, such as labor and fraternal organizations, to operate in New Mexico completely free from regulation by OSI. *See, e.g.* NMSA 1978, § 59A-1-15(A); NMSA 1978, § 59A-1-16(A); NMSA 1978, § 59A-44-23; NMSA 1978, § 59A-44-40(A)(1)-(2); NMSA 1978, § 59A-44-40(F);

225.    Moreover, Defendants have the sole ability to determine whether a HCSM is "insurance" according to the New Mexico Insurance Code. Defendants could have easily determined that the Gospel Light Mennonite Church Medical Aid Plan, which makes clear to all members that it is not insurance and does not indemnify or guarantee payment, is not insurance according to the New Mexico Insurance Code.[68] Nevertheless, Defendants have interpreted the New Mexico Insurance Code to disallow HCSMs, including the Gospel Light Mennonite Church Medical Aid Plan, from operating in New Mexico.

226.    Defendants' interpretation of New Mexico's insurance code, including but not limited to their interpretation of "insurance," are intentionally inconsistent, incoherently overlapping, and mutually contradictory, resulting in anything but generally applicable law enforcement regarding similarly situated parties.

227.    Strict scrutiny of these state actions is required here by the general applicability doctrine under the Free Exercise Clause.

228.    Defendants cannot satisfy this test because, as discussed in this complaint, Defendants' actions are not based upon a compelling governmental interest, there is no compelling

---

[68] *See Cordova v. Wolfel*, 1995-NMSC-061, ¶ 8, 120 N.M. 557, 903 P.2d 1390 ("Insurance is a contract whereby for consideration one party agrees to indemnify or guarantee another party against specified risks."); *cf. id.* ("We note that self-insurance and insurance serve similar purposes and that insurance principles may sometimes apply to self-insurance by way of analogy. Nonetheless, we reject as inaccurate Cordova's theory that self-insurance is a sub-set of insurance." (emphasis added)).

51

governmental interest, and Defendants did not use the least restrictive means to achieve their interests.

229.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm as the Gospel Light Mennonite Church Medical Aid Plan would be prohibited from operating in New Mexico and because the Individual Plaintiff Members would no longer be able to carry out their religious beliefs by participating in the Gospel Light Mennonite Church Medical Aid Plan.

230.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' civil rights according to 42 U.S.C. § 1983.

231.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

232.    As a result, Plaintiffs seek injunctive and declaratory relief against Defendants to stop their unlawful actions that violate the United States Constitution's guarantee of the free exercise of religion.

**Claim 3**
**Violation of the Establishment Clause According to 42 U.S.C. § 1983**
**Discrimination Against and Among Religions**

233.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

234.    The Establishment Clause, the other Religion Clause of the First Amendment, demands the strictest neutrality toward and among religions such that it categorically bars discrimination against or among religions of particular faiths or exercise.[69]

---

[69] *See, e.g., Larson v. Valente*, 456 U.S. 228, 244, (1982) ("Larson"); *Trump v. Hawaii*, 138 S.Ct. 2392, 2418 (2018); *Colo. Christian*, 534 F.3d at 1266.

52

235.    "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."[70]

236.    For the same reasons Defendants' actions violate the Free Exercise Clause above, they also independently violate this strictest of antidiscrimination principles embodied in the Establishment Clause.

237.    As alleged herein, Defendants have discriminated against Plaintiffs based upon Plaintiffs' shared religious faith and sharing commitments in favor of similarly situated entities and individuals that embrace and pursue different religious faiths or no religious faith.[71]

238.    All such discrimination under the Establishment Clause is "usually flatly forbidden without reference to" strict scrutiny or any other balancing test.[72]

239.    In any event, Defendants' actions are not the least restrictive of religious exercise to further any governmental interest, much less a compelling one.

240.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

241.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

242.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

243.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

---

[70] *Lund v. Rowan Cty.*, 863 F.3d 268, 280 (4th Cir. 2017) (en banc) (quoting *Larson*, 456 U.S. at 244)).
[71] *Larson*, 456 U.S. at 244; *Colo. Christian*, 534 F.3d at 1266. Protections for religious exercise to fulfill the Free Exercise Clause (e.g., religious safe harbors) obviously do not constitute discrimination in violation of the Establishment Clause. *See, e.g., Liberty Univ. v. Lew*, 733 F.3d 72, 100 (4th Cir.), cert. denied, 571 U.S. 1071 (2013) (rejecting Establishment Clause and Equal Protection Clause challenges to the ACA safe harbor in IRC §5000A(d)(2)(B)).
[72] *Colo. Christian*, 534 F.3d at 1266 (collecting Supreme Court cases).

**Claim 4**
**Violation of The Free Speech Clause According to 42 U.S.C. § 1983**
**Content Discrimination**

244.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

245.    Defendants have violated the Free Speech Clause of the First Amendment, and the rights of Plaintiffs guaranteed thereunder, by violating neutrality principles enshrined therein.

246.    Plaintiffs are engaging in shared religious and communicative exercise, including but not limited to the sharing of health care needs, practices, expenses, and other burdens.

247.    Plaintiffs and its members organize and worship around Biblical Christian faith and principles that apply to everyday life, including, but not limited to, physical health needs.

248.    Plaintiffs express their shared faith by congregating and communicating through cards and notes, their monthly newsletter and spiritually through prayer.

249.    The actions of Defendants described herein have infringed these rights of Plaintiffs to freely express themselves based upon the content of their speech.

250.    The same expressive rights Defendants have honored for similarly situated groups Defendants now threaten to deny forever to Gospel Light Mennonite Church Medical Aid Plan and its 490 members in New Mexico.

251.    For the same reasons described in the Causes of Action above, Defendants' enforcement policy and action against Gospel Light Mennonite Church Medical Aid Plan and its members amount to non-neutral content restrictions of their Free Speech rights.

APPENDIX 0063

252.    Content-based restrictions of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[73]

253.    The entire class of content-based restrictions on speech—whether or not they also discriminate according to viewpoint—must undergo strict scrutiny.[74]

254.    Even facially content-neutral laws constitute content-based regulations of speech if a law cannot be "justified without reference to the content of speech" or was adopted "because of disagreement with the message [the speech] conveys."[75]

255.    Defendants do not have a rational, let alone compelling, reason for their actions.

256.    Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

257.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

258.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

259.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

260.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

---

[73] *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted) ("*Reed*").
[74] "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) ("*Rosenberger*").
[75] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

APPENDIX 0064

**Claim 5**
**Violation of The Free Speech and Assembly Clauses According to 42 U.S.C. § 1983**
**Expressive Association**

261.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

262.    Defendants have violated the Free Speech and Assembly Clauses of the First Amendment, and the rights of Plaintiffs guaranteed thereunder, by violating their rights to "expressive association" guaranteed by the First Amendment.[76]

263.    This freedom to associate prohibits "intrusion into the internal structure or affairs of an association" and "plainly presupposes a freedom not to associate."[77]

264.    Courts defer to a group's explanation of the "nature of its expression [and its] view of what would impair its expression."[78]

265.    The First Amendment's protection of expressive association and speech "applies with special force [to] religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals."[79]

266.    The First Amendment prohibits regulations that might (a) "affect the way an organization carried out what it understood to be its religious mission,"[80] (b) prevent it from "defin[ing] itself" by limiting its staff to "those committed to [its] mission,"[81] or (c) cause it "as it currently identifies itself to cease to exist."[82]

---

[76] *See Hurley v. Irish-American GLB*, 515 U.S. 557 (1995) ("*Hurley*"); *Boy Scouts v. Dale*, 530 U.S. 640 (2000) ("Dale"); *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ("*Roberts*").
[77] *Roberts*, 468 U.S. at 623.
[78] *Dale*, 530 U.S. at 653.
[79] *Hosanna*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring).
[80] *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 336 (1987) ("Amos").
[81] *Amos*, 483 U.S. at 342 (Brennan, J., concurring).
[82] *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006); *FCA*, 46 F.4th at 1099 (without relief, the club "may continue to dwindle" until it "cease[s] to exist").

APPENDIX 0065

267.    Gospel Light Mennonite Church Medical Aid Plan and its members are entitled not just to "special solicitude,"[83] but to "double" First Amendment protection, since their core activity expressive association and religious observance are "doubly protected by the Free Exercise and Free Speech Clauses."[84]

268.    Defendants would effectively take over Gospel Light Mennonite Church Medical Aid Plan's management of its own membership rolls by dictating who could be admitted, excluded, and expelled.

269.    The same associational rights Defendants have honored for similarly situated groups Defendants now threaten to deny forever to Gospel Light Mennonite Church Medical Aid Plan and its 490 members in New Mexico.

270.    At the same time, Defendants also would subject Gospel Light Mennonite Church Medical Aid Plan and its members to antidiscrimination requirements and prevailing social policy contrary to the religious faith that Gospel Light Mennonite Church Medical Aid Plan and its members all share and that is the basis for their sharing of their health care burdens, forcing Gospel Light Mennonite Church Medical Aid Plan to secularize or close its doors.

271.    Such constitutional rights of free speech, assembly, and expressive association are protected by strict scrutiny.

272.    Plaintiff Gospel Light Mennonite Church Medical Aid Plan and its past, current, and prospective members (including the three individual Plaintiff members) constitute an expressive association that desires to associate for the purpose of engaging in shared religious and communicative exercise, including but not limited to the voluntary sharing of health care needs, practices, expenses, and other burdens.

---

[83] *Hosanna*, 565 U.S. at 189.
[84] *Kennedy*, 142 S.Ct. at 2433.

APPENDIX 0066

273.    These deeply held shared beliefs include Biblical teaching on such religious and social policies of life, marriage, and sexuality.

274.    Defendants' actions as described herein have infringed these rights of Plaintiffs and other New Mexico members to freely express themselves and associate together for all the deeply held religious purposes described herein.

275.    Defendants do not have a rational, let alone compelling, reason for their actions.

276.    Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

277.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

278.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

279.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

280.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

**Claim 6**
**Violation of The Equal Protection Clause According to 42 U.S.C. § 1983**
**Discrimination Involving a Fundamental Right**

281.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

282.    The Equal Protection Clause of the Fourteenth Amendment requires that any government action that interferes with a "fundamental right" be subject to strict scrutiny.[85]

---

[85] *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

58

283.    "Unquestionably, the free exercise of religion is a fundamental constitutional right."[86]

284.    Defendants' actions described herein interfere with Plaintiffs' free exercise of religion and thereby independently violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution, for all the reasons alleged above.

285.    The same "intent to treat differently"[87] that violates the Free Exercise Clause violates the Equal Protection Clause because it burdens a "fundamental right."

286.    If motivated by animus, Defendants' actions are flagrantly unconstitutional, as "[r]eligious animus is not a permissible government interest, much less a compelling one."[88]

287.    Upon information and belief, Defendants' differential treatment of Plaintiffs, Defendants' interpretation and application of New Mexico insurance laws to Plaintiffs, and Defendants' other actions toward Plaintiffs described herein are motivated by animus.

288.    Such actions patently violate the Fourteenth Amendment.

289.    Even if not motivated by animus, the actions of Defendants hereunder are subject to strict scrutiny because they infringe the fundamental right of free exercise of religion.

290.    Defendants do not have a rational, let alone compelling, reason for their actions.

291.    Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

292.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

---

[86] *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974); *accord Jesus Christ is the Answer Ministries, Inc. v. Balt. Cty.*, 915 F.3d 256, 265 (4th Cir. 2019) (quoting *Johnson*).
[87] *Colo. Christian*, 534 F.3d at 1260 (McConnell, J.).
[88] *Jesus Christ is the Answer*, 915 F.3d at 262 n.3.

APPENDIX 0068

293.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

294.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

295.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

### Claim 7
### Violation of The Equal Protection Clause According to 42 U.S.C. § 1983
### Discrimination Involving Suspect Class

296.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

297.    The Equal Protection Clause of the Fourteenth Amendment requires that any government action that discriminates against a "suspect class" be subject to strict scrutiny.[89]

298.    "Religion is a suspect class."[90]

299.    The differential treatment of Gospel Light Mennonite Church Medical Aid Plan and its members due to their "religious beliefs and practices would result in classifying them based on membership in a suspect class and would violate the Equal Protection Clause unless the classification satisfies strict scrutiny."[91]

300.    For all the reasons stated in the previous Cause of Action, the actions of Defendants discriminate against Plaintiffs in violation of the Fourteenth Amendment.

301.    Even if not motivated by animus, the actions of Defendants hereunder are subject to strict scrutiny because they infringe the fundamental right of free exercise of religion.

---

[89] *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).
[90] *Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022) (citing *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).
[91] *Saud v. Days*, 50 F.4th at 710.

APPENDIX 0069

302.     To the extent Defendants were motivated by animus against the religion or religious exercise or beliefs of Gospel Light Mennonite Church Medical Aid Plan or its members, those actions patently violate the Fourteenth Amendment and are flatly barred.

303.     Otherwise, such actions of Defendants are subject to strict scrutiny.

304.     Defendants do not have a rational, let alone compelling, reason for their actions.

305.     Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

306.     Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

307.     This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

308.     As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

309.     Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

### Claim 8
### Violation of The Due Process Clause According to 42 U.S.C. § 1983
### Denial of Fair Hearing Process

310.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

311.     As alleged herein, Defendants have violated the Due Process Clause of the Fourteenth Amendment, and the rights of Gospel Light Mennonite Church Medical Aid Plan and its members guaranteed thereunder, by failing to provide Gospel Light Mennonite Church Medical Aid Plan with the full protections that due process requires.

61

312.    "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of the due process.'"[92] "This applies to *administrative agencies which adjudicate as well as to courts*. Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'"[93]

313.    The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process."[94] Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a greater concern about bias."[95]  "Even the most minimal guarantees of procedural due process require that the decision be issued by a 'neutral and detached hearing body[.]'"[96]

314.    The blending of powers within OSI, including the "overlap between prosecutorial and adjudicative functions," "raises a greater concern about bias."  That combination of powers, together with the evidence of prejudgment and protectionism discussed above, make it impossible for OSI to avoid the appearance or "probability of unfairness."[97]

315.    Under the Fourteenth Amendment, the bare minimum that "due process requires is notice and opportunity to be heard by a 'disinterested decisionmaker.'"[98]

316.    Defendants and the OSI administrative process deny this bare minimum of the due process to Plaintiffs.

---

[92] *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009); *accord William Jefferson & Co. v. Bd. of Ass'mt*, 695 F.3d 960, 963-64 (9th Cir. 2012) (applying *Caperton* to local agency process).

[93] *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citations omitted; emphasis added); *accord Cox v. Com'r*, 514 F.3d 1119, 1126 (10th Cir. 2008); *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).

[94] *Harline v. DEA*, 148 F.3d 1199, 1205 (10th Cir. 1998).

[95] *William Jefferson & Co*., 695 F.3d at 965.

[96] *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).

[97] Agency adjudication that blurs separation of powers has long been allowed. But Gospel Light Mennonite Church Medical Aid Plan reserves its right to challenge the role of agencies acting in multiple capacities, especially if the Supreme Court alters longstanding precedent.

[98] *Clearone, Inc. v. Shure Acquisition Holdings, Inc*., 35 F.4th 1345, 1352 (Fed. Cir. 2022).

317.    Defendant Catechis has rendered the final decision in Plaintiff Gospel Light Mennonite Church Medical Aid Plan's appeal.

318.    Defendant Catechis is not a disinterested, neutral, and impartial decisionmaker in this matter and with regard to Plaintffs.

319.    Among other things, Catechis, as successor to Superintendent Toal, made the determination prior to Gospel Light Mennonite Church Medical Aid Plan's hearing that HCSMs were offering "unauthorized insurance."

320.    Among other things, Catechis, as successor to Superintendent Toal, made the determination that OSI would contradict and reverse its long-standing position that HCSMs operating openly and freely in the State of New Mexico would be challenged as offering "unauthorized insurance."

321.    Among other things, Defendants have prejudged this case with demonstrated hostility to religious healthcare sharing ministries and a stated intention to shut down their operations in the State of New Mexico.

322.    Among other things, Defendants have used this enforcement action to institutionalize favoritism and protectionism to insulate and protect New Mexico's own producers and providers in its own ACA-governed insurance market.

323.    Among other things, Defendants and the OSI administrative hearing process that they controlled denied Plaintiff Gospel Light Mennonite Church Medical Aid Plan the opportunity to question the Superintendent of Insurance under oath for evidence of inconsistency, illegality, motive, or other irregularities necessary to pursue and develop evidence of animus by Defendants against Plaintiff Gospel Light Mennonite Medical Aid Plan and other HCSMs and their members.

APPENDIX 0072

324.    Defendants and the OSI administrative hearing process that they control have forced Plaintiff Gospel Light Mennonite Church Medical Aid Plan to face extended litigation, a $2.5 million fine and expulsion of Plaintiff and all its operations from the State of New Mexico and deprive Gospel Light Mennonite Church Medical Aid Plan's members of any opportunity to participate in an HCSM as their religious beliefs and right to free exercise direct.

325.    The OSI administrative forum the Defendants control is inadequate, particularly to adjudicate complex constitutional questions necessary to protect the Plaintiffs' constitutional rights, as demonstrated by Hearing Officer Walker's decision and Defendant Catechis' adoption of that opinion as her own.

326.    Defendants' actions cannot withstand any form of judicial scrutiny.

327.    Defendants do not have a rational, let alone compelling, reason for their actions.

328.    Defendants' actions also are not a rational or even minimally acceptable means to further any governmental interest, much less a compelling one.

329.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

330.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

331.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

332.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

64

## Claim 9
## Federal Preemption

333.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

334.    Defendants' interpretation and application of New Mexico insurance laws conflict with the interpretation and application of governing federal laws in a manner that requires preemption under the Supremacy Clause of the United States Constitution.

335.    The McCarran-Ferguson Act ("MFA") helps reserve "insurance regulation" to the states by protecting such regulation from "federal preemption."

336.    Only regulations of "insurance," as defined by the MFA, qualify for this protection.[99] Federal cases control the meaning of "insurance" for purposes of preemption.[100] To qualify for MFA protection, OSI must define "insurance" consistently with federal cases.[101]

337.    Insurance requires assumption of "true risk," under the "conventional concept of risk-bearing[, which] involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts," and a "true underwriting of risks, the one [real] earmark of insurance[.]"[102] "[If risk] is not shifted [to] others, there can be neither insurance nor indemnity. Insurance also … involves distribution of the risk, but distribution without assumption hardly can be held to be insurance. These are elemental conceptions and controlling ones."[103]

---

[99] *See SEC v. Variable Annuity Life Ins*., 359 U.S. 65, 67-72 (1959).
[100] *Variable Annuity*, 359 U.S. at 69.
[101] In *McVey*, the district court ruled that the West Virginia insurance commissioner's "enforcement threat against the Membership Program" did not "involve regulation of the business of insurance" as defined by the MFA. 523 F.Supp.3d at 872-73. "Air Evac is likely to prevail in demonstrating that its Membership Program is not insurance, and therefore that any state regulation of it is preempted[.]" *Id*. One key was a finding of "no indemnification." *Id*.
[102] *Variable Annuity*, 359 U.S. at 70-73.
[103] *Jordan v. Grp. Health Ass'n*, 107 F.2d 239, 245 (D.C. Cir. 1939) (citations omitted).

65

338.    Hallmarks of insurance have always included the related concepts of indemnity, promise to pay, and assumption of risk.[104] In short, a contract for insurance always requires a legally enforceable promise or "obligation to indemnify the insured."[105]

339.    To the extent New Mexico law, as interpreted or as applied by Defendants, disagrees, New Mexico law is preempted.

340.    As described above, Gospel Light Mennonite Church Medical Aid Plan's programs meet the federal definition of "not insurance" and therefore, New Mexico's contrary law—or Defendants' contrary interpretation of it—is preempted.

341.    Defendants' interpretation of insurance contrary to the MFA nullifies New Mexico's anti-preemption protection, subjecting it to implied preemption by federal law when interpretation of its insurance laws makes simultaneous compliance with both federal and state regulations impossible ("impossibility preemption"), a form of "conflict preemption."[106]

342.    Defendants' interpretation of insurance contrary to the MFA also nullifies anti-preemption protection when their state-law interpretation poses an obstacle to the accomplishment of federal goals ("obstacle preemption"), another form of "conflict preemption."[107]

---

[104] *See, e.g., Kinkaid v. John Morrell & Co.*, 321 F.Supp.2d 1090, 1098 (N.D.Iowa 2004).

[105] *Jones v. Liberty Mutual*, 385 F.3d 820, 827 (4th Cir. 2004) ("obligation to indemnify [arises from] legal obligation to pay"); *see Travelers Indem. v. Dammann & Co.*, 594 F.3d 238, 258 (3d Cir. 2010) (same); *Stewart v. E.M.J. Corp.*, 2005 U.S. App. LEXIS 2050, at *14-15 (10th Cir. 2005) ("only [one] compelled to pay another party due to a legal obligation is eligible to seek indemnification"); *Equal Rights Ctr. v. Archstone Smith Tr.*, 603 F.Supp.2d 814, 824 (D.Md. 2009) (to "'shift [the] entire responsibility …' is exactly what indemnity means").

[106] *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 707 (4th Cir. 2015) (federal law preempted a state tort duty that would obstruct a wireless carrier's ability to provide coverage and impede the FCC's authority). "Conflict preemption applies to state law 'when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id*. at 707.

[107] *See Johnson*, 781 F.3d at 707; *see also Columbia Venture v. Dewberry & Davis*, 604 F.3d 824 (4th Cir. 2010). "Obstacle preemption is a type of conflict preemption authorized by the Supremacy Clause. It applies 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id*. at 829-30 (citations omitted).

66

343.    Defendants' interpretation also fatally conflicts with the ACA's safe harbor—its "Religious Exemption" for "Health Care Sharing Ministries" in IRC §5000A(d)(2)(B).

344.    As part of the ACA in 2010, Congress enacted the HCSM religious exemption in IRC §5000A(d)(2)(B) to ensure that Americans would have access to HCSMs in every state.

345.    In 2014, CMS officially recognized Gospel Light Mennonite Church Medical Aid Plan's federal HCSM status under that ACA provision, entitling all Gospel Light Mennonite Church Medical Aid Plan members nationwide to its benefits.

346.    By preventing Gospel Light Mennonite Church Medical Aid Plan from serving its New Mexico members, Defendants would prevent Gospel Light Mennonite Church Medical Aid Plan from complying with federal law to treat all its members equally nationwide "without regard to the State in which a member resides or is employed."[108]

347.    This violation of the ACA's religious exemption has both an organizational component (affecting Gospel Light Mennonite Church Medical Aid Plan) and an individual component (affecting its members).

348.    By preventing Gospel Light Mennonite Church Medical Aid Plan as an organization from treating its New Mexico members equally with Gospel Light Mennonite Church Medical Aid Plan members in other states (*i.e.*, its members in any and all other states), Defendants would obstruct Gospel Light Mennonite Church Medical Aid Plan's compliance with the ACA religious exemption.

349.    Defendants' interpretation of state law would make Gospel Light Mennonite Church Medical Aid Plan's "compliance with both federal and state regulations" impossible, requiring that this interpretation be preempted.[109] Defendants also would make Gospel Light

---

[108] IRC §5000A(d)(2)(B)(ii)(II).
[109] *See, e.g., Johnson*, 781 F.3d at 707.

APPENDIX 0076

Mennonite Church Medical Aid Plan noncompliant with the ACA by depriving members of Gospel Light Mennonite Church Medical Aid Plan (and all HCSMs) in the other 49 states of equal treatment by preventing Gospel Light Mennonite Church Medical Aid Plan (and all HCSMs) from serving any member who moves to New Mexico.

350.    Defendants' exclusion of all HCSMs also would deprive *all New Mexicans*, as individual members of Gospel Light Mennonite Church Medical Aid Plan and beneficiaries of the ACA religious exemption, of the benefits of that safe harbor to which they are entitled by federal law.

351.    Viewed in any of these ways, state law, as interpreted by Defendants, would make "compliance with both federal and state regulations" impossible, requiring preemption.[110]

352.    Further, Defendants' interpretation will render the federal safe harbor meaningless.

353.    In enacting the ACA, including IRC §5000A(d)(2), Congress necessarily defined HCSM membership as "not insurance." That is why members of HCSMs are exempt from penalties imposed by the ACA for not having insurance.[111] If Gospel Light Mennonite Church Medical Aid Plan's programs were insurance, they would satisfy the ACA without any need for the IRC §5000A religious exemption.  The federal religious exemption would be meaningless.

354.    In this way, Defendants have interpreted state law so as to be "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the ACA—including its intent to treat HCSMs as "not insurance"—requiring preemption by IRC §5000A.[112]

---

[110] *See, e.g., Johnson*, 781 F.3d at 707.
[111] Congress "zeroed out" such penalties in 2018. But Congress can reimpose them at any time.
[112] *Columbia*, 604 F.3d at 829-30 ("Obstacle preemption … applies 'where state law stands as an obstacle [to] accomplishment and execution of the full purposes and objectives of Congress.'").

APPENDIX 0077

355.    By interpreting state law to "interfere[] with the methods by which [IRC §5000A] was designed to reach [its] goal"—including its intent to make HCSMs available to Americans nationwide—Defendants' interpretation must be preempted by IRC §5000A.[113]

356.    By interpreting state insurance law to create an irreconcilable conflict with IRC §5000A, and gutting the determination of CMS that Gospel Light Mennonite Church Medical Aid Plan qualified for the federal religious exemption's benefits, Defendants have acted to "impede the [CMS's] authority, again ensuring preemption.[114]

357.    In addition to negating IRC §5000A and the CMS's specific determination for Gospel Light Mennonite Church Medical Aid Plan and its members thereunder, Defendants' interpretation negated IRC §501(c)(3) and IRC §501(m)(1) and the IRS's specific determination for Gospel Light Mennonite Church Medical Aid Plan and its members thereunder.

358.    Specifically, the IRS ruled that effective June 24, 2014, that Gospel Light Mennonite Church Medical Aid Plan qualified for federal tax-exempt status under IRC §501(c)(3) even though IRC §501(m)(1) strictly prohibits such status for any entity that even "substantially" provides any kind of "commercial insurance."

359.    Federal law is clear that IRC §501(c)(3) status is forbidden to any sort of insurer.

360.    The IRS may recognize the IRC §501(c)(3) status of an entity "*only if no substantial part* of its activities consists of providing *commercial type insurance*.'" IRC §501(m)(1) (emphasis added). "Congress intended a broad definition of the term 'commercial-type insurance.'"[115]

---

[113] *Id*. ("Obstacle preemption … occurs where state law 'interferes with the methods by which the federal statute was designed to reach [its] goal.'") (citations omitted; emphasis in original).

[114] *Johnson*, 781 F.3d at 706.

[115] *Paratransit Insurance Corp. v. Tax Com'r*, 102 T.C. 745, 752 (1994). Because it "provides commercial-type insurance under the meaning of 26 U.S.C. §501(m)(1)," the IRS "appropriately determined that FICURMA is not eligible for exemption." *FICURMA v. U.S.*, 850 F.Supp.2d 125, 132 (D.D.C. 2012) (relying on *Paratransit*).

69

361.    This federal definition was intended to capture anything even like insurance. Gospel Light Mennonite Church Medical Aid Plan clearly is not "insurance" within the meaning of this definition, as the IRS has recognized Gospel Light Mennonite Church Medical Aid Plan's IRC §501(c)(3) status continually since first formally recognizing it in 2014.

362.    In this way, Defendants' interpretation of state insurance law is preempted by IRC §501(m)(1) and the IRS determination of Gospel Light Mennonite Church Medical Aid Plan's tax-exempt status for all the same reasons that it is preempted by IRC §5000A and the CMS determination of Gospel Light Mennonite Church Medical Aid Plan's HCSM status.

363.    Thus, Defendants' unlawful interpretation of New Mexico insurance law ruptures the otherwise reasonably uniform national regulatory environment—led by the ACA religious exemption—that allows Gospel Light Mennonite Church Medical Aid Plan to operate freely as "not insurance" nationwide. It renders New Mexico the lone hostile outlier, a sharp departure from its own regulatory policy prior to March 26, 2020.

364.    For all the above reasons, Defendants' interpretation of New Mexico insurance law, contrary to federal law, that results in Gospel Light Mennonite Church Medical Aid Plan being labeled "insurance" is preempted by federal law under the Supremacy Clause of the United States Constitution.

365.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

366.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

367.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

368.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

**Claim 10**
**Declaratory Judgment Under 28 U.S.C. § 2201**

369.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

370.    As alleged above, Plaintiff Gospel Light Mennonite Church Medical Aid Plan qualifies as not engaged in "insurance" or the "business of insurance" as those terms are defined by the federal ACA and IRC and does not engage in the "transaction of insurance" under New Mexico law.

371.    As alleged above, Plaintiff Gospel Light Mennonite Church Medical Aid Plan also qualifies as a "Health Care Sharing Ministry" under IRC §5000A(d)(2).

372.    As alleged above, Plaintiff Gospel Light Mennonite Church Medical Aid Plan qualifies for and is entitled to the religious exemption under IRC §5000A(d)(2)(B).

373.    As alleged above, Defendants have determined that Gospel Light Mennonite Church Medical Aid Plan's ministry is "insurance" under the New Mexico Insurance Code and have subjected Gospel Light Mennonite Church Medical Aid Plan to expulsion from the state and a $2,510,000 fine.

374.    Federal courts may grant declaratory relief under 28 U.S.C. §2201, and here there is a real and actual controversy between Plaintiffs and Defendants regarding whether Defendants may undertake to act as described herein.

375.    Plaintiff Gospel Light Mennonite Church Medical Aid Plan's request for a declaration that its ministry does not constitute "insurance" within the meaning of the ACA and

APPENDIX 0080

New Mexico insurance laws and that its ministry is an HCSM under IRC §5000A(d)(2)(B) and thus entitled to the religious exemption thereunder "arises under" federal law.  28 U.S.C §1331.

376.    This issue is substantial: Proper interpretation of these questions impacts not just Gospel Light Mennonite Church Medical Aid Plan and its approximately 490 New Mexico members (including the three individual Plaintiffs), but also whether thousands of other New Mexicans can engage in constitutionally protected religious exercise by participating in HCSMs.

377.    Deciding this narrow statutory issue will not generate a federalism conflict. Rather, New Mexico's regulatory power over HCSMs should be confined by New Mexico's insurance laws in a manner consistent with federal law, including but not limited to the U.S. Constitution, the MFA, the ACA, the definition of "insurance," the definition of "health care sharing ministry," and the religious exemption for HCSMs contained therein.

378.    Plaintiffs are entitled to a declaration under 28 U.S.C. §2201 that Gospel Light Mennonite Church Medical Aid Plan's ministry does not constitute "insurance" within the meaning of the ACA and New Mexico insurance laws and that its ministry is an HCSM under IRC §5000A(d)(2)(B) and thus entitled to the religious exemption thereunder.

**Claim 11**
**Violation of N.M. Const. Art. II, § 11**
**Against Defendant OSI**

379.    Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

380.    Article II, Section 11 of the Bill of Rights of the New Mexico Constitution, makes this clear and unequivocal declaration: "Every man shall be free to worship God according to the dictates of his own conscience, and no person shall ever be molested or denied any civil or political right or privilege on account of his religious opinions or mode of religious worship."

72

381.    Defendant New Mexico Office of the Superintendent of Insurance is a public body
that may be sued according to the New Mexico Civil Rights Act. *See* NMSA 1978, § 41-4A-2.

382.    The New Mexico Civil Rights Act states that "[a] public body or person acting on
behalf of, under color of or within the course and scope of the authority of a public body shall not
be subject or cause to be subjected any resident of New Mexico or person within the state to
deprivation of any rights, privileges or immunities secured pursuant to the bill of rights of the
constitution of New Mexico." NMSA 1978, § 41-4A-3(A).

383.    The New Mexico Civil Rights Act allows for any "person who claims to have
suffered a deprivation of any rights, privileges or immunities pursuant to the bill of rights of the
constitution of New Mexico due to acts or omissions of a public body or person acting on behalf
of, under color of or within the course and scope of the authority of a public body" to bring a claim
against the public body. NMSA 1978, § 41-4A-3(B).

384.    While the New Mexico Civil Rights Act does not define "person," person is
generally defined to include both individuals and organizations such as nonstock corporations.

385.    Defendant Catechis was acting on behalf of, under color of, or within the course
and scope of the authority of the Office of the Superintendent of Insurance when she issued her
order prohibiting the Gospel Light Mennonite Church Medical Aid Plan from operating in New
Mexico and issuing a fine for doing so.

386.    Because Defendant Catechis was acting on behalf of, under color of, or within the
course and scope of the authority of the Superintendent of Insurance, Plaintiffs may bring this
action against the Office of the Superintendent of Insurance. NMSA 1978, § 41-4A-3(C).

387.    The actions of Defendants violate Article II, Section 11 of the Bill of Rights of the
New Mexico Constitution:

APPENDIX 0082

a.    By not allowing Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare members to be free to worship God according to the dictates of their own consciences;

b.    By molesting Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare members on account of their religious opinions or mode of religious worship; and

c.    By denying the civil rights and privileges to Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare's members on account of their religious opinions or mode of religious worship.

388.    In practical terms, the Defendants' punitive actions told Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare members that although they believe sharing one another's medical expenses is a Biblical directive (a dictate of their own consciences), the members will nevertheless be punished (and their HCSM will be fined $2,510,000 dollars) if they do in fact worship God by living out the Biblical command to, "not forget to do good and to share, for with such sacrifices God is well pleased." Hebrews 13:16.

389.    Additionally, the Defendants' punitive actions have shown Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare members that not only will they be denied the right to share the funds they have been privileged to earn, but the Defendants also deem their religious opinions and modes of religious worship to be of no account.

390.    Sharing with other Christians is a "sacrifice," the Bible says.[116]

391.    By definition, a sacrifice is an act of worship:

NEW WEBSTER'S DICTIONARY (1993): "sacrifice. An offering, e.g. of animal life, food or incense, made to a deity etc. as propitiation, thanksgiving etc.; the act or practice of making such an offering; (*theol*.) Christ's offering of himself in the Crucifixion."

---

[116] The New Testament book of *Hebrews* was not first written in English, it was written in Greek. The word we translate in *Hebrews* 13:16 as "sacrifice" was originally the Greek word θυσία (*thisia*). Whether read in an English translation or in the original Greek, sacrifice means a act of religious worship.

APPENDIX 0083

THE AMERICAN HERITAGE DICTIONARY (1976): "sacrifice. The act of offering something to a deity in propitiation or homage."

WEBSTER'S ENCYCLOPEDIC DICTIONARY (1957): "sacrifice. The act of offering something to God in atonement, as an act of worship; what is thus offered."

FUNK & WAGNALLS, VOL TWO (1949): "sacrifice. The act of making an offering to a deity, in worship or atonement."

392.    Because Article II, § 11 of the New Mexico Constitution addresses a fundamental constitutional right, claims that a public body have violated that right should be considered through the application of strict scrutiny.

393.    Defendants' actions fail strict scrutiny because there is no compelling governmental interest in preventing the Gospel Light Mennonite Church Medical Aid Plan and its members from sharing each other's health care costs in New Mexico.

394.    All members of the Gospel Light Mennonite Church Medical Aid Plan that live in New Mexico have access to health insurance programs should they wish to enroll in an insurance plan that pays for all health care expenses. In fact, the Gospel Light Mennonite Church Medical Aid Plan makes it abundantly clear that it is a ministry and not an insurance plan.

395.    Even if there is a compelling governmental interest in prohibiting the Gospel Light Mennonite Church Medical Aid Plan and its members from sharing each other's health care costs in New Mexico, Defendants' actions still fail strict scrutiny because they are not using the least restrictive means to further that governmental interest because the Office of Superintendent of Insurance has taken action to stop the Gospel Light Mennonite Church Medical Aid Plan from operating in New Mexico at all.

396.    As a result, Plaintiffs seek injunctive and declaratory relief against Defendants Office of the Superintendent of Insurance to stop its unlawful actions that violate Article II, § 11 of the New Mexico Bill of Rights.

APPENDIX 0084

**Claim 12**
**Violation of the New Mexico Religious Freedom Restoration Act**
**Against Defendant OSI**

397.    Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

398.    Defendant New Mexico Office of the Superintendent of Insurance is a government

agency that may be sued according to the New Mexico Religious Freedom Restoration Act. *See*

NMSA 1978, § 28-22-2(B).

399.    The New Mexico Religious Freedom Restoration Act prohibits government

agencies from restricting a person's free exercise of religion.

400.    The Office of Superintendent of Insurance, by ordering the Gospel Light Mennonite

Church Medical Aid Plan to cease and desist from operating in New Mexico, is depriving the

Gospel Light Mennonite Church Medical Aid Plan and its New Mexico members from engaging

in the free exercise of religion, including but not limited to their beliefs that they must care for one

another, which is carried out, in part, through sharing each other's health care costs.

401.    No exception to the New Mexico Religious Freedom Restoration Act applies in this

case because there is no compelling governmental interest in preventing the Gospel Light

Mennonite Church Medical Aid Plan and its members from sharing each other's health care costs

in New Mexico.

402.    All members of the Gospel Light Mennonite Church Medical Aid Plan who live in

New Mexico have access to health insurance programs should they wish to enroll in an insurance

plan that pays for all health care expenses. In fact, the Gospel Light Mennonite Church Medical

Aid Plan makes clear that it is a ministry and not an insurance plan.

403.    Even if there is a compelling governmental interest in prohibiting the Gospel Light

Mennonite Church Medical Aid Plan and its members from sharing each other's health care costs

76

APPENDIX 0085

in New Mexico, no exception to the New Mexico Religious Freedom Restoration Act applies in this case because the Office of the Superintendent of Insurance is not using the least restrictive means to further that governmental interest because the Office of Superintendent of Insurance has taken action to stop the Gospel Light Mennonite Church Medical Aid Plan from operating in New Mexico at all.

404.   As a result of this, Plaintiffs seek injunctive and declaratory relief against Defendant Office of the Superintendent of Insurance to stop its unlawful actions that violate the New Mexico Religious Freedom Restoration Act.

**Prayer for Relief**

Plaintiffs respectfully request the following relief:

A.   A declaratory judgment, according to 28 U.S.C. § 2201, that the actions of Defendant Catechis taken according to the New Mexico Insurance Code are invalid because they violate the United States Constitution and are unenforceable;

B.   A declaratory judgment, according to NMSA 1978, § 41-4A-3(B), that the actions of Defendant Office of the Superintendent of Insurance taken according to the New Mexico Insurance Code are invalid because they violate the New Mexico Constitution and are unenforceable;

C.   A declaratory judgment, according to NMSA 1978, § 28-22-4(A)(1), that the actions of Defendant Office of the Superintendent of Insurance taken according to the New Mexico Insurance Code are invalid because they violate the New Mexico Religious Freedom Restoration Act;

D.   A declaratory judgment, according to 28 U.S.C. § 2201, that Gospel Light Mennonite Church Medical Aid Plan's ministry does not constitute "insurance" within the

77

meaning of the ACA and the New Mexico Insurance Code, and that Gospel Light Mennonite

Church Medical Aid Plan's ministry is an HCSM under §5000A(d)(2)(B) and thus entitled to the

religious exemption thereunder;

E.      A permanent injunction enjoining Defendants from enforcing the New Mexico

Insurance Code against the Gospel Light Mennonite Church Medical Aid Plan and other HCSMs;

F.      An order awarding Plaintiffs their costs and attorneys' fees according to 42 U.S.C.

§ 1988, NMSA 1978, § 41-4A-5, and NMSA 1978, § 28-22-4(A)(2); and

G.      Such other and further relief as the Court deems just and proper.

Dated March 31, 2023

Respectfully submitted,

*/s/ Nicholas T. Hart*

Carter B. Harrison IV
Nicholas T. Hart
Daniel J. Gallegos
**HARRISON & HART, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 295-3261
carter@harrisonhartlaw.com
nick@harrisonhartlaw.com
daniel@harrisonhartlaw.com

and

J. Michael Sharman
Commonwealth Law Offices, P.C.
246 E. Davis Street, Suite 200
Culpeper, VA 22701
Tel: (540) 727-1007
Email: mikesharman@verizon.net
*Pro Hoc Vice (forthcoming)*

*Attorneys for Plaintiffs*

78

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Gospel Light Mennonite Church Medical Aid Plan, dba Liberty HealthShare et al.

**(b)** County of Residence of First Listed Plaintiff    Stark County, OH
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Harrison & Hart LLC, 924 Park Ave SW, Suite E, ABQ, NM 87102, (505) 292-3261

## DEFENDANTS

New Mexico Office of the Superintendent of Insurance, et al.

County of Residence of First Listed Defendant    Santa Fe County, NM
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Stephen Thies - NM Office of Superintendent of Insurance, PO Box 1689, Santa Fe, NM 87504-1689

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [x] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §§ 1983 and 1988

Brief description of cause:
Plaintiffs allege federal and state constitutional violations, including violations of religious freedom, equal protection, and due process by Defendants

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $    CHECK YES only if demanded in complaint:

JURY DEMAND:   [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE   Francis J. Mathew    DOCKET NUMBER   D-101-CV-2023-00660

DATE   March 31, 2023

SIGNATURE OF ATTORNEY OF RECORD   /s/ Nicholas T. Hart

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

APPENDIX 0088

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201



March 31, 2014

RE:   Gospel Light Mennonite Church Medical Aid Plan – Review of Materials Submitted

Dear Mr. Sharman,

This letter conveys the results of our review of the materials submitted in connection with your request for consideration as a health care sharing ministry for the purposes of subpart G of 45 CFR part 155, which governs the granting of certificates of exemption from the shared responsibility payment under section 5000A of the Internal Revenue Code (the Code) by an Affordable Insurance Exchange (also known as a Health Insurance Marketplace).

Section 5000A of the Code, as added by the Patient Protection and Affordable Care Act (Affordable Care Act), establishes an exemption from the shared responsibility payment for members of a health care sharing ministry. Section 1311(d)(4)(H) of the Affordable Care Act specifies that one of the minimum functions of an Exchange is to grant certificates of exemption from the shared responsibility payment under section 5000A of the Code in certain categories. Section 1411(a)(4) of the Affordable Care Act specifies that the Secretary of Health and Human Services (Secretary) shall establish a program for determining whether to grant a certification of exemption from the shared responsibility payment for certain categories of exemptions listed in section 5000A of the Code, including the exemption for members of a health care sharing ministry. The Secretary established this program in part through the process described in 45 CFR 155.615(c)(2)[1], which provides that to be considered a health care sharing ministry for the purposes of certificates of exemption provided by an Exchange, an organization must submit information to HHS that substantiates the organization's compliance with the standards specified in section 5000A(d)(2)(B)(ii) of the Code.

Section 5000A(d)(2)(B)(ii)(I) – (V) specifies that, "the term 'health care sharing ministry' means an organization—

        (I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a),
        (II) where members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance to these beliefs without regard to the state in which a member resides or is employed,
        (III) members of which retain membership even after they develop a medical condition,

_____

[1] 78 FR 39494, 39527 (July 1, 2013).

1

**EXHIBIT A**
APPENDIX 0089

(IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999 and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and

(V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request."

Having completed the review of the materials you submitted dated January 29, 2014 and March 17, 2014, the Centers for Medicare & Medicaid Services (CMS) has determined that Gospel Light Mennonite Church Medical Aid Plan has submitted sufficient information to substantiate its compliance with the standards specified in section 5000A(d)(2)(B)(ii) of the Code and will be considered a health care sharing ministry for the purposes of subpart G of 45 CFR part 155.

This determination is limited to Gospel Light Mennonite Church Medical Aid Plan's compliance with standards relevant to an organization being considered a health care sharing ministry for the purposes of subpart G of 45 CFR part 155. As such, this determination does not supersede other relevant state or federal laws that govern the conduct of Gospel Light Mennonite Church Medical Aid Plan. Furthermore, this determination does not reflect any decision by the Internal Revenue Service regarding Gospel Light Mennonite Church Medical Aid Plan's status as a health care sharing ministry or compliance with the Internal Revenue Code. Gospel Light Mennonite Church Medical Aid Plan should not inform its members or the general public that this determination provides any such rights or status other than those rights which flow from an organization being considered a health care sharing ministry for the purposes of subpart G of 45 CFR part 155, which relate strictly to an individual's eligibility under 45 CFR 155.605(d) to obtain from a Health Insurance Marketplace a certificate of exemption from the individual shared responsibility payment under section 5000A of the Internal Revenue Code.

Please note that if any change in your status or operation affects any of the information you have submitted to CMS for the purpose of requesting consideration as a health care sharing ministry pursuant to 45 CFR 155.615(c)(2), you must notify CMS within 30 days of such change. If your organization no longer meets the standards specified in section 5000A(d)(2)(B)(ii) of the Code, CMS may revoke this decision regarding the status of Gospel Light Mennonite Church Medical Aid Plan as a health care sharing ministry for the purposes of subpart G of 45 CFR part 155.

If you have any questions or concerns, please contact Ben Walker at benjamin.walker@cms.hhs.gov. Thank you for your cooperation.

Sincerely,

Gary Cohen
Director, Center for Consumer Information & Insurance Oversight

2

**EXHIBIT A**
APPENDIX 0090



**COMMONWEALTH OF VIRGINIA
STATE CORPORATION COMMISSION**

**Office of the Clerk**

June 24, 2014

DARREL BEACHY
186 SPRING BRANCH TRAIL
STANARDSVILLE, VA 22973

**RECEIPT**

RE:      Gospel Light Mennonite Church Medical Aid Plan

ID:      0779560 - 2

DCN:     14-06-09-0021

Dear Customer:

This is your receipt for $75.00, to cover the fees for filing articles of incorporation with this office.

The effective date of the certificate of incorporation is June 24, 2014.

If you have any questions, please call (804) 371-9733 or toll-free in Virginia, 1-866-722-2551.

Sincerely,

Joel H. Peck
Clerk of the Commission

CORPRCPT
NEWCD
CIS0362

P.O. Box 1197, Richmond, VA 23218-1197
Tyler Building, First Floor, 1300 East Main Street, Richmond, VA 23219-3630
Clerk's Office (804) 371-9733 or (866) 722-2551 (toll-free in Virginia) www.scc.virginia.gov/clk
Telecommunications Device for the Deaf-TDD/Voice: (804) 371-9206

**EXHIBIT B**
APPENDIX 0091

ENTITY NAME: Gospel Light Mennonite Church
Medical Aid Plan

Name availability done in:

Initials:          Conflict with ID #:

eFile: ___by___   _____     ENTITY ID #: _____

CIS: ___by___    _____        DCN #: 140609 0021

_____

_____        _____

## CHARTER EXAMINER WORKSHEET

CHARTER / ENTRANCE FEE ____50____     JURISDICTION: _____

FILING FEE          ____25____

EXPEDITE FEE(S)     _____

TOTAL FEES          ____75____

AMENDMENT OR OTHER INFORMATION:

____OK JBO 6/20/14____

| | SPECIAL EFFECTIVE DATE / TIME |
|---|---|

INDUSTRY CODE: _____

SEND COPY TO: _____

COPYWORK REQUESTED:                    CORRESPONDENT:

_____            _____

_____            _____

_____            _____

AMOUNT AVAILABLE              ____ MAIL
  FOR COPYWORK:               ____ CALL
                              ____ FAX
_____              ____ FED EX

REVISED 08/11

FOR OFFICE USE ONLY    FOR OFFICE USE ONLY    FOR OFFICE USE ONLY    FOR OFFICE USE ONLY

0779560  -2  EXHIBIT B
APPENDIX 0092

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, JUNE 24, 2014

The State Corporation Commission has found the accompanying articles submitted on behalf of

## Gospel Light Mennonite Church Medical Aid Plan

to comply with the requirements of law, and confirms payment of all required fees.  Therefore, it is ORDERED that this

## CERTIFICATE OF INCORPORATION

be issued and admitted to record with the articles of incorporation in the Office of the Clerk of the Commission, effective June 24, 2014.

The corporation is granted the authority conferred on it by law in accordance with the articles, subject to the conditions and restrictions imposed by law.

STATE CORPORATION COMMISSION

By

Judith Williams Jagdmann
Commissioner

CORPACPT
CIS0362
14-06-09-0021

EXHIBIT B
APPENDIX 0093



**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

**SCC819**
**(03/14)**

**ARTICLES OF INCORPORATION**
**OF A VIRGINIA NONSTOCK CORPORATION**

The undersigned, pursuant to Chapter 10 of Title 13.1 of the Code of Virginia, state(s) as follows:

1.  The name of the corporation is

    <u>Gospel Light Mennonite Church Medical Aid Plan.</u>

2.  **(Mark appropriate box or insert applicable provisions; see instructions.)**
    ☐ The corporation shall have no members.    **OR**
    ☒ The corporation shall have one or more classes of members with such designations, qualifications and rights as set forth in the bylaws.    **OR**
    ☐ The class(es) of members of the corporation and their designations, qualifications and rights are as follows:

    _____
    _____

3.  **(Mark appropriate box or insert applicable provisions; see instructions.)**
    ☐ The directors shall elect their successors.    **OR**
    ☒ The directors shall be elected by the members.    **OR**
    ☐ The directors shall be elected or appointed as follows:

    _____
    _____

4.  A.  The name of the corporation's initial registered agent is

        <u>Darrel Beachy.</u>

    B.  The initial registered agent is **(mark appropriate box)**:

        (1) an <u>individual</u> who is a resident of Virginia **and**
        ☒ an initial director of the corporation.    **OR**
        ☐ a member of the Virginia State Bar.

        (2) ☐ a domestic or foreign stock or nonstock corporation, limited liability company or registered limited liability partnership authorized to transact business in Virginia.

5.  A.  The corporation's initial registered office address, including the street and number, if any, which is identical to the business office of the initial registered agent is

        <u>186 Spring Branch Trail</u>          <u>Stanardsville</u>          , VA   <u>22973</u>   .
        (number/street)                              (city or town)                               (zip)

    B.  The registered office is located in the ☒ county **OR** ☐ city of <u>Madison</u>  .

6.  The initial directors are (see instructions):

    | NAME(S) | ADDRESS(ES) |
    | --- | --- |
    | <u>Darrel Beachy</u> | <u>186 Spring Branch Trail, Stanardsville, VA 22973</u> |
    | <u>Joseph Gingerich</u> | <u>145 Old Schoolhouse Road, Dyke, VA 22973</u>  |

INCORPORATOR(S):

_Darrel Beachy_                    _Darrel Beachy_
_Joseph Gingerich_                 _Joseph Gingerich_
          SIGNATURE(S)                             PRINTED NAME(S)

June 3, 2014
          DATE                               TELEPHONE NUMBER (OPTIONAL)

**Personal Information**, such as a social security number, should NOT be included in a business entity document submitted to the Office of the Clerk for filing with the Commission. For more information, see Notice Regarding Personal Identifiable Information at www.scc.virginia.gov/clk.

**REVIEW THE INSTRUCTIONS THAT FOLLOW BEFORE SUBMITTING THIS FORM.**

EXHIBIT B
APPENDIX 0094

## BYLAWS
## FOR GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

### ARTICLE I

#### IDENTIFICATION

**Section 1.** **Name.** The name of this corporation shall be Gospel Light Mennonite Church Medical Aid Plan, Inc.

**Section 2.** **Office.** The principal office of this Corporation shall be in Virginia.

**Section 3.** **Fiscal Year.** The fiscal year of the Corporation shall begin on the first day of January each year and end on the last day of December in the same year.

**Section 4.** **Management.** The supreme governing or legislative body of this Corporation shall be a Board of Directors to be duly elected by the members of Gospel Light Mennonite Church as may be provided in these bylaws. The day to day activities of the Corporation shall be carried on by the Chairman, Vice Chairman, and Treasurer of the Corporation.

**Section 5.** **Funds.** The assets of this Corporation shall be kept upon the books thereof in one fund or in segregated funds as the Board of Directors may prescribe.

**Section 6.** **Private Property Exempt.** The private property of all participants, Officers, and Directors of this Corporation shall be exempt from the corporate liabilities.

### ARTICLE II

#### PURPOSE

In Galatians 6:2 the Apostle Paul instructs believers to, "Bear one another's burdens, and so fulfill the law of Christ." II Corinthians 8:14 further explains, "At the present time your plenty will supply what they need, so that in turn their plenty will supply what you need."

**The purpose for the formation of this Corporation is to enable followers of Christ to bear one another's burdens and:**

1.     **To associate** within the community of the Christian faith for discipleship, medical-sharing, physical needs-sharing, financial stewardship, and evangelical purposes and in accordance with the Bylaws of this organization and the laws of the state or states wherein this Corporation may be doing business.

2.     **To promote** the biblical concept of mutual aid sharing, historically practiced among Christians as it relates to the socio-economic and spiritual needs of its members.

3.     **To create funds** from its activities and to maintain and invest its funds; and to disburse and apply its funds among the aged, disabled or sick among its members and among the widows and orphans or dependents of deceased members and in accordance with the laws of the state or states wherein this Corporation may be doing business.

**EXHIBIT C**
APPENDIX 0095

4.    **To remain faithful** to this Statement of Faith: We believe the Bible alone is the inspired Word of God; therefore it is the final and only source of absolute spiritual authority.

We believe in the triune God of the Bible.  He is one God who is revealed in three distinct Persons – God, the Father; God, the Son; and God, the Holy Spirit.

We believe Jesus Christ was God in the flesh – fully God and fully man. He was born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins, was bodily resurrected on the third day, and now is seated in the heavens at the right hand of God, the Father.

We believe that all people are born with a sinful nature and can be saved from eternal death only by grace alone, through faith alone, trusting only in Christ's atoning death and resurrection to save us from our sins and give us eternal life.

We believe in the bodily resurrection of all who have put their faith in Jesus Christ.

All we believe and do is for the glory of God alone.

## ARTICLE III

### MEMBERSHIP

**Section 1.**    **Age and Gender.** Membership shall not be limited on the basis age or gender. Membership is limited to the members of Gospel Light Mennonite Church and those who prescribe to the Statement of Faith at Article II, Section 4. All members must be in accordance with the rules and regulations set forth by the Board of Directors.

**Section 2.**    **Dependents.** Dependents of members of Gospel Light Mennonite Church Medical Aid Plan, Inc. may be included in the Corporation in accordance with the rules and regulations as set forth by the Board of Directors, but they shall have no voting rights.

**Section 3.**    **Voting.** On matters requiring approval from the members of the Corporation, each participant shall have one, equally-weighted vote.

**Section 4.**    **Application.** Admission to participation in the Corporation shall be made according to the rules, regulations and restrictions fixed from time to time by the Board of Directors of the Corporation.

## ARTICLE IV

### ORGANIZATION

**Section 1.**    **Day-to-Day Management.** The day-to-day management of the Corporation has been delegated by the Board of Directors to a governing body known as the Officers of the Corporation, which shall consist of a Chairman, Vice Chairman, and Treasurer.

2

## ARTICLE V

### BOARD OF DIRECTORS

**Section 1.    Number and Term of Office.**  The minimum number of operating directors shall be three. The directors shall serve three-year terms that shall be staggered so that only one director's term may expire each year.

**Section 2.    Method of Selection.**  The Board of Directors shall be elected by the members of Gospel Light Mennonite Church as the terms for the incumbent members of the Board of Directors expire or become vacant. There shall be a ballot of nominees provided by the Corporation's principal office based upon the nominations of the membership Body at large. Ballots will be provided to all the qualifying members, and the persons receiving the most votes shall fill the positions on the Board of Directors.

**Section 3.    Duties.**  The corporate power of this Corporation shall be vested in the Board of Directors who shall have the management and control of the business of the Corporation.  They shall employ such agents, representatives and persons as they may deem advisable.

**Section 4.    Officers of the Board.**  The members of the Board of Directors shall elect the Chairman of the Board, Vice Chairman of the Board, and Treasurer of the Board at annual meetings, all of whom shall have such duties as are assigned by the Board of Directors.

**Section 5.    Resignation.**  A Director may resign at any time by filing his written resignation with the Chairman.  The nomination and election process of Section 2 shall be used to fill that unexpired term.

**Section 6.    Salary.**  All directors shall serve without pay, except that the Board may, from time to time, make regulations providing for the payment of traveling expenses and other expenses incurred by directors in attending board meetings or otherwise performing their duties.

**Section 7.    Annual Meetings.**  The date of the regular annual meeting of the Board of Directors shall normally be in the month of November, with the exact date and hour to be designated by the Chairman or Vice Chairman of the Board.  The annual meeting of the Board of Directors shall be at a home office, or by telephone, or at such other place as the Chairman or Vice Chairman of the Board may specify.

**Section 8.    Other Meetings.**  Other meetings of the Board of Directors may be held upon the call of the Chairman or Vice Chairman at any time or place upon proper advance notice given to each director, specifying the general purpose of the meeting.

**Section 9.    Quorum.**  At any meeting of the Board of Directors, the presence of a majority of the members of the Board shall constitute a quorum for the transaction of any business.

**Section 10.    Committees.**  The Board of Directors may, from time to time, appoint such standing and special committees as may be deemed necessary and advisable.

**Section 11.    Proxy Voting.**  Proxy voting shall not be allowed by Directors.

## ARTICLE VI

### ORDER OF BUSINESS

The order of business at the meetings of the Board of Directors shall be as follows:

Opening Prayer
1. Roll Call.
2. Reading of the minutes of the preceding meeting and action thereon.
3. Reports of Officers.
4. Reports of Committees.
5. Unfinished business.
6. New business.

## ARTICLE VII

### OFFICERS OF THE CORPORATION

**Section 1.    Officers.**  At the Annual Meeting of the Board of Directors, they shall appoint officers of this Corporation and shall function according to the policies and directives set forth by the Board of Directors.  The Board of Directors may from time to time create other offices with designation of duties and shall appoint persons to fill such offices.

**Section 2.    Chairman.**  The Chairman shall preside at all meetings of the Board. He shall fairly present all matters of business and perform the duties assigned to him by the Board of Directors.

**Section 3.    Vice Chairman.**  The Vice Chairman shall function in the place of the Chairman as necessary because of the absence, sickness or death of the Chairman.  He shall also perform such other duties as shall from time to time be imposed upon him by the Board of Directors.

**Section 4.    Treasurer.**  The Treasurer shall be the legal custodian of all notes, securities and other valuables which may from time to time come into the possession of the Corporation and shall promptly deposit the same in some reliable bank or other depository designated by the Board of Directors.  The Treasurer shall have such other duties as the Board of Directors may designate.

**Section 5.    Vacancies.**  All vacancies of officers of the Corporation shall be filled by a special meeting of the Board of Directors.

**Section 6.    Legal Documents.**  All legal documents and checks, drafts, notes and orders for the payment of money shall be signed by those officers or employees of the Corporation as the Board of Directors may from time to time designate.

**Section 7.    Accounting.** The officers of the Corporation shall be responsible for preparing and presenting annual financial reports for the benefit of the members of Gospel Light Mennonite Church.

**Section 8.    Loans to Officers.**  No loan of money or property or any advance on account of services to be performed in the future shall be made to any officer or director

4

of the corporation except for travel advances under such conditions which the Board of directors may determine.

## ARTICLE VIII

### INDEMNIFICATION OF DIRECTORS, OFFICERS AND EMPLOYEES

The Corporation shall indemnify any person made a party to any claim, action, suit or proceeding (civil, criminal or administrative) by reason of the fact that he is or was a Director, Officer or employee of the Corporation or of any corporation (for profit or not for profit), partnership, association, trust, foundation, or other organization or entity where he served at the request of the Corporation, against the reasonable expenses, including attorneys' fees actually and reasonably incurred by him in connection with the defense of such claim, action, suit or proceeding, or in connection with any appeal therein, except in relation to matters as to which it shall be adjudged therein that such Director, Officer, or employee is liable for negligence, misconduct or wrongdoing in the performance of his duties.  The standard of conduct required shall be that such person acted in good faith for a purpose which he reasonably believed to be in the best interests of the Corporation, and, in addition, in any criminal action or proceeding, had no reasonable cause to believe that his conduct was unlawful.  Expenses, as aforesaid, shall also include but not be limited to, disbursements and amounts of judgments, fines or penalties incurred by or imposed upon him in connection with any such claim, action, suit or proceeding.  The Corporation may also reimburse to any such Director, Officer or employee the reasonable costs of settlement of any such claim, action, suit or proceeding if it shall be found by a majority of a committee composed of the Directors not involved in the matter in controversy (whether or not a quorum) or by a committee of disinterested persons appointed by the Directors, that it was to the best interests of the Corporation that such settlement be made and that such Director, Officer or employee was not guilty of negligence or misconduct or wrongdoing under the standards aforesaid.

## ARTICLE IX

### AMENDMENTS

These bylaws may be amended, repealed or added to at any regular meeting (or at any special meeting of the Board of Directors called for that purpose) by unanimous vote of the Board of Directors. No amendment, repeal or addition shall be considered unless notice of the proposed amendment, repeal or addition is submitted to the members of the Board of Directors at least 30 days prior to the date of such meeting.

## ARTICLE X

### TAX-EXEMPT PURPOSE

The Corporation is organized exclusively for charitable and religious purposes under section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code. No part of the net earnings of the Corporation shall inure to the benefit

5

of, or be distributed to its participants, directors, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay any reasonable compensation for services rendered and to make payments and distributions in furtherance of the exempt purposes set forth herein. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office. Notwithstanding any other provision of these Bylaws, the Corporation shall not carry on any other activities not permitted to be carried on (a) by an organization exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or (b) by an organization, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

## ARTICLE XI

### DISSOLUTION

Upon dissolution of the Corporation, all assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said court shall determine, which are organized and operated exclusively for such purposes.

These Bylaws were adopted on October _14_, 2014.

I, the undersigned Vice-Chairman of the Corporation, do hereby certify that the above Bylaws were duly adopted by the Corporation on the date set forth above.

**Darrel Beachy; Director, Vice-Chairman**

Signature: _____ Print name: _Darrel Ray Beachy_ Date: _10/14/14_

6

APPENDIX 0100

```
INTERNAL REVENUE SERVICE                    DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201

        APR 16 2015
Date:
                                    Employer Identification Number:
                                     47-2042581
GOSPEL LIGHT MENNONITE CHURCH       DLN:
 MEDICAL AID PLAN INC                17053294343024
C/O COMMONWEALTH LAW OFFICES PC     Contact Person:
TYLER HOCHSTETLER                    GINGER L JONES            ID# 31646
246 E DAVIS ST STE 200              Contact Telephone Number:
CULPEPER, VA  22701                  (877) 829-5500

                                    Accounting Period Ending:
                                      December 31
                                    Public Charity Status:
                                      170(b)(1)(A)(vi)
                                    Form 990 Required:
                                      No
                                    Effective Date of Exemption:
                                      June 24, 2014
                                    Contribution Deductibility:
                                      Yes
                                    Addendum Applies:
                                      No
```

Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code.  Contributions to you are
deductible under section 170 of the Code.  You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code.  Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations.  We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

For important information about your responsibilities as a tax-exempt
organization, go to www.irs.gov/charities. Enter "4221-PC" in the search bar
to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities,
which describes your recordkeeping, reporting, and disclosure requirements.

```
                                    Letter  947
```

**EXHIBIT D**

APPENDIX 0101

-2-

GOSPEL LIGHT MENNONITE CHURCH


We have sent a copy of this letter to your representative as indicated in your
power of attorney.

                          Sincerely,


                          *Tamara Ripperda*

                          Director, Exempt Organizations


                                                      Letter  947

# Bylaws
## of
# GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

## Article 1
## Offices

### Section 1. Principal Office

The principal office of the corporation is located in Stark County, State of Ohio.

### Section 2. Change of Address

The designation of the county or state of the corporation's principal office may be changed by amendment of these bylaws. The board of directors may change the principal office from one location to another by noting the changed address and effective date below, and such changes of address shall not be deemed, nor require, an amendment of these bylaws:

Current Address:  4845 Fulton Dr NW, Canton, OH 44718

### Section 3. Other Offices

The corporation may also have offices at such other places, within or without its state of incorporation, where it is qualified to do business, as its business and activities may require, and as the board of directors may, from time to time, designate.

## Article 2
## Corporate Purpose

### Section 1. Scriptural Purpose.

The following is the biblical and Christian purpose of this corporation as contained in the Holy Scriptures:

In Galatians 6:2 the Apostle Paul instructs believers to, "Bear ye one another's burdens, and so fulfill the law of Christ." Galatians 6:10 further instructs, "As we have therefore opportunity, let us do good unto all men, especially unto them who are of the household of faith." II Corinthians 8:14 further explains, "At the present time your plenty will supply what they need, so that in turn their plenty will supply what you need." .  Jesus taught in Luke 10:27 to 'love your neighbor as yourself'. He further explained through the parable of the Good Samaritan (Luke 10:30-37) that our neighbor is anyone in need.

### Section 2. Purpose to Preserve Christian Tradition of Sharing.

Our purpose is to preserve the Christian tradition of health care sharing and to enable followers of Christ to bear one another's burdens and:

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.        Bylaws                                    Page 1

**EXHIBIT E**

APPENDIX 0103

**1.** **To associate** within the community of the Christian faith for discipleship, medical-sharing, physical needs-sharing, financial stewardship, and evangelical purposes and in accordance with the Bylaws of this organization and the laws of the state or states wherein this Corporation may be doing business.

**2.** **To promote** the Christian tradition of healthcare cost sharing as historically practiced among Christians as it relates to the socio-economic and spiritual needs of its members to all who share our core beliefs.

**3.** **To create funds** from its activities and to maintain and invest its funds; and to disburse and apply its funds among the aged, disabled or sick among its members and among the widows and orphans or dependents of deceased members and in accordance with the laws of the state or states wherein this Corporation may be doing business.

**4.** **To remain faithful** as corporate directors and officers to this Statement of Faith:

We believe the Bible alone is the inspired Word of God; therefore it is the final and only source of absolute spiritual authority.

We believe in the triune God of the Bible. He is one God who is revealed in three distinct Persons — God, the Father; God, the Son; and God, the Holy Spirit.

We believe Jesus Christ was God in the flesh — fully God and fully man. He was born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins, was bodily resurrected on the third day, and now is seated in the heavens at the right hand of God, the Father.

We believe that all people are born with a sinful nature and can be saved from eternal death only by grace alone, through faith alone, trusting only in Christ's atoning death and resurrection to save us from our sins and give us eternal life.

We believe in the bodily resurrection of all who have put their faith in Jesus Christ.

All we believe and do is for the glory of God alone.

**Section 3. Evangelistic Purpose.**

Our evangelistic purpose is to include in our sharing ministry those who at the time of inclusion may not adhere to our corporate Statement of Faith, but who share beliefs that glorify God, that fulfill the purpose of Christ, and do not advance in any way the kingdom of Satan but instead advance God's kingdom. We do this to evangelize, influence and persuade onlookers to join our community of believers in Christ.

# Article 3
## Directors

### Section 1. Number

The corporation shall have, at minimum, four directors and collectively they shall be known as the board of directors. More directors may be added as may, from time to time, be deemed by the board of directors to be needed or useful.

APPENDIX 0104

### Section 2. Qualifications

Directors shall be of the age of majority in this state. Other qualifications for directors of this corporation shall be as follows: Affirm the corporate Statement of Faith; Have demonstrated leadership skills in private or public enterprises; Have an articulated desire to further the interests of the organization; Have professional or demonstrated skills and competence in their chosen professions; Have the respect and admiration of their peers and associates.

### Section 3. Powers

Subject to the provisions of the laws of this state and any limitations in the articles of incorporation and these bylaws relating to action required or permitted to be taken or approved by the members, if any, of this corporation, the activities and affairs of this corporation shall be conducted and all corporate powers shall be exercised by or under the direction of the board of directors.

### Section 4. Duties

It shall be the duty of the directors to:

    a.  Perform any and all duties imposed on them collectively or individually by law, by the articles of incorporation, or by these bylaws;

    b.  Appoint and remove, employ and discharge, and, except as otherwise provided in these bylaws, prescribe the duties and fix the compensation, if any, of all officers, agents, and employees of the corporation;

    c.  Supervise all officers, agents, and employees of the corporation to assure that their duties are performed properly;

    d.  Meet at such times and places as required by these bylaws;

    e.  Approve, amend, define and establish the Sharing Guidelines utilized by the members in the sharing of medical expenses among and between the members.

    f.  Register their addresses with the secretary of the corporation, and notices of meetings mailed or telegraphed to them at such addresses shall be valid notices thereof.

### Section 5. Term of Office

Terms of office shall be staggered so as not to have more than one vacancy per elective term. Directors may be elected to successive staggered terms.

### Section 6. Compensation

Directors shall serve without compensation except that they shall be allowed reasonable advancement or reimbursement of expenses incurred in the performance of their duties, including, but not limited to, attending regular and special meetings of the board. Any other payments to directors shall be approved in advance in accordance with this corporation's conflict of interest policy, as set forth in Article 9 of these bylaws.

### Section 7. Place of Meetings

Meetings shall be held at the principal office of the corporation unless otherwise provided by the board or at such other place as may be designated from time to time by resolution of the board of directors.

### Section 8. Regular Meetings

Regular meetings of directors shall be held on the first Thursday of each quarter (every three months) at 11:00 AM., or at such other time as is agreeable to the directors.

At the first regular meeting of directors, directors shall be elected by the incorporators. Voting for the election of directors shall be by written ballot. Each director shall cast one vote per candidate, and may vote for as many candidates as the number of candidates to be elected to the board. The candidates receiving the highest number of votes up to the number of directors to be elected shall be elected to serve on the board. To insure staggered terms of office, the initial directors, elected by the incorporators, shall be elected initially to 1, 2 and 3 year terms of office, and so on, so as to be re-elected to multiple year terms of office thereafter when their initial term of office expires.

### Section 9. Special Meetings

Special meetings of the board of directors may be called by the chairperson of the board, the Executive Director, the Associate Director, the secretary, by any two directors, or, if different, by the persons specifically authorized under the laws of this state to call special meetings of the board. Such meetings shall be held at the principal office of the corporation or, if different, at the place designated by the person or persons calling the special meeting.

### Section 10. Notice of Meetings

Unless otherwise provided by the articles of incorporation, these bylaws, or provisions of law, the following provisions shall govern the giving of notice for meetings of the board of directors:

a.  **Regular Meetings.** No notice need be given of any regular meeting of the board of directors.

b.  **Special Meetings.** At least one week prior notice shall be given by the secretary of the corporation to each director of each special meeting of the board. Such notice may be oral or written, may be given personally, by first class mail, by telephone or by facsimile machine, and shall state the place, date, and time of the meeting and the matters proposed to be acted upon at the meeting. In the case of facsimile notification, the director to be contacted shall acknowledge personal receipt of the facsimile notice by a return message or telephone call within twenty-four hours of the first facsimile transmission.

c.  **Waiver of Notice.** Whenever any notice of a meeting is required to be given to any director of this corporation under provisions of the articles of incorporation, these bylaws, or the law of this state, a waiver of notice in writing signed by the director, whether before or after the time of the meeting, shall be equivalent to the giving of such notice.

### Section 11. Quorum for Meetings

A quorum shall consist of a majority of the members of the board of directors.

Except as otherwise provided under the articles of incorporation, these bylaws, or provisions of law, no business shall be considered by the board at any meeting at which the required quorum is not present, and the only motion which the chair shall entertain at such meeting is a motion to adjourn.

### Section 12. Majority Action as Board Action

Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present is the act of the board of directors, unless the articles of incorporation, these bylaws, or provisions of law require a greater percentage or different voting rules for approval of a matter by the board.

### Section 13. Conduct of Meetings

Meetings of the board of directors shall be presided over by the chairperson of the board, or, if no such person has been so designated, or in his or her absence, the Executive Director of the corporation, or in his or her absence, by the Associate Director of the corporation, or in the absence of each of these persons, by a chairperson chosen by a majority of the directors present at the meeting. The secretary of the corporation shall act as secretary of all meetings of the board, provided that, in his or her absence, the presiding officer shall appoint another person to act as secretary of the meeting.

Meetings shall be governed by such procedures as may be approved from time to time by the board of directors, insofar as such rules are not inconsistent with or in conflict with the articles of incorporation, these bylaws, or with provisions of law.

### Section 14. Vacancies

Vacancies on the board of directors shall exist (1) on the death, resignation, or removal of any director, and (2) whenever the number of authorized directors is increased.

Any director may resign effective upon giving written notice to the chairperson of the board, the Executive Director, the secretary, or the board of directors, unless the notice specifies a later time for the effectiveness of such resignation. No director may resign if the corporation would then be left without a duly elected director or directors in charge of its affairs, except upon notice to the office of the attorney general or other appropriate agency of this state.

Directors may be removed from office, with cause, as permitted by and in accordance with these Bylaws and the laws of this state.

For purposes of these Bylaws, "Cause" means (i) the failure by a Director to adhere to all reasonable standards of fiduciary responsibility as a director of the corporation as defined by these Bylaws and federal and state law; (ii) the commission by a Director of any act of fraud, theft or embezzlement with respect to this or any Corporation, business or enterprise; (iii) the conviction of a Director of any felony; (iv) the commission by a Director of any act of moral turpitude (substantiated by the preponderance of evidence, a court decision, or a Director's own admission) which subjects or could be reasonably

anticipated to subject the corporation to public ridicule, contempt, scorn, hatred or censure, or could materially diminish the public goodwill, reputation or esteem of the corporation; (iv) the breach by a Director of any material provision of these Bylaws and the failure to cure such breach within 30 business days after the Corporation provides notice of such breach.

Unless otherwise prohibited by the articles of incorporation, these bylaws, or provisions of law, vacancies on the board may be filled by approval of the board of directors. If the number of directors then in office is less than a quorum, a vacancy on the board may be filled by approval of a majority of the directors then in office or by a sole remaining director. A person elected to fill a vacancy on the board shall hold office until the next election of the board of directors or until his or her death, resignation, or removal from office.

### Section 15. Nonliability of Directors

The directors shall not be personally liable for the debts, liabilities, or other obligations of the corporation.

### Section 16. Indemnification by Corporation of Directors and Officers

The directors and officers of the corporation shall be indemnified by the corporation to the fullest extent permissible under the laws of this state.

### Section 17. Insurance for Corporate Agents

Except as may be otherwise provided under provisions of law, the board of directors may adopt a resolution authorizing the purchase and maintenance of insurance on behalf of any agent of the corporation (including a director, officer, employee, or other agent of the corporation) against liabilities asserted against or incurred by the agent in such capacity or arising out of the agent's status as such, whether or not the corporation would have the power to indemnify the agent against such liability under the articles of incorporation, these bylaws, or provisions of law.

## Article 4
## Officers

### Section 1. Designation of Officers

The officers of the corporation shall be an Executive Director, an Associate Director, a Secretary, and a Treasurer. The corporation may also have a chairperson of the board, one or more deputy directors, assistant secretaries, assistant financial officers, and other such officers with such titles as may be determined from time to time by the board of directors.

### Section 2. Qualifications

Any person of the age of majority in this state may serve as an officer of this corporation provided he or she adheres to our Statement of Faith.

### Section 3. Election and Term of Office

Officers shall be first, nominated by the Executive Director and then, ratified by a majority vote by the board of directors, at any time, and each officer shall hold office until he or she resigns or is removed or is otherwise disqualified to serve, or until his or her successor shall be elected and qualified, whichever occurs first.

The Executive Director must be appointed by the Board of Directors.

### Section 4. Removal and Resignation

Any officer may be removed, either with or without cause, by a written request by the Executive Director and then, by a majority vote by the board of directors, at any time. Any officer may resign at any time by giving written notice to the Executive Director or secretary of the corporation. Any such resignation shall take effect at the date of receipt of such notice or at any later date specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The above provisions of this section shall be superseded by any conflicting terms of a contract which has been approved or ratified by the board of directors relating to the employment of any officer of the corporation.

The Executive Director may resign at any time by giving written notice to the Board of Directors, or be removed, with cause, by a unanimous vote of the Board of Directors. The Executive Director may not vote regarding his or her removal with cause. Cause shall mean the same as defined in Article 3, Section 14 of these Bylaws. The founding Executive Director, if removed by a unanimous vote of the Board, shall receive an annual retirement compensation equal to his last annual salary.

### Section 5. Vacancies

Any vacancy caused by the death, resignation, removal, disqualification, or otherwise, of any officer shall be filled by the board of directors. In the event of a vacancy in any office other than that of Executive Director, such vacancy may be filled temporarily by appointment by the Executive Director until such time as the board shall fill the vacancy. Vacancies occurring in offices of officers appointed at the discretion of the board may or may not be filled as the board shall determine.

### Section 6. Duties of Executive Director

The Executive Director shall be the chief executive officer of the corporation and shall, subject to the control of the board of directors, supervise and control the affairs of the corporation and the activities of the officers. He shall nominate all officers of the corporation to be ratified by the board of directors, and no officer shall be removed from office without the express written approval of the Executive Director. He or she shall perform all duties incident to his or her office and such other duties as may be required by law, by the articles of incorporation, or by these bylaws, or which may be prescribed from time to time by the board of directors. Unless another person is specifically appointed as chairperson of the board of directors, the Executive Director shall preside at all meetings of the board of directors and, if this corporation has members, at all meetings

APPENDIX 0109

of the members. Except as otherwise expressly provided by law, by the articles of
incorporation, or by these bylaws, he or she shall, in the name of the corporation, execute
such deeds, mortgages, bonds, contracts, checks, or other instruments which may from
time to time be authorized by the board of directors.

### Section 7. Duties of Associate Director

In the absence of the Executive Director, or in the event of his or her inability or refusal
to act, the Associate Director shall perform all the duties of the Executive Director, and
when so acting shall have all the powers of, and be subject to all the restrictions on, the
Executive Director. The Associate Director shall have other powers and perform such
other duties as may be prescribed by law, by the articles of incorporation, or by these
bylaws, or as may be prescribed by the board of directors.

### Section 8. Duties of Secretary

The secretary shall:

Certify and keep at the principal office of the corporation the original, or a copy, of these
bylaws as amended or otherwise altered to date.

Keep at the principal office of the corporation or at such other place as the board may
determine, a book of minutes of all meetings of the directors, and, if applicable, meetings
of committees of directors and of members, recording therein the time and place of
holding, whether regular or special, how called, how notice thereof was given, the names
of those present or represented at the meeting, and the proceedings thereof.

See that all notices are duly given in accordance with the provisions of these bylaws or as
required by law.

Be custodian of the records and of the seal of the corporation and affix the seal, as
authorized by law or the provisions of these bylaws, to duly executed documents of the
corporation.

Keep at the principal office of the corporation a membership book containing the name
and address of each and any members, and, in the case where any membership has been
terminated, he or she shall record such fact in the membership book together with the
date on which such membership ceased.

Exhibit at all reasonable times to any director of the corporation, or to his or her agent or
attorney, on request, the bylaws, the membership book, and the minutes of the
proceedings of the directors of the corporation.

In general, perform all duties incident to the office of secretary and such other duties as
may be required by law, by the articles of incorporation, or by these bylaws, or which
may be assigned to him or her from time to time by the board of directors.

### Section 9. Duties of the Treasurer

The Treasurer shall be the legal custodian of all notes, securities and other valuables
which may from time to time come into the possession of the Corporation and shall
promptly cause deposit of the same in some reliable bank or other depository designated
by the Board of Directors.  The Treasurer shall have such other duties as the Board of

Directors may designate.

The Treasurer may cause the following duties to be carried out by another officer or employee or designee:

Have charge and custody of, and be responsible for, all funds and securities of the corporation, and deposit all such funds in the name of the corporation in such banks, trust companies, or other depositories as shall be selected by the board of directors.

Receive, and give receipt for, monies due and payable to the corporation from any source whatsoever.

Disburse, or cause to be disbursed, the funds of the corporation as may be directed by the board of directors, taking proper vouchers for such disbursements.

Keep and maintain adequate and correct accounts of the corporation's properties and business transactions, including accounts of its assets, liabilities, receipts, disbursements, gains, and losses.

Exhibit at all reasonable times the books of account and financial records to any director of the corporation, or to his or her agent or attorney, on request.

Render to the Executive Director and directors, whenever requested, an account of any or all of his or her transactions of the financial condition of the corporation.

Prepare, or cause to be prepared, and certify, or cause to be certified, the financial statements to be included in any required reports.

In general, perform all duties incident to the office of Treasurer and such other duties as may be required by law, by the articles of incorporation of the corporation, or by these bylaws, or which may be assigned to him or her from time to time by the Treasurer and/or the Executive Director.

### Section 10. Compensation

The salaries of the officers, if any, shall be fixed from time to time by resolution of the board of directors. In all cases, any salaries received by officers of this corporation shall be reasonable and given in return for services actually rendered to or for the corporation. All officer salaries shall be approved in advance in accordance with this corporation's conflict of interest policy, as set forth in Article 9 of these bylaws.

## Article 5
## Committees

### Section 1. Executive Committee

The board of directors may, by a majority vote of its members, designate an Executive Committee consisting of no less than two (2) board members and may delegate to such committee the powers and authority of the board in the management of the business and affairs of the corporation, to the extent permitted, and, except as may otherwise be provided, by provisions of law.

By a majority vote of its members, the board may at any time revoke or modify any or all of the executive committee authority so delegated, increase or decrease but not below two (2) the number of the members of the executive committee, and fill vacancies on the Executive Committee from the members of the board. The executive committee shall keep regular minutes of its proceedings, cause them to be filed with the corporate records, and report the same to the board from time to time as the board may require.

## Section 2. Audit Committee

The board of directors may, by a majority vote of its members, designate an Audit Committee consisting of no less than two (2) board members and may delegate to such committee the powers and authority of the board in the examination of financial records of the Corporation for the purpose of producing for public examination a certified annual audit of the financial affairs of the Corporation. The audit shall follow accepted accounting practices. The Audit Committee may retain outside, expert assistance in the preparation of such an annual audit.

The audit committee shall keep regular minutes of its proceedings, cause them to be filed with the corporate records, and report the same to the board from time to time as the board may require.

## Section 3. Other Committees

The corporation shall have such other committees as may from time to time be designated by resolution of the board of directors. These committees may consist of persons who are not also members of the board and shall act in an advisory capacity to the board.

## Section 3. Meetings and Action of Committees

Meetings and action of committees shall be governed by, noticed, held, and taken in accordance with the provisions of these bylaws concerning meetings of the board of directors, with such changes in the context of such bylaw provisions as are necessary to substitute the committee and its members for the board of directors and its members, except that the time for regular and special meetings of committees may be fixed by resolution of the board of directors or by the committee. The board of directors may also adopt rules and regulations pertaining to the conduct of meetings of committees to the extent that such rules and regulations are not inconsistent with the provisions of these bylaws.


# Article 6
## Execution of Instruments, Deposits, and Funds

### Section 1. Execution of Instruments

The board of directors, except as otherwise provided in these bylaws, may by resolution authorize any officer or agent of the corporation to enter into any contract or execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances. Unless so authorized, no officer, agent,

or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable monetarily for any purpose or in any amount.

### Section 2. Checks and Notes

Except as otherwise specifically determined by resolution of the board of directors, or as otherwise required by law, checks, drafts, promissory notes, orders for the payment of money, and other evidence of indebtedness of the corporation shall be signed by the Chief Financial Officer and countersigned by the Executive Director of the corporation when in excess of $5,000.

### Section 3. Deposits

All funds of the corporation shall be deposited from time to time to the credit of the corporation in such banks, trust companies, or other depositories as the board of directors may select.

### Section 4. Gifts

The board of directors may accept on behalf of the corporation any contribution, gift, bequest, or devise for the nonprofit purposes of this corporation.

## Article 7
## Corporate Records, Reports, and Seal

### Section 1. Maintenance of Corporate Records

The corporation shall keep at its principal office:

a. Minutes of all meetings of directors, committees of the board, and, if this corporation has members, of all meetings of members, indicating the time and place of holding such meetings, whether regular or special, how called, the notice given, and the names of those present and the proceedings thereof;

b. Adequate and correct books and records of account, including accounts of its properties and business transactions and accounts of its assets, liabilities, receipts, disbursements, gains, and losses;

c. A record of its members, if any, indicating their names and addresses and, if applicable, the class of membership held by each member and the termination date of any membership;

d. A copy of the corporation's articles of incorporation and bylaws as amended to date, which shall be open to inspection by the members, if any, of the corporation at all reasonable times during office hours.

### Section 2. Corporate Seal

The board of directors may adopt, use, and at will alter, a corporate seal. Such seal shall be kept at the principal office of the corporation. Failure to affix the seal to corporate instruments, however, shall not affect the validity of any such instrument.

### Section 3. Directors' Inspection Rights

Every director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents of every kind and to inspect the physical properties of the corporation, and shall have such other rights to inspect the books, records, and properties of this corporation as may be required under the articles of incorporation, other provisions of these bylaws, and provisions of law.

### Section 4. Right to Copy and Make Extracts

Any inspection under the provisions of this article may be made in person or by agent or attorney and the right to inspection shall include the right to copy and make extracts.

### Section 5. Periodic Report

The board shall cause any annual or periodic report required under law to be prepared and delivered to an office of this state or to the members, if any, of this corporation, to be so prepared and delivered within the time limits set by law.

# Article 8
# IRC 501(c) (3) Tax Exempt Purpose

### Section 1. Limitations on Activities

No substantial part of the activities of this corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation (except as otherwise provided by Section 501(h) of the Internal Revenue Code), and this corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of, or in opposition to, any candidate for public office.

Notwithstanding any other provisions of these bylaws, this corporation shall not carry on any activities not permitted to be carried on (a) by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, or (b) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code.

### Section 2. Prohibition Against Private Inurement

No part of the net earnings of this corporation shall inure to the benefit of, or be distributable to, its members, directors or trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes of this corporation.

### Section 3. Distribution of Assets

Upon the dissolution of this corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation, shall be distributed for one or more exempt purposes within the meaning of Section 501(c) (3) of the Internal Revenue Code or shall be distributed to the federal government, or to a state or local government,

for a public purpose. Such distribution shall be made in accordance with all applicable provisions of the laws of this state.

# Article 9
## Conflict of Interest and
## Compensation Approval Policies

### Section 1. Purpose of Conflict of Interest Policy

The purpose of this conflict of interest policy is to protect this tax-exempt corporation's interest when it is contemplating entering into a transaction or arrangement that might benefit the private interest of an officer or director of the corporation or any "disqualified person" as defined in Section 4958(f)(1) of the Internal Revenue Code and as amplified by Section 53.4958-3 of the IRS Regulations and which might result in a possible "excess benefit transaction" as defined in Section 4958(c)(1)(A) of the Internal Revenue Code and as amplified by Section 53.4958 of the IRS Regulations. This policy is intended to supplement but not replace any applicable state and federal laws governing conflict of interest applicable to nonprofit and charitable organizations.

### Section 2. Definitions

   a.  **Interested Person.** Any director, principal officer, member of a committee with governing board delegated powers, or any other person who is a "disqualified person" as defined in Section 4958(f)(1) of the Internal Revenue Code and as amplified by Section 53.4958-3 of the IRS Regulations, who has a direct or indirect financial interest, as defined below, is an interested person.

   b.  **Financial Interest.** A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:

      1.  An ownership or investment interest in any entity with which the corporation has a transaction or arrangement;

      2.  A compensation arrangement with the corporation or with any entity or individual with which the corporation has a transaction or arrangement; or

      3.  A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which the corporation is negotiating a transaction or arrangement.

   Compensation includes direct and indirect remuneration as well as gifts or favors that are not insubstantial.

   A financial interest is not necessarily a conflict of interest. Under Section 3, paragraph B, a person who has a financial interest may have a conflict of interest only if the appropriate governing board or committee decides that a conflict of interest exists.

### Section 3. Conflict of Interest Avoidance Procedures

   a.  **Duty to Disclose.** In connection with any actual or possible conflict of interest, an interested person must disclose the existence of the financial interest and be given

the opportunity to disclose all material facts to the directors and members of committees with governing board delegated powers considering the proposed transaction or arrangement.

**b. Determining Whether a Conflict of Interest Exists.** After disclosure of the financial interest and all material facts, and after any discussion with the interested person, he/she shall leave the governing board or committee meeting while the determination of a conflict of interest is discussed and voted upon. The remaining board or committee members shall decide if a conflict of interest exists.

**c. Procedures for Addressing the Conflict of Interest.** An interested person may make a presentation at the governing board or committee meeting, but after the presentation, he/she shall leave the meeting during the discussion of, and the vote on, the transaction or arrangement involving the possible conflict of interest.

The chairperson of the governing board or committee shall, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement.

After exercising due diligence, the governing board or committee shall determine whether the corporation can obtain with reasonable efforts a more advantageous transaction or arrangement from a person or entity that would not give rise to a conflict of interest.

If a more advantageous transaction or arrangement is not reasonably possible under circumstances not producing a conflict of interest, the governing board or committee shall determine by a majority vote of the disinterested directors whether the transaction or arrangement is in the corporation's best interest, for its own benefit, and whether it is fair and reasonable. In conformity with the above determination, it shall make its decision as to whether to enter into the transaction or arrangement.

**d. Violations of the Conflicts of Interest Policy.** If the governing board or committee has reasonable cause to believe a member has failed to disclose actual or possible conflicts of interest, it shall inform the member of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.

If, after hearing the member's response and after making further investigation as warranted by the circumstances, the governing board or committee determines the member has failed to disclose an actual or possible conflict of interest, it shall take appropriate disciplinary and corrective action.

**Section 4. Records of Board and Board Committee Proceedings**

The minutes of meetings of the governing board and all committees with board delegated powers shall contain:

a. The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of

interest was present, and the governing board's or committee's decision as to
whether a conflict of interest in fact existed.

b.  The names of the persons who were present for discussions and votes relating to
the transaction or arrangement, the content of the discussion, including any
alternatives to the proposed transaction or arrangement, and a record of any votes
taken in connection with the proceedings.

### Section 5. Compensation Approval Policies

A voting member of the board of directors who receives compensation, directly or
indirectly, from the corporation for services is precluded from voting on matters
pertaining to that member's compensation.

A voting member of any committee whose jurisdiction includes compensation matters
and who receives compensation, directly or indirectly, from the corporation for services
is precluded from voting on matters pertaining to that member's compensation.

No voting member of the governing board or any committee whose jurisdiction includes
compensation matters and who receives compensation, directly or indirectly, from the
corporation, either individually or collectively, is prohibited from providing information
to any committee regarding compensation.

When approving compensation for directors, officers and employees, contractors, and
any other compensation contract or arrangement, in addition to complying with the
conflict of interest requirements and policies contained in the preceding and following
sections of this article as well as the preceding paragraphs of this section of this article,
the board or a duly constituted compensation committee of the board shall also comply
with the following additional requirements and procedures:

a.  the terms of compensation shall be approved by the board or compensation
committee prior to the first payment of compensation;

b.  all members of the board or compensation committee who approve compensation
arrangements must not have a conflict of interest with respect to the compensation
arrangement as specified in IRS Regulation Section 53.4958-6(c)(iii), which
generally requires that each board member or committee member approving a
compensation arrangement between this organization and a "disqualified person"
(as defined in Section 4958(f)(1) of the Internal Revenue Code and as amplified
by Section 53.4958-3 of the IRS Regulations):

1.  is not the person who is the subject of the compensation arrangement, or a
family member of such person;

2.  is not in an employment relationship subject to the direction or control of
the person who is the subject of the compensation arrangement;

3.  does not receive compensation or other payments subject to approval by
the person who is the subject of the compensation arrangement;

4.  has no material financial interest affected by the compensation
arrangement; and

     5.  does not approve a transaction providing economic benefits to the person who is the subject of the compensation arrangement, who in turn has approved or will approve a transaction providing benefits to the board or committee member.

c.  the board or compensation committee shall obtain and rely upon appropriate data as to comparability prior to approving the terms of compensation. Appropriate data may include the following:

     1.  compensation levels paid by similarly situated organizations, both taxable and tax-exempt, for functionally comparable positions. "Similarly situated" organizations are those of a similar size, purpose, and with similar resources;

     2.  the availability of similar services in the geographic area of this organization;

     3.  current compensation surveys compiled by independent firms;

     4.  actual written offers from similar institutions competing for the services of the person who is the subject of the compensation arrangement;

As allowed by IRS Regulation 4958-6, if this organization has average annual gross receipts (including contributions) for its three prior tax years of less than $1 million, the board or compensation committee will have obtained and relied upon appropriate data as to comparability if it obtains and relies upon data on compensation paid by three comparable organizations in the same or similar communities for similar services.

d.  the terms of compensation and the basis for approving them shall be recorded in written minutes of the meeting of the board or compensation committee that approved the compensation. Such documentation shall include:

     1.  the terms of the compensation arrangement and the date it was approved;

     2.  the members of the board or compensation committee who were present during debate on the transaction, those who voted on it, and the votes cast by each board or committee member;

     3.  the comparability data obtained and relied upon and how the data was obtained;

     4.  If the board or compensation committee determines that reasonable compensation for a specific position in this organization or for providing services under any other compensation arrangement with this organization is higher or lower than the range of comparability data obtained, the board or committee shall record in the minutes of the meeting the basis for its determination;

     5.  If the board or committee makes adjustments to comparability data due to geographic area or other specific conditions, these adjustments and the reasons for them shall be recorded in the minutes of the board or committee meeting;

     6.   any actions taken with respect to determining if a board or committee member had a conflict of interest with respect to the compensation arrangement, and if so, actions taken to make sure the member with the conflict of interest did not affect or participate in the approval of the transaction (for example, a notation in the records that after a finding of conflict of interest by a member, the member with the conflict of interest was asked to, and did, leave the meeting prior to a discussion of the compensation arrangement and a taking of the votes to approve the arrangement);

     7.   The minutes of board or committee meetings at which compensation arrangements are approved must be prepared before the later of the date of the next board or committee meeting or 60 days after the final actions of the board or committee are taken with respect to the approval of the compensation arrangements. The minutes must be reviewed and approved by the board and committee as reasonable, accurate, and complete within a reasonable period thereafter, normally prior to or at the next board or committee meeting following final action on the arrangement by the board or committee.

## Section 6. Annual Statements

Each director, principal officer, and member of a committee with board delegated powers shall annually sign a statement which affirms such person:

    a.   has received a copy of the conflicts of interest policy;

    b.   has read and understands the policy;

    c.   has agreed to comply with the policy; and

    d.   understands the corporation is charitable and in order to maintain its federal tax exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes.

## Section 7. Periodic Reviews

To ensure the corporation operates in a manner consistent with charitable purposes and does not engage in activities that could jeopardize its tax-exempt status, periodic reviews shall be conducted. The periodic reviews shall, at a minimum, include the following subjects:

    a.   Whether compensation arrangements and benefits are reasonable, based on competent survey information, and the result of arm's-length bargaining.

    b.   Whether partnerships, joint ventures, and arrangements with management organizations conform to the corporation's written policies, are properly recorded, reflect reasonable investment or payments for goods and services, further charitable purposes, and do not result in inurement, impermissible private benefit, or in an excess benefit transaction.

## Section 8. Use of Outside Experts

When conducting the periodic reviews as provided for in Section 7, the corporation may, but need not, use outside advisors. If outside experts are used, their use shall not relieve the governing board of its responsibility for ensuring periodic reviews are conducted.

## Article 10
## Amendment of Bylaws

### Section 1. Amendment

These bylaws may be amended, repealed or added to at any regular meeting (or at any special meeting of the Board of Directors called for that purpose) by unanimous vote of the Board of Directors. No amendment, repeal or addition shall be considered unless notice of the proposed amendment, repeal or addition is submitted to the members of the Board of Directors at least 30 days prior to the date of such meeting.

## Article 11
## Construction and Terms

If there is any conflict between the provisions of these bylaws and the articles of incorporation of this corporation, the provisions of the articles of incorporation shall govern.

Should any of the provisions or portions of these bylaws be held unenforceable or invalid for any reason, the remaining provisions and portions of these bylaws shall be unaffected by such holding.

All references in these bylaws to the articles of incorporation shall be to the articles of incorporation, articles of organization, certificate of incorporation, organizational charter, corporate charter, or other founding document of this corporation filed with an office of this state and used to establish the legal existence of this corporation.

All references in these bylaws to a section or sections of the Internal Revenue Code shall be to such sections of the Internal Revenue Code of 1986 as amended from time to time, or to corresponding provisions of any future federal tax code.

# Membership Provisions
## of the Bylaws of
## the Gospel Light Mennonite Church Medical Aid Plan, Inc.

### Article 12
### Members

**Section 1. Determination and Rights of Members**

The corporation shall have only one class of members. No member shall hold more than one membership in the corporation. A single member, a couple enrolled as a member, or a family enrolled as a member shall all be regarded as a single member with a single vote. Except as expressly provided in or authorized by the articles of incorporation, the bylaws of this corporation, or provisions of law, all memberships shall have the same rights, privileges, restrictions, and conditions.

**Section 2. Qualifications of Members**

The qualifications for membership in this corporation are as follows:

1. Pay annual dues.

2. Complete, sign and submit an enrollment or renewal application containing acceptance of our membership Shared Beliefs.

3. Comply with godly lifestyle requirements as may from time to time be required by the Sharing Guidelines

4. Give a requested gift amount each month to another person's medical need.

**Section 3. Admission of Members**

Applicants shall be admitted to membership upon approval of a signed enrollment application and remittance of annual dues.

**Section 4. Fees and Dues**

The first annual dues payable to the corporation by members shall be $125.00, or such other fees, dues or assessments as may be specified from time to time by resolution of the Board of Directors.

**Section 5. Number of Members**

There is no limit on the number of members the corporation may admit.

**Section 6. Membership Record**

The corporation shall keep a membership record containing the name and address of each member. Termination of the membership of any member shall be recorded, together with the date of termination of such membership. Such record shall be kept at the corporation's principal office.

### Section 7. Nonliability of Members

A member of this corporation is not personally liable for the debts, liabilities, or obligations of the corporation. The private property of all members shall be exempt from all debts, liabilities, or obligations of the corporation.

### Section 8. Nontransferability of Memberships

No member may transfer a membership or any right arising there from. All rights of membership cease upon the member's death.

### Section 9. Termination of Membership

The membership of a member shall terminate upon the occurrence of any of the following events:

1. Upon his or her notice of such termination delivered to the Executive Director or secretary of the corporation or his or her designate, by mail or electronic message or any other means elected by the member, such membership to terminate upon the date of delivery of the notice, date of deposit in the mail, or such date noted by the member.

2. If this corporation has provided for the payment of dues by members, upon a failure to renew his or her membership by paying dues on or before their due date, such termination to be effective thirty (30) days after a written notification of delinquency is given personally, electronically or mailed to such member by the secretary of the corporation or his or her designate. A member may avoid such termination by paying the amount of delinquent dues within a thirty (30) day period following the member's receipt of the written notification of delinquency.

3. After providing the member with reasonable written notice and an opportunity to be heard either orally or in writing, upon a determination by the board of directors that the member has engaged in conduct materially and seriously prejudicial to the interests or purposes of the corporation. Any person expelled from the corporation shall receive a refund of dues already paid for the current dues period.

All rights of a member in the corporation shall cease on termination of membership as herein provided.

## Article 13
## Meetings of Members

### Section 1. Place of Meetings

Meetings of members shall be held at the principal office of the corporation or at such other place or places as may be designated from time to time by resolution of the board of directors. An annual vote of the members on matters submitted to them by the board of directors, conducted electronically, shall suffice in lieu of a physical meeting.

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.    Bylaws    Page 20

## Section 2. Regular Vote

A regular annual vote of members shall be held for the purpose of advising the Board of Directors on amending the organization's Sharing Guidelines. The provision(s) receiving the highest number of votes shall be submitted to the Board of Directors for approval or review. Each voting member shall cast one vote, with voting being by ballot only. The Board of Directors is not bound by the vote of the members.

The time of such voting shall be fixed by the board of directors and member votes shall be submitted by whatever means is deemed by the Board of Directors as most advisable.

## Section 3. Notice of Meetings

Unless otherwise provided by the articles of incorporation, these bylaws, or provisions of law, notice stating the place, day, and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) before the date of the meeting, either electronically, personally or by mail, by or at the direction of the Executive Director, or the secretary, or the persons calling the meeting, to each member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the member at his or her address as it appears on the records of the corporation, with postage prepaid. Personal notification includes notification by telephone or by electronic means (e-mail, on line notification, text message), or by other means currently in use by the organization to otherwise communicate with members.

## Section 4. Action by Written Ballot

Except as otherwise provided under the articles of incorporation, these bylaws, or provisions of law, any action which may be taken at any regular or special meeting of members may be taken without a meeting if the corporation distributes a written ballot to each member entitled to vote on the matter. The ballot shall:

1. set forth the proposed action;

2. provide an opportunity to specify approval or disapproval of each proposal;

3. specify the date by which the ballot must be received by the corporation in order to be counted. The date set shall afford members a reasonable time within which to return the ballots to the corporation.

Ballots shall be mailed or delivered electronically in the manner required for giving notice of membership meetings as specified in these bylaws.

Approval of action by ballot shall be valid only when the number of votes cast by ballot within the time period specified equals or exceeds the quorum required to authorize the action, and the number of approvals equals or exceeds the number of votes that would be required to approve the action when the total number of votes cast was the same as the number of votes cast by ballot.

## Section 5. Conduct of Votes

The secretary of the corporation shall act as secretary of all votes of members, provided that, in his or her absence, the presiding officer shall appoint another person to act as secretary of the vote.

Votes shall be governed by such rules as may be revised from time to time, insofar as such rules are not inconsistent with or in conflict with the articles of incorporation, these bylaws, or with provisions of law.

## ADOPTION OF BYLAWS

We, the undersigned, are all of the directors or incorporators of this corporation, and we consent to, and hereby do, adopt the foregoing bylaws, consisting of __22__ preceding pages, as the bylaws of this corporation.

Dated this 22ⁿᵈ day of __May__, 2015

# STATE OF NEW MEXICO
## OFFICE OF SUPERINTENDENT OF INSURANCE

**DEPUTY SUPERINTENDENT**

Robert E. Doucette, Jr.



**DEPUTY SUPERINTENDENT**

Andy Romero

**SUPERINTENDENT OF INSURANCE**

John G. Franchini

FOR IMMEDIATE RELEASE: December 3, 2019
Contact Melissa Martinez, 505-476-0333, eireann.sibley@ins.nh.gov

SANTA FE, NM – As a result of several states' legal actions, the New Mexico Office of Superintendent of Insurance is advising consumers that Aliera, a company that markets itself as a health care sharing ministry, may be operating illegally in New Mexico.

In the past, Aliera acted as a plan administrator to Unity Healthshare, which is a qualified health care sharing ministry. Recently, however, a State of Georgia Superior Court of Fulton County found that "evidence shows that Aliera has taken actions to misappropriate [Unity's] assets; namely by unilaterally attempting to transition the United HCSM plans to Trinity. The court also found that the company misrepresented itself to state insurance regulators, and that "Timothy Moses, who exercises substantial control over Aliera, was convicted of felony securities fraud and perjury in federal court."

The court also found that Aliera is a for-profit company and cannot qualify as a health care sharing ministry under state or federal law. Additional states, including Texas, Colorado, and Washington, have issued cease and desist orders against Aliera/United. OSI is concerned about potential fraudulent or criminal activity on the part of Aliera. Since the company may be an illegal health care sharing ministry, consumers should be aware that if they remain in an Aliera product, they may be covered by an unlicensed insurance company.

Aliera or United Healthshare may also be known as Trinity Healthshare or OneShare Health. The court in the Georgia case requested that Aliera reach out to members about their options, and consumers who have purchased a Unity/Aliera product should be aware that they may be receiving this communication.

"I urge consumers to proceed with caution when purchasing health coverage options outside of Affordable Care Act compliant plans. Consumers' best bet for individual and family health plan coverage options is still to shop with BeWellNM.com," said Superintendent of Insurance John Franchini. "If you are ever unsure about an insurance company or agent you are working with, stop before signing any paperwork and call our agency to confirm the company or agent offering the coverage is legitimate and licensed in the state. Our number is 1-855-427-5674."

A few health care sharing ministries (also known as health care sharing organizations) operate in New Mexico. These organizations do not offer insurance, but may present plans in a way that look and feel similar to a health

Main Office: 1120 Paseo de Peralta, Room 428, Santa Fe, NM  87501
Satellite Office:  6200 Uptown Blvd NE, Suite 100, Albuquerque, NM 87110
Main Phone: (505) 827-4601 | Satellite Phone: (505) 322-2186 | Toll Free: (855) 4 - ASK - OSI
www.osi.state.nm.us

**EXHIBIT F**
APPENDIX 0126

insurance plan. Members of these organizations "share" health costs on a voluntary basis. Consumers should be aware that these plans have no obligation to pay for any medical services and have no requirement to cover any particular categories of health care services, such as preventive care.

If a consumer has any problems with Aliera or any of its affiliated companies, please contact OSI to let the agency know and find out about any available assistance. Consumers who are unsure of what kind of coverage they currently have, whether it's traditional health insurance, a health care sharing ministry, or something else, may contact OSI to find out what questions to ask. Contact OSI at 1-855-427-5674 or https://www.osi.state.nm.us/index.php/contact-us/.



**FOR IMMEDIATE RELEASE:**
March 26, 2020

**Contact: Melissa Gutierrez**
melissa.gutierrez@state.nm.us

## NM OFFICE OF SUPERINTENDENT OF INSURANCE
## CAUTIONS CONSUMERS ABOUT HEALTH CARE SHARING MINISTRIES

SANTA FE, NM –The New Mexico Office of Superintendent of Insurance cautions consumers who have subscribed, or are considering subscribing to health benefit plans offered by Health Care Sharing Ministries (HCSM) that these are not authorized health insurance plans. A HCSM may use marketing practices that suggest its plans include the protections found in approved health insurance plans. However, that may not be correct.

These plans may be less expensive than a regulated major medical plan. They may also appear to provide the benefits and protections that a major medical plan is required to provide under the Affordable Care Act ("ACA") and other health insurance regulations. In reality, though, a HCSM plan is an unauthorized insurance product that likely will not provide the protections of an authorized, regulated, and ACA compliant major medical plan.

Consumers should be aware of the following regarding HCSM plans:

- They do NOT comply with the ACA, even if their materials say they do.
- Many HCSM plans specifically state that they do not guarantee payment for any health care and the member is ultimately responsible for anything the ministry does not pay. This important notification may be obscured or buried in fine print.
- They typically have restrictions or exclusions on pre-existing conditions, leaving the member uncovered and responsible for the health care costs for treatment of those conditions.
- Often such programs do not provide mental health coverage or substance use disorder treatment.
- Members may also be subject to religious or moral restrictions from the sharing ministry, which may leave members responsible for the full costs of health care that result from an activity the ministry does not agree with.
- Health care providers (doctors, hospitals) are under no obligation to accept or honor discounts from these programs if there is no contract or agreement to do so.

"I urge consumers not to purchase health insurance other than an ACA compliant plan. A consumer's best source for individual and family health plan coverage is to shop affordable major medical coverage with your broker or agent or with BeWellNM.com. If you are outside of the open enrollment period, still contact BeWellNM.com or your broker or agent to see if you qualify for a special enrollment period." said Superintendent of Insurance Russell Toal. "One of the first questions a consumer should ask before buying insurance from an agent or broker is whether they and the company they are recommending are licensed with the state of New Mexico and what their license numbers are. Licensed agents and brokers should readily provide this information to consumers. If they don't, it should be a cause for concern."

**EXHIBIT G**

APPENDIX 0128

Consumers who are unsure what kind of coverage they currently have, whether it's traditional health insurance, a health care sharing ministry plan, or something else, may contact OSI to find out what questions to ask. Contact Viara Ianakieva by email at viara.ianakieva@state.nm.us or by telephone at (505) 827-4651.

The Superintendent of Insurance is taking action to protect consumers from unauthorized HCSM. Today, OSI issued an Order to Cease and Desist and to Impose Penalties against a HCSM operating in New Mexico. Any person with questions regarding the Cease and Desist Order may contact Rebecca Branch, Assistant Staff Counsel, at rebecca.branch@state.nm.us or (505) 827-4535.

If a consumer has any problems with a health care sharing ministry, or believes they've been deliberately misled by one of these entities, please contact OSI to let the agency know and find out about any available assistance. Any person with such a complaint should contact OSI at 1-855-427-5674 or https://www.osi.state.nm.us/index.php/contact-us/.

####

APPENDIX 0129

| | |
|---|---|
| **From:** | Toal, Russell, OSI |
| **To:** | OSI-Employees |
| **Subject:** | FYI, being released this afternoon |
| **Date:** | Thursday, March 26, 2020 3:24:58 PM |
| **Attachments:** | Press Release - Health Share Ministries ..pdf |

Russell Toal

Superintendent of Insurance

1120 Paseo de Peralta, Suite 428

Santa Fe, NM 87504-1689

OSI DOCKET NO. 2021-0085

OSI_003661

**EXHIBIT H**

APPENDIX 0130



**FOR IMMEDIATE RELEASE:**
**March 26, 2020**

**Contact: Melissa Gutierrez**
**melissa.gutierrez@state.nm.us**

## NM OFFICE OF SUPERINTENDENT OF INSURANCE
## CAUTIONS CONSUMERS ABOUT HEALTH CARE SHARING MINISTRIES

SANTA FE, NM –The New Mexico Office of Superintendent of Insurance cautions consumers who have subscribed, or are considering subscribing to health benefit plans offered by Health Care Sharing Ministries (HCSM) that these are not authorized health insurance plans.  A HCSM may use marketing practices that suggest its plans include the protections found in approved health insurance plans.  However, that may not be correct.

These plans may be less expensive than a regulated major medical plan. They may also appear to provide the benefits and protections that a major medical plan is required to provide under the Affordable Care Act ("ACA") and other health insurance regulations.  In reality, though, a HCSM plan is an unauthorized insurance product that likely will not provide the protections of an authorized, regulated, and ACA compliant major medical plan.

Consumers should be aware of the following regarding HCSM plans:

- They do NOT comply with the ACA, even if their materials say they do.
- Many HCSM plans specifically state that they do not guarantee payment for any health care and the member is ultimately responsible for anything the ministry does not pay. This important notification may be obscured or buried in fine print.
- They typically have restrictions or exclusions on pre-existing conditions, leaving the member uncovered and responsible for the health care costs for treatment of those conditions.
- Often such programs do not provide mental health coverage or substance use disorder treatment.
- Members may also be subject to religious or moral restrictions from the sharing ministry, which may leave members responsible for the full costs of health care that result from an activity the ministry does not agree with.
- Health care providers (doctors, hospitals) are under no obligation to accept or honor discounts from these programs if there is no contract or agreement to do so.

"I urge consumers not to purchase health insurance other than an ACA compliant plan.  A consumer's best source for individual and family health plan coverage is to shop affordable major medical coverage with your broker or agent or with BeWellNM.com. If you are outside of the open enrollment period, still contact BeWellNM.com or your broker or agent to see if you qualify for a special enrollment period." said Superintendent of Insurance Russell Toal. "One of the first questions a consumer should ask before buying insurance from an agent or broker is whether they and the company they are recommending are licensed with the state of New Mexico and what their license numbers are. Licensed agents and brokers should readily provide this information to consumers. If they don't, it should be a cause for concern."

Consumers who are unsure what kind of coverage they currently have, whether it's traditional health insurance, a health care sharing ministry plan, or something else, may contact OSI to find out what questions to ask. Contact Viara Ianakieva by email at viara.ianakieva@state.nm.us or by telephone at (505) 827-4651.

The Superintendent of Insurance is taking action to protect consumers from unauthorized HCSM. Today, OSI issued an Order to Cease and Desist and to Impose Penalties against a HCSM operating in New Mexico. Any person with questions regarding the Cease and Desist Order may contact Rebecca Branch, Assistant Staff Counsel, at rebecca.branch@state.nm.us or (505) 827-4535.

If a consumer has any problems with a health care sharing ministry, or believes they've been deliberately misled by one of these entities, please contact OSI to let the agency know and find out about any available assistance. Any person with such a complaint should contact OSI at 1-855-427-5674 or https://www.osi.state.nm.us/index.php/contact-us/.

####

Main Office: 1120 Paseo de Peralta, Room 428, Santa Fe, NM  87501
Satellite Office:  6200 Uptown Blvd NE, Suite 100, Albuquerque, NM 87110
Main Phone: (505) 827-4601 | Satellite Phone: (505) 322-2186 | Toll Free: (855) 4 - ASK - OSI
www.osi.state.nm.us

APPENDIX 0132

# STATE OF NEW MEXICO
## OFFICE OF SUPERINTENDENT OF INSURANCE

**DEPUTY SUPERINTENDENT**
Robert E. Doucette, Jr.



**DEPUTY SUPERINTENDENT**
Andy Romero

**SUPERINTENDENT OF INSURANCE**
John G. Franchini

FOR IMMEDIATE RELEASE: December 3, 2019
Contact Melissa Martinez, 505-476-0333, eireann.sibley@ins.nh.gov

SANTA FE, NM – As a result of several states' legal actions, the New Mexico Office of Superintendent of Insurance is advising consumers that Aliera, a company that markets itself as a health care sharing ministry, may be operating illegally in New Mexico.

In the past, Aliera acted as a plan administrator to Unity Healthshare, which is a qualified health care sharing ministry. Recently, however, a State of Georgia Superior Court of Fulton County found that "evidence shows that Aliera has taken actions to misappropriate [Unity's] assets; namely by unilaterally attempting to transition the United HCSM plans to Trinity. The court also found that the company misrepresented itself to state insurance regulators, and that "Timothy Moses, who exercises substantial control over Aliera, was convicted of felony securities fraud and perjury in federal court."

The court also found that Aliera is a for-profit company and cannot qualify as a health care sharing ministry under state or federal law. Additional states, including Texas, Colorado, and Washington, have issued cease and desist orders against Aliera/United. OSI is concerned about potential fraudulent or criminal activity on the part of Aliera. Since the company may be an illegal health care sharing ministry, consumers should be aware that if they remain in an Aliera product, they may be covered by an unlicensed insurance company.

Aliera or United Healthshare may also be known as Trinity Healthshare or OneShare Health. The court in the Georgia case requested that Aliera reach out to members about their options, and consumers who have purchased a Unity/Aliera product should be aware that they may be receiving this communication.

"I urge consumers to proceed with caution when purchasing health coverage options outside of Affordable Care Act compliant plans. Consumers' best bet for individual and family health plan coverage options is still to shop with BeWellNM.com," said Superintendent of Insurance John Franchini. "If you are ever unsure about an insurance company or agent you are working with, stop before signing any paperwork and call our agency to confirm the company or agent offering the coverage is legitimate and licensed in the state. Our number is 1-855-427-5674."

A few health care sharing ministries (also known as health care sharing organizations) operate in New Mexico. These organizations do not offer insurance, but may present plans in a way that look and feel similar to a health

Main Office: 1120 Paseo de Peralta, Room 428, Santa Fe, NM 87501
Satellite Office: 6200 Uptown Blvd NE, Suite 100, Albuquerque, NM 87110
Main Phone: (505) 827-4601 | Satellite Phone: (505) 322-2186 | Toll Free: (855) 4 - ASK - OSI
www.osi.state.nm.us

**2 | P a g e**

insurance plan. Members of these organizations "share" health costs on a voluntary basis. Consumers should be aware that these plans have no obligation to pay for any medical services and have no requirement to cover any particular categories of health care services, such as preventive care.

If a consumer has any problems with Aliera or any of its affiliated companies, please contact OSI to let the agency know and find out about any available assistance. Consumers who are unsure of what kind of coverage they currently have, whether it's traditional health insurance, a health care sharing ministry, or something else, may contact OSI to find out what questions to ask. Contact OSI at 1-855-427-5674 or https://www.osi.state.nm.us/index.php/contact-us/.

APPENDIX 0134



## 2022 Sharing Guidelines

Effective September 1, 2022

### Liberty HealthShare

4845 Fulton Dr. NW
Canton, OH 44718
855-58-LIBERTY (855-585-4237)



**EXHIBIT I**
APPENDIX 0135

2022 Liberty HealthShare Sharing Guidelines



Table of Contents

I. Program Overview .............................................................................................................. 3

A. Purpose of Guidelines ..................................................................................................... 4

B. Participation is Voluntary ............................................................................................... 4

II. Types Of Members ........................................................................................................... 4

A. Sharing Member ............................................................................................................ 3

B. Donors .......................................................................................................................... 3

III. Sharing Member Qualifications And Financial Participation ........................................... 5

A. Observe Christian Standards ......................................................................................... 5

B. Accept Our Shared Beliefs ............................................................................................ 5

C. Maintain a Christian Lifestyle ...................................................................................... 6

D. Apply to be a Member .................................................................................................. 6

E. Select Household Size ................................................................................................... 7

F. List Dependents Accurately .......................................................................................... 7

G. Membership and Program Changes .............................................................................. 9

H. Divorce/Separation of Couples .................................................................................... 9

I. Submit Dues and Suggested Monthly Shares ............................................................... 9

J. Notify When Withdrawing Membership ........................................................................ 11

IV. Member Medical Expenses ............................................................................................ 11

A. Sharing Limits .............................................................................................................. 11

B. Medical Expenses Not Eligible for Sharing ................................................................. 15

9.1.2022

APPENDIX 0136

2022 Liberty HealthShare Sharing Guidelines

V. Dispute Resolution and Appeal .................................................................................. 19
  A. First Level Appeal ................................................................................................. 19
  B. Second Level Appeal ............................................................................................ 19
  C. Third Level and Final Appeal ................................................................................ 19
  D. Mediation and Arbitration ................................................................................... 19

VI. Amending the Guidelines ...................................................................................... 20
  A. Enacting Changes ................................................................................................ 20
  B. Effective Date ...................................................................................................... 20
  C. Notification of Changes ....................................................................................... 20

VII. Sharing Member Rights and Responsibilities ....................................................... 20
  A. Sharing Members Rights ...................................................................................... 20
  B. Sharing Member Responsibilities ......................................................................... 20

VIII. Liberty Rise Sharing Program Guidelines (ages 18-29) ........................................ 22
  A. Age Restriction and Household Size ..................................................................... 22
  B. Program Changes After Loss of Qualification ...................................................... 22
  C. Continuing Membership After Married Member No Longer Qualifies Due to Age ..... 22
  D. Wellness Visits .................................................................................................... 22
  E. Sharing Limits / Medical Expenses Eligible for Sharing ........................................ 22
  F. Medical Expenses Not Eligible for Sharing .......................................................... 23

IX. Liberty Unite, Liberty Connect and Liberty Essential Sharing Program Guidelines ..... 24
  A. Prenotification of Medical Expense ...................................................................... 24
  B. Eligibility for Sharing Limited to Medical Expenses Exceeding $200 ..................... 25
  C. Medical Expenses Eligible for Sharing ................................................................. 25
  D. Additional Programs ........................................................................................... 28
  E. Medical Expenses Not Eligible for Sharing .......................................................... 28

X. Liberty Assist Sharing Program Guidelines (ages 65-85) ........................................ 29
  A. Age Restriction and Household Size ..................................................................... 29
  B. Preexisting Conditions ......................................................................................... 29
  C. Medical Expenses Eligible for Sharing ................................................................. 29
  D. Medical Expenses Not Eligible for Sharing .......................................................... 30

XI. Definition of Terms ............................................................................................... 31

Legal Notices ............................................................................................................ 35

**Because Liberty HealthShare is not insurance, it is not subject to state or federal insurance regulations.
However, certain states require that a notice about the Program be included in these materials as follows:**

ATTENTION: This program is not an insurance company nor is it offered through an insurance company. This program does not guarantee or promise that your medical bills will be paid or assigned to others for payment. Whether anyone chooses to pay your medical bills will be totally voluntary. As such, this program should never be considered as a substitute for an insurance policy. Whether you receive any payments for medical expenses and whether or not this program continues to operate, you are always liable for any unpaid bills.

APPENDIX 0137

2022 Liberty HealthShare Sharing Guidelines

## I. Program Overview

Liberty HealthShare is the program name of Gospel Light Mennonite Church Medical Aid Plan, Inc., which is the non-profit ministry that facilitates voluntary contributions for the sharing of qualifying healthcare costs between members. The program is based on shared ethical and religious beliefs, a religious tradition of mutual aid, neighborly assistance and financial sharing. The program does not share expenses resulting from behaviors and lifestyles destructive to personal health but is specially tailored for individuals who maintain a Christian lifestyle and make responsible choices in regard to health and believe in helping others.

Members share one another's medical expenses, and Liberty HealthShare serves only to facilitate this mutual sharing, directing member's gifts to those who have eligible expenses. Each member is obligated to be price conscious concerning his/her medical decision making. **It is the obligation of each adult member to read and understand these Sharing Guidelines.**
Our sharing is voluntary and requires the active participation by our members in all respects.



9.1.2022
APPENDIX 0138

## A. Purpose of Guidelines

These Guidelines are for use by Liberty HealthShare (LHS) in directing monthly contributions in accordance with the program's Guidelines. The Guidelines describe the types of medical expenses the members have agreed to share among themselves. Decisions made by Liberty HealthShare concerning the interpretation of these Guidelines in individual cases may not set precedent for future decisions.

## B. Participation is Voluntary

Monthly contributions are voluntary gifts and are not refundable. Each member is a self-pay patient who sends monthly contributions to assist another member who has medical expenses. Whether anyone chooses to share in another member's medical expenses is voluntary. Giving a monetary gift to assist another member in the program does not create a legally enforceable right to receive funds for healthcare expenses.

> **Whether or not any member receives assistance from other members for medical expenses, members are always liable for their own medical decisions and the expenses that may accrue as a result of their decisions and remain ultimately responsible to pay their bill.**
>
> **As a voluntary sharing ministry, we are always constrained by finite resources no matter how many members we may have. We are acutely aware that we cannot always be all things to all people and may therefore decline participation to those who present pre-existing medical needs since such expenses may strain our giving beyond our current capacity.**
>
> **Liberty HealthShare reserves the right to sever the voluntary relationship with members who are not aligned with the sharing mentality or who are unwilling to cooperate with stewardship efforts to avoid exorbitant medical prices.**

## II. Types of Members

Two types of Membership are available for participants:

### A. Sharing Member

Sharing Members are those who wish to regularly participate each month by contributing at least the suggested Monthly Share Amount to share in another member's medical expenses. Sharing Members, when they experience medical expenses, may submit those needs for sharing among other members according to the Sharing Guidelines.

### B. Donors

Members and non-members who wish to contribute amounts of their own choosing to be applied and/or used for sharing wherever Liberty HealthShare determines funds ought to be directed.

2022 Liberty HealthShare Sharing Guidelines

## III. Sharing Member Qualifications and Financial Participation

In order to become and remain a Sharing Member, a person must meet and satisfy the following criteria and requirements:

### A. Observe Christian Standards

The modern medical cost sharing movement was begun by a small band of Christians to practically demonstrate how to fulfill the command by Christ to "bear one another's burdens." In accordance with that practice, every member of Liberty HealthShare is expected to:

> Strive to live in accordance with biblical principles
> Honor the biblical teaching to 'share one another's burdens' (Gal. 6:2)
> Participate regularly in worship or prayer

### B. Accept Our Shared Beliefs

Liberty HealthShare members come together to share medical bills because we hold to beliefs of conscience - based on moral, ethical and religious values - that affect the way we live and compel us to support, care and help each other. We share each other's medical expenses not as matter of convenience or cost savings, but because we are compelled by God and conscience to do so. Sharing such burdens is part of our religious, ethical and moral code. It is our biblical obligation to help our fellow man when in need. We are our brother's keeper! It is our spiritual duty to God and our ethical responsibility to ourselves and the other members of our cost-sharing ministry to care for our bodies and maintain our health. It is also our ethical responsibility to be good stewards of the resources of our community. Finally, it is our fundamental right and responsibility to make decisions about our healthcare and not to relinquish that right to others.

These beliefs form the religious and ethical basis for our interaction and relationship as a community. Members are required to subscribe to this Statement of Shared Beliefs as evidenced by their signature on the application form. We make a somber and significant pledge to one another that we will aid, support and devote our resources to one another in this most personal area of our life: our healthcare!

### Statement of Shared Beliefs

At the core of what we do, and how we relate to and engage with one another as a community of people, is a set of common beliefs.

† We believe that our personal rights and liberties originate from God and are bestowed on us by God and are not concessions granted to us by governments or men.

† We believe every individual has a fundamental religious right to worship the God of the Bible in his or her own way.

† We believe it is our biblical and ethical obligation to assist our fellow man when they are in need according to our available resources and opportunity.

† We believe it is our spiritual duty to God and our ethical duty to others to maintain a healthy lifestyle and avoid foods, behaviors or habits that produce sickness or disease to others or ourselves.

† We believe it is our fundamental right of conscience to direct our own healthcare, in consultation with physicians, family or other valued advisors, free from government dictates, restraints and oversight.

5

9.1.2022

APPENDIX 0140

2022 Liberty HealthShare Sharing Guidelines

### C. Maintain a Christian Lifestyle

Members highly value the spiritual principle that our bodies are gifts from God and we must respect and care for our physical bodies. Further, we have an ethical obligation to our fellow members to live healthy lives and make wise choices so as not to place any unnecessary burdens on those who are sharing with us. As a community of people, we try our best to live out Jesus Christ's mandates.

To qualify as a Sharing Member, an applicant must comply with any lifestyle requirements contained in these Guidelines and must submit a detailed account of their medical history. In general, a Christian lifestyle requirement includes, but is not limited to, the following:



1. Refrain from tobacco use in any form.
   (Including smokeless tobacco and vaping devices)

2. Follow scriptural teachings on the use or abuse of alcohol.

3. Avoid abuse of prescription drugs, which means consuming prescription medications in a manner not intended by the prescriber that would likely result in bodily harm or dependency.

4. Abstain from the abuse of legal drugs or use of illegal drugs including, any hallucinogenic substance, barbiturates, amphetamines, cocaine, heroin or other opiates, marijuana, illegal intravenous drugs or narcotics.

5. Exercise regularly and eat healthy foods that do not harm the body.

As a sharing ministry, we are always constrained by finite resources no matter how many members we may have. Existing medical conditions disclosed on an application can help us make suggestions as to spiritual or lifestyle changes that can improve the health of the individual and benefit the group as a whole.

If, at any time, it is discovered that a Sharing Member did not submit a complete and accurate medical history on the Membership Enrollment Application or on the Medical History Questionnaire, a membership declination may be issued retroactively to his/her Enrollment Date. In such an event, the membership enrollment dues paid at the time of application will not be refunded. Sharing Members may apply to have a sharing limitation removed by providing medical evidence that they qualify for such removal, however, any removal will not apply retroactively.

### D. Apply to be a Member

Each person(s) applying for membership must submit a Member Enrollment Application. Applicants must also pay their membership enrollment dues and be accepted into the Program by Liberty HealthShare. Membership begins on the Enrollment Date specified by Liberty HealthShare in writing to the Sharing Member. If a person(s) does not qualify for membership due to medical reasons, the membership enrollment dues submitted at time of application will be returned to the applicant. All enrollment applications are subject to medical history review. If eligible for enrollment, the approved membership will begin the first of the following month the records are received.

9.1.2022

APPENDIX 0141

## E.  Select Household Size

Sharing Members enroll at a selected household size as a single, couple or family. Depending upon household composition, couples and families may be subject to the provisions in Paragraph F below defining dependent children. Couples send more than singles, and families send more than couples do.



A Single is one Sharing Member

A Couple is two Sharing Members of the same household related by birth, marriage or adoption. This would include:



- A married couple
- A parent/guardian and the second Sharing Member as a dependent child
- Two dependent children, participating without either parent (see guidelines regarding dependents below, Paragraph F)

A Family is comprised of three or more Sharing Members of the same household related by birth, marriage or adoption. This would include:



- A married couple and one or more dependent children
- One parent/guardian and two or more dependent children
- Three or more dependent children, participating without either parent

## F.  List Dependents Accurately

An unmarried dependent child may participate with his or her parent(s) or legal guardian(s) under a Sharing Membership up to and including age 19.

### 1.  Disabled Dependents

Unmarried dependents may continue as Sharing Members with their parent/guardian if they are medically unable to maintain a full-time occupation or be a full-time student because of illness or injury, physical or mental disability. A physician or qualified health professional may be required to verify this disability.

### 2.  Full-Time Students

An unmarried dependent child who is 20 through 26 years of age may participate in his or her parent/guardian's Sharing Membership only if he/she is a full-time student or assigned to a multi-month church mission or internship.

A full-time student is a person enrolled for a total of 12 or more resident credit hours in a high school, an accredited college or university, or a certified vocational/technical training school. Resident credit hours are those derived from courses offered on a semester or term schedule that applies campus wide. Full- time student status begins 30 days before the first day of classes in which a dependent is already enrolled, and the status is presumed through the last day of August if the dependent was a full-time student in April or May of that same calendar year. Upon reaching his/her 27th birthday, a dependent is no longer eligible for full-time student status.

APPENDIX 0142

2022 Liberty HealthShare Sharing Guidelines

**It is the member's responsibility to notify Liberty HealthShare of any change in the student or marital status of their dependent child that may affect continued participation as a dependent of the member.** If student status or marital status is not as presented at the time an episode of care is submitted for sharing, such medical expenses will not be eligible for sharing.

A dependent who wishes to continue membership but who no longer qualifies due to age or marital status must apply and qualify on his/her own merit as a new Sharing Member. If the dependent applies and is accepted within 30 days of the loss of qualification, the membership enrollment dues are waived. If the dependent has a medical condition when he or she applies as a separate Sharing Member, any existing medical conditions will be eligible for sharing with no interruption of his or her Sharing Member status.

### 3.  Newborns

A newborn may be added as a dependent to a membership. It is the responsibility of the Sharing Member to notify Liberty HealthShare within 60 days of the birth. An electronically signed membership change form must be completed via the Member's ShareBox or phoned in to the enrollment department. If the membership change is not completed within 60 days of the birth, the newborn's eligible medical expenses will not be eligible for sharing and the dependent's effective date will begin the first of the month following the submitted membership change and will be subject to medical history review prior to approval.



### 4.  Newly Adopted

A newly adopted child may be added as a dependent to a membership provided all medical criteria be met within the program for acceptance.  The Sharing Member must provide notification of adoption, including all medical history or existing conditions, in writing within 60 days after finalized adoption. Existing medical conditions disclosed for a dependent may result in a declination, or a limitation on the types of needs eligible for sharing.

### 5.  Change in Household Size Due to Addition of Newborn or Adopted Member

The addition of a newborn or an adopted member may result in a change in household size and a change in the suggested minimum share amount as well as the Annual Unshared Amount. These changes will occur immediately and not at the start of the next period. For example, a Single would become a Couple and a Couple would become a Family.



9.1.2022

APPENDIX 0143

### G.  Membership and Program Changes

#### 6. Membership Changes

Any primary or guardian member who requests to add or exclude a dependent or spouse on an active membership, or change their membership sharing level, must complete a membership change form by the 25th of the month prior to the requested date of change. To complete a membership change, the primary member must submit an electronic document request to change members, which is available through their ShareBox. If a member does not have access to their ShareBox, they must contact the enrollment department with the requested membership change information. All membership additions (except babies added within 60 days from date of birth), are subject to medical history review prior to approval of addition.

#### 7. Program Level Changes

Program level changes can only be made 60 days prior to the annual membership renewal date. A program level change must be requested by the primary member by the 25th of the month prior to the annual renewal date and will become effective the first of the annual renewal month. To complete a program level change, the primary member must submit an electronic document request to change programs, which is available through their ShareBox. If a member does not have access to their ShareBox, they must contact the enrollment department with the requested program level change information.

### H.  Divorce/Separation of Couples

In the event of divorce or separation where the primary member and spouse desire to continue as Sharing Members with Liberty HealthShare, both parties must complete and sign the Liberty HealthShare membership separation agreement. The original combined membership will be cancelled, and a new membership created for each party the 1st of the following month agreement is signed and received. Both members will keep their original effective date and the first-time membership enrollment dues will be waived. Each new membership is subject to the new monthly share amount and any new AUA changes.

### I.  Submit Dues and Suggested Monthly Shares

To remain an active member, Sharing Members must submit membership dues and contribute a monthly share of at least the amount suggested by Liberty HealthShare each month.

#### a.  Membership Dues

Membership Enrollment dues are required at the time of application for enrollment and are non-refundable unless the enrollment is denied for medical reasons.  Annual renewal dues are applied annually by the 1st day of the member's annual renewal month. A member's renewal will not be prevented or disallowed due to the amount of bills submitted for sharing in any prior year(s) of membership.

#### b.  Monthly Share Amount and How It Changes

The Monthly Share Amount is the monetary contribution, not including the annual renewal dues, voluntarily given to share in another member's eligible medical expenses as suggested by Liberty HealthShare. The Monthly Share Amount is determined by majority vote of the Board of Directors and is based upon the amount of bills submitted by members for sharing, the amount needed to administer the Program, and the number of participating Members. An annual or more frequent advisory vote of the Members may be taken to assess program features, changes and the will of the Members regarding the same. The Monthly Share Amount may be revised upward or downward as determined by majority vote of the Board of Directors. Notice of such change will be made to the Members in a timely manner, but with no less than 60 days' notice.

2022 Liberty HealthShare Sharing Guidelines

c.  Assigned Need

Each month a Sharing Member is assigned a specific need in which to share. By submission of the suggested Monthly Share Amount, the member instructs Liberty HealthShare to assign his/her contribution as prescribed in these Guidelines, which set forth the conditions upon which Sharing Member medical expenses will be shared. By participation in the Program, the Sharing Member both accepts those conditions as enforceable and binding within the program for the assigning of his/her contribution and designates Liberty HealthShare as the final authority for the interpretation of these Guidelines.

All Sharing Members will be assigned an individual "ShareBox," a secure online portal to contribute their suggested monthly share amount directly to another member in need. Suggested Monthly Share Amounts are requested by the 5th day of each month. If the suggested Monthly Share Amount is not contributed by the end of the month, the membership is suspended retroactively as of the 1st day of the month, for which a suggested monthly share amount is not paid. During the first two months of membership, the share amount will be sent to Liberty HealthShare to be used at the discretion of the ministry.



Members practice the biblical teaching, "*Give and it shall be given to you.*" Sharing Members who participate regularly by sending their suggested monthly share amount to an assigned member in need will have their needs (if and/or when they occur) assigned to active Sharing Members.

4.  Administrative Costs

In addition to the first two months of membership (see III.I.3.), an administrative fee not to exceed 12% is assigned to each Monthly Share Amount regardless of family size beginning the third month of membership and following. A single, couple or family membership all contribute up to 12% from their Monthly Share Amount for administration. In addition, the membership enrollment dues and annual renewal dues are utilized by Liberty HealthShare to defray administrative costs. These amounts calculate together to formulate an administrative overhead. Administrative costs and their assessments to the members may be revised at any time by majority vote of the Board of Directors of Liberty HealthShare. Notice of any such change will be given to the members in a timely manner.

5.  When Available Shares are less than Eligible Needs

In any given month, the available suggested share amounts may or may not meet the eligible needs submitted for sharing. If a member's eligible bills exceed the available shares to meet those needs, the following actions may be taken:

a.  A pro-rata sharing of eligible needs may be initiated whereby the members share a percentage of eligible medical bills within that month and hold back the balance of those needs to be shared in a subsequent month.

b.  If the suggested share amount is not adequate to meet the eligible needs submitted for sharing over a 60-day period, then the suggested share amount may be increased in sufficient proportion to satisfy the eligible needs. This action may be undertaken temporarily or on an ongoing basis.

9.1.2022

APPENDIX 0145

### J.  Notify When Withdrawing Membership

Any member who desires to withdraw their participation must send written notice of their discontinuation, including the reason for such discontinuation, by the 25th day of the month prior to the month in which contributions will cease. If such withdrawal occurs 30 days after their Membership enrollment date, there shall be no refund of their membership enrollment dues. If the member chooses at any time to re-enroll, they must complete a new application and membership will start over as a new Sharing Member.

A membership that is suspended due to non-payment for less than two months, is automatically reactivated on the 1st day of the month after the Sharing Member contributes a Monthly Share Amount for each month that the membership was suspended and if applicable, submits the annual renewal dues. Sharing needs occurring after a Sharing Member's suspension date and before the reactivation date are not eligible for sharing, even after membership is reactivated. In addition, medical expenses incurred during the term of membership are ineligible for sharing if the Member is no longer an Active Member in Good Standing. [See IV.A.3.]

If a Sharing Member has been suspended or expired for more than two months and wishes to become active again in the Program, he/she must reapply as a new applicant, with no preferential treatment for acceptance. If membership was suspended or expired for not regularly submitting the Monthly Share Amount as requested, the suspended or expired member(s) (other than dependent children who are reapplying on their own) must submit the first suggested monthly contributions with the application in addition to the membership enrollment dues, if applicable. Reactivating a membership assigns the Sharing Member(s) a new membership period.

## IV.  Member Medical Expenses

### A. Sharing Limits

The members of Liberty HealthShare do not have unlimited resources and **must be good stewards** of the shared amounts contributed by other members. In order to both provide for the needs of Sharing Members and avoid burdensome suggested monthly share amounts beyond the ability of the member, total eligible needs for sharing among the members are limited as defined in this section and as indicated in writing to the individual Sharing Member.

#### 1.  Annual Unshared Amount (AUA)

The amount of medical expense eligible for sharing must exceed an annual accumulative amount assigned for each single, couple or family membership. The annual amount shall be calculated upon each member's Enrollment Activation Date until his or her next annual renewal date or program level change. All eligible medical expenses that exceed the applicable AUA shall then be subject to the program limits per incident selected by the member.

#### 2.  First Two Months of Participation

For the first two months after the Enrollment Activation Date as a Sharing Member, medical expenses for any reason, other than accidents, acute illness or injury, are not eligible for sharing among members and do not apply towards the AUA.

#### 3.  Eligibility for Sharing Limited to Active Sharing Members in Good Standing

Regardless of any other provision in these Sharing Guidelines, eligible medical expenses will only be shared for Active Sharing Members in good standing. Sharing requests will not be considered or facilitated for members who have withdrawn, cancelled, become inactive or are not in good standing for any reason according to the current Sharing Guidelines.

Any eligible expenses incurred and submitted at least 60 days prior to a member's change in active status may be shared. Expenses incurred or submitted within 60 days of a member's change in active status will not be eligible for sharing. Exceptions to this provision include:

    a. Death of the member.
    b. A member and spouse whose membership is terminated to due to divorce or separation and continue with separate memberships
       i.  Eligible expenses submitted under the member's original program are subject to the new program and current Sharing Guidelines and remain with the member who incurred them.
    c. A member who is no longer eligible as a dependent on a membership and continues as a separate Sharing Member.

4. Excess Charges (Balance Bills)

**Whether or not any member receives assistance from other members for medical expenses, members are always liable for their own medical decisions and the expenses that may accrue as a result. Members remain ultimately responsible to pay their bill.** As a voluntary sharing ministry, we are aware that we cannot be all things to all people. We are always constrained by finite resources no matter how many members we may have and have a duty to our fellow members to be good stewards of the community resources.

Members are provided access to healthcare cost reference tools and the provider directory to research and select healthcare providers who charge fair and reasonable industry rates. All submitted charges will undergo an assessment to determine if charges are fair and reasonable and Liberty HealthShare reserves the right, on behalf of its members, to determine what amount of an expense is unreasonable. These are expenses that result when healthcare providers seek payment in excess of the fair and reasonable amount already shared by members. Qualifying medical expenses with reasonable charges are eligible for sharing. **Excess charges deemed unreasonable are not shareable.**

5. Occupational or Work-Related Injuries

Expenses arising from the care and treatment of an injury or illness that is occupational, or that arises from work for wage or profit, including self-employment, are not eligible for sharing. However, such expenses will be considered for sharing if:

a. The State in which the injuries occurred has no Worker's Compensation laws or requirement.

b. The State laws proscribing participation in the Worker's Compensation system of that State do not require the business owner and/or enterprise to participate in Workers Compensation. Documentation may be required.

c. The business owner personally has an objection to his or her own participation in insurance based on religious conscience. Such a statement must be submitted in writing by the business owner and verified by Liberty HealthShare.

6. Other Sources of Medical Expense Payment

**In order to conserve the Share Power of the Sharing Members, it is the obligation of the member to pursue payment from any other responsible payer for such medical expenses submitted to Liberty HealthShare for assistance.** Needs do not qualify for sharing to the extent that they are discountable by the health care provider or payable by any other source, whether private, governmental or institutional. If a governmental, insurance, religious, liable party, fraternal organization or any other financial assistance source will pay any portion of the qualifying medical bill, that amount will offset any unshared and/or shared amounts applied to the member's needs up to the total amount of the need. If the Sharing Member refuses to accept such assistance, then that portion of the medical need also becomes ineligible for sharing.

a. Religious Objections  This limitation applies to the Sharing Member in question unless the member declares, in writing, that accepting such assistance would violate his deeply held religious or ethical convictions, including being a recipient of Medicare, Medicaid and Social Security payments.

b. Members' Cooperation  If the Sharing Member does not cooperate fully and assist Liberty HealthShare in determining if his/her need is discountable or payable by another source, the need will become not eligible for sharing. **Please note that it is the official policy of Liberty HealthShare to never require a Sharing Member to seek assistance from government taxpayer supported aid programs.**

c. Other Sources  Other sources include, but are not limited to all private insurance and governmental and institutional insurance including, but not limited to, Medicare, Medicaid, Veterans Administration, Champus, Medpay, PIP, Uninsured and Underinsured Motorist coverages, No-Fault coverage and Worker's Compensation. If the Sharing Member is 65 years of age or older, this limitation also includes needs that are payable by Medicare Parts A, B, C and/or D, whether the Sharing Member is enrolled in Medicare or not.

9.1.2022

APPENDIX 0147

d.  Medical Expenses Paid by Other Source Ineligible; Duty to Assist with Reimbursement  To the extent that such expenses are paid by any other source, such expenses will be regarded as not eligible for sharing. To the extent that members then share in expenses that may be the responsibility of any other source, the member receiving sharing is obliged to cooperate with any documentation or information needed to facilitate reimbursement to the members.

e.  Receipt of Payment from Other Sources  To the extent that such expenses are then subsequently paid by any other source, as allowed by law, the Sharing Member is responsible for reimbursing Liberty HealthShare members for any payment subsequently received from another source, which was previously shared among the members and paid.

f.  Reimbursement Policy  After a 6-month post-accident period, sharing may be permitted if necessary where payment of medical expenses by any other source is not presently available.

## 7. Pre-existing Conditions

A condition for which signs, symptoms or treatment were present prior to application, or can be reasonably expected to require medical intervention in the future, **needs to be declared upon application for Liberty HealthShare membership,** and updated with any new symptoms/signs or diagnoses that become apparent after the application submission. Failure to declare a medical condition upon application, or failure to update Liberty HealthShare after application, may preclude sharing in that condition any time in the future. **Failure to fully disclose known or suspected pre-existing condition information at the time of application and before Enrollment Date is a violation of our shared trust between members and may subject the member to termination of membership.** Chronic or recurrent conditions that have evidenced signs/symptoms and/or received treatment and/or medication within the past 36 months are not eligible for sharing during the first year of membership.

After the first full year of continuous membership, up to $50,000 of total medical expenses incurred for a pre-existing condition may be shared in total during the second and third years of membership. Upon the inception of the 37th month of continuous membership and thereafter, the condition may no longer be subject to the pre-existing condition sharing limitations. Appeals may be considered for earlier sharing in surgical interventions when it is in the mutual best interest of both the members and the membership to do so.

## 8. Pre-existing Condition Review

Eligible medical expenses submitted for sharing may be subject to pre-existing condition review including, but not limited to, request for medical notes, records, hospital charts, surgical records or other relevant medical history information. Any prior sharing for a given condition shall not serve as evidence that the condition is other than pre-existing.

## 9. Prenotification of Medical Expense

Prenotification is a process by which Liberty HealthShare can assist members to avoid unnecessary services, hospitalizations, and shorten inpatient medical stays. Our goal is to improve quality of care and reduce expenses deemed necessary by providers and shared by the members. Providing sufficient advance notice, whenever possible and as required, is a responsibility of a Sharing Member in order to allow Liberty HealthShare the opportunity to provide a variety of suggestions designed to avoid unreasonable billing practices by some physicians and many facilities. Our processes do not dictate what medical treatment a member chooses, but rather are designed to help members assess impending interactions with a complex and confusing medical system. Because Liberty HealthShare membership does not share in medically unnecessary interventions, we provide a process to help guide the member to assess medical necessity in a setting that is separate from their physician office.

**Notice of medical necessity provided by the medical provider to the prenotification staff does not establish eligibility for sharing nor guarantee that all provider/physician/facility expenses and bills will be shared. All applicable sections of the Sharing Guidelines apply whether or not confirmation of medical necessity is provided.**

9.1.2022

APPENDIX 0148

## 10.  Partial Sharing for Newer, Optional and/or Less Accepted or Less Proven Therapies

Procedures, testing, diagnostics, interventions, therapeutics for which the medical evidence supporting efficacy is anecdotal, poor, insufficient, and/or not broadly accepted, or that have marginal clinical utility even when proven, or that are experimental for a specific relevant condition, are generally not eligible for sharing. Likewise, procedures, therapies, diagnostics and surgeries that have questionable, minimal or subjective potential benefits compared to far less expensive options are generally not sharable. There are individual cases that benefit from individualization of sharing decisions by Liberty HealthShare, and more importantly, from extensive effort by the member to appropriately evaluate the utility and cost-effectiveness of a given diagnostic or intervention in his/her special case. In order to encourage members to engage fully in the cost/quality evaluation of many newer, optional, and/or less accepted or less proven medical interventions, and to avoid centralization of those decisions, Liberty HealthShare on behalf of the membership may choose between not sharing at all in certain therapies that are experimental or optional or unproven value,

a.  or to share partially (e.g., from 10%-80%) in such medical services, and apply reasonable caps to the amount the membership will share;

b.  or to share in such medical services only up to the cost of the more standard accepted and cost-effective diagnostic or therapy;

c.  or in the case of competing diagnostic methods or therapies with marginal differences in efficacy but substantial differences in cost, Liberty HealthShare membership may choose to only partially share (10-80%) in the more expensive option, while the therapeutic choice and some of its financial impact remains in the hands of the member;

d.  or, in the case of a certain highly experimental therapies of interest to a member, Liberty HealthShare membership may choose to partially share in them with the acceptance by the member that any money spent on the experimental procedure would not be available for any subsequent therapeutic choices for that condition being treated. The effect would be like raising the AUA for that specific condition by whatever was shared for the experimental therapy.

e.  Every individual and individual case is different. We will not consider precedent or prior cases as a determiner in any individual decision made by Liberty HealthShare. Due process and fair consideration will be applied in all cases.

f.  Liberty HealthShare is able to assist in price negotiation alongside the member. The purpose of this partial sharing is to keep the decision-making primarily at the patient/member level for these more subjective decisions, while assuring that appropriate stewardship of membership resources is maintained.



9.1.2022

APPENDIX 0149

## B. Medical Expenses Not Eligible for Sharing

Eligible medical expenses not submitted within 180 days of the date of service are not eligible for sharing. **Medical expenses of $200 or less in billed charges are not considered burdens that should be carried by other members, are not eligible, and should not be submitted for sharing (unless otherwise noted in these Guidelines)**. Medical expenses arising from any one of the following are not eligible for sharing among members. Members should not submit requests for or have their physician or facility submit bills to Liberty HealthShare for these expenses:



1. **Abortion, Contraceptives, Sex Changes** Services, supplies, care or treatment in connection with an abortion unless the physical life of the mother is endangered by the continued pregnancy and that treatment via a cesarean section has been determined by a neonatologist to be inadvisable. Oral, injectable, implantable and patch contraceptive hormonal therapies, IUD's, condoms, diaphragms, cervical caps, contraceptive sponges, spermicide and other therapies provided for purposes of contraception. Care, services or treatment for non-congenital transsexualism, gender dysphoria or sexual reassignment or change including medications, implants, hormone therapy, surgery, medical or psychiatric treatment.

2. **Alcohol/Drugs** Services, supplies, care or treatment for a Sharing Member for an Injury and/or disease and/or bodily malfunction, which occurred as a result of abuse and/or use of alcohol or drugs/pharmaceuticals, including, but not limited to drug, and/or alcohol rehabilitation treatment.

3. **Breast Implants** The placement, replacement or removal of breast enhancement devices and complications related to breast implants unless related to reconstructive mammoplasty.

4. **Charges Before or After Membership Status Change** Medical care, treatment or supplies for which an expense was incurred before a person was a Sharing Member or after membership became suspended or expired, or the expense is not eligible for sharing because the Member is no longer an Active Member in Good Standing. (See IV.A.3.).

5. **Complications of Ineligible Treatments** Care, services or treatment required as a result of complications from a treatment not eligible for sharing, or that result from a therapy determined by a provider to be not medically necessary.

6. **Cosmetic Procedures** Elective cosmetic treatment, including but not limited to, pharmacological regimens; nutritional procedures or treatments; plastic surgery; salabrasion, chemosurgery and other such skin abrasion procedures associated with the removal or revision of scars, tattoos or actinic changes, is not eligible for sharing.

7. **Custodial Care** Services or supplies provided mainly as a rest cure, maintenance, custodial care or other care that does not treat an illness or injury.

8. **Dental Care** Dental prostheses and care or treatment of the person's teeth above or below the gums, except the repair of sound natural teeth due to injuries that occur while the person is a Sharing Member.

9. **Doula Services** Trained companion who is not a healthcare professional who supports another individual during childbirth.

9.1.2022

APPENDIX 0150

2022 Liberty HealthShare Sharing Guidelines

10. Durable Medical Equipment (DME)  Equipment designed for repeated use (durability to last for three years or more), assists with completion of daily activities and serves as a support for chronic medical conditions. DME includes, but is not limited to, internal or external hearing aids, orthotics (foot, back, hand and others), wheelchairs (manual and electric), hospital beds, traction equipment, canes, crutches, walkers, power scooters, kidney machines, ventilators, portable oxygen equipment, tubing, masks, monitors, pressure mattresses, lifts, nebulizers, rigid/semi rigid leg, arm, back and neck braces, external or implanted neurostimulators. The purchase, rental or replacement of durable or reusable equipment or devices is not eligible for sharing. Devices required for providing support, treatment or prevention of further injury from an acute accident, injury, illness or surgery are eligible for sharing.

11.  Emergency Room Charges When Not an Emergency  When treatment at an emergency room is not determined an emergency by normal standards of medical care and when less costly treatment was available by taking reasonable measures to seek such care.

12.  Exercise Programs  Exercise programs for treatment of any condition, except for physician-supervised cardiac rehabilitation and or physical therapy.



13.  Expenses Where Conflicts-of-Interest Exist  Expenses that result in unnecessary or inappropriate diagnostic or wellness testing being ordered, or which lead to excessive charges, may not be shared. Examples include orders by practices that generate revenues for the practice from laboratories or radiology procedures or other tests that they order. Conflicts of interest do not necessarily preclude sharing, however the prices charged, and the appropriateness of the services provided, will be subject to scrutiny by Liberty HealthShare, and may or may not be shared in, partially or completely, based on the results of such scrutiny.

14.  Experimental, Investigational, Unproven or Unapproved Services  Care and treatment that is either experimental, investigational or unproven, or that has not been approved by the American Medical Association, FDA, CMS, or other industry recognized authoritative bodies, or that is illegal by U.S. law.

15.  Eye care  Eye exercise therapy, radial keratotomy or other eye surgery to correct nearsightedness or farsightedness or any other vision problems that could be corrected with corrective eyewear; also, routine eye examinations, including refractions, lenses for the eyes and exams for their fitting. This exclusion does not apply to the initial permanent lenses following cataract removal. **Ineligible**: Optometry. Routine vision exams or any treatment related to vision correction. **Eligible**: Ophthalmology. Treatment of disorders and diseases of the eye not routinely vision correction related.

16.  Food or Nutritional Formula  Food, including adult, child and baby formulas of any kind. This applies whether or not a prescription is written for the over-the-counter food or formula and regardless of whether there is a specific medical disease the therapy for which is dietary restriction (such as gluten sensitivity). Individual determinations will be made for cases in which an infant or child requires formula *specifically formulated for the individual child* in question because of an underlying metabolic disorder.

17.  Gastric Bypass  Gastric bypass/sleeve or other types of bariatric/weight loss surgery are not eligible for sharing.

18.  Genetic Testing  Not eligible, with the exception to aid in treatment of a previously diagnosed condition, which was eligible for sharing.

9.1.2022

APPENDIX 0151

2022 Liberty HealthShare Sharing Guidelines

19.  Gross Negligent Acts, Hazardous Activities, Illegal Acts and Self-Inflicted Injury  Expenses resulting from an illness or injury where the Sharing Member has acted with gross negligence or with reckless disregard to safety, as evidenced by medical records and as determined by Liberty HealthShare. Care and treatment of an injury or illness that results from engaging in a hazardous activity is not eligible for sharing.

   a.  An activity is hazardous if it is an activity, which is characterized by a constant or recurring threat of danger or risk of bodily harm.
   b.  Charges for services received as a result of injury or illness caused by engaging in an illegal act or occupation; by committing or attempting to commit any crime, criminal act, assault or other illegal behavior; including but not limited to illegal drug activity, crimes against persons, crimes against property and gun offenses is not eligible for sharing.
   c.  Any medical expense due to an intentionally self-inflicted Injury, while sane or insane is not eligible for sharing.

20.  Hair Loss  Care and treatment for hair loss, hair transplants or any drug that promises hair growth, whether or not prescribed by a physician.

21.  Hearing Aids and Exams  Charges for services or supplies in connection with routine hearing exams, internal or external hearing aids, or exams for their fitting.

22.  Hormone Replacement Therapy  Except in children, where prescribed by a physician for short-term (not maintenance) use.

23.  Hospital Employees  Professional services billed by a physician or nurse who is an employee of a hospital or skilled nursing facility and paid by the hospital or facility for the service.

24.  Impotence, Infertility, Surgical Sterilization or Reversal  Surgical and non-surgical services for the treatment of impotence and testosterone supplementation. Infertility. Diagnostic, surgical repair, non-surgical repair, surgical impregnation, prescription drugs for the treatment of infertility, expenses and complications that result from surrogacy. Charges for care and treatment for, or reversal of, surgical sterilization, including vasectomy and tubal ligation.

25.  Massage Services

26.  Medical Marijuana  Expenses related to medical marijuana use, regardless of whether use is legal in a particular state.



27.  Mental Health Services  Charges for psychiatric or psychological counseling, mental disability, learning disability, bereavement counseling, biofeedback therapy, attention deficit disorder (ADD), attention deficit hyperactivity disorder (ADHD), psychological testing, treatment, medication and hospitalization.

28.  Miscarriage  Expenses related to miscarriage when conception was prior to Enrollment Date are not eligible for sharing.

9.1.2022

APPENDIX 0152

**29.  Non-Emergency Transportation, Emergency or Non-Emergency Travel or Accommodations**  Expenses resulting from transportation by ambulance for conditions that will not seriously jeopardize the Sharing Member's health or life are not eligible for sharing. Any additional expense for transportation to a facility that is not the nearest facility capable of providing medically necessary care is not eligible for sharing. Charges for travel or accommodations whether or not recommended by a physician are not eligible for sharing.

**30.  Non-Compliance with Medical Advice**  Failure or refusal to comply with physician treatment plan and/or leaving a facility against medical advice (AMA) shall be subject to clinical review and may result in a determination of ineligibility for sharing.

**31.  No Obligation to Pay**  Charges incurred for which the Sharing Member has no legal obligation to pay.

**32.  Not a Medically Necessary Service**  Care and treatment that does not meet the criteria of or is not specified as a Medically Necessary Service, or care, treatment, services or supplies not recommended and approved by a physician; or treatment, services or supplies when the Sharing Member is not under the regular care of a physician. Liberty HealthShare reserves the right to, and will frequently undertake a process to, review billing submitted by providers or members for payment, and upon review by a qualified medical professional, decline to share expenses deemed not to be a medically necessary service.



**33.  Nutritional Supplements**  Prescribed and/or over the counter supplements.

**34.  Outpatient Pharmaceuticals**  Maintenance pharmaceuticals and over-the-counter medications (whether prescribed or not) are not shareable beyond any pharmaceutical discount programs that Liberty HealthShare may offer. Exceptions are made for cancer therapeutics, which may be shareable, but are subject to potentially substantial limitations as delineated under the paragraph on Partial Sharing.

**35.  Outpatient Prescribed or Non-prescribed Medical Supplies**  Outpatient prescribed or non-prescribed medical supplies including, but not limited to, over-the-counter drugs and treatments, nutritional formulas (regardless of age), elastic stockings, tubing, masks, ostomy supplies, insulin infusion pumps, ace bandages, gauze, syringes, diabetic test strips and similar supplies.

**36.  Personal Comfort Items**  Personal comfort items or other equipment, such as, but not limited to,  air conditioners, air-purification units, humidifiers, electric heating units, orthopedic mattresses, blood pressure instruments, scales, elastic bandages or stockings, nonprescription drugs and medicines, and first-aid supplies and non-hospital adjustable beds.

**37.  Relative Providing Services**  Professional services performed by a person who ordinarily resides in the Sharing Member's home or is related to the Sharing Member as a spouse, parent, child, brother or sister, whether the relationship is by blood or exists in law.

**38.  Replacement Braces**  Replacement of braces of the leg, arm, back, neck, unless there is sufficient change in the Sharing Member's physical condition to make the original device no longer functional.

**39.  Sports-Related Safety/Performance Devices and Programs**  Devices used specifically as safety items or to affect performance primarily in sports-related activities. All membership, registration or participation costs related to physical conditioning programs, such as athletic training, bodybuilding, exercise, fitness flexibility and diversion or general motivation are not eligible for sharing.

**40.  War, Military Activity, or Intentional Involvement in Terroristic Action or Civil Unrest**  Any cost incurred that is due to illness, accident, treatment or medical condition arising out of any declared or undeclared act of war, military activity, or intentional involvement in terroristic action or civil unrest (including riots, violent protests, or civil disobedience).

9.1.2022

APPENDIX 0153

2022 Liberty HealthShare Sharing Guidelines

## V. Dispute Resolution and Appeal

Liberty HealthShare is a voluntary association of like-minded people who come together to assist each other by sharing medical expenses. Such a sharing and caring association does not lend itself well to the mentality of legally enforceable rights. However, it is recognized that differences of opinion will occur, and that a methodology for resolving disputes must be available. Therefore, by becoming a Sharing Member of Liberty HealthShare, you agree that any dispute you have with or against Liberty HealthShare will be settled using the following steps of action, and only as a course of last resort.

If a determination is made, with which the Sharing Member disagrees and believes there is a logically defensible reason why the initial determination is wrong, then the Sharing Member may file an appeal. The appeal letter must be sent via email to appeals@libertyhealthshare.org, or by mail to Liberty HealthShare, Appeals Department, 4455 Hills and Dales Rd. NW, Canton, Ohio 44718. The letter must contain the case or bill number along with the reason for the appeal. **Appeals will be accepted from Sharing Members only; appeals will not be accepted from providers.**

A.  First Level Appeal  Most differences of opinion can be resolved simply by calling Liberty HealthShare. If this option of an informal call does not resolve the dispute, an Appeals Utilization Review Nurse will review the appeal letter and all supporting documentation, and contact the member within 10 working days via phone or email with the determination. The appeal letter must contain the case or bill number along with the reason for the appeal (what and why the Sharing Member is appealing).

B.  Second Level Appeal  If the Sharing Member is unsatisfied with the determination of the Appeals Utilization Review Nurse, then the Sharing Member may request a second level appeal. The appeal must be in writing, must contain the case or bill number, and state the elements of the dispute and the relevant facts. Importantly, the appeal should address all of the following:

1.  What information does Liberty HealthShare have that is either incomplete or incorrect?
2.  How do you believe Liberty HealthShare has misinterpreted the information already on hand?
3.  What provision in the LHS Guidelines do you believe Liberty HealthShare applied incorrectly?

Within 30 days, the Appeals Manager and the Director of Medical Services will review the appeal, and the aggrieved party will be contacted via phone or email with the determination.

C. Third Level and Final Appeal  Should the matter still stay unresolved, then the aggrieved party may request a third and final appeal. The appeal will be submitted by Liberty HealthShare's VP of Medical Services to the Liberty HealthShare Board of Directors. Within 30 days, the Liberty HealthShare Board of Directors shall render their determination and appealing member will be notified.

D.  Mediation and Arbitration  If the aggrieved Sharing Member disagrees with the conclusion of the Final Appeal Panel, then the matter shall be settled by mediation and, if necessary, legally binding arbitration in accordance with the Rules of Procedure for Christian Conciliation of the Institute for Christian Conciliation, a division of Peacemaker Ministries. Judgment upon an arbitration decision may be entered in any court otherwise having jurisdiction.

Sharing Members agree and understand that these methods shall be the sole remedy for any controversy or claim arising out of the Sharing Guidelines and expressly waive their right to file a lawsuit in any civil court against one another for such disputes, except to enforce an arbitration decision. Any such arbitration shall be held in Fredericksburg, Virginia subject to the laws of the Commonwealth of Virginia.

Liberty HealthShare shall pay the fees of the arbitrator in full and all other expenses of the arbitration; provided that each party shall pay for and bear the cost of its own transportation, accommodations, experts, evidence and legal counsel and provided further that the aggrieved Sharing Member shall reimburse the full cost of arbitration should the arbitrator determine in favor of Liberty HealthShare and not the aggrieved Sharing Member. The aggrieved Sharing Member agrees to be legally bound by the Arbitrator's decision. The Rules of Procedure for Christian Conciliation of the Institute for Christian Conciliation, a division of Peacemaker Ministries, will be the sole and exclusive procedure for resolving any dispute between individual members and Liberty HealthShare when disputes cannot be otherwise settled.

9.1.2022

APPENDIX 0154

## VI. Amending the Guidelines

**A.  Enacting Changes**  These Guidelines may be amended from time to time as circumstances require and as determined to be  appropriate by a majority vote of the Liberty HealthShare Board of Directors. The Board of Directors has the option, at its  discretion, of first taking an advisory vote of the Sharing Members prior to making any such amendments.

**B.  Effective Date**  Amendments to the Guidelines will take effect as soon as is administratively practical or as otherwise designated by the Board of Directors. **Medical expenses submitted for sharing will be subject to the edition of the Guidelines in effect on the relevant Dates of Service, regardless of when the medical expenses are submitted or recorded as received by Liberty HealthShare, and such edition of the Guidelines shall supersede all other editions of the Guidelines and any other communication, written or verbal.**

**C.  Notification of Changes**  Sharing Members will be notified of changes to the Guidelines in the normal course of communication with members. Notice of material changes to the Guidelines will be given within 60 days.

## VII.  Sharing Member Rights and Responsibilities

As a Sharing Member of Liberty HealthShare, you have certain rights and responsibilities.

**A.  Sharing Member Rights. You have the right to:**

1. Receive considerate, courteous service from all employees and representatives of Liberty HealthShare.

2. Receive accurate information regarding program Guidelines and eligibility of needs in both member literature and when in contact with Liberty HealthShare.

3. Have medical expense needs processed accurately once all necessary documentation has been received.

4. Have all medical records and personal information handled in a confidential manner and in compliance with Privacy Standards.

5. Be informed about health care practitioners and providers giving discounted services to Sharing Members.

6. File a dispute, when you have one, without fear of prejudice or reprisal.

7. Make recommendations regarding program Guidelines.

**B.  Sharing Member Responsibilities. You have the responsibility to:**

1. Submit medical bills within 180 days of the date of service in order to be shared.

2. Treat Liberty HealthShare employees and representatives in a considerate and courteous manner.

3. Read all Liberty HealthShare materials carefully as soon as you receive them and ask questions when necessary.

4. Regularly check for and review all amendments of and information relating to the Guidelines that may be posted on the Liberty HealthShare website from time to time and ask questions when necessary.

5. Take personal charge of your medical care and make informed and knowledgeable health care choices.

6. Learn how to promote and protect your own health and wellness, eat properly, exercise, and eliminate harmful habits, stressors and risk factors within your control.

7. Seek medical advice when appropriate, take the necessary steps to understand the medical advice you receive and any diagnosis you are given and obtain needed care in a timely manner.

8. Take the necessary steps to learn about the effects on your body of any medical condition with which you are diagnosed or afflicted and how you can help manage and control the condition.

9.1.2022

APPENDIX 0155

2022 Liberty HealthShare Sharing Guidelines

9.  Steward your own resources and the resources of the membership of Liberty HealthShare by inquiring about costs prior to obtaining care in all non-emergency situations, make cost comparisons between providers and make cost efficient choices about the care you obtain.

10. Be informed about the policies and practices of Liberty HealthShare and follow them for the benefit of all Sharing Members.

11. Be honest about your health conditions, and provide all pertinent information to your doctor, family members and Liberty HealthShare when needed.

9.1.2022

APPENDIX 0156

## VIII. Liberty Rise Sharing Program Guidelines

The provisions of the preceding Sharing Guidelines are generally applicable to members of the Liberty Rise Sharing Program with the following exceptions:

### A. Age Restriction and Household Size

Liberty Rise Sharing Program availability is limited to young adult individuals (ages 18-29) who are single or with spouse (married couples without one or more dependent children). Minor children are not eligible to be enrolled under this program.  Enrollment is limited to individuals who have not been a primary member on any Liberty HealthShare program within 12 months of enrollment in the Liberty Rise Sharing Program.

Married individuals must each apply for separate Liberty Rise Sharing Program memberships. Liberty Rise Sharing Members are no longer eligible for the program upon the occurrence of the following:



1.  Upon reaching his/her 30th birthday, or
2.  The Liberty Rise Sharing Member or his/her spouse has one or more dependent children (natural born or legally adopted of either spouse).

### B. Program Changes After Loss of Qualification

Individuals who no longer qualify under the Liberty Rise Sharing Program due to age or

the addition of a dependent child who wish to continue their Liberty HealthShare membership must apply and qualify on his/her own merit as a new Sharing Member under one of the other Liberty HealthShare program options. If the individual applies and is accepted within 30 days of the loss of qualification, the membership enrollment dues are waived.

### C. Continuing Membership After Married Member No Longer Qualifies Due to Age

In the event two spouses are members of the Liberty Rise Sharing Program and one spouse reaches the age limit, but the other spouse does not, both spouses may apply for a couple's membership in another Liberty HealthShare program, or the younger spouse has the option to remain as a member of the Liberty Rise Sharing Program.

### D. Wellness Visits

Liberty HealthShare encourages our members to see their Primary Care Physician or provider yearly to maintain their health and well-being. After the first two months of membership, an annual preventative wellness visit and related lab work for which there are no medical symptoms or diagnosis in advance are eligible for sharing, up to a maximum of $400 of the fair and reasonable charges as determined by Liberty HealthShare.

### E. Sharing Limits / Medical Expenses Eligible for Sharing

Medical expenses eligible for sharing are limited to **$50,000 per year** for all services combined with associated maximum yearly sharing limits for each service outlined below:

9.1.2022

APPENDIX 0157

2022 Liberty HealthShare Sharing Guidelines

### Liberty Rise Sharing Limits / Medical Expenses Eligible for Sharing

| Service | Unshared Amount per Visit | Maximum Sharing Limit |
|---|---|---|
| Primary Care Physician | $25 | $750 / year |
| Specialist Physician | $40 | $750 / year |
| Urgent Care | $50 | $500 / year |
| Hospital Stay* | | $1,250 / day |
| In/Out-Patient Surgeon Fee* | | $1,250 / day |
| Emergency Room | $500 | $1,000 / year |
| CT Scan | $200 | $1,250 / year |
| MRI Scan | $200 | $1,250 / year |

*Prenotification Required

### F. Medical Expenses Not Eligible for Sharing

Medical expenses outlined under Sec. IV.B. of the LHS Sharing Guidelines are not eligible for sharing under the Liberty Rise Sharing Program. Maternity expenses are not eligible for sharing under the Liberty Rise Sharing Program.

9.1.2022

APPENDIX 0158

2022 Liberty HealthShare Sharing Guidelines

## IX. Liberty Unite, Liberty Connect and Liberty Essential Sharing Program Guidelines

The provisions of the preceding Liberty HealthShare Sharing Guidelines are applicable to members of the Liberty Unite, Liberty Connect and Liberty Essential sharing programs with the following additions:

### A. Prenotification of Medical Expense

To be considered for medical cost sharing, the member **MUST** notify Liberty HealthShare **IN ADVANCE** by contacting the prenotification department for any services, procedures, and diagnostics listed below, except in the case of true emergencies. The Sharing Member, their physician, or their representative should contact the prenotification department **as soon as the need for admission or services is recognized, and at least seven days prior to admission whenever possible.** An electronic prenotification form can be found on the Liberty HealthShare website and in ShareBox. **It is the responsibility of the Sharing Member to ensure that the prenotification staff is contacted and not depend on the physician or facility to do so. Liberty HealthShare's relationship is with the member, not the medical provider.**

**To be eligible for consideration for medical cost sharing, prenotification is required:**

1. Inpatient hospital confinements including emergency admissions (as soon as it becomes evidently needed), skilled nursing, inpatient rehabilitation facility and hospice. The term "Inpatient" includes any facility admission, observation or other confinement that lasts more than 23 hours
2. Organ/tissue transplant services
3. Extended emergency department observation periods and observation care
4. All home health care services
5. All outpatient surgery (including surgical centers, clinics and hospitals)
6. Maternity, obstetric and prenatal needs—member must notify Liberty HealthShare prenotification department of current date of conception to establish eligibility, as early as possible upon learning of pregnancy
7. Non-emergent Magnetic Resonance Imaging (MRI) scans
8. Positron Emission Tomography Scanning (PET)
9. Cardiac rehabilitation
10. Chemotherapy or radiation therapy before initiation of treatment
11. Pain injections/pain management with limitation of medical necessity
12. Outpatient infusion therapy
13. Invasive diagnostic testing involving puncturing the skin or entering the body in an outpatient or surgical setting.

**The following specifically DO NOT require prenotification:**
CT scans, outpatient/physician office visits, EKG, emergency department visits, urgent care, routine laboratory testing, screening mammograms, ultrasound, wellness and flu vaccinations, plain x-rays, skin biopsies, ancillary therapies, chiropractic care, acupuncture, complementary or alternative medical (CAM) management diagnostic mammograms, diagnostic colonoscopies. Tests where prenotification is not required are not necessarily eligible for sharing, based on the Sharing Guidelines.

**All hospital admissions MUST be reported to the prenotification staff within 48 hours following admission, or on the next business day after admission, to be eligible for sharing.** If the Sharing Member is unable to prenotify due to the severity of the illness or injury, then a physician or a responsible party representing the member should contact the prenotification department at the earliest time reasonably possible. After admission to the hospital, the clinical review staff will continue to evaluate the Sharing Member's progress to monitor the length of hospital stay. All hospital admissions may be reviewed retrospectively to determine if the treatment received is eligible for sharing. To increase the likelihood of sharing meeting a member's expectations, we encourage members to prenotify with Liberty HealthShare when in any doubt. Failure to prenotify may be reviewed by Liberty HealthShare staff and its requirement waived if there is reasonable justification for that failure.

9.1.2022

APPENDIX 0159

### B. Eligibility for Sharing Limited to Medical Expenses Exceeding $200

Medical Expenses **$200 or less in billed charges (per visit/per member) are not to be submitted and are ineligible for sharing**, unless otherwise noted in the guidelines. Ineligible expenses cannot be applied to a Member's Annual Unshared Amount (AUA).

### C. Medical Expenses Eligible for Sharing

Eligible medical expenses are shared on a per person per incident basis for illnesses or injuries incurring medical expenses after the membership Enrollment Activation Date when medically necessary and provided by or under the direction of licensed physicians, urgent care facilities, clinics, emergency rooms, or hospitals (inpatient and outpatient), or other approved providers of conventional or naturopathic care. Medical expenses eligible for sharing include, but are not limited to, home health care, physician and hospital services, emergency medical care, medical testing, x-rays, emergency ambulance transportation and prescriptions, unless otherwise limited or excluded by these Guidelines.

Total eligible medical expenses incurred must exceed the Annual Unshared Amount to be eligible for sharing (See IV.A.1.). **Unless otherwise noted in these guidelines, total eligible medical expenses incurred must also exceed $200 per visit/billed charges per member.** A Medical Expense Incident is any medically diagnosed condition receiving medical treatment and incurring medical expenses for the same diagnosis. All related medical bills for the same diagnosis comprise the same incident. **All eligible medical expenses must be submitted for sharing within 180 days of the date of service, in the manner and form specified by Liberty HealthShare.** This may include, but not be limited to, standard industry billing forms (HCFA 1500 and/or UB 92) and medical records.

**Liberty Unite, Connect and Essential Sharing Program Members may share in these types of medical costs below, which may be limited in extent by other paragraphs in these Sharing Guidelines:**

1. **Acute Hospital Charges** Inpatient or Outpatient hospital treatment or surgery for a medically diagnosed condition.

2. **Ambulance** Emergency land or air ambulance transportation to the nearest medical facility capable of providing the medically necessary care to avoid seriously jeopardizing the Sharing Member's life or health.

3. **Cancer Care** Medical expenses for cancer are eligible for sharing under these guidelines:
   a. Onset of signs/symptoms related to the cancer diagnosis are exhibited after initiation of sharing membership.
   b. Limitations are set by sharing program at the time of diagnosis and are subject to AUA.
   c. Prenotification is required for oncology treatment plan review for eligibility for sharing including naturopathic and alternative treatments.

4. **Cardiac Rehabilitation** Up to 12 therapy visits provided by a licensed therapist per membership year. After initial evaluation, prenotification and approval is required before any therapy needs will be considered for sharing. After a Sharing Member has completed 12 visits, a reassessment is required to approve additional visits (up to 24) for a total of 36 visits.

5. **Chiropractic Care, Acupuncture, Osteopathic Manipulative Treatment and Ancillary Therapies (Physical Therapy, Speech Therapy, Occupational Therapy, Respiratory Therapy).** Chiropractic care, acupuncture, osteopathic manipulative treatment and ancillary therapies are eligible for sharing up to $50.00 per visit by a licensed provider with $1,000.00 maximum share limit per member per membership year (inclusive of ALL chiropractic, acupuncture, osteopathic manipulative treatment and ancillary services) and subject to AUA.

6. **Cosmetic Procedures** Cosmetic care and treatment provided for disfiguration caused by amputation, disease (including acne), accident or initial breast reconstruction following a mastectomy, are eligible for sharing.

7. **Direct Primary Care (DPC) Membership** Members may request to have a variable portion of their monthly DPC membership fees shared, the amounts of which may be adjusted from time to time by the Liberty HealthShare administration. If a practice bills separately for an office visit, those bills are eligible for sharing if the member has not also requested a reimbursement for DPC monthly fees. If a practice is identified as billing excessively, ordering unnecessary tests, or profiting egregiously from ancillary services that should be included within their DPC membership, then fees for that practice may not be shared in or the sharing stopped once identified. DPC membership is not subject to guideline limitations for medical expenses $200 or less.

9.1.2022

APPENDIX 0160

8. **Emergency Room**  Qualifying emergency room services provided on an outpatient basis at a hospital are eligible for sharing, subject to AUA; however, **the first $500 is not eligible for sharing** unless hospital admission occurs within 23 hours of emergency room treatment. Emergency room charges are not eligible for sharing when treatment at an emergency room is not determined an emergency by normal standards of medical care and when less costly treatment was available by taking reasonable measures to seek such care.

9. **Home Health Care**  Skilled care services at home for up to 30 days by a home health care agency for each related medical expense incident, provided such home care reduces the expected medical expense and replaces hospital or nursing home services.

10. **Hospice Care**  For the life of the membership, sharing in hospice care is limited to 30 days of hospice care, and 5 days of respite care.  Charges for medical social services are limited to $200 of eligible expense.

11. **Hysterectomy**  Expenses related to a hysterectomy are eligible for sharing only when medically necessary. Hysterectomies intended for preventing normal or perimenopausal variations in menstruation are not eligible for sharing.

12. **Interpreter Services**  Eligible for sharing if medically necessary to provide medical care.

13. **Limb Prosthetics** and their replacement, if medically necessary.

14. **Maternity**  Mothers who have been a Sharing Member for at least six consecutive months prior to conception are eligible for sharing maternity expenses. Sharing is limited to $125,000 per pregnancy (whether for a single or multiple birth pregnancy) and subject to the Annual Unshared Amount (AUA).

   a.  **Eligible Maternity Expenses Include:**
      i.  Physician care, hospital or birthing center admission, or home delivery accompanied by a certified midwife or physician.
      ii.  Delivery by caesarean section that is medically necessary as determined by a physician.
      iii.  Maternity expenses with a natural delivery but with complications that threaten the life of the mother or infant and requiring care or services not normally rendered at the time of delivery.
      iv.  Lactation consultation limited to two (2) post-partum visits in hospital.

   b.  **Newborn Expenses:**
      i.  Medical expenses for a newborn, circumcisions, congenital birth defects, and/or complications at the time of delivery, including but not limited to, premature birth, are treated as a separate incident, may be eligible for sharing and are subject to the AUA.
      ii.  Neonatal Intensive Care Unit stays for newborns must be reported to the Prenotification department within 48 hours following admission.
      iii.  The newborn must be added as a member within 60 days of the birth for eligible medical expenses to be shared.

   c.  **Doula Services** are **not** eligible for sharing.

15. **Medical Costs Incurred Outside the United States**  Charges for the care and treatment of a medically diagnosed condition when treatment outside the United States is financially beneficial or when traveling or residing outside the United States may be eligible for sharing. Eligibility of such charges are subject to all other provisions of the Guidelines. Medical billing must be submitted in English and converted to U.S. currency. Medical Tourism for actual medical services provided for shareable expenses when the total cost is less than the fair and reasonable charges of physicians or facilities who bill honorably in the United States may also be eligible for sharing upon proper submission of detailed billing that has been authenticated and notarized by a Civil-Law Notary or Notary Public for the country where such medical services were rendered.

16. **Naturopathic/Alternative Treatments or Medication/Complementary Alternative Medicine/Integrative Health**
Nontraditional treatment used in place of standard medical care provided by a Naturopathic Physician or Doctor of Naturopathy (ND or NMD), a traditional Naturopath or other practitioner of alternative treatments including any labs that are ordered to determine treatment, is eligible for sharing up to a $1,000.00 maximum share limit per member per membership year (inclusive of ALL naturopathic, alternative treatments or medication, complementary alternative medicine and integrative health) and subject to AUA.

APPENDIX 0161

2022 Liberty HealthShare Sharing Guidelines

17.  **Organ Transplant**   Expenses incurred in connection with any organ or tissue transplant may be shared among the members up to a maximum of the member's chosen program limits per organ per lifetime. This includes, but is not limited to, expenses incurred in evaluation, screening, candidacy determination process, organ transplantation, organ procurement, transportation of organ, donor expenses, follow-up care, immunosuppressant therapy, and re-transplantation. Organ transplant includes, but is not limited to, transplantation of the heart, lungs, kidneys, liver, pancreas and bone marrow. Expenses incurred in connection with any organ or tissue transplant that exceed the maximum shareable expense for the chosen program per organ per lifetime are not eligible for sharing.

18.  **Physician's Services** for the diagnosis, treatment, management or prevention of an Illness or Injury.

19.  **Prescription Drugs** Inpatient and outpatient acute therapy drugs (excluding maintenance or preventive therapy) and prescription medications prescribed for treatment within the first 45 days after acute illness, are eligible for sharing subject to all other provisions of the Guidelines, including the Annual Unshared Amount.
   a.   Medications available over-the-counter are not eligible for sharing, regardless of whether a prescription is written.
   b.   Outpatient prescription medications are supported by a pharmacy program of Liberty HealthShare.  Members are expected to review the pharmacy program formulary for categories and therapeutically equivalent drug names and to select lower-tiered drugs in consultation with their doctor.

20.  **Wellness Visits**   Liberty HealthShare encourages our members to see their Primary Care Physician or provider yearly to maintain their health and well-being. After the first two months of membership, an annual preventative wellness visit and related lab work for which there are no medical symptoms or diagnosis in advance are eligible for sharing, up to a maximum of $400 of the fair and reasonable charges as determined by Liberty HealthShare and not subject to the AUA nor subject to guideline limitations for medical expenses $200 or less.
   a.   Well baby visits including immunizations are eligible for sharing within the first 13 months after birth and **not** subject to the AUA or the two-month waiting period.
   b.   Any **new** condition based on symptoms discussed during your preventative wellness visit and any additional diagnostics or labs that are ordered to determine treatment are shareable according to LHS guidelines and are subject to the AUA.

21.  **Screenings**  Not subject to guideline limitations for medical expenses $200 or less.
   a.   The following preventative screenings are **not** subject to the AUA:
      i.   Screening pap smears are eligible for sharing once every year.
      ii.  Screening mammograms, PSA tests, and Cologuard® are eligible for sharing once every two years up to and including age 49.
      iii. Screening mammograms, PSA tests, and Cologuard® are eligible for sharing once every year for members 50 years of age and older.
   b.   The following screenings are eligible for sharing and **are** subject to the AUA:
      i.   Screening colonoscopies and bone density screenings
      ii.  Ultrasound/MRI/Thermogram screening conducted in lieu of a screening mammogram
      iii. All diagnostic screenings

22.  **Subacute Health Care**   Facility Inpatient rehabilitation up to 30 days per incident.

23.  **Urgent Care Facilities/ Outpatient Clinics**   Eligible for sharing for treatment of acute accident, injury or illness.

24.  **Vaccinations**  Not subject to guideline limitations for medical expenses $200 or less. Vaccinations for infectious diseases are subject to the AUA and subject to the paragraph on Partial Sharing when there are less expensive alternatives. The Influenza vaccine is **not** subject to the AUA.

9.1.2022

APPENDIX 0162

2022 Liberty HealthShare Sharing Guidelines

### D. Additional Programs

1.  **Supportive Services**  Sharing Members may choose to participate in a voluntary program that utilizes prevention and intervention strategies, working with members, families and providers ensuring continuity of care and promoting overall health and wellness. If conditions are expected to be of a serious nature, a Liberty HealthShare clinician may alter or waive the normal provisions of the guidelines when it is reasonable to expect a cost-effective result without a sacrifice to the quality of care. This does not affect membership and may provide supportive resources to assist with those services not eligible for sharing.

2.  **Burial Expenses**  Sharing Members and /or his or her dependents, who die (s) after two years (24 months) of uninterrupted participation as a Sharing Member, may be eligible for the expenses listed below, up to $5,000, to ease the burden on the family upon death.
    a.  Embalming
    b.  Cremation
    c.  Casket
    d.  Headstone
    e.  Burial plot
    f.  Burial Vault
    g.  Funeral director's costs
    h.  Travel expenses for the Member's body

    The original bill(s) and a certified copy of the death certificate(s) are to be submitted to Liberty HealthShare within 180 days of the death of the Member.

3.  **Provision for Eligible Medical Expenses after Death**  If a Sharing Member, at the time of his or her death, has outstanding Eligible Medical Expenses that have not been shared at the time of death, the following provisions apply:
    a.  Eligible Medical Expenses submitted by the provider in the normal course of business, shall be shared in the same manner, as if the member had not died.
    b.  Eligible Medical Expenses not submitted by the provider, but paid or payable directly by or on behalf of the member and submitted for sharing within a reasonable time of the billing or payment, shall be shared, and payment shall be directed to the deceased Sharing Member's estate, or pursuant to an order of the applicable Court with probate jurisdiction.

### E. Medical Expenses Not Eligible for Sharing

Medical expenses outlined under Sec. IV.B. of the LHS Sharing Guidelines are not eligible for sharing under the Liberty Unite, Connect and Essential Sharing Programs.

9.1.2022

APPENDIX 0163

2022 Liberty HealthShare Sharing Guidelines

## X. Liberty Assist Sharing Program Guidelines

The provisions of the preceding Sharing Guidelines are generally applicable to members of the Liberty Assist Sharing Program who are also on Medicare Parts A and B, with the following exceptions:

A.  Age Restriction and Household Size  The program is only available to individuals who are 65 years of age or older and MUST be enrolled in Medicare Parts A and B to participate. Enrollment must occur within 3 months prior, 3 months after or the month of turning 65 years of age. Married individuals must apply and participate as separate Sharing Members of the Liberty Assist Sharing Program. **This program expires when the member turns 85 years of age.**



1. Exceptions to the above age requirements for individuals 65-70 years of age:
   a. Individual retires and current employers' insurance is terminated (enrollment must occur within 30 days of termination)
   b. Member is currently enrolled in a Liberty HealthShare Sharing Program
   c. A former Liberty HealthShare Member who is currently enrolled in a Medicare Advantage program

B.  Preexisting Conditions  New Liberty HealthShare Members are required to provide medical condition history for review but are  not subject to preexisting sharing limits.

C.  Medical Expenses Eligible for Sharing  This program is secondary to Medicare Parts A and B. Once the AUA has been met,  the difference between the Medicare allowable amount and the amount paid by Medicare may be eligible for sharing, subject to  the provisions of the LHS Sharing Guidelines. **Medical expenses eligible for sharing are limited to $100,000 per year for all services.**

Medical expenses may be eligible for sharing in those instances where Medicare Parts A and B have approved treatment, but do not pay all or part of the treatment, except for those conditions or services listed below. This includes copayments, coinsurance and deductibles (as defined by Medicare). It is the Member's responsibility to know what conditions and services are covered by Medicare. See www.medicare.gov or call 1 800 MEDICARE (1 800 633 4227) for more information.

**The Annual Unshared Amount will be calculated based on Medicare's calendar year and not the Liberty Assist Sharing Program membership enrollment date.**

1. Hospitalization Expenses
   a. Copayments for hospitalization expenses from the 61st through the 90th day of any Medicare "benefit period"
   b. Copayments for any hospital confinement beyond the 90th day in a "benefit period," up to 60 days during the Member's lifetime
   c. Medicare-eligible hospital charges for a period of up to 365 additional days during the Member's lifetime after the Member has exhausted all Medicare hospital benefits
   d. Replacement of up to 3 pints of blood while hospitalized

2. Skilled Nursing  Copays for days 21-100 (days beyond 100 are not eligible for sharing).

9.1.2022

APPENDIX 0164

3. **Out of Country Urgent Care**  Sharing for Members who travel or serve as missionaries outside of the United States will be limited to medically necessary urgent care,  as Medicare does not pay for medical care received outside of the United States. Eighty percent of the billed charges for out of country urgent care incurred during the first 60 days of each trip that Medicare would have paid if it was provided in the United States, may be eligible for sharing up to a $50,000 lifetime maximum.

4. **Hospice**  Member must meet Medicare's requirements, including a doctor's certification of terminal illness.

5. **Other Copay and Deductibles**  The following may be eligible for sharing after the AUA has been met:
   a. Part A Deductible
   b. Part A Copay
   c. Part B Deductible
   d. Part B Coinsurance

D. **Medical Expenses Not Eligible for Sharing**
   1. Any expense not approved by Medicare
   2. Any amount in excess of the Medicare approved amount
   3. Eligible expenses up to the annual cost sharing amount
   4. All outpatient prescription drugs
   5. Any expense over the annual sharing limit of $100,000
   6. Medical expenses outlined under Sec. IV.B. of the LHS Sharing Guidelines are not eligible for sharing under the Liberty Assist Sharing Program.

9.1.2022

APPENDIX 0165

## XI. Definition of Terms

Commonly used terms used throughout the Guidelines and Enrollment Application are defined as follows:

1. **Annual Unshared Amount** - The amount of an eligible need that does not qualify for sharing.

2. **Applicant** - An adult Sharing Member participating by himself or herself; and/or their spouse, and/or a child(ren) enrolled by a parent or guardian, who certifies that he/she takes financial responsibility for the child(ren)'s sharing membership and who signs the enrollment application on behalf of the child(ren).

3. **Application Date** - The date Liberty HealthShare receives the Membership Enrollment Application with the appropriate dates included.

4. **Assignment of Member Shares Received for Eligible Expenses** - An arrangement whereby the Program Participant assigns their receipt of voluntary Member Shares for eligible expenses, if any, in strict accordance with the terms of these Sharing Guidelines, to a Provider. If a provider accepts said arrangement, Providers' rights to receive payment from the self-pay member for services rendered are equal to those received by the member from other Program Participants and are limited by the terms of the Sharing Guidelines. A Provider that accepts this arrangement indicates acceptance of an "Assignment of Sharing" as consideration in full for services, supplies, and/or treatment rendered.

5. **Balance Bill** - A medical bill from a healthcare provider billing a member for the difference between the provider's total billed charges less any portion of the medical need applied to the member's Annual Unshared Amount and any amount shared by members.

6. **CMS** - A federal agency within the United States Department of Health and Human Services known as the Centers for Medicare and Medicaid Services.

7. **Complications of Pregnancy** - Conditions in evidence before the pregnancy ends: acute nephritis, ectopic pregnancy; hemorrhage, miscarriage; nephrosis; cardiac decompensation; missed abortion; hyperemesis gravidarum; pre-eclampsia, and eclampsia of pregnancy.

8. **Dental Care** - Any care rendered by a dentist who is properly trained and licensed to practice dentistry and who is practicing within the scope of such license.

9. **Dependent** - The applicant's spouse; children (natural born or legally adopted of either spouse) or an unmarried person under the age of 26 who is the applicant's child by birth or legal adoption or for which the applicant has a Qualified Medical Child Support Order (QMCSO). An applicant's stepchild is also a dependent so long as the applicant's spouse is also participating under the same sharing membership.

10. **Discount Provider** - Any hospital, physician or other health care provider who has agreed to accept reduced fees for services rendered to Liberty HealthShare members.

11. **Eligible Medical Expenses** - The charge for a service or supply provided in accordance with the terms of the Sharing Guidelines and approved for sharing, whose applicable charge amount does not exceed the program limits.

12. **Enrollment Date** - The date that membership becomes effective. Conditions that exist prior to the enrollment date will be considered pre-existing.

13. **Excess or Excessive Charges** - Charges in excess of fair and reasonable consideration or reasonable fees; or for services not deemed to be reasonable or medically necessary; or for billed amounts found to constitute invalid charges, based upon the determination of Liberty HealthShare or its delegate in accordance with the terms of the Sharing Guidelines.

14. **Facility** - Any facility that provides medical services on an outpatient basis, whether a hospital-affiliated facility or independent facility.

9.1.2022

APPENDIX 0166

15.  Fair and Reasonable Consideration - An amount that would constitute fair and reasonable payment to a provider for services provided in accordance with the terms of the Sharing Guidelines and approved for sharing, under the facts and circumstances surrounding the provision thereof, taking into consideration the cost to the provider for providing the services; the fees that the provider typically accepts as payment for the services from or on behalf of the majority of patients receiving the services; the fees that providers of similar training and experience in the same "area" most frequently accept as payment for the services from or on behalf of the majority of patients receiving the services and the Medicare reimbursement rates for such Services. Regardless of typical practices of any provider or other providers of comparable services, Fair and Reasonable Consideration shall not include amounts for any invalid charges.

16.  Gross Negligence – A conscious and voluntary indifference to, and a blatant violation of, a legal duty. It is also a reckless disregard to safety.

17.  Guidelines or Sharing Guidelines - The documentation that describes the types of medical expenses shared by members and how Liberty HealthShare functions to facilitate that sharing.

18.  Hospital - An institution that meets all of the following requirements:

a.  It provides medical and surgical facilities for the treatment and care of injured or sick persons on an inpatient basis;

b.  It is under the supervision of a staff of physicians;

c.  It provides 24 hour a day nursing service by registered nurses;

d.  It is duly licensed as a hospital;

e.  It is not, other than incidentally, a place for rest, a place for the aged, a nursing home or a custodial or training type institution, or an institution which is supported in whole or in part by a federal government fund and

f.  It is accredited by the Joint Commission on Accreditation of Hospitals sponsored by the AMA and the AHA.

The requirement of surgical facilities shall not apply to a hospital specializing in the care and treatment of mentally ill patients, provided such institution is accredited as such a facility by the Joint Commission on Accreditation of Hospitals sponsored by the AMA and the AHA. "Hospital" shall also have the same meaning, where appropriate in context, set forth in the definition of "Ambulatory Surgical Center."

19.  Ineligible - Expense not eligible for sharing and not subject to the AUA.

20.  Incident - Any medically diagnosed condition receiving medical treatment and incurring medical expenses for the same diagnosis.

21.  License, Licensed or Licensure - A person performing medical services, the applicable and current licensure, certification or registration required to legally entitle that person to perform such services in the state or jurisdiction where the services are rendered.

22.  Marriage - The spiritual and legal union of one man and one woman under the covenant of matrimony and the laws and regulations of the state in which such union was formed.

23.  Maternity - Medical expenses for the mother's care pertaining to prenatal or infant delivery, and initial, routine hospital expenses for the infant. Maternity does not include complications of pregnancy or medical expenses for the infant beyond routine hospital expenses, neither of which is subject to maternity provisions of the Sharing Guidelines.

24.  Maximum Eligible Amount, Maximum Amount or Maximum Eligible Charge - The eligible amount to be shared for a specific item or charged expense under the terms of the Sharing Guidelines. Maximum Eligible Charge(s) may be the lesser of:

a.  Fair and reasonable consideration;

b.  the allowable charge otherwise specified under the terms of the Sharing Guidelines;

c.  a negotiated rate established in a direct or indirect contractual arrangement with a Provider, or

d.  the actual charge billed for the item or expense.

APPENDIX 0167

2022 Liberty HealthShare Sharing Guidelines

The Program will assign for sharing the actual charge billed to the self-pay member if it is less than the fair and reasonable amount. The Program has the discretionary authority to decide if a charge is for a medically necessary and reasonable service. The Maximum Eligible Charge will not include any invalid charges including, but not limited to, identifiable billing errors, up-coding, duplicate charges, misidentified or unclearly described items and charges for services not performed.

25.  **Medical Expense Need** - The charge(s) or expense(s) for medical services from a licensed medical practitioner or facility, or an approved practitioner of alternative treatments, arising from an illness or accident for a Sharing Member and the fees incurred by Liberty HealthShare to reduce such charges or expenses.

26.  **Medically Necessary Service** - Health services ordered by a physician or practitioner exercising prudent clinical judgment, provided to a Program Participant for the purpose of preventing, diagnosing or treating an illness, injury, disease or symptoms. Such services, to be considered medically necessary, must be clinically appropriate in terms of type, frequency, extent, site and duration for the diagnosis or treatment of the Participant's sickness or Injury, and must meet each of the following criteria:
   a.  It is supported by national medical standards of practice.
   b.  It is consistent with conclusions of prevailing medical research that:
      i.  Demonstrates that the health service has a beneficial effect on health outcomes; and
      ii.  Is based on trials that meet the following designs:
         1.  Well-conducted randomized controlled trials. (Two or more treatments are compared to each other, and the patient is not allowed to choose which treatment is received.)
         2.  Well-conducted cohort studies. (Patients who receive study treatment are compared to a group of patients who receive standard therapy. The comparison group must be nearly identical to the study treatment group.)
   c.  It is the most cost-effective method and yields a similar outcome to other available alternatives.
   d.  All new technologies, procedures and treatments are decided based upon the language in (b)(ii) above.

To help determine medical necessity, Liberty HealthShare may refer to the Sharing Member's medical records and other resources and may require a second opinion from a healthcare professional chosen by Liberty HealthShare. To be Medically Necessary, all of these criteria must be met. The determination of whether a service, supply, or treatment is or is not medically necessary may include findings of the American Medical Association (AMA) and medical advisors to Liberty HealthShare. Liberty HealthShare has the discretionary authority to decide whether care or treatment is or was medically necessary.

27.  **Monthly Share Amount** - The monetary contribution, not including the membership enrollment dues/annual renewal dues or administrative costs, voluntarily given to share in another member's medical expense need as assigned by Liberty HealthShare according to the Sharing Guidelines. Expenses Not Eligible for Sharing are provider charges not eligible for sharing, including charges in excess of the Maximum Eligible Amount, or other ineligible charges as established by the Sharing Guidelines.

28.  **Outpatient** - A patient who receives services at a hospital but is not admitted as a registered overnight bed patient; this must be for a period of less than 24 hours. This term can also be applicable to services rendered in a freestanding facility or hospital-affiliated facility.

29.  **Physician** - A person who is licensed to perform certain medical services and holds one of the following degrees and/or titles: Medical Doctor or Surgeon (MD); Doctor of Osteopathy (DO); Doctor of Optometry (OD); Doctor of Podiatric Medicine (DPM.); Doctor of Dental Surgery (DDS); Doctor of Dental Medicine (DMD.); or Naturopathic Doctor (ND or NMD) who have graduated from a CNME accredited medical school.

APPENDIX 0168

2022 Liberty HealthShare Sharing Guidelines

30.  Practitioner - A person legally entitled to perform certain medical services who holds one of the licenses, degrees and/or titles listed below, and who is acting within the scope of his or her Licensure when performing such services:

a.  Advanced Practice Nurse (APN) or Advanced Practice Registered Nurse (APRN)
b.  Audiologist
c.  Certified Diabetic Educator and Dietician
d.  Certified Nurse Midwife (CNM)
e.  Certified Nurse Practitioner (CNP)
f.  Certified Operating Room Technician (CORT)
g.  Certified Psychiatric/Mental Health Clinical Nurse
h.  Certified Registered Nurse Anesthetist (CRNA)
i.  Certified Surgical Technician (CST)
j.  Licensed Acupuncturist (LAC)
k.  Licensed Clinical Social Worker (LCSW)
l.  Licensed Mental Health Counselor (LMHC)
m.  Licensed Occupational Therapist
n.  Licensed or Registered Physical Therapist or Physiotherapist
o.  Licensed Practical Nurse (LPN)
p.  Licensed Professional Counselor (LPC)
q.  Licensed Speech Language Pathologist
r.  Licensed Speech Therapist
s.  Licensed Surgical Assistant (LSA)
t.  Licensed Vocational Nurse (LVN)
u.  Master of Social Work or Social Welfare (MSW)
v.  Physician Assistant (PA)
w.  Psychologist (PhD, EdD, PsyD)
x.  Registered Nurse (R.N.)
y.  Registered Nurse Practitioner (NP)
z.  Registered Respiratory Therapist (RRT)
aa.  Registered Speech Therapist (RST) or other Licensed Speech Therapist/Speech Language Pathologist

31.  Pre-existing Condition - A chronic or recurrent medical condition that exists at or prior to the Enrollment Date or can be reasonably expected to require medical intervention in the future.

32.  Professionals - Physicians and practitioners.

33.  Program -The medical cost-sharing program administered by Liberty HealthShare.

34.  Providers - Hospitals, facilities, physicians and practitioners.

35.  Reasonable - In the discretion of Liberty HealthShare, services or supplies, or fees for services or supplies which are necessary for the care and treatment of Illness or Injury not caused by the treating Provider. Determination that fee(s) or services are reasonable will be made by Liberty HealthShare or its delegate, taking into consideration unusual circumstances or complications requiring additional time, skill and experience in connection with a particular service or supply; industry standards and practices as they relate to similar scenarios; and the cause of Injury or Illness necessitating the service(s) and/or charge(s). Liberty HealthShare retains discretionary authority to determine whether service(s) and/or fee(s) are Reasonable based upon information presented to Liberty HealthShare.

36.  Service(s) or Services and Supplies - Services, procedures, treatment, care, goods and supplies the provision of use of which is meant to improve the condition or health of a Program Participant. A reference to services regarding a procedure, treatment or care, unless otherwise indicated, shall be deemed to refer also to the goods and supplies provided or used in such procedure, treatment or care.

37.  Sharing Limitation - medical expenses arising from or associated with a condition not eligible for sharing.

38.  Sharing Member - A person who qualifies to participate monthly by contributing the suggested Monthly Share Amount for the medical expense needs of others and who qualifies to receive gifts from fellow Sharing Members for medical expense needs they may submit for sharing.

a. An Active Member in Good Standing is a Sharing Member who has completed all registration and membership requirements, including submission of any documents, and is current on all member responsibilities, including but not limited to payment of any dues and recommended Monthly Share Amount contributions.

9.1.2022

APPENDIX 0169

## LEGAL NOTICES

The following legal notices are the result of discussions by Liberty HealthShare[SM] or other healthcare sharing ministries with several state regulators and are part of an effort to ensure that Sharing Members understand that Liberty HealthShare is not an insurance company and that it does not guarantee payment of medical costs. Our role is to enable self-pay patients to help fellow Americans through voluntary financial gifts.

### GENERAL LEGAL NOTICE

This program is not an insurance company nor is it offered through an insurance company. This program does not guarantee or promise that your medical bills will be paid or assigned to others for payment. Whether anyone chooses to pay your medical bills will be totally voluntary. As such, this program should never be considered as a substitute for an insurance policy. Whether you receive any payments for medical expenses and whether or not this program continues to operate, you are always liable for any unpaid bills.

### STATE SPECIFIC NOTICES

**Alabama Code Section 22-6A-2**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Alaska Statutes Section 21.03.021**

Notice: The organization coordinating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive a payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Arizona Revised Statutes Section 20-122**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company and the ministry's guidelines and plan of operation are not an insurance policy. Whether anyone chooses to assist you with your medical bills will be completely voluntary because participants are not compelled by law to contribute toward your medical bills. Therefore, participation in the ministry or a subscription to any of its documents should not be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this ministry continues to operate, you are always personally responsible for the payment of your own medical bills.

**Arkansas Code Section 23-60-104**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company and neither its guidelines nor plan of operation is an insurance policy. If anyone chooses to assist you with your medical bills, it will be totally voluntary because participants are not compelled by law to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive a payment for medical expenses or if this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Florida Statutes Section 624.1265**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor its plan of operation is an insurance policy. Membership is not offered through an insurance company, and the organization is not subject to the regulatory requirements or consumer protections of the Florida Insurance Code. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant is compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payments for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Georgia Code Section 33-1-20**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

APPENDIX 0170

**Idaho Code Section 41-121**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Illinois Compiled Statutes Section 215-5/4-Class 1-b**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation constitute or create an insurance policy. Any assistance you receive with your medical bills will be totally voluntary. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Whether or not you receive any payments for medical expenses and whether or not this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Indiana Code Section 27-1-2.1-1**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor its plan of operation is an insurance policy. Any assistance you receive with your medical bills will be totally voluntary. Neither the organization nor any other participant can be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Whether or not you receive any payments for medical expenses and whether or not this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Kentucky Revised Statutes Section 304.1-120**

Notice: Under Kentucky law, the religious organization facilitating the sharing of medical expenses is not an insurance company, and its guidelines, plan of operation, or any other document of the religious organization do not constitute or create an insurance policy. Participation in the religious organization or a subscription to any of its documents shall not be considered insurance. Any assistance you receive with your medical bills will be totally voluntary. Neither the organization or any participant shall be compelled by law to contribute toward your medical bills. Whether or not you receive any payments for medical expenses, and whether or not this organization continues to operate, you shall be personally responsible for the payment of your medical bills.

**Louisiana Revised Statutes Section Title 22-318**

Notice: The ministry facilitating the sharing of medical expenses is not an insurance company. Neither the guidelines nor the plan of operation of the ministry constitutes an insurance policy. Financial assistance for the payment of medical expenses is strictly voluntary. Participation in the ministry or a subscription to any publication issued by the ministry shall not be considered as enrollment in any health insurance plan or as a waiver of your responsibility to pay your medical expenses.

**Maine Revised Statutes Title 24-A, § Section 704**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Maryland Code, Insurance, Section 1-202**

Notice: This publication is not issued by an insurance company nor is it offered through an insurance company. It does not guarantee or promise that your medical bills will be published or assigned to others for payment. No other subscriber will be compelled to contribute toward the cost of your medical bills. Therefore, this publication should never be considered a substitute for an insurance policy. This activity is not regulated by the State Insurance Administration, and your liabilities are not covered by the Life and Health Guaranty Fund. Whether or not you receive any payments for medical expenses and whether or not this entity continues to operate, you are always liable for any unpaid bills.

**Michigan Compiled Laws Section 550.1867**

Notice: The Gospel Light Mennonite Church Medical Aid Plan, Inc. DBA Liberty HealthShare that operates this health care sharing ministry is not an insurance company and the financial assistance provided through the ministry is not insurance and is not provided through an insurance company. Whether any participant in the ministry chooses to assist another participant who has financial or medical needs is totally voluntary. A participant will not be compelled by law to contribute toward the financial or medical needs of another participant. This document is not a contract of insurance or a promise to pay for the financial or medical needs of a participant by the ministry. A participant who receives assistance from the ministry for his or her financial or medical needs remains personally responsible for the payment of all of his or her medical bills and other obligations incurred in meeting his or her financial or medical needs.

APPENDIX 0171

**Mississippi Code Section 83-77-1**
Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment of medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Missouri Revised Statues Section 376.1750**
Notice: This publication is not an insurance company nor is it offered through an insurance company. Whether anyone chooses to assist you with your medical bills will be totally voluntary, as no other subscriber or member will be compelled to contribute toward your medical bills. As such, this publication should never be considered to be insurance. Whether you receive any payments for medical expenses and whether or not this publication continues to operate, you are always personally responsible for the payment of your own medical bills.

**Montana Code Annotated Section 50-4-111**
NOTICE: The health care sharing ministry facilitating the sharing of medical expenses is not an insurance company and does not use insurance agents or pay commissions to insurance agents. The health care sharing ministry's guidelines and plan of operation are not an insurance policy. Without health care insurance, there is no guarantee that you, a fellow member, or any other person who is a party to the health care sharing ministry agreement will be protected in the event of illness or emergency. Regardless of whether you receive any payment for medical expenses or whether the health care sharing ministry terminates, withdraws from the faith-based agreement, or continues to operate, you are always personally responsible for the payment of your own medical bills. If your participation in the health care sharing ministry ends, state law may subject you to a waiting period before you are able to apply for health insurance coverage.

**Nebraska Revised Statutes Section 44-311**
IMPORTANT NOTICE. This organization is not an insurance company, and its product should never be considered insurance. If you join this organization instead of purchasing health insurance, you will be considered uninsured. By the terms of this agreement, whether anyone chooses to assist you with your medical bills as a participant of this organization will be totally voluntary, and neither the organization nor any participant can be compelled by law to contribute toward your medical bills. Regardless of whether you receive payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills. This organization is not regulated by the Nebraska Department of Insurance. You should review this organization's guidelines carefully to be sure you understand any limitations that may affect your personal medical and financial needs.

**New Hampshire Revised Statues Annotated Section 126-V:1**
IMPORTANT NOTICE: This organization is not an insurance company, and its product should never be considered insurance. If you join this organization instead of purchasing health insurance, you will be considered uninsured. By the terms of this agreement, whether anyone chooses to assist you with your medical bills as a participant of this organization will be totally voluntary, and neither the organization nor any participant can be compelled by law to contribute toward your medical bills. Regardless of whether you receive payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills. This organization is not regulated by the New Hampshire Insurance Department. You should review this organization's guidelines carefully to be sure you understand any limitations that may affect your personal medical and financial needs.

**North Carolina General Statutes Section 58-49-12**
Notice: The organization facilitating the sharing of medical expenses is not an insurance company and neither its guidelines nor its plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be voluntary. No other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this organization continues to operate, you are always personally liable for the payment of your own medical bills.

**Pennsylvania Consolidated Statues 40 Pa.C.S. Section 23**
Notice: This publication is not an insurance company nor is it offered through an insurance company. This publication does not guarantee or promise that your medical bills will be published or assigned to others for payment. Whether anyone chooses to pay your medical bills will be totally voluntary. As such, this publication should never be considered a substitute for insurance. Whether you receive any payments for medical expenses and whether or not this publication continues to operate, you are always liable for any unpaid bills.

9.1.2022

APPENDIX 0172

**South Dakota Codified Laws Section Title 58-1-3.3**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payments for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Texas Insurance Section 1681.002**

Notice: This health care sharing ministry facilitates the sharing of medical expenses and is not an insurance company, and neither its guidelines nor its plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the ministry or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this ministry continues to operate, you are always personally responsible for the payment of your own medical bills. Complaints concerning this health care sharing ministry may be reported to the office of the Texas attorney general.

**Virginia Code Section 38.2-6300**

Notice: This publication is not insurance, and is not offered through an insurance company. Whether anyone chooses to assist you with your medical bills will be totally voluntary, as no other member will be compelled by law to contribute toward your medical bills. As such, this publication should never be considered to be insurance. Whether you receive any payments for medical expenses and whether or not this publication continues to operate, you are always personally responsible for the payment of your own medical bills.

**Wisconsin Statutes Section 600.01**

ATTENTION: This publication is not issued by an insurance company, nor is it offered through an insurance company. This publication does not guarantee or promise that your medical bills will be published or assigned to others for payment. Whether anyone chooses to pay your medical bills is entirely voluntary. This publication should never be considered a substitute for an insurance policy. Whether or not you receive any payments for medical expenses, and whether or not this publication continues to operate, you are responsible for the payment of your own medical bills.

**Wyoming Statues Section 26.1.104**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Any assistance with your medical bills is completely voluntary. No other participant is compelled by law or otherwise to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents shall not be considered to be health insurance and is not subject to the regulatory requirements or consumer protections of the Wyoming insurance code. You are personally responsible for payment of your medical bills regardless of any financial sharing you may receive from the organization for medical expenses. You are also responsible for payment of your medical bills if the organization ceases to exist or ceases to facilitate the sharing of medical expenses.

9.1.2022

APPENDIX 0173

NM OFFICE OF SUPERINTENDENT OF INSURANCE
F I L E D
02/22/2023 01:53:13 pm

## BEFORE THE NEW MEXICO OFFICE OF SUPERINTENDENT OF INSURANCE

IN THE MATTER OF            )
GOSPEL LIGHT MENNONITE      )          Docket No. 2021-0085
CHURCH MEDICAL AID PLAN     )
D/B/A LIBERTY HEALTHSHARE    )
         Respondent.        )
_____)

## FINAL ORDER

**THIS MATTER** comes before the Interim New Mexico Superintendent of Insurance ("Superintendent") upon receipt of the Hearing Officer's Recommended Decision and Order Setting Deadline for Exceptions filed to the docket in this proceeding on January 20, 2023 and Liberty Healthshare's Exceptions to Hearing Officer's Recommended Decision filed in this proceeding on February 3, 2023. Having considered the record, the Hearing Officer's Recommended Decision and Respondent's Exceptions, and being fully informed in the premises,

**THE SUPERINTENDENT FINDS AND CONCLUDES:**

1. The Superintendent has jurisdiction over the subject matter and the parties;

2. The Superintendent initiated this proceeding by issuing an Order to Cease and Desist and Order to Show Cause ("Initial Order") directed to Respondent on November 23, 2021;

3. The Superintendent originally appointed Richard B. Word as the Hearing Officer to preside over this matter. Upon Hearing Officer Word's recusal due to his pending retirement, the Superintendent appointed R. Alfred Walker as the Hearing Officer to preside over this matter. The Hearing Officers conducted evidentiary hearings. The parties submitted written arguments and requested findings of fact and conclusions of law;

4. After considering the record, Hearing Officer R. Alfred Walker issued a Recommended Decision on January 20, 2023;

5.  Respondent filed Exceptions to the Recommended Decision on February 3, 2023;

6.  The Superintendent rules on the Exceptions as follows:

a.  Exception 1: Burden of Proof. Overruled. No party requested a finding of fact or conclusion of law relating to burden of proof. Upon review of the record, the Superintendent determines that Petitioner met its burden of proving the allegations of the Initial Order by a preponderance of the evidence;

b.  Exception 2: Standard of Proof. Overruled. No party requested a finding of fact or conclusion of law relating to the standard of proof. Upon review of the record, the Superintendent determines that Petitioner met its burden of proving the allegations of the Initial Order by a preponderance of the evidence;

c.  Exception 3: Hearing Officer's Findings of Fact 7 and 8. Overruled. Respondent describes the Hearing Officer's findings as "accurate" but appears to challenge the conclusion reached from the facts. The conclusion is that a contract was formed, and the facts support that conclusion. Respondent does not cite to any part of the record to challenge the findings, and these findings are supported by substantial evidence.

d.  Exception 4: Hearing Officer's Finding of Fact 10. Overruled. The Superintendent need not concern herself with the application of the parole evidence rule in New Mexico or under what circumstances a written contract may be modified orally or by course of performance. The question addressed was whether a contract was formed, and performance by Respondent is evidence of the formation of a contract not the interpretation of the contract. This finding is supported by substantial evidence.

e.  Exception 5: Hearing Officer's Finding of Fact 11. Overruled. Again, Respondent does not seem to challenge the finding as inaccurate but challenges the conclusion this fact

supports. The conclusion is that a contract was formed, and the fact supports that conclusion. Respondent does not cite to any part of the record to challenge the finding, and this finding is supported by substantial evidence.

f.      Exception 6: Hearing Officer's Finding of Fact 14. Overruled. Again, Respondent attacks the conclusion which this fact supports. The conclusion is that Respondent is an entity that reimburses any costs of health care services and is therefore a health insurance carrier. Respondent does not cite to any part of the record to challenge the finding, and this finding is supported by substantial evidence.

g.      Exception 7: Hearing Officer's Finding of Fact 15. Overruled. Respondent relies on dictionary definitions of "coverage." Respondent ignores the evidence in the record that its own members described the Gospel Light Plan as providing coverage for or covering various medical costs. Respondent does not cite to any part of the record to challenge the finding, and this finding is supported by substantial evidence.

h.      Exception 8: Hearing Officer's Finding of Fact 17. Overruled. Finding of Fact 17 is not contradicted by Finding of Fact 9. Finding of Fact 9 supports the conclusion that a contract was formed, because despite the disclaimer of any obligation, Respondent's performance of the obligation provided the mutuality of obligation for the formation of the contract. The performance of the obligation is the payment or reimbursement of loss. This finding is supported by substantial evidence.

i.      Exception 9: Hearing Officer's Conclusion of Law 1. Overruled. Respondent did not propose findings of fact or conclusions of law on the issues of subject matter jurisdiction or personal jurisdiction. The Hearing Officer's findings of fact are supported by substantial evidence,

and his conclusions of subject matter jurisdiction and personal jurisdiction are supported by those findings and by the law.

j.     Exception 10: Hearing Officer's Conclusion of Law 3. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 3 is supported by those findings and by the law.

k.     Exception 11: Hearing Officer's Conclusion of Law 4. Overruled. Even though the Hearing Officer did not make a finding specifically describing the Gospel Light Plan as a contract for a health benefits plan, the Hearing Officer found that the Gospel Light Plan is a contract. Finding of Fact 11 and Conclusion of Law 2. The Hearing Officer also found that Respondent provides coverage in this state for health benefits. Finding of Fact 15. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 4 is supported by those findings and by the law.

l.     Exception 12: Hearing Officer's Conclusion of Law 5. Overruled. Respondent engages in the same circular reasoning that it accuses the Hearing Officer of engaging in. Respondent says that it cannot be a health insurance carrier because only a health insurance carrier can offer health benefits, and it cannot offer health benefits because it is not a health insurance carrier. The Hearing Officer is correct that the Legislature intended the Insurance Code to regulate both health benefits and anyone who offers health benefits. The Hearing Officer's findings of fact on these issues are supported by substantial evidence, and his Conclusion of Law 5 is supported by those findings and by the law.

m.     Exception 13: Hearing Officer's Conclusion of Law 6.  Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 6 is supported by those findings and by the law.

n.      Exception 14: Hearing Officer's Conclusion of Law 7. Overruled. As noted above, the Hearing Officer made findings that the Gospel Light Plan was a contract to provide health benefits. Respondent argues that the Hearing Officer did not make a finding that the contract was one of insurance. However, the Hearing Officer found that Respondent undertakes to pay or indemnify its members as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies. Finding of Fact 17. That language comes from the statutory definition of insurance. Since the question of what constitutes insurance is a question of law, it was appropriate for the Hearing Officer to describe the contract as one of insurance in his conclusions, rather than in his findings. Respondent reiterates its arguments about why the Gospel Light Plan is not insurance, but the Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 7 is supported by those findings and by the law.

o.      Exception 15: Hearing Officer's Conclusion of Law 8. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 8 is supported by those findings and by the law.

p.      Exception 16: Hearing Officer's Conclusion of Law 9. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 9 is supported by those findings and by the law.

q.      Exception 17: Hearing Officer's Conclusion of Law 10. Overruled. Respondent reiterates its arguments about why the New Mexico Insurance Code is an unconstitutional burden on its and its members free exercise rights, but the Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 10 is supported by those findings and by the law.

r.      Exception 18: Hearing Officer's Conclusion of Law 11. Overruled. Respondent reiterates its arguments about why the Superintendent's public statements are evidence of religious animus and bias against Respondent. Respondent also asserts that is was error for the Hearing Officer to quash Respondent's subpoena of the Superintendent, which prevented Respondent from creating a record of animus and bias. However, without evidence of animus and bias in the record, it was appropriate for the Hearing Officer to prevent the disqualification of the Superintendent as the final decisionmaker, which would have occurred if the Superintendent were called as a witness, in order for Respondent to attempt to get the Superintendent to say something disqualifying. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 11 is supported by those findings and by the law.

s.      Exception 19: Hearing Officer's Conclusion of Law 12 and Recommended Decision B. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 12 and Recommended Decision B are supported by those findings and by the law.

t.      Exception 19: Hearing Officer's Conclusion of Law 13 and Recommended Decision C. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 13 and Recommended Decision C are supported by those findings and by the law; and

7.   The Hearing Officer's Recommended Decision is supported by substantial evidence in the record and is legally sound; and

**IT IS THEREFORE ORDERED that:**

A.  Liberty Healthshare's Exceptions to the Recommended Decision are overruled.

B.  The Hearing Officer's Findings of Fact, Conclusions of Law, and Recommendations are adopted as the Superintendent's own;

C.  Respondent shall cease and desist from soliciting, offering to sell, selling, collecting membership fees or monthly share amounts, or servicing HSCMS in New Mexico until Respondent complies with the requirements of the New Mexico Insurance Code;

D.  Under law, respondent could be fined up to $20,000 per violation under to NMSA 1978, Section 59A-1-18, Respondent is hereby fined five thousand dollars ($5,000) for each of its 502 violations of the New Mexico Insurance Code, for a total fine of two million five hundred ten thousand dollars ($2,510,000);

E.  Respondent has the right to appeal this Final Order to district court pursuant to NMSA 1978, Section 39-3-1.1 (1999) and Rule 1-074 NMRA;

F.  This Order is effective immediately;

G.  Copies of this Order shall be sent to all persons listed as service recipients on OSI's eDocket; and

H.  This docket is hereby closed.

**DONE AND ORDERED** under the Seal of the Office of Superintendent of Insurance at Santa Fe, New Mexico this 22nd day of February, 2023.


**HON. JENNIFER A. CATECHIS**
**INTERIM SUPERINTENDENT OF INSURANCE**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 22nd day of February, 2023, I caused the foregoing *Final Order* to be filed through the OSI's eDocket online filing system, which caused all persons entitled to notice in this case to be served electronically.


_____

**Jennifer Romero, OSI Paralegal**

Mark 9:50
Salt is good, but if the salt loses its flavor, how will you season it? Have salt in yourselves, and have peace with **one another**."

John 13:14
If I then, your Lord and Teacher, have washed your feet, you also ought to wash **one another**'s feet.

John 13:34
A new commandment I give to you, that you love **one another**; as I have loved you, that you also love **one another**.

John 13:35
By this all will know that you are My disciples, if you have love for **one another**."

John 15:12
This is My commandment, that you love **one another** as I have loved you.

John 15:17
These things I command you, that you love **one another**.

Romans 12:5
so we, being many, are **one** body in Christ, and individually members of **one another**.

Romans 12:10
Be kindly affectionate to **one another** with brotherly love, in honor giving preference to **one another**;

Romans 12:16
Be of the same mind toward **one another**. Do not set your mind on high things, but associate with the humble. Do not be wise in your own opinion.

Romans 13:8
Owe no **one** anything except to love **one another**, for he who loves **another** has fulfilled the law.

Romans 14:13
Therefore let us not judge **one another** anymore, but rather resolve this, not to put a stumbling block or a cause to fall in our brother's way.

Romans 15:5
Now may the God of patience and comfort grant you to be like-minded toward **one another**, according to Christ Jesus,

Romans 15:7
Therefore receive **one another**, just as Christ also received us, to the glory of God.

Romans 15:14

Now I myself am confident concerning you, my brethren, that you also are full of goodness, filled with all knowledge, able also to admonish **one another**.

Romans 16:16

Greet **one another** with a holy kiss. The churches of Christ greet you.

1 Corinthians 7:5

Do not deprive **one another** except with consent for a time, that you may give yourselves to fasting and prayer; and come together again so that Satan does not tempt you because of your lack of self-control.

1 Corinthians 11:33

Therefore, my brethren, when you come together to eat, wait for **one another**.

1 Corinthians 12:25

that there should be no schism in the body, but that the members should have the same care for **one another**.
(Whole Chapter: 1 Corinthians 12 In context: 1 Corinthians 12:24-26)

1 Corinthians 16:20

All the brethren greet you. Greet **one another** with a holy kiss.

2 Corinthians 13:12

Greet **one another** with a holy kiss.

Galatians 5:13

For you, brethren, have been called to liberty; only do not use liberty as an opportunity for the flesh, but through love serve **one another**.

Galatians 6:2

Bear **one another**'s burdens, and so fulfill the law of Christ.

Ephesians 4:2

with all lowliness and gentleness, with longsuffering, bearing with **one another** in love,

Ephesians 4:25

Therefore, putting away lying, "Let each **one** of you speak truth with his neighbor," for we are members of **one another**.

Ephesians 4:32

And be kind to **one another**, tenderhearted, forgiving **one another**, even as God in Christ forgave you.

Ephesians 5:19

speaking to **one another** in psalms and hymns and spiritual songs, singing and making melody in your heart to the Lord,

Ephesians 5:21
submitting to **one another** in the fear of God.

Colossians 3:9
Do not lie to **one another**, since you have put off the old man with his deeds,

Colossians 3:13
bearing with **one another**, and forgiving **one another**, if any**one** has a complaint against **another**; even as Christ forgave you, so you also must do.

Colossians 3:16
Let the word of Christ dwell in you richly in all wisdom, teaching and admonishing **one another** in psalms and hymns and spiritual songs, singing with grace in your hearts to the Lord.

1 Thessalonians 3:12
And may the Lord make you increase and abound in love to **one another** and to all, just as we do to you,

1 Thessalonians 4:9
But concerning brotherly love you have no need that I should write to you, for you yourselves are taught by God to love **one another**;

1 Thessalonians 4:18
Therefore comfort **one another** with these words.

1 Thessalonians 5:11
Therefore comfort each other and edify **one another**, just as you also are doing.

Hebrews 3:13
but exhort **one another** daily, while it is called "Today," lest any of you be hardened through the deceitfulness of sin.
(Whole Chapter: Hebrews 3 In context: Hebrews 3:12-14)

Hebrews 10:24
And let us consider **one another** in order to stir up love and good works,

Hebrews 10:25
not forsaking the assembling of ourselves together, as is the manner of some, but exhorting **one another**, and so much the more as you see the Day approaching.

James 4:11
Do not speak evil of **one another**, brethren. He who speaks evil of a brother and judges his brother, speaks evil of the law and judges the law. But if you judge the law, you are not a doer of the law but a judge.

James 5:9
Do not grumble against **one another**, brethren, lest you be condemned. Behold, the Judge is standing at the door!

3

James 5:16
Confess your trespasses to **one another**, and pray for **one another**, that you may be healed. The effective, fervent prayer of a righteous man avails much.

1 Peter 1:22
Since you have purified your souls in obeying the truth through the Spirit in sincere love of the brethren, love **one another** fervently with a pure heart,

1 Peter 3:8
Finally, all of you be of **one** mind, having compassion for **one another**; love as brothers, be tenderhearted, be courteous;

1 Peter 4:8
And above all things have fervent love for **one another**, for "love will cover a multitude of sins."

1 Peter 4:9
Be hospitable to **one another** without grumbling.

1 Peter 4:10
As each **one** has received a gift, minister it to **one another**, as good stewards of the manifold grace of God.

1 Peter 5:5
Likewise you younger people, submit yourselves to your elders. Yes, all of you be submissive to **one another**, and be clothed with humility, for "God resists the proud, But gives grace to the humble."

1 Peter 5:14
Greet **one another** with a kiss of love. Peace to you all who are in Christ Jesus. Amen.

1 John 1:7
But if we walk in the light as He is in the light, we have fellowship with **one another**, and the blood of Jesus Christ His Son cleanses us from all sin.

1 John 3:11
For this is the message that you heard from the beginning, that we should love **one another**,

1 John 3:23
And this is His commandment: that we should believe on the name of His Son Jesus Christ and love **one another**, as He gave us commandment.

1 John 4:7
Beloved, let us love **one another**, for love is of God; and every**one** who loves is born of God and knows God.

1 John 4:11
Beloved, if God so loved us, we also ought to love **one another**.
(Whole Chapter: 1 John 4 In context: 1 John 4:10-12)

1 John 4:12

No **one** has seen God at any time. If we love **one another**, God abides in us, and His love has been perfected in us.

2 John 1:5

And now I plead with you, lady, not as though I wrote a new commandment to you, but that which we have had from the beginning: that we love **one another**.

**HCSM Tracker - Confirmed**

| | Name | Initial request received | Response sent | Follow-up received | Recognition letter sent | Current status | Address |
|---|---|---|---|---|---|---|---|
| | | | | **2014** | | | |
| 1. | Christian Healthcare Ministries | 9/10/13 | 12/17/13 | 12/18/13 | 1/9/14 | **CONFIRMED** | 127 Hazelwood Ave., Barberton, OH 44203 |
| 2. | Christian Care Ministry, Inc. (Medi-Share) | 9/17/13 | 12/17/13 | 12/18/13 | 1/9/14 | **CONFIRMED** | UPDATED Address (10/2015): Current addresses a) PO Box 120099 West Melbourne FL 32912 b) 4150 West Eau Gallie Blvd., Melbourne FL 32912 Prior Address: 3507 Carriage Gate Dr., Melbourne, FL 32901 |
| 3. | Samaritan Ministries International, Inc. | 12/12/13 | 2/3/14 | 2/6/14 | 2/26/14 | **CONFIRMED** | P.O. Box 3618, Peoria, IL 61612 |
| 4. | Logos Missions, Inc. | 1/2/14 | 2/3/14 | 2/11/14 | 2/25/14 | **CONFIRMED** | 5235 N. Elston Ave., Chicago, IL 60630 |
| 5. | Liberty HealthShare, Inc. | 11/21/13 3/17/14 | 6/26/14 | 7/14/14 | | **Withdrew application 2/11/15** | |
| 6. | Gospel Light Mennonite Church Medical Aid Plan (Aroda, VA) | 1/29/14 | 3/14/18 | 3/17/14 | 3/31/14 | **CONFIRMED** | Physical address: 10271 W. Gordon Av., Gordonsville, VA 22942 Mailing address: 1552 Elly Rd. Aroda, VA 22709 |
| 7. | Brethren Medical Plan, Inc. | 1/6/14 (approx.) | 4/9/14 6/26/14 9/26/14 | 4/11/14 7/1/14 10/3/14 | 11/13/14 | **CONFIRMED** | PO Box 1050, Ceres, CA 95307 |
| 8. | Extended Coverage Hospital Assurance Plan | 1/20/14 | 3/14/14 | 3/18/14 | 3/31/14 | **CONFIRMED** | 8904 N. CR 740 W, Rossville, IN 46065 |
| 9. | United Bethel Brotherhood Aid | 1/29/14 | 3/14/14 | 3/24/14 | 4/9/14 | **CONFIRMED** | 14641 Middleburg – Plain City Road, Plain City, OH 43064 |
| 10. | South Eastern Mennonite Medical Aid | 2/4/14 2/28/14 | | | 3/31/14 | **CONFIRMED** | 1012 W. Madison St., Franklin, KY 42134 |
| 11. | Old German Baptist Brethren Assurance Plan (Waynesboro, PA) | 2/19/14 | 3/14/14 | 3/18/14 | 3/31/14 | **CONFIRMED** | 6374 Nunnery Rd., Waynesboro, PA 17268 |
| 12. | Oak Grove Mennonite | 1/28/14 3/11/14 | | | 4/9/14 | **CONFIRMED** | 1776 Elly Rd., Aroda, VA 22709 |

**EXHIBIT L**
APPENDIX 0187

| 13. | Brotherhood Hospitalization Plan (Millersburg, OH) | 1/31/14 3/17/14 | | | 3/31/14 | **CONFIRMED** | 4811 TR 352, Millersburg, OH 44654 |
|---|---|---|---|---|---|---|---|
| 14. | Wayne-Holmes Mutual Aid | 2/10/14 | 3/31/14 | 4/4/14 | 4/14/14 | **CONFIRMED** | 5245 Township Road 406, Sugarcreek, OH 44681 |
| 15. | Anabaptist Medical Aid Plan | 2/11/14 3/17/14 | | | 4/9/14 | **CONFIRMED** | 58050 E. 180 Rd., Fairland, OK 74343 |
| 16. | Old German Baptist Brethren Church, Medical Cost Sharing Plan (Twain Harte, CA) | 3/6/14 3/18/14 | | | 3/31/14 | **CONFIRMED** | <u>Physical address</u>: 22004 Tuolumne Road North, Twain Harte, CA 95383 <u>Mailing address</u>: 21350 Knox Dr., Twain Harte, CA 95383 |
| 17. | Brotherhood Medical Assistance Plan (Middlebury, IN) | 3/13/14 | | | 3/31/14 | **CONFIRMED** | 56430 County Rd. 33, Middlebury, IN 46540 |
| 18. | Amish Mennonite Church Aid (Leola, PA) | 3/18/14 | | | 3/31/14 | **CONFIRMED** | 99 South Groffdale Rd., Leola, PA 17540 |
| 19. | Pilgrim Christian Fellowship Medical Aid Plan | 3/21/14 | | | 4/9/14 | **CONFIRMED** | <u>Physical address</u>: 240 Twin Hill Rd., Stuarts Draft, VA 24477 <u>Mailing address</u>: P.O. Box 946, Stuarts Draft, VA 24477 |
| 20. | Old German Baptist Brethren Assurance Plan (Brookville, OH) | 3/26/14 | | | 4/9/14 | **CONFIRMED** | 9205 Arlington Rd., Brookville, OH 45309 |
| 21. | Montezuma Amish-Mennonite Church Hospital Aid Plan (Montezuma, GA) | 3/28/14 | | | 4/9/14 | **CONFIRMED** | <u>Physical address</u>: 2307 Whitehouse Rd., Montezuma, GA 31063 <u>Mailing address</u>: 6262 Highway 26 East, Montezuma, GA 31063 |
| 22. | Kootenai Valley Mennonite Church Medical Aid Plan (Bonners Ferry, ID) | 3/31/14 | | | 4/14/14 | **CONFIRMED** | <u>Physical address</u>: 782 Moon Shadow Rd., Bonners Ferry, ID 83805 <u>Mailing address</u>: 570 Lions Den Rd., Bonners Ferry, ID 83805 |
| 23. | Melita Christian Fellowship Hospital Aid Plan (Utica, OH) | 3/31/14 | | | 4/14/14 | **CONFIRMED** | <u>Physical address</u>: 9956 Camp Ohio Rd., Utica, OH 43080 <u>Mailing address</u>: 13250 Hull Rd., Utica, OH 43080 |
| 24. | Woodlawn Amish-Mennonite Church Medical Aid Plan (IN) | 3/31/14 | | | 4/14/14 | **CONFIRMED** | <u>Physical address</u>: 62861 County Road 41, Goshen, IN 46528 <u>Mailing address</u>: 4255 S. 900 W., Topeka, IN 46571 |
| 25. | Faith Mennonite Fellowship Mutual Aid Plan (Lott, TX) | 3/31/14 | | | 4/14/14 | **CONFIRMED** | <u>Physical address</u>: 2020 US Highway 77, Lott, TX 76656 <u>Mailing address</u>: 2051 State Highway 320, Lott, TX 76656 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 26. | Ebenezer Amish-Mennonite Fellowship (Malta, OH) (dba Ebenezer Health Care Sharing Ministry) | 3/31/14 | | | 4/14/14 | **CONFIRMED** | Physical address: 3497 Deerfield Church Rd., Malta OH 43758<br>Mailing address: 1150 McConkey Rd., Malta, OH 43758 |
| 27. | South Atlantic Mennonite Conference Brotherhood Aid (Olar, SC) | 3/31/14 | 4/9/14 | 5/23/14 | 6/11/14 | **CONFIRMED** | 7649 Govan Rd., Olar, SC 29843 |
| 28. | Conservative and Amish Mennonite Medical Sharing Ministry, Inc. | 4/4/14 | | | 4/14/14 | **CONFIRMED** | 13841 US Highway 20, Middlebury, IN 46540 |
| 29. | Virginia Assurance Plan | 4/19/14 | | | 4/23/14 | **CONFIRMED** | 300 Pine Needle Lane, Ferrum, VA 24088 |
| 30. | Southeastern Mennonite Conference Brotherhood Aid Program | 4/21/14 | | | 4/23/14 | **CONFIRMED** | 631 Mountain Rd., Front Royal, VA 22630<br>NEW ADDRESS: PO Box 142, Harrisonburg, VA 22803 |
| 31. | Cimarron Christian Brotherhood Medical Aid Plan | 4/21/14 | | | 4/23/14<br><br>November - 2015 | **CONFIRMED**<br><br>**Organization relinquished recognition as an HCSM** | Physical address: 12003 S. Washington Rd., Perkins, OK 74059<br>Mailing address: 10520 S. Perkins Rd., Perkins, OK 74059 |
| 32. | Center Amish-Mennonite Church Medical Aid Plan | 4/25/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 7611 W. Morgan Av., Hutchinson, KS 67501<br>Mailing address: 9212 W. Nickerson Blvd., Nickerson, KS 67561 |
| 33. | Brethren Assurance Plan | 4/30/14 | | | 6/11/14 | **CONFIRMED** | 2350 Rench Rd., Pleasant Hill, OH 45359 |
| 34. | Faith Mission Fellowship | 5/2/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 3510 Mission Home Lane, Free Union, VA 22940<br>Mailing address: 2394 Simmons Gap Rd., Free Union, VA 22940 |
| 35. | Emmanuel Fellowship Medical Aid Plan | 5/2/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 2643 Appleway Rd., Chambersburg, PA 17202<br>Mailing address: 971 Coble Rd., Chambersburg, PA 17202 |
| 36. | Shaver's Creek Fellowship Medical Aid Plan | 5/2/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 719 King St., Petersburg, PA 16669<br>Mailing address: 7216 Nelson Rd., Alexandria, PA 16611 |
| 37. | Calvary Christian Fellowship (dba Calvary Health Care Sharing Ministry) | 5/2/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 6830 Jones Bend Rd., Cottage Grove, TN 38224<br>Mailing address: 144 Hathaway Rd., Paris, TN 38242 |

| 38. | Crystal Valley Mennonite Church (dba Crystal Valley Health Care Sharing Ministry) | 5/5/14 | | | 6/11/14 | CONFIRMED | Physical address: 2420 State Route 230, Dundee, NY 14837<br><br>Mailing address: 5071 Pre-emption Rd., Dundee, NY 14837 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 39. | Indiana Assurance Plan | 5/9/14 | | | 6/11/14 | CONFIRMED | 2602 W. State Road 218, Delphi, IN 46923-8398 |
| 40. | Golden City Mennonite Fellowship Medical Aid Plan | 5/10/14 | | | 6/11/14 | CONFIRMED | Physical address: 1069 E. Hwy BB, Lamar MO 64759<br>Mailing address: 37 SE 80th Lane, Lamar, MO 64759 |
| 41. | Belvidere Mennonite Church Hope Medical Aid Plan | 5/12/14 | | | 6/11/14 | CONFIRMED | Physical address: 9805 David Crockett Pkwy West, Belvidere, TN 37306<br>Mailing address: 575 McClure Cemetery Rd., Huntland, TH 37345 |
| 42. | Maysville Christian Fellowship Medical Aid Plan | 5/12/14 | | | 6/11/14 | CONFIRMED | Physical address: 5060 NE State Route D, Maysville, MO 64469<br>Mailing address: 4700 NE State Route E, Weatherby, MO 64497 |
| 43. | Franklin Amish-Mennonite Church Medical Aid Plan | 5/14/14 | | | 6/11/14 | CONFIRMED | Physical address: 102 Mennonite Church Rd., Franklin, KY 42134<br>Mailing address: 4129 Halls Store Rd., Russellville, KY 42276 |
| 44. | Spring River Mennonite Church Medical Aid Plan | 5/10/14 | | | 6/11/14 | CONFIRMED | Physical address: 17 Lawrence 2080, LaRussell, MO 64848<br>Mailing address: 10259 County Lane 5, Sarcoxie, MO 64862 |
| 45. | Leon Salem Mennonite Church Medical Aid Plan | 5/17/14 | | | 6/11/14 | CONFIRMED | Physical address: 21033 Lineville Rd., Leon, IA 50144<br>Mailing address: 15346 US Highway 69, Weldon, IA 50264 |
| 46. | Old German Baptist Brethren Church Medical Cost Sharing Plan | 5/20/14 | | | 6/11/14 | CONFIRMED | 898 Piedmont Rd., Somerset, PA 15501 |
| 47. | Christian Health Aid | 5/22/14 | | | 6/11/14 | CONFIRMED | 301 S. Fry St., PO Box 336, Montezuma, KS 67867 |
| 48. | Pleasant Valley Mennonite Church Medical Aid Fund | 5/22/14 | | | 6/11/14 | CONFIRMED | Physical address: 140 Pleasant Valley Rd., Ephrata, PA 17522<br>Mailing address: 345 Hartings Park Rd., Denver, PA 17517 |
| 49. | Canaan Fellowship Mennonite Medical Fund | 5/23/14 | | | 6/11/14<br><br>January-2016 | CONFIRMED<br><br>Organization terminating | 144 N. 900 East, Cannelburg, IN 47519 |

APPENDIX 0190

| | | | | | | operations as an HCSM | |
|---|---|---|---|---|---|---|---|
| 50. | Sunnyside Mennonite Church Mutual Assistance Plan | 5/23/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 1001 Honore Ave., Sarasota, FL 34232 <br> Mailing address: 1015 Honore Ave., Sarasota, FL 34232 |
| 51. | Kansas Assurance Plan | 5/29/14 | | | 6/11/14 | **CONFIRMED** | 25842 NW Crawford Rd., Westphalia, KS 66093 |
| 52. | Mountain View Mennonite Church Brotherly Sharing | 6/1/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 1154 Saint Paul Rd., Salisbury, PA 15558 <br> Mailing address: 879 Springs Rd. Grantsville, MD 21536 |
| 53. | Still Waters Mennonite Church Jericho Road Sharing Plan | 6/4/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 9417 US Highway 62, Georgetown, OH 45121 <br> Mailing address: 9566 Wallace Rd., Russellville, OH 45168 |
| 54. | Unionville Christian Brotherhood Medical Aid Plan | 6/4/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 13240 614th St., Cincinnati, IA 52549 <br> Mailing address: 13506 600th St., Cincinnati, IA 52549 |
| 55. | Messiah Amish-Mennonite Church | 6/4/14 | | | 6/11/14 | **CONFIRMED** | Physical address: 5237 State Route 557, Millersburg, OH 44654 <br> Mailing address: 6135 Township Road 351, Millersburg, OH 44654 |
| 56. | Christian Medical Plan | 6/27/14 | | | 9/26/14 | **CONFIRMED** | 1727 N 300 E, Flora, IN 46929 |
| 57. | Mount Pleasant Mennonite Church Medical Aid Plan | 7/1/14 | | | 9/26/14 | **CONFIRMED** | Physical address: Mount Pleasant Road, Paradise, PA 17562 <br> Mailing address: 162 Iva Road, Ronks, PA 17572 |
| 58. | New Haven Mennonite Church Brotherly Assistance Program | 7/1/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 230 Crest Road, Lititz, PA 17543 <br> Mailing address: 140 Rothsville Station Rd., Lititz, PA 17543 |
| 59. | Fairhaven Mennonite Church Medical Aid Plan | 7/1/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 801 S. Railroad St., Myerstown, PA 17067 <br> Mailing address: 95 Sportsman Rd., Denver, PA 17517 |
| 60. | West Fairview Mennonite Church Medical Sharing Plan | 7/31/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 597 350th St., Beaver Crossing, NE 68313 <br> Mailing address: 543 252nd St., Milford, NE 68405 |
| 61. | Sharon Mennonite Fellowship Medical Aid Plan | 7/31/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 890 Greble Rd., Lebanon, PA 17046 <br> Mailing address: 989 Frystown Rd., Fredericksburg, PA 17026 |
| 62. | Open Door Mennonite Fellowship Medical Aid Plan | 8/1/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 176 Blimline Rd., Reading, PA 19608 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Mailing address: 1354 Woodland Circle, Denver, PA 17517 |
| 63. | Sixth Street Mennonite Church Medical Aid Plan | 8/1/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 1336 North 6th St., Philadelphia, PA 19122<br>Mailing address: 1160 Narvon Rd., Narvon, PA 17555 |
| 64. | Conservative Brotherhood Health Aid Plan | 8/1/14 | | | 9/26/14 | **CONFIRMED** | 1122 Larch Ave., Kalona, IA 52247 |
| 65. | Berea Christian Fellowship Medical Aid Account | 8/6/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 12944 North 1100 West, Bremen, IN 46506<br>Mailing address: 26766 County Road 40, Goshen, IN 46526 |
| 66. | Believer's Fellowship Medical Aid Plan | 8/8/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 6006 North 320 West, Worthington, IN 47471<br>Mailing address: 1780 East Wilson Rd., Bloomfield, IN 47424 |
| 67. | Center Aid Plan, Inc. | 8/19/14 | | | 9/26/14 | **CONFIRMED** | 4 Lakeview Circle, South Hutchinson, KA 67505 |
| 68. | Bittinger Mennonite Church Medical Fund | 8/19/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 10707 Bittinger Rd., Bittinger, MD 21522<br>Mailing address: 467 Monta Vista Rd., Oakland, MD 21550 |
| 69. | Gap Mills Christian Fellowship Medical Aid Plan | 8/19/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 760 Zenith Rd., Gap Mills, WV 24941<br>Mailing address: 4994 Sweet Springs Valley, Gap Mills, WV 24941 |
| 70. | Mountain View Mennonite Church Medical Aid Plan | 8/30/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 960 Lincoln Way West, McConnellsburg, PA 17233<br>Mailing address: 20044 Great Cove Rd., McConnellsburg, PA 17233 |
| 71. | Old German Baptist Brethren Church Medical Cost Sharing Plan (Athens, WI) | 9/4/14 | | | 9/26/14 | **CONFIRMED** | 6334 County Road M, Athens, WI 54411-8419 |
| 72. | Union Valley Mennonite Church Medical Aid Plan | 9/7/14 | | | 9/26/14 | **CONFIRMED** | Physical address: 2071 Battle Creek Rod., Ulster, Pa 18850<br>Mailing address: 804 Grange Hall Rd., Ulster, PA 18850 |
| 73. | Strodes Mills Mennonite Church Brotherly Assistance Plan | 9/11/14 | | | 11/13/14 | **CONFIRMED** | Physical address: 7131 US Highway 522 S, McVeytown, PA 17051<br>Mailing address: 6790 Ferguson Valley Rd., McVeytown, PA 17051 |

| 74. | Plain Church Group Ministry, LLC (f/k/a Free Will Plan) | 9/30/14 11/13/14 | | | 11/14/14 | **CONFIRMED** | <u>Physical address</u>: 315 Lehman Ave., Topeka, IN 46571 <br> <u>Mailing address</u>: 8402 Harcourt Rd., Suite 500, Indianapolis, IN 46260 |
| 75. | Brotherly Love Medical Aid Plan (Cedar Springs Amish-Mennonite Church) | 10/4/14 | | | 11/13/14 | **CONFIRMED** | <u>Physical address</u>: Cedar Springs Amish-Mennonite Church, 249 Antioch Rd., Clarkson, KY 42726 <br> <u>Mailing address</u>: 31300 State Hwy 25, Advance, MO 63730 |
| 76. | Altrua Ministries | 10/13/14 | | | 12/19/14 | **CONFIRMED** | <u>Physical address</u>: 8400 Manchaca Rd., Ste. 804, Austin, TX 78748 <br> <u>Mailing address</u>: P.O. Box 151057, Austin, TX 78715 |
| 77. | Island Creek Mennonite Church Brotherhood Aid | 10/24/14 | | | 11/13/14 | **CONFIRMED** | <u>Physical address</u>: 894 Island Creek Dr., Hillsville, VA 24343 <br> <u>Mailing address</u>: 3480 Danville Pike, Hillsville, VA 24343 |
| 78. | Faith Mennonite Church Medical Aid Plan | | | | 11/13/14 | **CONFIRMED** | <u>Physical address</u>: 117 Marion Street, Hillsdale, MI 49242 <br> <u>Mailing address</u>: 5075 Houseknecht Rd., Jonesville, MI 49250 |
| 79. | Summitview Christian Fellowship Medical Aid Plan | 11/10/14 | | | 12/19/14 | **CONFIRMED** | <u>Physical address</u>: 144 Summitview Rd., New Holland, PA 17551 <br> <u>Mailing address</u>: 37 Skyview Dr., Honey Brook, PA 19344 |
| 80. | Greene County Mennonite Church Medical Aid Plan | 11/18/14 | | | 12/19/14 | **CONFIRMED** | <u>Physical address</u>: 3625 Chuckey Pike, Chuckey, TN 37641 <br> <u>Mailing address</u>: 19 Joe Johnson Rd., Chuckey, TN 37641 |
| 81. | Grace Haven Fellowship Medical Aid Plan | 11/24/14 | | | 12/19/14 | **CONFIRMED** | <u>Physical address</u>: 5881 Township Rd. 351, Millersburg, OH 44654 <br> <u>Mailing address</u>: 7496 Township Rd. 319, Millersburg, OH 44654 |
| 82. | Magnolia Conservative Mennonite Brotherhood Aid | 11/24/14 | | | 12/19/14 | **CONFIRMED** | <u>Physical address</u>: 2600 Magnolia Dr., Macon, MS 39341 <br> <u>Mailing address</u>: 18182 Hwy 45, Macon, MS 39341 |
| 83. | Lehman Street Mennonite Medical Aid Plan | 11/25/14 | | | 12/19/14 | **CONFIRMED** | <u>Physical address</u>: 515 Lehman St., Lebanon, PA 17042 <br> <u>Mailing address</u>: 282 Frystown Rd., Myerstown, PA 17067 |
| 84. | Conservative Brotherhood Health Aid Plan | 12/2/14 | | | 12/19/14 | **CONFIRMED** | 1122 Larch Ave., Kalona, IA 52247 |

| 85. | Blue Ball Mennonite Church Medical Aid Plan | 12/3/14 | | | 12/19/14 | **CONFIRMED** | Physical address: 143 Ewell Rd., Blue Ball, PA 17506<br>Mailing address: 5894 Michele Dr., Narvon, PA 17555 |
|-----|---------------------------------------------|---------|--|--|----------|----------------|------------------------------------------------------------|
| 86. | Juniata Mennonite Church Medical Aid Plan | 12/4/14 | | | 12/19/14 | **CONFIRMED** | Physical address: 20378 Route 75 South, Port Royal, PA 17082<br>Mailing address: 923 Mill Race Rd., Mt. Pleasant Mills, PA 17853 |
| 87. | Mount Olive Mennonite Church Deacon Fund | 12/7/14 | | | 12/19/14 | **CONFIRMED** | Physical address: 13305 Maugansville Rd, Hagerstown, MD 21740<br>Mailing address: 13416 Clear Spring Rd., Clear Spring, MD 21722 |
| 88. | Gospel Haven Health Care Sharing Ministry | 12/10/14 | | | 12/19/14 | **CONFIRMED** | Physical & Mailing address: 10562 W. Lingle Lane, Gosport, IN 47433 |
| 89. | Lakeland Mennonite Church Medical Aid Plan | 12/22/14 | | | 12/31/14 | **CONFIRMED** | Physical address: 389 Rock Stream Rd., Rock Stream, NY 14878<br>Mailing address: 6070 Route 14A, Rock Stream, NY 14878 |
| 90. | Marrowbone Christian Brotherhood Medical Aid Plan | 12/22/14 | | | 12/31/14 | **CONFIRMED** | Physical address: 400 Chism Rd., Burkesville, KY 42717<br>Mailing address: 550 Casey Fork Rd., Burkesville, KY 42717 |
| 91. | Gap View Mennonite Church Alms Fund | 12/30/14 | | | 12/31/14 | **CONFIRMED** | Physical address: 5324 Mine Rd., Gap, PA 17527<br>Mailing address: 5135 Old Philadelphia Pike, Kinzers, PA 17535 |
| **2015** | | | | | | | |
| 92. | Shippensburg Christian Fellowship Medical Aid Plan | 1/3/15 | | | 2/4/15 | **CONFIRMED** | Physical address: 10600 Blind Lane, Shippensburg, PA 17257<br>Mailing address: 10672 Blind Lane, Shippensburg, PA 17257 |
| 93. | Weaverland Health Care Sharing Ministry | 1/24/15<br>2/5/15 | | | 3/9/15 | **CONFIRMED** | 1601 Lincoln Rd., Lititz, PA 17543 |
| 94. | Mid-West Aid Plan (a.k.a. Mid-West Medical Aid, Brotherhood Sharing Plan) | 1/28/15 | | | 2/4/15 | **CONFIRMED** | 30555 County Rd. 46, Wakarusa, IN 46573 |
| 95. | St. Thomas Mennonite Aid Fund | 1/30/15 | | | 2/4/15 | **CONFIRMED** | Physical address: 7435 Schoolhouse Rd., St. Thomas, PA 17252<br>Mailing address: 8640 Fort McCord Rd., Chambersburg, PA 17202 |
| 96. | Shade Mountain Christian Fellowship Church Aid Plan | 1/30/15 | | | 2/4/15 | **CONFIRMED** | Physical address: 11941 Route 35 South, Mifflin, PA 17058 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Mailing address: 964 Price Rd., Honey Grove, PA 17035 |
| 97. | Society of Our Lady of the Most Holy Trinity | 2/5/15 | | | 3/9/15 | **CONFIRMED** | 1200 Lantana St., Corpus Christi, TX 78407 |
| 98. | Shinnston Fellowship Mennonite Aid Plan | 2/7/15 | | | 3/9/15 | **CONFIRMED** | Physical address: 1634 Hornors Run Rd., Shinnston, WV 26431<br>Mailing address: 461 Owings Rd., Shinnston, WV 26431 |
| 99. | Emmanuel Mennonite Aid Plan | 2/9/15 | | | 3/9/15 | **CONFIRMED** | Physical address: 2544 Hwy 55 West, Hartselle, AL 35640<br>Mailing address: 214 Emmanuel Rd., Hartselle, AL 35640 |
| 100. | Chambersburg Christian Fellowship Medical Aid Plan | 2/11/15 | | | 3/9/15 | **CONFIRMED** | Physical address: 160 E. Liberty St., Chambersburg, PA 17201<br>Mailing address: 2456 Edenville Rd., Chambersburg, PA 17202 |
| 101. | Meigs Mennonite Church Medical Aid Plan | 2/11/15 | | | 3/9/15 | **CONFIRMED** | Physical address: 1860 Big Creek Rd., Meigs, GA 31765<br>Mailing address: 744 Chason Rd., Ochlocknee, GA 31773 |
| 102. | Woodlawn Medical Aid, Inc. | 2/27/15 | | | 3/9/15 | **CONFIRMED** | 4255 S 900 W Topeka, IN 46571 |
| 103. | Shady Lawn Mennonite Church Alms Fund | 2/27/15 | | | 4/13/15 | **CONFIRMED** | Physical address: 5695 Highway 5, Mountain View, AR 72560<br>Mailing address: 4970 Highway 5, Mountain View, AR 72560 |
| 104. | Sterling Harbor Mennonite Church Medical Aid Plan | 4/3/15 | | | 4/13/15 | **CONFIRMED** | P.O. Box 1203, Sterling, AK 99672 |
| 105. | Hopewell Mennonite Church Medical Aid Plan | 4/25/15 | | | 5/13/15 | **CONFIRMED** | Physical address: 14527 Whiskey Hill Road NW, Hubbard, OR 97032<br>Mailing address: P.O. Box 117, Hubbard, OR 97032 |
| 106. | Anabaptist Healthshare (Mennonite Aid Plan) | 5/27/15 | | | 7/14/15 | **CONFIRMED** | 1552 Elly Road, Aroda, VA 22709 |
| 107. | Kitchi Pines Mennonite Church Medical Aid Plan | 9/30/2015 | | | 12/7/2015 | **CONFIRMED** | 28953 Birchmont Beach Rd. NE<br>Pennington, MN 56663 |
| 108. | Helping Hands Mennonite Medical Aid Plan | 10/5/2015 | | | 12/7/2015 | **CONFIRMED** | 144 N. 900 E.<br>Cannelburg, IN 47519 |

4-2016/FOIA 04-2016

# COMMONWEALTH LAW OFFICES, P.C.

246 E. DAVIS STREET, SUITE 200, CULPEPER, VA 22701
VOICE: (540) 727-1007 FAX: (540) 727-7917

December 9, 2014

Benjamin L. Walker, Director
Eligibility Policy and Operations Branch
DHHS/CMS/OA/CCIIO/EPOG
7500 Security Boulevard, Room 738G.05
Bethesda, Maryland 21244

Also sent *via*:
Facsimile  (443) 380-6804
Email      benjamin.walker@cms.hhs.gov

Re:  Gospel Light Mennonite Church Medical Aid Plan

Dear Mr. Walker:

My firm represents Gospel Light Mennonite Church Medical Aid Plan, which was recognized by CMS as a health care sharing ministry on March 31, 2014.

Page 2 of the recognition letter we received from Dr. Gary Cohen states: "Please note that if any change in your status or operation affects any of the information you have submitted to CMS for the purpose of requesting consideration as a health care sharing ministry pursuant to 45 CFR 155.615(c)(2), you must notify CMS within 30 days of such change."

In compliance with that requirement, please be advised that the leadership of the Gospel Light Mennonite Church Medical Aid Plan has decided to describe the limitation for inclusion of sharing within the Gospel Light Mennonite Church Medical Aid Plan that the sharing would be for the glory of God, by those who are called by His name, and for no purpose that would advance Satan's agenda rather than God's kingdom.

Thank you, and should you have any comments or questions please do not hesitate to contact me.

Best Regards,

J. Michael Sharman
With Tyler Hochstetler, admitted California and Virginia Bars.

**EXHIBIT M**

APPENDIX 0196

# STATE OF NEW MEXICO
# OFFICE OF SUPERINTENDENT OF INSURANCE

**SUPERINTENDENT**

Russell Toal



**DEPUTY SUPERINTENDENT**

Jennifer A. Catechis

## CONSUMER ADVISORY

### MARCH INSURANCE TIP OF THE MONTH

**During the Special Enrollment Period, the Office of the Superintendent of Insurance wants to make sure that New Mexicans purchase good health insurance plans.**

The Special Enrollment Period allows people to sign up for health insurance from February 15 to May 15. With the Special Enrollment Period open, the Office of the Superintendent of Insurance (OSI) wants every New Mexican to sign up for health insurance. You can sign up for individual coverage that has all of the benefits of the Affordable Care Act—like covering pre-existing conditions. You might be eligible for low-cost or free insurance thru beWellnm.com! With health insurance, you and your family will be covered if you need treatment for Covid-19.

The Special Enrollment Period is set up to help people who might be affected by the COVID-19 pandemic but *anyone* without health coverage can enroll.

As the Special Enrollment Period gets underway, OSI wants consumers to know that there are scammers trying to lure people into purchasing low-quality health insurance or health insurance-like products. These low-quality products DO NOT meet the requirements of the ACA because they offer extremely limited coverage. These might be short-term plans, trade association plans, health care sharing ministries or other limited plans. These bad plans can leave consumers stuck with huge medical bills from doctors and hospitals. These non-ACA plans deny and limit health care coverage by:

✓ Limiting coverage for pre-existing conditions
✓ Limiting prescription coverage
✓ Limiting coverage for hospitalizations and emergency rooms
✓ Limited or no coverage for mental health / behavioral health treatment
✓ Limiting coverage for outpatient / same-day surgery

**"We want to make sure that New Mexicans get real health insurance coverage,"** said OSI Superintendent Russell Toal. **"Consumers need to be careful about responding to unsolicited ads and sales pitches – the best way to protect yourself is by using the New Mexico insurance exchange, beWellnm. Don't provide personal information if a salesperson calls or emails you. If you are concerned about a sales person, please call OSI or check our website to make sure they are licensed."**

Main Office: 1120 Paseo de Peralta, Room 428, Santa Fe, NM  87501
Satellite Office:  6200 Uptown Blvd NE, Suite 100, Albuquerque, NM 87110
Main Phone: (505) 827-4601 | Satellite Phone: (505) 322-2186 | Toll Free: (855) 4 - ASK - OSI
www.osi.state.nm.us

**2 | P a g e**



==What are the red flags that mean someone is trying to sell you a bad,== non-ACA health ==plan?==

- ✓ High-pressure sales tactics like repeated calls or offers to visit your home
- ✓ Trying to make you decide right away by telling you that this offer is only good right now, or we have a special offer today
- ✓ ==Being told that the coverage is== "just as good as the ACA" or =="ACA-exempt"==
- ✓ Use of words such as "limited benefit plan" or "supplement plan."

How can you avoid buying a bad health plan? The best way to make sure you are getting a good ACA health plan is to sign up through our New Mexico health insurance exchange, beWellnm (www.bewellnm.com). If you use the exchange, your plan will be ACA-compliant: it will cover pre-existing conditions, prescription medication and hospital care.



If you or a family member need help determining what kind of questions to ask when considering health insurance, or you just want some assistance decoding the language of a health plan, visit www.beWellnm.com or call **1-833-862-3935**. Or, visit the OSI website—www.osi.state.nm.us - and look for the "For Consumers" information.

**COVID-19 Health Insurance Helpline: 1-833-415-0566**
**More information is available on the OSI website: www.osi.state.nm.us**
**File a Consumer Complaint: www.osi.state.nm.us/index.php/file-a-complaint**

Main Office: 1120 Paseo de Peralta, Room 428, Santa Fe, NM  87501
Satellite Office:  6200 Uptown Blvd NE, Suite 100, Albuquerque, NM 87110
Main Phone: (505) 827-4601 | Satellite Phone: (505) 322-2186 | Toll Free: (855) 4 - ASK - OSI
www.osi.state.nm.us

APPENDIX 0198

## BEFORE THE NEW MEXICO OFFICE OF SUPERINTENDENT OF INSURANCE

IN THE MATTER OF          )
TRINITY HEALTHSHARE, INC.,          )          Docket No. 20-00020-COMP-CL
    Respondent.          )
_____          )

## ORDER

THIS MATTER comes before the New Mexico Superintendent of Insurance ("Superintendent") following a request for Administrative Hearing submitted by Trinity Healthshare, Inc. ("Respondent") on April 15, 2020 following an Order to Cease and Desist and Imposing Penalties. Having considered the record, the Hearing Officer's Recommended Decision and being fully informed in the premises,

### THE SUPERINTENDENT FINDS AND CONCLUDES:

**1.**    The Superintendent has jurisdiction pursuant to the New Mexico Insurance Code, NMSA 1978, Sections 59A-1-1 et seq. ("Insurance Code").

**2.**    The Superintendent appointed R. Alfred Walker as the Hearing Officer to preside over this matter. The Hearing Officer conducted a hearing which commenced on July 8, 2020.

**3.**    After considering the record, the Hearing Officer issued a Recommended Decision on November 17, 2020.

**4.**    The Hearing Officer's Recommended Decision is well supported and legally sound.

### IT IS THEREFORE ORDERED:

**A.**    The November 17, 2020 Hearing Officer's Findings of Fact, Conclusions of Law, and Recommendations are adopted as my own.

**B.**    Respondent must immediately cease and desist from offering, collecting on, or servicing Health Care Sharing Ministries in New Mexico.

**C.**    In addition to the requirements of the preceding paragraph B, Respondent must choose one of the following two options to remedy its violations of the Insurance Code:

**EXHIBIT O**

APPENDIX 0199

1. Respondent shall, within thirty (30) days of the date of this Order, submit a penalty payment in the amount of $2,680,000. Payment shall be in the form of a check made out to "Office of Superintendent of Insurance" and shall be mailed to the following address:

> **Office of Superintendent of Insurance**
> **Attention: Office of Legal Counsel**
> **1120 Paseo de Peralta, Room 428**
> **Santa Fe, NM 87501.**

Or;

2. Within ten (10) days of the date of this Order, Respondent shall cancel all 134 of the membership plans it issued in New Mexico, refund all contributions received from the members of those plans since the inception of the plans, and inform each plan member of all possible options for obtaining major medical coverage, specifically including enrollment through beWellnm.com.

Should Respondent choose option 2, Respondent must file within fifteen (15) days of the date of this Order a declaration of compliance to the OSI Docket at OSI-docketfiling@state.nm.us.

**D.**    If Respondent fails to comply with Paragraphs B or C of this Order, the Superintendent may take further action as authorized under law and as he deems appropriate.

**DONE AND ORDERED** at Santa Fe, New Mexico this 19th day of November, 2020.


**HON. RUSSELL TOAL**
**SUPERINTENDENT OF INSURANCE**

**ORDER**
**Docket No. 20-00020-COMP-CL**
**2** | P a g e

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing *Order* was sent via electronic mail to the following individuals, as indicated below, this 19th day of November, 2020.

Bryan E. Brock, General Counsel
Office of Superintendent of Insurance
P.O. Box 1689, Santa Fe, NM 87504-1689
bryan.brock@state.nm.us

Mark S. Barron, Counsel for Respondent
Baker & Hostetler LLP
1801 California Street, Suite 4400
Denver, Colorado 80202-2662
mbarron@bakerlaw.com
mbaisley@bakerlaw.com
dbauer@bakerlaw.com
jbaxter@bakerlaw.com
jmenk@bakerlaw.com
Attorneys for Trinity Healthshare, Inc

Rebecca Branch, Legal Counsel
Office of Superintendent of Insurance
P.O. Box 1689, Santa Fe, NM 87504-1689
rebecca.branch@state.nm.us

R. Alfred Walker, Hearing Officer
Office of Superintendent of Insurance
P.O. Box 1689, Santa Fe, NM 87504-1689
alfred.walker@state.nm.us

*Melissa Y. Gutierrez*
**MELISSA Y. GUTIERREZ, Law Clerk**
**Office of Legal Counsel**
**Office of Superintendent of Insurance**

**ORDER**
**Docket No. 20-00020-COMP-CL**
**3** | P a g e

APPENDIX 0201