**No. 23-2123**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

**BREANNA RENTERIA** and **LAURA SMITH**,[1]
*Plaintiffs-Appellants,*

v.

**ALICE KANE**, in her official capacity as Superintendent of
Insurance for the State of New Mexico,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of New Mexico
No. 1:23-cv-00276-MLG, The Honorable Matthew L. Garcia

## APPELLANTS' PETITION FOR REHEARING EN BANC

Carter B. Harrison IV
Nicholas T. Hart
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102

J. Michael Sherman
**Commonwealth Law Offices, P.C.**
246 E. Davis Street, Suite 200
Culpeper, VA 22701
*Counsel for Plaintiffs-Appellants*

Edward D. Greim
Matthew R. Mueller
Katherine E. Mitra
**Graves Garrett Greim LLC**
1100 Main Street, Suite 2700
Kansas City, MO 64105

March 28, 2025

---

[1] Tammy Waters was a party to this appeal, but has since been dismissed by agreement of the Parties.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

FRAP 35(b)(1) STATEMENT ............................................................. 1

INTRODUCTION .......................................................................... 2

STANDARD OF REVIEW .................................................................. 4

I.    Appellants Will Likely Succeed on the Merits. ...................... 5

    A. The Majority's Free Exercise Analysis Contravened
       Precedent. ....................................................................... 5

        1. OSI's order substantially burdens Appellants'
           sincerely held beliefs. ...................................... 6

        2. The majority misapplied precedent in holding
           OSI's actions neutral. ....................................... 8

        3. OSI's actions are not generally applicable. ............ 11

        4. OSI cannot satisfy strict scrutiny. ...................... 14

    B. New Mexico's Attempts to Regulate HCSMs as
       "Insurance" Are Preempted by the ACA's Carve Out. 16

II.    The Remaining Factors Weigh in Appellants' Favor. ............ 21

CONCLUSION ............................................................................ 22

CERTIFICATE OF COMPLIANCE ..................................................... 23

CERTIFICATE OF SERVICE ........................................................... 24

ADDENDUM .............................................................................. 25

# TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*Bethel Conservative Mennonite Church v. Comm'r,*
746 F.2d 388 (7th Cir. 1984) ........................ 20

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ........................ 8

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ........................ 1, 8, 12, 15

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992) ........................ 16

*Colorado Christian University v. Weaver,*
534 F.3d 1245 (10th Cir. 2008) ........................ 1, 9

*Does 1-11 v. Bd. of Regents of Univ. of Colo.,*
100 F.4th 1251 (10th Cir. 2024) ........................ 1, 5, 8, 9, 11, 14, 15

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963) ........................ 20

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ........................ 1, 8, 9, 12

*Hobby Lobby Stores, Inc. v. Sebelius,*
723 F.3d 1114 (10th Cir. 2013) ........................ 4, 5

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ........................ 1, 15

*King v. Burwell,*
576 U.S. 473 (2015) ........................ 16

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
    584 U.S. 617 (2018) ........................................................1, 9

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ..............................................................16

*Pryor v. Sch. Dist. No. 1,*
    99 F.4th 1243 (10th Cir. 2024) ........................................21

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ..........................................1, 12, 13, 21

*Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.,*
    450 U.S. 707 (1981) ................................................................8

*US Airways, Inc. v. O'Donnell,*
    627 F.3d 1318 (10th Cir. 2010) ............................16, 19-20

## Other Authorities

10th Cir. R. 35.1(A) ....................................................................5

26 U.S.C. § 501(m)(1) ........................................................18, 19

26 U.S.C. § 5000A(d)(2)(B) ................................................4, 18

26 U.S.C. § 5000A(d)(2)(B)(ii)(I) ....................................17, 18

26 U.S.C. § 5000A(d)(2)(B)(ii)(II) ..................................17, 19

26 U.S.C. § 5000A(D)(2)(B)(ii)(IV) ........................................21

42 U.S.C. § 300gg-13(a)(4) ......................................................17

42 U.S.C. § 18041(d) ................................................................17

IRC § 5000A(d)(2)(B)(ii)) ..........................................................7

N.M. Stat. Ann. § 59A-1-15 .................................................................. 13, 14

N.M. Stat. Ann. § 59A-1-16 .................................................................. 13, 14

N.M. Stat. Ann. § 59A-6-1 ........................................................................ 7

N.M. Stat. Ann. § 59A-7-3 ....................................................................... 14

N.M. Stat. Ann. § 59A-16-12 ........................................................... 7, 14, 19

N.M. Stat. Ann. § 59A-22-42 .................................................................. 6, 7

N.M. Stat. Ann. § 59A-23-7.14 ................................................................... 7

N.M. Stat. Ann. § 59A-44-16 .................................................................... 14

N.M. Stat. Ann. § 59A-44-23 .................................................................... 14

N.M. Stat. Ann. § 59A-44-24 .................................................................... 14

N.M. Stat. Ann. § 59A-44-36 .................................................................... 14

N.M. Stat. Ann. § 59A-46-44 ..................................................................... 7

# FRAP 35(b)(1) STATEMENT

1. The panel decision conflicts with the following decisions of this Court and the Supreme Court. Maintaining uniformity requires en banc consideration:

   a. Errantly heightened "neutrality" standard: *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); *Emp. Div. v. Smith*, 494 U.S. 872 (1990); *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251 (10th Cir. 2024); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008).

   b. Failure to examine religious gerrymander for "neutrality": *Lukumi*; *Does 1-11*.

   c. Incorrect standard for "general applicability": *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022); *Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam); *Fulton*; *Lukumi*; *Smith*.

   d. After Appellants proved animus, applying strict scrutiny instead of striking down: *Masterpiece Cakeshop*; *Does 1-11*.

2. The panel was the first in the country to read state insurance law to eliminate a core conscience protection for religious believers in the Affordable Care Act ("ACA"). Congress exempted from the ACA's insurance mandate those whose faith leads them to share health care costs with fellow believers and whose faith bars them from co-funding procedures such as abortion. Such health care sharing ministries ("HCSM"s) are federally registered under the ACA and must operate under Section 501(c)(3) of the Internal Revenue Code. Yet New Mexico reads HCSMs into extinction by interpreting its Insurance Code to require (i) their licensure as for-profit insurance companies and (ii) punishment of HCSM members. If New Mexico is correct, conscience protections essential to the ACA's constitutionality will evaporate nationwide, presenting a question of exceptional importance.

## INTRODUCTION

A panel majority of this Court, over the dissent of Judge Carson, contravened bedrock precedent when it refused to enjoin the New Mexico Office of Superintendent of Insurance ("OSI") from engaging in flagrant, unconstitutional actions that (1) violate Appellants' First Amendment rights and (2) are preempted by the Affordable Care Act ("ACA").

OSI has ordered Gospel Light Mennonite Church Medical Aid Plan ("Gospel Light")—a religious, federally registered health care sharing ministry ("HCSM") that is not designated as an insurer under the Affordable Care Act ("ACA")—to pay a multi-million dollar fine, register as a New Mexico insurer, and comply with other provisions of the New Mexico Insurance Code ("NMIC") that contradict federal law. New Mexico thereby became the first State to unlawfully regulate Gospel Light as insurance.[2] This violates Appellants' and other members' sincere religious beliefs.

The panel majority approved OSI's shocking conduct only by contravening bedrock First Amendment authority, misapplying the "neutrality," "general applicability," and "strict scrutiny" prongs of *Emp. Div. v. Smith*, 494 U.S. 872 (1990).

---

[2] The majority erroneously mischaracterized an Ohio case where private parties merely alleged Gospel Light was an "unauthorized insurer," to rebut Gospel Light's and Judge Carson's assertion that, before New Mexico, "no state governmental entity ever concluded that Gospel Light . . . should be regulated as an insurance carrier." Opinion 17, n.6; Opinion, 36-7 (Carson, J., dissenting). But those allegations were made by private parties, not the State. And the court never found those allegations true.

But these errors reverberate beyond First Amendment law and beyond this Circuit, for they eliminate a conscience protection Congress found essential for delimiting the ACA's individual mandate. Congress exempted individuals enrolled in HCSMs from mandatory insurance coverage, 26 U.S.C. § 5000A(d)(2)(B), simultaneously declaring HCSMs not regulable as insurance. OSI's order, and its targeting of all state HCSMs (Appx.Vol.I.0126-29, 0199-201), violate this provision, render compliance with both federal and state law impossible, and threaten HCSMs everywhere. The majority opinion's approval dissolves ACA conscience protections for HCSM members nationwide.

OSI's and the panel majority's extraordinary actions demands extraordinary review. En banc review will protect HCSM members' First Amendment and statutory conscience rights, and to rescue an essential ACA protection from oblivion.

## STANDARD OF REVIEW

Preliminary injunction movants must show: "(1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *Hobby*

*Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013). "[OSI] bears the burden of proof on the ultimate question of the challenged [laws'] constitutionality." *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1268 (10th Cir. 2024) (quotation omitted). This Court reviews preliminary injunction denials for abuse of discretion and must reverse if the district court "commits an error of law or makes clearly erroneous factual findings." *Id.* (quotation omitted). It reviews legal questions de novo. *Id.* En banc review "focus[es] the entire court on an issue of exceptional public importance or on a panel decision that conflicts with a decision of the United States Supreme Court or of this court." 10th Cir. R. 35.1(A).

## I. Appellants Will Likely Succeed on the Merits.

### A. The Majority's Free Exercise Analysis Contravened Precedent.

The majority contravened multiple well-established Supreme Court and Tenth Circuit precedents in determining Appellants were not likely to succeed on their First Amendment claim. First, the majority imposed a heightened standard for neutrality. Second, it neglected a critical component of the neutrality analysis. Third, it found the law was generally applicable because the purposes of exempt organizations and

Gospel Light differ—an incorrect standard. Finally, it failed to consider that OSI's animus alone violated the First Amendment, instead citing strict scrutiny as the next step. These departures from precedent require reversal.

### 1. OSI's order substantially burdens Appellants' sincerely held beliefs.

Appellants' consciences compel them to (a) share healthcare costs with fellow religious believers (Appx.Vol.I.0011, 0016-17, 0075, 0140) and (b) avoid cooperation in payment for acts they believe clearly contradict the Bible's teachings such as abortion and contraception. Appx.Vol.II.0212, 0400; Appx.Vol.IV.0638; Appx. V.0831, 0845, 0857-58, 0878-79; N.M. Stat. § 59A-22-42 (requiring insurance companies to cover contraception in New Mexico). Appellants joined Gospel Light to exercise these religious beliefs.

Gospel Light is a nationwide ministry for religious believers to share financial burdens. Appx.Vol.II.0210-11, 0358, 0368, 0372, 0467; Appx.Vol.III.0508; Appx.Vol.IV.0638, 0708. Members must sign a statement of faith and abide by a religious code of conduct, and Gospel Light regularly sends devotions and scripture to members. Appx.Vol.I.0104, 0140; Appx.Vol.II.0209-10, 0367, 0374-75. Gospel Light

does not provide insurance, as Appellants understood when they joined and as Gospel Light disclosed. Appx.Vol.II.0210-11, 0371-73, 0379, 0389, 0398, 0425, 0438. As a recognized 501(c)(3) HCSM exempt under the ACA (Appx.Vol.I.0099-0102; Appx.Vol.II.0353-56; IRC § 5000A(d)(2)(B)(ii)), its witness sustained a rich ministry for hundreds of New Mexicans, including Appellants.

That was until OSI ordered Gospel Light to cease its health care sharing ministry in New Mexico; imposed a $2.5 million civil penalty; classified Gospel Light as insurance; and obtained a TRO prohibiting Gospel Light from operating in New Mexico. Appx.Vol.V.0924. Gospel Light can't resume its ministry unless it violates its own religious principles and acts as an insurer under the NMIC, which requires it to: (1) refuse to treat applicants or insureds differently based on their religion, N.M. Stat. § 59A-16-12; (2) provide contraceptives, *id.* §§ 59A-22-42, 59A-23-7.14, 59A-46-44; and (3) obtain a certificate of authority from OSI, paying massive fees and taxes, *id.* § 59A-6-1. Compliance "only in New Mexico" is no option: it would strip Gospel Light of its ACA exemptions as an HCSM and 501(c)(3), and require it to cease operating as an HCSM in other States. Appellants face the impermissible "choice"

of either (1) ending their religious practice of health care sharing and risking non-compliance with the ACA's individual mandate or (2) participating in insurance programs that violate their sincerely held beliefs. *Cf. Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021) (holding a similar "choice" is a substantial burden); *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 723 (2014) (similar).[3] This burden is substantial: New Mexico has "put[] substantial pressure on [Appellants] to modify [their] behavior and to violate [their] beliefs." *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981).

## 2. The majority misapplied precedent in holding OSI's actions neutral.

The panel majority erred in its neutrality holding in two critical ways. First, it skipped the core of the neutrality analysis. Actions are not neutral where enforcement exemptions for secular organizations, but not religious ones, inevitably create a "religious gerrymander[]." *Does 1-11*, 100 F.4th at 1275 (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993)). As explained in Judge Carson's

---

[3] As the District Court recognized, Appellants' hardships establish standing because Appellants' "inability to share healthcare costs would prevent them from engaging in their sincerely held religious beliefs." Appx.Vol.V.0891 (citation and footnote omitted).

dissent and *infra* Part I.A.3, the majority materially erred in skipping this analysis; these exemptions demonstrate a religious gerrymander.

The panel majority also contravened Supreme Court and Tenth Circuit precedent by requiring Appellants to show clear animus, not just non-neutrality. *Does 1-11*, 100 F.4th at 1280-81 (citing *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 635 (2018)); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008). Applying this heightened standard, the panel majority erroneously deemed the law neutral. This error alone compels en banc review and reversal.

The real standard is much lower. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533 (citation omitted). "The Free Exercise Clause bars even subtle departures from neutrality on matters of religion." *Masterpiece Cakeshop*, 584 U.S. at 638 (quotation omitted). State actors' characterization of religious beliefs "as merely rhetorical—something insubstantial and even insincere" show the law is not neutral. *Does 1-11*, 100 F.4th at 1281 (quoting *Masterpiece Cakeshop*, 584 U.S. at 635).

OSI's characterizations of Gospel Light and Appellants establish non-neutrality. In 2019, OSI recognized that HCSMs "do not offer insurance." Appx.Vol.I.0126-27. One year later, OSI began targeting Gospel Light and all other HCSMs. App.Vol.I.0128-29, 0199-201. Its 2021 public advisory warned New Mexicans to avoid HCSMs labeling them as "scammers trying to lure people into purchasing low-quality health insurance or health insurance-like products." Appx.Vol.II.0213 ¶ 49, 0407-08. OSI erroneously warned HCSMs are an "unauthorized insurance product that likely will not provide the protections of an authorized, regulated, and [ACA] compliant major medical plan," "urge[d] consumers" to buy health insurance rather than join HCSMs, and accused HCSMs of burying important notifications "in fine print." Appx.Vol.I.0128; Appx.Vol.II.0212 ¶ 47.

After OSI brought an enforcement against Gospel Light, and Gospel Light and Appellants challenged the action, OSI sharply criticized Appellants' religious beliefs, belittling their religious practices as merely "being charitable," "a value shared by people of all creeds and no creeds." Appx.Vol.II.0482. OSI challenged Appellants' beliefs as illegitimate because Appellants did not "produce[] citations to Scriptural or other

texts" referencing HCSMs and instead allegedly "bas[ed] their case on vague Biblical verses that, essentially, require them to be charitable" while "[m]any other Christians, not to mention atheists and members of non-Christian faiths, manage to live by such a commandment without participating" in HCSMs. Appx.Vol.III.0550. OSI mocked Appellants' beliefs, asking whether there is "anywhere in the scripture that says something about, along the lines that, thou shall be a member of a healthcare sharing ministry." Appx.Vol.IV.0686. OSI equated Appellants' beliefs to "donating to GoFundMe pages" and contended Appellants could use GoFundMe to satisfy any religious itch. Appx.Vol.II.0482. Yet New Mexico also insinuated that even five people who agreed to share healthcare costs after church could be targeted for unlawfully practicing insurance. Appx.Vol.IV.0586-0587.

Ultimately, OSI has not acted neutrally because it has belittled Appellants' religious beliefs as "insubstantial and even insincere." *Does 1-11*, 100 F.4th at 1281 (quoting *Masterpiece Cakeshop*, 584 U.S. at 635).

### 3. OSI's actions are not generally applicable.

The panel majority erroneously held the law is generally applicable because Gospel Light's purposes differ from exempt, secular

organizations—including fraternal benefit societies and labor unions—the law allows to provide insurance and because those organizations' provision of health insurance is only "incidental or ancillary" to their primary purposes. Opinion 23-24. But in *Tandon v. Newsom*, 593 U.S. 61 (2021), the Supreme Court made clear that the correct comparison between religious and secular organizations is not their purposes, but their risks—specifically whether religious exemptions pose greater risks to the government's purported interest than secular exemptions. *Id.* at 62. In doing so, the majority, like the District Court, fashioned an exception to *Tandon*'s clear holding that finds no support in the law.

The majority's rule would render almost all, if not all, laws generally applicable (including those in *Lukumi*, *Fulton*, and *Tandon*) because religious organizations inherently have different, sectarian purposes than their secular counterparts. This error independently requires reversal to align Tenth Circuit precedent with Supreme Court precedent.

Appellants should prevail on a correctly applied general applicability analysis. Laws are not generally applicable "whenever they treat any comparable secular activity more favorably than religious

exercise." *Tandon*, 593 U.S. at 62 (citation omitted). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* (citation omitted). A law is not generally applicable if religious activity poses an equal or lesser threat to the government's asserted interest than exempted secular activity. *Id.* at 63.

OSI's asserted interest in enforcing the Code "is the protection of the consumers of New Mexico by the proper regulation of the insurance industry." Appellee Brief 25. But as Appellee admits, many organizations are fully or partially exempt from the regulation, including fraternal benefit societies, nonprofit health care plans, health maintenance organizations, prepaid dental plans, motor clubs, charitable gift annuities, certain labor organizations, and risk management divisions. N.M. Stat. §§ 59A-1-15, 59A-1-16.

New Mexico's broad purported interest in protecting consumers through insurance regulation is no more impacted by an exemption for Appellants than by exemptions for these organizations. This is evident from the statute itself. For example, any labor organization that incidentally "maintains funds to assist members and their families in

times of illness, injury or need, and is not for profit" and meets certain standards is exempt. *Id.* § 59A-1-16(A). Fraternal benefit societies, *see* N.M. Stat. § 59A-1-15, can also provide "health insurance benefits," *id.* §§ 59A-7-3, 59A-44-16, without complying with key Code requirements. *Id.* §§ 59A-16-12, 59A-44-23, 59A-44-24, 59A-44-36. Because fraternal benefit societies provide actual health insurance, unlike Gospel Light, this exemption undermines New Mexico's stated interest more than any HCSM exemption. And because Gospel Light is not insurance, recognition of its HCSM status under the ACA and an NMIC exemption would pose no harm and would, in fact, further "proper regulation of the insurance industry." Appellee Brief 25.

### 4. OSI cannot satisfy strict scrutiny.

"[A]lthough violations of the . . . Free Exercise Clause are generally analyzed in terms of strict scrutiny, where governmental bodies discriminate out of animus against particular religions, such decisions are plainly unconstitutional, regardless of any compelling interests advanced by the government." *Does 1-11*, 100 F.4th at 1268-69 (quotation omitted). Whenever the government "'act[s] in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and

practices,' it is appropriate to 'set aside' the regulation." *Id.* at 1269 (quoting *Masterpiece Cakeshop*, 584 U.S. at 638-39). The panel majority ignored this rule. For the reasons stated in *Does 1-11* and above, the Court must set aside this action. *Id.* at 1270-71.

Regardless, even under the strict scrutiny rubric, this Court must "find a First Amendment violation unless the government can . . . demonstrate[e] its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (citation and footnote omitted). Laws "will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. When States afford exemptions to some groups, this "undermines" any compelling interest, and the State must offer a "compelling reason why it has a particular interest in denying an exception to [Appellants] while making them available to others." *Fulton*, 593 U.S. at 542; *see also Lukumi*, 508 U.S. at 546-47.

In its briefing before the panel, OSI never identified *any* compelling interest, much less a compelling interest in applying the Code to Appellants or Gospel Light. OSI fails strict scrutiny. For numerous reasons, en banc review is necessary to restore adherence to precedent.

## B. New Mexico's Attempts to Regulate HCSMs as "Insurance" Are Preempted by the ACA's Carve Out.[4]

The panel majority erred in concluding that federal law did not preempt New Mexico's attempts at regulating HCSMs. "[C]onflict preemption [] occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010) (citation omitted). Congress' intent to preempt is the critical issue. *Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 516 (1992).

Congress' intent, if not express, may be inferred from the statutory language and framework. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 486 (1996). The Supreme Court has emphasized the importance of interpreting the words of the ACA "in their context and with a view to their place in the overall statutory scheme." *King v. Burwell,* 576 U.S. 473, 486 (2015) (citation omitted). The Court's "duty, after all, is 'to construe statutes, not isolated provisions.'" *Id.* (citation omitted).

---

[4] The panel agreed that the ACA preemption issues were preserved for appeal. Op. 26; *id.* 59-60 (Carson, J., dissenting).

Congress struck an important balance in the ACA. Its individual mandate to buy health insurance includes a carefully delimited conscience-based exemption for HCSM members to protect those citizens' religious beliefs. This compromise was essential for protecting believers from the ACA's mandated coverage for objectionable medications and procedures—including contraceptives, abortifacients, and contraceptive counseling. 42 U.S.C. § 300gg-13(a)(4). That exemption requires that HCSMs are nonprofit, tax-exempt organizations whose "members . . . share a common set of ethical or religious beliefs and share medical expenses . . . in accordance with those beliefs" and "without regard to the State in which a member resides or is employed." 26 U.S.C. § 5000A(d)(2)(B)(ii)(I)-(II).

Congress knew that this exemption could conflict with or displace some state insurance regulation. That is why Congress preempted state law that "prevent[s] the application of the provisions of [the ACA]." 42 U.S.C. § 18041(d).

But New Mexico ignored this warning, becoming the first State to threaten the ACA's religious exemption and, therefore, its overall framework by requiring HCSMs to register as insurers. It is regulating

Gospel Light—and necessarily all HCSMs—as though they are insurers despite Congress's decision that they're not. 26 U.S.C. § 5000A(d)(2)(B); Appx.Vol.I.0187. OSI's order conflicts with the ACA and erects obstacles to its "full purposes and objectives," in at least five ways:

1. Congress exempted HCSM participants from the ACA's individual mandate. 26 U.S.C. § 5000A(d)(2)(B). That exemption would have been unnecessary had Congress understood HCSMs to provide insurance, as HCSM participation could have satisfied the individual mandate to purchase insurance without the exemption.

2. The IRC's requirements for an HCSM likewise reflect Congress's intent that HCSMs not be regulated as insurers. To qualify for the exemption, an HCSM must be a 501(c)(3) nonprofit organization. 26 U.S.C. § 5000A(d)(2)(B)(ii)(I). A 501(c)(3) cannot substantially provide "commercial-type insurance." *Id.* § 501(m)(1). The majority scoffs at this, saying Gospel Light can simply "choose between functioning as a nonprofit or selling commercial insurance." Opinion 29. But if health care sharing is insurance then no ministry could qualify as an ACA-exempt HCSM.

3. Relatedly, both the IRS and the Centers for Medicare & Medicaid Services have recognized Gospel Light's status as a 501(c)(3) HCSM for over a decade. Appx.Vol.I.0101; Appx.Vol.II.0356. Had Gospel Light been selling insurance, it would not have been granted and could not have maintained its tax-exempt status. 26 U.S.C. § 501(m)(1).

4. Because OSI's order would prevent Gospel Light and other HCSMs from operating in New Mexico, the order prevents Gospel Light from sharing medical expenses "without regard to the State in which a member resides," 26 U.S.C. § 5000A(D)(2)(B)(ii)(II), as New Mexico residents must necessarily be excluded.

5. Gospel Light cannot simultaneously comply with the ACA and IRC requirements to facilitate the sharing of medical expenses only among "members . . . which share a common set of ethical or religious beliefs" and the NMIC prohibition on discrimination based on religion. N.M. Stat. § 59A-16-12(A)–(B).

If OSI's order remains enforceable, it will present an insurmountable obstacle to Congress's intended purpose of providing religious exemptions to the individual mandate by effectively extinguishing one of the only two exemptions, *US Airways*, 627 F.3d at

1324, rendering simultaneous compliance with the Code and the ACA impossible, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963) (preemption "is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility"), and eliminating a safeguard for religious adherents to the individual mandate coverage requirements. It blocks the only avenue for them to fulfill their firmly held religious belief to "bear one another's burdens," and forces them to financially support morally illicit procedures. *Bethel Conservative Mennonite Church v. Comm'r*, 746 F.2d 388, 392-93 (7th Cir. 1984) ("[T]he purpose of [health care sharing] unquestionably is to provide an organized means for the [Christian] community to implement the longstanding Mennonite belief in the voluntary contribution of resources for its members' benefit regardless of the members' financial resources."). Believers cannot simply seek out different HCSMs because the OSI's attack is against HCSMs generally, not only any fact or circumstance unique to Gospel Light, meaning those alternative ministries will undoubtedly face the same regulation attempts. Even more troubling, if OSI's actions are left unchecked, the result will be the elimination of all HCSMs because new

ministries are forbidden from qualifying under the exemption. 26 U.S.C. § 5000A(D)(2)(B)(ii)(IV) (requiring HCSMs to have "been in existence at all times since December 1, 1999"). Because OSI's order "prevent[s] the application" of the HCSM exemption, and both OSI's order and Congress's determination cannot coexist, OSI's order is preempted.

## II. The Remaining Factors Weigh in Appellants' Favor.

Because Appellants will likely succeed on their First Amendment claims under this proper reading of the law, they have established irreparable harm. *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024); *see also Tandon*, 593 U.S. at 64 (holding religious adherents are "irreparably harmed by the loss of free exercise rights 'for even minimal periods of time'"). Appellants will lose their ministry and be forced to obtain insurance whose terms violate their religious convictions.

Likewise, the public interest and balance of equities weigh in Appellants' favor. "A governmental interest in upholding a mandate that is likely unconstitutional does not outweigh a movant's interest in protecting his constitutional rights." *Pryor*, 99 F.4th at 1254 (quotation omitted). "It is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (quotation omitted).

## CONCLUSION

The en banc court should grant review because the panel decision:

(1) contravenes First Amendment precedent, violating HCSM members'

religious liberty; and (2) erases the ACA's HCSM exemption nationwide.


Respectfully submitted,

*/s/Nicholas T. Hart*
Carter B. Harrison IV
Nicholas T. Hart
**HARRISON & HART, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 295-3261
carter@harrisonhartlaw.com
nick@harrisonhartlaw.com

Edward D. Greim
Matthew Mueller
Katherine E. Mitra
**GRAVES GARRETT GREIM LLC**
1100 Main Street, Suite 2700
Kansas City, MO 64105
(816) 256-3181
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
kmitra@gravesgarrett.com

J. Michael Sharman
**COMMONWEALTH LAW OFFICES, P.C.**
246 E. Davis Street, Suite 200
Culpeper, VA 227001
(504) 727-1007
mikesharman@verizon.net

*Counsel for Plaintiffs-Appellants*

Dated: March 28, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(b)(1) because this brief contains 3,896 words, excluding all portions exemption by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief has been prepared in 14-point Century Schoolbook font, a proportionally spaced typeface, using Microsoft Word as part of Microsoft Office 365.

*/s/ Nicholas T. Hart*
Nicholas T. Hart
*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this brief, on March 28, 2025, with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the Court's CM/ECF system. All participants are registered CM/ECF users and will be electronically served by that system.

/s/ Nicholas T. Hart
Nicholas T. Hart
*Counsel for Plaintiffs-Appellants*

# ADDENDUM

1. 10th Circuit Panel Judgment – February 27, 2025

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**February 27, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

BREANNA RENTERIA; LAURA
SMITH; TAMMY WATERS,

    Plaintiffs - Appellants,

v.

NEW MEXICO OFFICE OF THE
SUPERINTENDENT OF
INSURANCE; ALICE T. KANE,
Superintendent of Insurance, in her
official capacity,

    Defendants - Appellees,

and

GOSPEL LIGHT MENNONITE
CHURCH MEDICAL AID PLAN,
d/b/a Liberty HealthShare,

    Plaintiff.

No. 23-2123
(D.C. No. 1:23-CV-00276-MLG-KK)
(D. N.M.)

## ORDER AND JUDGMENT*

Before **CARSON**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.

---

    * This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and 10th Circuit Rule 32.1.

This appeal arises from an enforcement action taken by the New Mexico Office of the Superintendent of Insurance (OSI) against Gospel Light Mennonite Church Medical Aid Plan (d/b/a Liberty HealthShare) (Gospel Light), which resulted in a final order that required Gospel Light to cease operating as a health care sharing ministry (HCSM) in New Mexico. Plaintiffs are Breanna Renteria, Laura Smith, and Tammy Waters (Plaintiffs), three members of Gospel Light.[1] Defendants are OSI and Alice T. Kane, the Superintendent of Insurance, in her official capacity. Plaintiffs sought a preliminary injunction to enjoin OSI from enforcing the final order, which the district court denied. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we affirm the denial of the preliminary injunction.

## I

## A

The Internal Revenue Code (IRC) defines HCSMs as tax-exempt § 501(c)(3) organizations, "members of which share a common set of ethical or religious beliefs and share medical expenses among members in

---

[1] As detailed more fully below, the district court abstained from hearing all claims raised by Gospel Light, the corporate entity, based upon the *Younger* abstention doctrine and dismissed these claims with prejudice. *See* Aplt. App. V at 100. Although Gospel Light appealed that order generally, it did not specifically appeal the dismissal so that decision is not before us in this appeal. Nevertheless, for simplicity's sake, we will refer to the individual Plaintiffs interchangeably with Gospel Light.

accordance with those beliefs." 26 U.S.C. § 5000A(d)(2)(B)(ii)(I)–(II). An HCSM must share expenses "without regard to the State in which a member resides or is employed," must allow members to "retain membership even after they develop a medical condition," and must have existed and shared expenses "continuously and without interruption since at least December 31, 1999." *Id.* § 5000A(d)(2)(B)(ii)(II)–(IV).

In recent years, OSI issued statements warning the public about HCSMs operating in New Mexico. In a press release dated December 3, 2019, OSI stated:

> A few health care sharing ministries (also known as health care sharing organizations) operate in New Mexico. These organizations do not offer insurance, but may present plans in a way that look and feel similar to a health insurance plan. Members of these organizations "share" health costs on a voluntary basis. Consumers should be aware that these plans have no obligation to pay for any medical services and have no requirement to cover any particular categories of health care services, such as preventive care.

Aplt. App. I at 129–30. On March 26, 2020, OSI issued another press release that described HCSMs as "an unauthorized insurance product that likely will not provide the protections of an authorized, regulated, and [Affordable Care Act (ACA)] compliant major medical plan"; listed examples of potential gaps in coverage a consumer could face; and urged consumers to purchase

"an ACA compliant plan." *Id.* at 131. Finally, OSI issued a "Consumer Advisory" in March of 2021[2] that stated:

> As the Special Enrollment Period gets underway, OSI wants consumers to know that there are scammers trying to lure people into purchasing low-quality health insurance or health insurance-like products. These low-quality products DO NOT meet the requirements of the ACA because they offer extremely limited coverage. These might be short-term plans, trade association plans, health care sharing ministries or other limited plans. These bad plans can leave consumers stuck with huge medical bills from doctors and hospitals. These non-ACA plans deny and limit health care coverage by:
>
> ✓ Limiting coverage for pre-existing conditions
> ✓ Limiting prescription coverage
> ✓ Limiting coverage for hospitalizations and emergency rooms
> ✓ Limited or no coverage for mental health / behavioral health treatment
> ✓ Limiting coverage for outpatient / same-day surgery

*Id.* at 200.

## B

Gospel Light's members make monthly voluntary gifts to assist other members with medical expenses but nonetheless maintain ultimate responsibility for their own medical bills. Members must live by Christian standards and may not request sharing for certain medical expenses, for

---

[2] The consumer advisory itself does not display a year. Plaintiffs asserted in their motion for a preliminary injunction that OSI issued the consumer advisory in 2021.

example, contraceptives, abortion, gender affirming care, or alcohol or drug rehabilitation.

On July 1, 2020, OSI received a consumer complaint in which a Gospel Light member asserted that the HCSM was "continuing to take money and not give [the consumer his] reimbursement." Aplt. App. II at 56. On May 12, 2021, OSI received another consumer complaint in which a different member asserted that despite paying her premiums on time, Gospel Light canceled a payment for a hospital bill after sending it to the wrong address and subsequently put the consumer "back on the 6 month wait." *Id.* at 59.

After investigating these complaints, OSI initiated an administrative enforcement action. It also ordered Gospel Light "to cease and desist from transacting insurance business in New Mexico," to provide OSI with data on Gospel Light's plans sold in New Mexico, and to show cause why OSI should not fine Gospel Light for each unauthorized insurance transaction. *Id.* at 43.

Gospel Light requested a hearing, and an OSI hearing officer found that Gospel Light "pa[id], indemnif[ied], or guarantee[d] [its] members as to loss from certain specified contingencies, perils, or risks," and as such, met the New Mexico definition of insurance. *Id.* at 123. The hearing officer also found that Gospel Light sold benefit plans or insurance without a certificate of authority issued by OSI. Based on these conclusions, the

hearing officer recommended that OSI fine Gospel Light $10,040,000 and order Gospel Light to cease operations in New Mexico until it complied with the New Mexico Insurance Code (NMIC). On February 22, 2023, in a final order, OSI adopted the hearing officer's recommendation that it should order Gospel Light to cease operations until it complied with the NMIC but reduced the fine to $2,510,000.

## II

Plaintiffs appealed OSI's final order in New Mexico state court and filed a complaint in the United States District Court for the District of New Mexico. In federal court, Plaintiffs asserted, *inter alia*, the following federal claims:

- Claim 1: 42 U.S.C. § 1983 claim for violations of the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause based on OSI's failure to act neutrally toward religion;

- Claim 2: § 1983 claim for violation of the Free Exercise Clause based on OSI's failure to treat both secular and religious activities in a generally applicable manner;

- Claim 3: § 1983 claim for violation of the Establishment Clause based on OSI's preferential treatment to entities that do not share Plaintiffs' faith;

- Claim 4: § 1983 claim for violation of the Free Speech Clause based on OSI's infringement of Plaintiffs' rights to express themselves without regard to the content of their speech;

- Claim 5: § 1983 claim for violation of the Free Speech and Assembly Clauses based on OSI dictating Gospel Light's membership;

- Claims 9 and 10: federal preemption and declaratory judgment claims under which Plaintiffs argued that OSI's final order conflicted with the McCarran-Ferguson Act (MFA), the ACA, and the IRC.

Plaintiffs moved for a preliminary injunction, primarily arguing that the enforcement of OSI's final order would violate their rights under the Free Exercise Clause as alleged in Claims 1 and 2. Defendants responded in opposition and also filed a motion to dismiss based on, *inter alia*, the *Younger* abstention doctrine. On June 2, 2023, the district court held a hearing on the pending motions and ordered the parties to file supplemental briefing. In this supplemental briefing, the parties advanced arguments about Plaintiffs' likelihood of success on the merits of the Free Exercise Clause claims (Claims 1 and 2) and the federal preemption claims (Claims 9 and 10).

On July 14, 2023, the district court granted OSI's motion to dismiss in part, applying the *Younger* abstention doctrine to dismiss Gospel Light as an organizational plaintiff from the federal suit because the state court provided an adequate forum for Gospel Light's claims and because an important state interest was at play. The district court also dismissed the state law claims based upon sovereign immunity. In that same opinion, the district court denied Plaintiffs' motion for a preliminary injunction, very

briefly reasoning that any irreparable harm was too speculative because it was uncertain whether the state court would enforce OSI's final order.

On August 4, 2023, Plaintiffs gave "notice of the filing of an appeal, to the United States Court of Appeals for the Tenth Circuit, of the *Memorandum Opinion and Order Granting in Part Motion to Dismiss and Denying Motion for Preliminary Injunction*[,] . . . taken against the New Mexico Office of the Superintendent of Insurance and Alice T. Kane, Interim Superintendent of Insurance in her official capacity." Aplt. App. V at 104. This filing gave notice that Plaintiffs were appealing the July 14, 2023, district court opinion and order denying their motion for a preliminary injunction.

The New Mexico state court subsequently issued a decision enforcing OSI's final order against Gospel Light. Thereafter, in federal court, Plaintiffs filed an emergency motion pursuant to Federal Rule of Civil Procedure 59 to reconsider the denial of the preliminary injunction.

On August 30, 2023, this court granted Plaintiffs' motion to hold their appeal in abeyance until the federal district court could rule on the motion to reconsider, which it did on October 12, 2023. In that order, the federal district court (1) granted the motion to reconsider to the extent that the state court order was new evidence and (2) again denied Plaintiffs' request

for a preliminary injunction. Plaintiffs did not file another notice of appeal with this court, and this appeal proceeded to briefing.

### III

### A

This court reviews a district court's denial of a preliminary injunction for abuse of discretion. *Gen. Motors Corp. v. Urb. Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). "A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings," *id.* (quoting *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1252 (10th Cir. 2006)), or acts in a manner that "is arbitrary, capricious, or whimsical," *Amoco Oil Co. v. EPA*, 231 F.3d 694, 697 (10th Cir. 2000) (quoting *Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1146 (10th Cir. 1990)).

"Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003). The grant of a preliminary injunction is "the exception rather than the rule." *Gen. Motors Corp.*, 500 F.3d at 1226 (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)). To obtain injunctive relief, "a party generally must demonstrate: (1) a substantial likelihood of success on the merits, (2) irreparable injury in the absence of the injunction, (3) its threatened injury outweighs the harm to the opposing party under the injunction, and (4) the injunction is not

adverse to the public interest." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1139 n.2 (10th Cir. 2017). When the government is the opposing party, factors three and four merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## B

Before addressing the merits of the parties' arguments, we must first examine which district court decisions are before us on appeal. Here is the relevant timeline:[3]

| | |
|---|---|
| July 14 | District court order denying Plaintiffs' motion for a preliminary injunction |
| Aug 4 | Plaintiffs' notice of appeal filed with the district court |
| Aug 9 | Plaintiffs' motion to reconsider filed with the district court |
| Aug 25 | Plaintiffs' unopposed motion to hold appeal in abeyance filed with the Tenth Circuit |
| Aug 30 | Tenth Circuit order granting motion to abate the appeal |
| Oct 12 | District court order granting reconsideration but again denying request for a preliminary injunction |
| Oct 13 | Tenth Circuit order lifting abatement of appeal with appeal proceeding to briefing |

Under Federal Rule of Appellate Procedure (FRAP) 4, "[a] party intending to challenge an order disposing of [a Rule 59 motion] . . . must file

---

[3] All events listed occurred in 2023.

a notice of appeal, or an amended notice of appeal . . . within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion." Fed. R. App. P. 4(a)(4)(B)(ii). "Put differently, '[w]hen an appellant challenges an order ruling on a [Rule 59 motion], a new or amended notice of appeal is necessary . . . .'" *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1160 (10th Cir. 2023) (quoting *Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1010 (10th Cir. 2018)); *see also Wall Guy, Inc. v. Fed. Deposit Ins. Corp.*, 95 F.4th 862, 870–71, 875 (4th Cir. 2024) ("[A] notice of appeal filed *before* the district court has even announced a decision on a future or pending motion cannot confer appellate jurisdiction over an appeal from a later order related to that motion . . . . Rule 4(a)(4)(B)(ii) explicitly required [the appellants] to file a new or amended notice of appeal[.]").

The provision in FRAP 4 stating that a notice of appeal "becomes effective to appeal a judgment or order" once an order disposing of a motion for reconsideration is entered, refers to the appeal of the judgment or order entered *before* the notice of appeal. Fed. R. App. P. 4(a)(4)(B)(i). Here, Plaintiffs filed a notice of appeal before the district court ruled on their motion for reconsideration, and Plaintiffs did not file "a new or amended notice of appeal" after the district court ruled on that motion. *See Matney*, 80 F.4th at 1160 (quoting *Husky Ventures, Inc.*, 911 F.3d at 1010).

Plaintiffs' motion for reconsideration before the district court, filed five days after they filed a notice of appeal with this court, operated like a tolling motion under FRAP 4(a)(4)(A). We said as much in our Order granting the Plaintiffs' motion to abate the appeal. Order (Aug. 30, 2023) ("[D]ue to the pending 'Motion to Reconsider,' filed within 28 days after entry of the order being appealed, the notice of appeal will not become effective until the district court enters an order disposing of the 'Motion to Reconsider.'" (citing Fed. R. App. P. 4(a)(4))).

The primary problem for Plaintiffs isn't timing, it is sequence. Because no new or amended notice of appeal was filed *after* the district court disposed of the motion for reconsideration by an order dated October 12, 2023, that order is not before us on appeal. Hence, the only district court decision or ruling on appeal before us in this appeal is the July 14, 2023, order denying Plaintiffs' motion for a preliminary injunction because that is the only order Plaintiffs provided notice of appealing in compliance with procedural rules. We thus proceed with our review accordingly.

## IV

Turning now to the merits, Plaintiffs seek a preliminary injunction that would, before trial, halt the enforcement of OSI's final cease and desist order against Gospel Light. As set out above, Plaintiffs carry a heavy burden to prevail. Plaintiffs have not shown a substantial likelihood of

success on the merits of their Free Exercise Clause claims. Nor have they done so with respect to their preemption claims because there is no conflict between the NMIC and either the IRC or the ACA.[4]

## A

We first lay the foundation for the Free Exercise Clause analysis by setting forth the applicable legal principles. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"[5] U.S. Const. amend. I. The Free Exercise Clause of the First Amendment "protects not only the right to harbor religious beliefs inwardly and secretly" but also "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 877 (1990)). "[T]he First Amendment provides absolute protection to religious thoughts and beliefs." *Harmon v. City of Norman*, 61 F.4th 779, 793 (10th Cir. 2023) (quoting *Grace United*

---

[4] Plaintiffs did not advance their Establishment Clause arguments in the briefing before the district court. Because it is now waived, there is no need to further discuss or consider their Establishment Clause claims. *See Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1234 (10th Cir. 2018).

[5] The Free Exercise Clause is applicable to the States via the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

*Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006)).

Religious conduct, on the other hand, may validly be regulated by Congress

and local governments. *Id.*

"The determination of what is a 'religious' belief or practice is more

often than not a difficult and delicate task[.]" *Thomas v. Rev. Bd. of Ind.*

*Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). "However, the resolution of that

question is not to turn upon a judicial perception of the particular belief or

practice in question; religious beliefs need not be acceptable, logical,

consistent, or comprehensible to others in order to merit First Amendment

protection." *Id.* "[C]ourts should refrain from trolling through a person's or

institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000);

*see also Thomas*, 450 U.S. at 716 (determining that the narrow function of

the court was not to dissect scriptural interpretation, but rather to

determine whether a "petitioner terminated his work because of an honest

conviction that such work was forbidden by his religion").

If a plaintiff shows that "a government entity has burdened [the

plaintiff's] sincere religious practice pursuant to a policy that is not 'neutral'

or 'generally applicable,'" then the court applies strict scrutiny to a claim

that a plaintiff's Free Exercise Clause rights have been violated. *Kennedy*,

597 U.S. at 525 (quoting *Smith*, 494 U.S. at 879–81). Under this level of

scrutiny, the government must "demonstrat[e] its course was justified by a

compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).

If the government action "is both neutral and generally applicable," this court applies rational-basis review, even if the action "incidentally burdens religious exercise." *Harmon*, 61 F.4th at 793. Rational-basis review is a "highly deferential" level of scrutiny. *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 767 (10th Cir. 2023) (quoting *Maehr v. U.S. Dep't of State*, 5 F4th 1100, 1122 (10th Cir. 2021)). It merely requires the government action to be "rationally related to a legitimate government end." *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002). "A party challenging a law under rational-basis review must 'negative every conceivable basis which might support it.'" *Citizens for Const. Integrity*, 57 F.4th at 767 (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 315 (1993)). In addition, under rational-basis review, the classification is "presumed constitutional," and this Court will uphold the classification "if there is any reasonably conceivable state of facts that could provide a rational basis for it." *Petrella v. Brownback*, 787 F.3d 1242, 1266 (10th Cir. 2015) (first quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012); and then quoting *Beach Commc'ns, Inc.*, 508 U.S. at 313).

"An ordinance is neutral 'so long as its object is something other than the infringement or restriction of religious practices.'" *Harmon*, 61 F.4th at 794 (quoting *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1232–33 (10th Cir. 2009)). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1272 (10th Cir. 2024) (quoting *Fulton v. Philadelphia*, 593 U.S. 522, 533 (2021)). If, for example, legislators pass a law with the purpose of "infring[ing] on religious views," that law is not neutral. *Harmon*, 61 F.4th at 794.

"[W]here governmental bodies discriminate out of animus against particular religions," "'impose[] regulations that are hostile to the religious beliefs of affected citizens[,]' or 'act[] in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices,' it is appropriate to 'set aside'" the government action. *Does 1-11*, 100 F.4th at 1269 (first quoting *Ashaheed v. Currington*, 7 F.4th 1236, 1244 (10th Cir. 2021); and then quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638–39 (2018)). "That is because government action motivated by religious animus cannot be narrowly tailored to advance a compelling governmental interest." *Id.* (internal quotation marks and citation omitted); *accord Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 531. As such,

"official expressions of hostility" amount to a Free Exercise violation. *Kennedy*, 597 U.S. at 525 n.1 (quoting *Masterpiece Cakeshop, Ltd.*, 584 U.S. at 639).

Before the district court, Plaintiffs contended that OSI has "targeted [HCSMs] for regulation and enforcement under state insurance law."[6] Aplt. App. II at 23. Plaintiffs further argued that the March 26, 2020, press release — which did not mention Gospel Light, its members, or their religious beliefs, but wherein the Superintendent stated that religious and moral restrictions associated with HCSMs could leave members responsible for health care costs — was a "signal of official disapproval" of the religious beliefs of Gospel Light's members. Aplt. App. V at 59. Finally, Plaintiffs argued OSI "revealed its animosity and judgment dismissal" of Plaintiffs' religious, expense sharing practice when OSI stated during the federal

---

[6] The dissent mimics this language by stating that Gospel Light "fell into the Superintendent's crosshairs." Dissent at 2. The dissent also states that before OSI began its investigation, "no state or government entity ever concluded that Gospel Light, . . . should be regulated as an insurance carrier." *Id.* at 2–3. However, during the pendency of this litigation, the Ohio Attorney General, in a *parens patriae* capacity, settled a federal lawsuit in which the plaintiffs alleged, "[d]espite holding itself out as an HCSM, it is alleged that [Gospel Light] is actually an unlicensed insurer because it fails to meet federal and state requirements for the exception." *Glasgow v. Beers*, No. 5:21-CV-2001, 2024 WL 1210790, at *2 (N.D. Ohio Mar. 20, 2024). Individual plaintiffs claims against Gospel Light remain pending in that case.

district court proceedings that charitable giving is not unique to Plaintiffs, HCSMs, or Christians, and that if Gospel Light ceased operations in New Mexico, Plaintiffs could share expenses via GoFundMe pages, church donations, or other religious or secular charities. *Id.* at 60 n.12.

On appeal, Plaintiffs initially argued that the NMIC is not neutral because it is not generally applicable. This argument fails because whether government action is neutral depends on the government's motivations, not whether the action is generally applicable. *See Harmon*, 61 F.4th at 794. Plaintiffs, however, went on to argue that OSI targeted Gospel Light for enforcement out of religious animus, citing as examples (1) the March 26, 2020, press release, (2) the March 2021 consumer advisory referring to some HCSMs as scams, and (3) OSI's suggestion that GoFundMe could be a suitable alternative for religious sharing of health care expenses.

In the March 26, 2020, press release, OSI cautioned consumers that HCSMs "will not provide the protections of an authorized, regulated, and ACA complaint major medical plan." Aplt. App. I at 131. This press release further advised, correctly, that "[m]embers may also be subject to religious or moral restrictions from the sharing ministry[.]" *Id.* Plaintiffs explained in their opening brief that "its members [sic] religious, doctrinal positions" are reflected in Gospel Light's sharing guidelines, which preclude sharing for, *inter alia*, abortion, contraception, and treatment of sexually

transmitted infections without consideration of gender identity.[7] Op. Br. at 52.

The dissent finds this press release "fairly read" to express "disdain for those – including Plaintiffs – whose beliefs preclude them from purchasing ordinary insurance products[.]" Dissent at 8. "Disdain" is hard to find in this press release which, again, does not mention Gospel Light, its members, or any religious beliefs. Indeed, the best reading is that OSI intended to caution consumers about HCSMs that do not comply with the ACA, do not cover pre-existing conditions, leave members uncovered to pay their own medical bills, as well as that health care providers are under no obligation to accept or honor discounts from HCSMs if there is contract with them to do so. After all, that is precisely what was said in this press release.[8]

---

[7] Gospel Light's full list of medical expenses that are not eligible for sharing can be found at Appellant Appendix I at 153–56.

[8] We are also mindful that OSI only began investigating Gospel Light when it received complaints from Gospel Light members who paid their shares but whose expenses were then not paid. The origin of the investigation distinguishes this case from the *Church of Lukumi Babalu Aye, Inc.*, where the city council adopted a resolution after it received "'concerns' expressed by residents of the city 'that certain religions may propose to engage in practices which are inconsistent with public morals, peace or safety.'" 508 U.S. at 526 (citations omitted). In other words, the genesis of the action in *Church of Lukumi Babalu Aye, Inc.* was at least partially animus towards the religious practices. As noted, evidence of similar animus is absent here.

In addition, although Plaintiffs are correct that OSI warned New Mexico consumers in the March 2021 consumer advisory that certain plans, including HCSMs, may be "scammers trying to lure people into purchasing low-quality health insurance," Aplt. App. I at 200, Gospel Light conceded the existence of such fraudulent HCSMs in the preliminary injunction hearing, Aplt. App. IV at 217, 227 ("[T]hese kind of fraudulent type entities . . . that are not legitimate healthcare sharing ministries . . . that keep 85 percent of the contributions for themselves, for their cars, for their houses, fraud, quite frankly. . . . I understand in a case like that . . . these people should not be operating because these people are out taking advantage of people."). Given that Gospel Light acknowledged the existence of fraudulent HCSMs, an identical statement from OSI, grounded in fact, cannot rise to an official expression of hostility. Finally, Plaintiffs provide no argument in support of why OSI's GoFundMe comment amounts to hostility.

In sum, the examples Plaintiffs point to as evincing a lack of neutrality in OSI's application of the NMIC are not persuasive. *Cf. Masterpiece Cakeshop, Ltd.*, 584 U.S. at 635 (determining a Colorado commissioner made an official expression of hostility because he described the "use [of] religion to hurt others" as "one of the most despicable pieces of rhetoric that people can use," thus describing religion as "despicable" and "characterizing it as merely rhetorical—something insubstantial and even

insincere"). Plaintiffs have not shown that OSI's motivations were based on religious animus rather than enforcement of the NMIC.

## B

We next look at general applicability. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534. Even if the government treats "some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue," this court must apply strict scrutiny if the government treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17–19 (2020)). Whether the secular and religious activities are comparable "must be judged against the asserted government interest that justifies the regulation at issue." *Id.* (determining comparability of secular activities and religious worship based on their respective risks of spreading COVID-19).

Before the district court and on appeal, Plaintiffs argued that the NMIC is not generally applicable because it provides exceptions for secular

activities, namely, fraternal benefit organizations and labor organizations, without oversight. To start, the parties do not dispute at least *some* fraternal benefit societies are secular. *See* N.M. Stat. § 59A-44-5(A)(2) ("A [fraternal benefit] society shall operate for the benefit of members and their beneficiaries by . . . lawfully operating for one or more social, intellectual, educational, charitable, benevolent, moral, fraternal, patriotic or *religious* purposes[.]" (emphasis added)). Even so, it is not true that fraternal benefit societies and labor organizations operate without oversight. The NMIC lists eleven articles and sections that apply to fraternal benefit societies. *Id.* § 59A-44-41.

In addition, the NMIC restricts the exemption for labor organizations by applying several conditions to their activities. *Id.* § 59A-1-16(A) (providing that "the [NMIC] shall not apply to . . . a labor organization that, incidental only to operations as a labor organization, issues benefit certificates to members or maintains funds to assist members and their families in times of illness, injury or need, and is not for profit"). This exemption for labor organizations is consistent with federal statutes providing that (1) the Employee Retirement Income Security Program governs labor organizations' employee benefit plans, such as health plans, 29 U.S.C. § 1003(a)(2), and (2) such federal statutes "shall supersede any

22

and all State laws insofar as they may now or hereafter relate to any employee benefit plan," *id.* § 1144(a).

Plaintiffs are, however, correct that fraternal benefit societies and labor organizations are partially exempted under the NMIC. *See* N.M. Stat. § 59A-1-16; *id.* § 59A-1-15(A) ("No provision of the [NMIC] shall apply to . . . fraternal benefit societies, as identified in Chapter 59A, Article 44 NMSA 1978, except as stated in that article[.]"). Nevertheless, Plaintiffs still have not shown that the NMIC is not generally applicable. It is not enough for a secular activity to be treated more favorably than religious exercise, the secular activity must also be *comparable* to the religious activity. *See Tandon*, 593 U.S. at 62 (determining comparability of secular activities and religious worship based on their respective risks of spreading COVID-19). Comparability "must be judged against the asserted government interest that justifies the regulation at issue." *Id.*

Gospel Light's sole purpose is to act as an HCSM. By contrast, any medical payments provided by the fraternal benefit societies or labor organizations is incidental or ancillary to their other, primary purposes for

being.[9] OSI's enforcement action here was not because of Gospel Light's religious beliefs, it was because they operated outside of the bounds of the NMIC that applied to their business activities. In other words, OSI's asserted interests were to protect New Mexico consumers by regulating the insurance industry, not to burden or regulate religious conduct. That other organizations, not entirely secular and not comparable to Gospel Light, merit partial exemptions under the NMIC does not carry the water for Plaintiffs that the NMIC treats a secular activity more favorably than a comparable religious activity.[10] Consequently, rational-basis review applies.

---

[9] The dissent finds error with this reasoning; it concludes that what matters is whether a secular organization receives "a better deal" when it engages "in a similar *activity*." Dissent at 18-19 (emphasis in original). But importantly, apart from *arguments* about the NMIC, there are not *facts* or *evidence* in the record before us as to whether the non-comparable benefit societies or labor unions are engaged in helping members pay medical bills. The dissent's sole authority on this point is a 1937 district court decision about the "Modern Woodmen Society." *Id.* at 20, n.10 (citing *Mod. Woodmen of Am. V. Casados*, 17 F. Supp. 763, 767 (D.N.M. 1937). The extent to which other organizations are getting "a better deal" for activity that may or may not be occurring was not developed by Gospel Light below and is not part of the record in this appeal.

[10] Plaintiffs list other organizations that receive exemptions under the NMIC in the section of their Opening Brief pertaining to weighing the opposing party's and the public's interests. Even if Plaintiffs had included these exemptions to support their arguments regarding strict scrutiny, Plaintiffs did not raise these exemptions in the relevant briefing before the district court and, regardless, have not shown comparability. *See Tandon*, 593 U.S. at 62.

## C

Rational-basis review merely requires the government action to be "rationally related to a legitimate government end." *Hardman*, 297 F.3d at 1126. This level of review is appropriate even if the government action "incidentally burdens religious exercise." *Harmon*, 61 F.4th at 793.

OSI sought to enforce the NMIC to protect consumers. The "regulation and licensure of insurance producers" are "important state interests," *Hunter v. Hirsig*, 660 F. App'x 711, 717 (10th Cir. 2016), and OSI's final order, which enforces the NMIC against Gospel Light, is rationally related to the regulation of health insurance. As such, the government action here satisfies rational-basis review, and Plaintiffs have not shown a substantial likelihood of success on the merits on their Free Exercise claims.

## V

## A

Turning to Plaintiffs' preemption claims, Plaintiffs argue they are likely to succeed on the merits of their claim that the ACA and the IRC preempt OSI's enforcement of the NMIC. The record before us is scant as to whether this argument was fully adjudicated by the district court such that it is before us to review.

The district court's discussion of preemption was part of a broader analysis on *Younger* abstention and whether there was an important state

interest. Its discussion of preemption was thus cabined within its ruling on the motion to dismiss. Although the district court ruled on the motion to dismiss and the motion for a preliminary injunction in the same opinion, it did not analyze the preemption arguments related to the motion for a preliminary injunction. Plaintiffs made this same point in their Opening Brief claiming it to be error.

This court "can reach issues that were either 'pressed' by the appellant before, or 'passed upon' by, the lower court." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 992 (10th Cir. 2019) (citations omitted). Reviewing the pleadings before the district court that were made part of the record before us, we are satisfied the Plaintiffs pressed their preemption claim enough to preserve it for appeal. We next proceed to consider and decide the preemption issue.

**B**

"Put simply, federal law preempts contrary state law." *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 917 (10th Cir. 2016) (quoting *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162 (2016)). There are two cornerstones of preemption jurisprudence. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "Second, [i]n all pre-emption cases, and particularly in those in

26

which Congress has legislated . . . in a field which the States have traditionally occupied," we begin "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (quoting *Medtronic, Inc.*, 518 U.S. at 485) (internal quotation marks omitted).

Federal preemption must be supported by the text of the United States Constitution, a federal statute, or even a regulation promulgated under a federal statute. *Sup. Ct. of N.M.*, 839 F.3d. at 918–19. "There is no federal pre-emption *in vacuo*[.]" *P.R. Dep't of Consumer Affs. v. Isla Petrol. Corp.*, 485 U.S. 495, 503 (1988). Conflict preemption, the type at issue here, occurs (1) when compliance with federal and state law is impossible or (2) because the state provisions are an "obstacle to the accomplishment and execution of the full purposes and objectives of" the federal law. *Sup. Ct. of N.M.*, 839 F.3d. at 918 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

On appeal, Plaintiffs argue they are likely to succeed on the merits of their preemption claims and proffer several arguments as to why federal law preempts the NMIC:[11]

(1) because the IRC prohibits nonprofits from providing commercial insurance, Gospel Light would lose its nonprofit status; *see* 26 U.S.C. § 501(m)(1) ("A[] [§ 501(c)(3)] organization . . . shall be exempt from tax . . . only if no substantial part of its activities consists of providing commercial-type insurance.");

(2) if Gospel Light complied with the NMIC, Gospel Light's unaltered operations in other states would prevent Gospel Light from sharing medical expenses without regard to the state in which a member resides, as called for by the "uniformity requirement" of the ACA; *see*

_____

[11] Plaintiffs also argue on appeal that because the NMIC forbids discrimination based on religion, compliance with the NMIC would cause Gospel Light to lose its status as an HCSM, which would preclude its members from sharing medical expenses in accordance with their religious beliefs; *see* N.M. Stat. § 59A-16-12(A)–(B) ("No insurer shall, on the basis of the race, color, religion or national origin of any individual or group of persons: A. refuse to make insurance available to any applicant for insurance; or B. treat any such applicant or insured differently than any other applicant or insured with respect to the terms, conditions, rates, benefits or requirements of any such insurance contract."); *but see* 26 U.S.C. § 5000A(d)(2)(B) (exempting from the individual mandate HCSM members who "share a common set of ethical or religious beliefs" from the individual mandate). Plaintiffs did not present this argument in the relevant briefing before the district court, and as such, we will not consider it on appeal. *See Singleton*, 428 U.S. at 120.

*id.* § 5000A(d)(2)(B)(II) (defining a "health care sharing ministry" as "an organization" whose members share expenses "without regard to the State in which a member resides or is employed"); and similarly, ceasing operations in New Mexico would violate the ACA's uniformity requirement and would cause New Mexicans to lose the religious ministry exemption to the ACA's individual mandate.[12]

None of Plaintiffs' arguments succeed. Plaintiffs' first argument sputters because any nonprofit could flout state law by arguing that compliance would cause their organization to land outside of the IRC's definition of a nonprofit. The answer is not to deem the NMIC preempted by federal law, but rather for Gospel Light to choose between functioning as a nonprofit or selling commercial insurance. Similarly, as to Plaintiff's second argument about the uniformity requirement, they do not cite any

---

[12] Although OSI is correct that the individual mandate has been reduced to zero, *see id.* § 5000A(c)(3)(A), these provisions of the ACA are still in effect, *see id.* § 5000A(d)(2)(B). Also, although the district court did not reach a conclusion on Plaintiffs' preemption arguments based on Gospel Light's nonprofit tax status, it nonetheless noted that "an HCSM could . . . improperly engage in the business of insurance in violation of the requirements of its nonprofit status." Aplt. App. V at 94 n.12. On Plaintiffs' preemption arguments based on the ACA, the district court concluded that although "the ACA defines and exempts HCSMs from the federally imposed individual mandate," "states are free to regulate HCSMs, and the ACA did not cabin state oversight of HCSM operations." *Id.* at 94–95.

authority confirming or suggesting they have a legal right to remain a HCSM.

The MFA says: "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance[.]" 15 U.S.C. § 1012(b). The MFA's anti-preemption provision is consistent with the Centers for Medicare & Medicaid Services' (CMS) letter to Gospel Light, in which CMS determined that Gospel Light was an HCSM under the ACA and stated as follows:

> [T]his determination does not supersede other relevant state or federal laws that govern the conduct of Gospel Light Mennonite Church Medical Aid Plan. Furthermore, this determination does not reflect any decision by the Internal Revenue Service regarding Gospel Light Mennonite Church Medical Aid Plan's status as a health care sharing ministry or compliance with the Internal Revenue Code.

Aplt. App. I at 93. Accordingly, the NMIC does not conflict with the IRC.

Also, the MFA provides that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a). During the proceedings before the district court, Gospel Light's expert, a former Floridan Insurance Commissioner, testified that "states are free to regulate [HCSMs] as they choose." Aplt. App. V at 94. That is

because, "[w]hatever its form, pre-emption analysis 'starts with the assumption that the historic police powers of the States are not to be superseded by . . . Federal Act unless that is the clear and manifest purpose of Congress. Accordingly, the purpose of Congress is the ultimate touchstone of pre-emption analysis.'" *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)).

The dissent says this point is wrong because Gospel Light sufficiently alleged that it does not provide insurance. Dissent at 26. But the problem with the dissent's view is as much procedural as substantive.

Out of the gate, the OSI Hearing Officer made extensive findings that Gospel Light entered into a legally enforceable contract with its members (payment of monthly share amounts in exchange for a promise of reimbursement for medical expenses), that Gospel Light "provides coverage in this state for health benefits" and is thus "subject to the provisions" of the NMIC, and that Gospel Light "is a health insurance carrier." Aplt. App. V at 112–21. The hearing officer's findings were adopted by OSI.

After Gospel Light filed this suit, the district court took no position on whether Gospel Light was engaged in the "business of insurance," as defined by state or federal law, because it found that it must abstain from

31

exercising jurisdiction over the question due to *Younger* abstention. Gospel Light did not appeal the decision of the district court to abstain.

The dissent glosses over these points and engages in its own analysis of the "defining hallmarks of practices that fit within the 'business of insurance'" that are absent from the district court record below. Dissent at 28. In so doing, the dissent constructs an argument that was not made by Plaintiffs and relies upon cases not cited or discussed by Plaintiffs. So, although Plaintiffs did make a preemption argument and the general point (repeatedly) that they are not engaged in the business of insurance, we do not as a general matter permit parties to pursue a new theory on appeal. *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 722 (10th Cir. 1993) ("[W]e have held that where an issue is raised but not pursued in the trial court, it cannot be the basis for the appeal.").

Plaintiffs bear the burden to show a clear and unequivocable right to the extraordinary remedy of a preliminary injunction. Our review is for an abuse of discretion, and, unlike the dissent, we cannot conclude the district court abused its discretion by declining to resolve arguments not made, inadequately developed, and subject to abstention.

In sum, like the Free Exercise claim, Plaintiffs have not carried their burden and shown a substantial likelihood of success on the merits of their preemption claim. Because we have concluded that Plaintiffs have failed to

show a substantial likelihood to succeed on any of the claims properly before us, "we find it unnecessary to address the remaining requirements for a preliminary injunction." *Warner v. Gross*, 776 F.3d 721, 736 (10th Cir. 2015), *aff'd sub nom. Glossip v. Gross*, 576 U.S. 863 (2015).

## VI

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quoting *U.S. ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989)). Here, Plaintiffs have not shown that the district court abused its discretion when it determined Plaintiffs did not merit such an extraordinary remedy. The district court's denial of Plaintiffs' motion for a preliminary injunction is **AFFIRMED**.

Entered for the Court

Richard E.N. Federico
Circuit Judge

33

<u>Renteria, et al. v. New Mexico Office of the Superintendent, et al.</u>, No. 23-2123

**CARSON**, Circuit Judge, dissenting:

State governments must enforce statutes in a neutral and generally applicable manner. In this case, that means the New Mexico Office of the Superintendent of Insurance ("OSI") cannot regulate Gospel Light Mennonite Church Medical Aid Plan ("Gospel Light"), a religious organization, more stringently than it regulates similarly situated secular organizations like labor unions and fraternal organizations. But the district court reached the opposite conclusion when it allowed the OSI to impose statutory restrictions upon Gospel Light while exempting similarly situated secular organizations. The majority upholds the OSI's impermissible action. Because the district court's and the majority's conclusions run contrary to established Tenth Circuit and Supreme Court precedent precluding discrimination based on religious views, I respectfully dissent.

The First Amendment protects the sincere practice of religion. It forbids the government from harnessing the weight of its enforcement authority to target with hostility those who hold a set of religious beliefs the government finds distasteful. So when state law creates a favored *secular* class, the state must justify why it deprives *religious* classes the same favorable treatment. <u>Roman Cath. Diocese v. Cuomo</u>, 592 U.S. 14, 29 (2020) (Kavanaugh, J., concurring). The New Mexico Insurance Code (NMIC), as interpreted by the OSI, creates a favored secular class for certain organizations by exempting them from its statutory requirements. But the OSI cannot, as it must, justify its treatment of Gospel Light in a manner that satisfies strict scrutiny.

I.

Plaintiffs hold sincere religious beliefs that, among other things, (a) require them to share the burden of medical expenses with likeminded persons, and (b) preclude them from sharing the expense of certain procedures, including abortions, contraceptives, gender-transition treatments, substance abuse programs, and sexually transmitted disease treatments.  Plaintiffs choose to carry out their beliefs through membership in Gospel Light, an organization that accepts as members only those who adhere to its belief statement, affirm that they want to share others' medical expenses out of a spiritual duty and not for secular reasons, and agree to live a defined "Godly Lifestyle."  In turn, Gospel Light facilitates not only cost-sharing for medical expenses but also a wide range of other religious conduct, such as internet-based events for members to pray and sing together, an online prayer-sharing community, and ministry led by a dedicated pastoral-care team.

Founded in 1995, Gospel Light operated for years in all fifty states and the District of Columbia until it fell into the Superintendent's crosshairs.[1]  Before then, no state governmental entity ever concluded that Gospel Light, which is recognized by the United

---

[1] Plaintiffs name as Defendant the Superintendent of Insurance in her official capacity.  Thus, although at least some of these statements occurred when a prior individual served as Superintendent, I attribute to Defendant all official statements made by anyone occupying the role of Superintendent or issued from the OSI.  [Appellee's Br. at 1 n.1, 26–27.]  Defendant has disavowed no statements made by her predecessors, nor does the record show that she has halted or significantly altered any relevant enforcement action that her predecessors began.

States government as a healthcare sharing ministry ("Sharing Ministry"),[2] should be

regulated as an insurance carrier.[3]  Indeed, as I explain later, an entity cannot be both a

healthcare sharing ministry as defined under federal law **and** an insurance carrier under

New Mexico state law.  Relying on this premise, Gospel Light operated for years without

following the New Mexico Insurance Code ("NMIC"), correctly believing it had the right

to do so as a federally recognized Sharing Ministry—not as an insurance carrier.

　　The majority holds the district court did not abuse its discretion in denying

Plaintiff's preliminary injunction because Plaintiffs did not show they are substantially

likely to succeed on the merits of their Free Exercise claim.  I disagree.[4]

---

[2] The federal Department of Health and Human Services certified Gospel Light's status as a Sharing Ministry as defined in the Affordable Care Act ("ACA").  <u>See</u> IRC § 5000A(d)(2)(B)(ii).

[3] During this appeal's pendency, Gospel Light and the Ohio Attorney General settled an investigation into Gospel Light in Ohio.  <u>Glasgow v. Beers</u>, 2024 WL 1210790, at *3 (N.D. Ohio March 20, 2024).  But Gospel Light made no public admissions of wrongdoing, and the Court in that case made no determination on the merits nor decided Gospel Light was an insurance company.  Regardless, a settlement in a different case in a different state certainly has no bearing on the question of whether the Superintendent targeted Gospel Light in this case.

[4] I agree with the majority that our precedent on Federal Rule of Procedure 4(a)(4)(B)(ii) deprives us of appellate jurisdiction to review the district court's Memorandum Order Granting in Part and Denying in Part Motion to Reconsider.  But because we lack jurisdiction over the likelihood-of-success issue from the second Order, I begin my analysis by addressing the district court's finding on irreparable harm, and only proceed to analyze the other prongs after resolving the irreparable harm issue.

A.

The majority concludes that the OSI acted neutrally toward Gospel Light, but the opposite is true. The Enforcement Action lacks neutrality. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." Fulton v. City of Philadelphia, 593 U.S. 522, 533 (2021) (first citing Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n, 584 U.S. 617, 636–39 (2018); and then Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993)). When a government expresses hostility to religion, its actions can never pass strict scrutiny, so courts must strike down or enjoin them. Masterpiece, 584 U.S. at 639; Colorado Christian Univ. v. Weaver, 534 F.3d 1245, 1260 (10th Cir. 2008) (discussing interrelationship between lack of neutrality and animus). The Enforcement Action reveals a lack of neutrality in two ways: 1) through the OSI's displays of animus toward Plaintiff's religious beliefs and 2) through what looks like the OSI's impermissible targeting of "religious conduct for distinctive treatment." Lukumi, 508 U.S. at 534. Thus, Plaintiffs will likely succeed on their Free Exercise claim on this basis without us even undertaking a full strict-scrutiny analysis.

In reviewing the OSI's actions, we must keep in mind that "[f]acial neutrality is not determinative." Id.; Does 1–11 v. Bd. of Regents of Univ. of Colo., 100 F.4th 1251, 1276 (10th Cir. 2024) (holding that a vaccine mandate without religious exemptions was not neutral even though it was not a mere pretext). Indeed, the Supreme Court has warned that in reviewing lower court decisions, we should be on the lookout not necessarily for blatant violations; but for "subtle departures from neutrality," "covert

4

suppression[s] of particular religious beliefs," "distinctive treatment" of "religious conduct," "masked" governmental hostility, and "religious gerrymanders." Lukumi, 508 U.S. at 534 (first quoting Gillette v. United States, 401 U.S. 437, 452 (1971); then Bowen v. Roy, 475 U.S. 693, 703 (1986); and then Walz v. Tax Comm'n, 397 U.S. 664, 696 (1970)). To avoid these more subtle violations, we must "survey meticulously the circumstances," id. (quoting Walz, 397 U.S. at 696 (Harlan, J., concurring)), and "probe the sincerity of the government's justifications . . . to evaluate whether they 'were but pretexts for discriminating against' religion," Does 1–11, 100 F.4th at 1276 (quoting Trump v. Hawaii, 585 U.S. 667, 699 (2018)) (citing Snyder v. Murray City Corp., 159 F.3d 1227, 1234 (10th Cir. 1998)).

Lukumi provides the framework for determining whether a law is neutral. There, the Supreme Court held that even if the animal-sacrifice ordinances were facially neutral from a plain reading of the text, they were still non-neutral because of their real-world effect. 508 U.S. at 535. Town Council members made clear, shocking comments on the public record that they opposed the Santeria religion and wanted to use the ordinances to shut down that religious sect or run it out of town. Id. at 528, 542. More importantly, at least for purposes of this case, the Supreme Court *also* found "strong evidence" of hostility outside of these comments. Id. at 535. Read and applied in tandem, the multiple ordinances accomplished a "religious gerrymander" by singling out those with a specific set of religious beliefs and prohibiting their sincere religious practices. Id. at 535. The "net result of the gerrymander"—caused by the slew of exemptions—was that the ordinances punished *only* those who engaged in the targeted activity for religious reasons.

Id. at 536–37.  This improper targeting of religious practice showed lack of a neutral motivation preempting the need for a strict scrutiny analysis.  Id. at 537–38.

And in Masterpiece, a state commission required the plaintiff, a cakeshop owner, to comply with state regulations in violation of his sincerely held religious beliefs.  584 U.S. at 630.  In adjudicating the plaintiff's complaint, commission members informed the plaintiff that he needed to "compromise" if he wanted to "do business in the state" and disparaged the plaintiff's beliefs by implying that his faith was despicable and insincere.  Id. at 634–35.  The commission showed less hostility toward—and found for—other bakers who did not share the plaintiff's religious views and conscientiously objected based on their own beliefs.  Id. at 636–37.  The commission's "disparity in treatment" and "official expressions of hostility to religion" showed that the commission "was neither tolerant nor respectful of [the plaintiff's] religious beliefs."  Id. at 637–39.  On these facts, the Supreme Court inferred the commission's lack of neutrality, held it amounted to animus, and set aside the government's enforcement action without even undertaking a strict scrutiny analysis.  Id. at 639.

Finally, in Does 1–11, we found animus even with less contemporaneous hostility.  100 F.4th at 1275.  There, the public university's COVID-19 vaccination policy lacked neutrality because it provided secular exemptions under a purportedly neutral policy and maintained that it acted purely to protect the health and safety of those on campus.  Id. at 1258.  But we held that the policy was not neutral because the university had, in the prior weeks and months, made overtly hostile statements and crafted policies targeting the religious beliefs of those it did not exempt.  Id. at 1277.  Although the hostile statements

6

did not occur during the adjudication or enforcement of the policy at issue and did not expressly target the plaintiffs, the government's general attitude of hostility, which it never disavowed, still served as evidence of the government's intolerance. Id. Thus we held that the policy at issue was a mere pretext to create a religious gerrymander that would—for purportedly neutral reasons (but in fact not at all neutral)—preclude a subset of religious believers from receiving an exemption. Id. at 1275–77. We also held that the policy resulted in "real-world discrimination among religions" because it imposed regulations hostile to those adhering to a certain set of religious beliefs while allowing exemptions to those who adhered to other sets of formal religious teachings. Id. at 1269. Despite the university's claims of inclusion and neutrality, the only plausible explanation for its actions was animus, so we struck down the policy as unconstitutional. Id. at 1257, 1269.

Following our precedent, I put aside the Superintendent's subjective protestations that she (and the OSI generally) felt no hostility toward Plaintiffs' beliefs and religious conduct and intended only to protect the public. I instead look for objective evidence of subtle departures from neutrality; covert suppression, disparate treatment, masked hostility, and religious gerrymanders to determine whether the Enforcement Action was a pretext for discriminating against Plaintiffs' beliefs and desired conduct. It's not hard to find.

I place the greatest weight on the fact that the NMIC as implemented by the OSI provides a veritable "slew of exemptions" for secular organizations that do not extend to Gospel Light. The exemptions speak loudly. But that does not mean that official

statements from the OSI are irrelevant. Indeed, the OSI's statements support a religious gerrymander's existence.

Complaints from members whose health expenses were not reimbursed provided the perfect pretext for the OSI to pursue HCSMs in New Mexico. Fairly read, the OSI's March 26, 2020, press release expressed disdain for those—including Plaintiffs—whose beliefs preclude them from purchasing ordinary insurance products and instead dictate they share healthcare expenses through Sharing Ministries such as Gospel Light. The press release described *all* Sharing Ministries (including Gospel Light) as "unauthorized insurance product[s]," and it harnessed the weight and authority of the OSI to cast a negative light on the "religious or moral restrictions" associated with Sharing Ministries. It aspersed many HCSMs by claiming they may obscure or bury their payment obligations in "fine print." It also stated HCSMs "do NOT comply with the ACA, even if their materials say they do," and "urge[d] consumers" to avoid Sharing Ministries. The OSI's disdain for HCSMs becomes even clearer when one examines the record, which clearly belies Gospel Light's participation in the nefarious practices alleged by the OSI. Gospel Light does not attempt to trick consumers into believing it provides insurance; time and time again it has publicly disclaimed providing insurance.[5] HCSMs are a

---

[5] Gospel Light prominently displays, in a bright purple box at the bottom of the Table of Contents—before even the first page—that it does not provide insurance. Gospel Light also displays, in a bright blue box on the first page of its legal notices, that "[t]his program is not an insurance company nor is it offered through an insurance company." In the second sentence of its complaint's recitation of the facts, Gospel Light proclaims "[a]n HCSM is not insurance."

clearly recognized ACA exemption, so do comply with federal law.[6]  And Gospel Light

prominently proclaims it does not guarantee payment for healthcare—one of the

hallmarks of traditional insurers.[7]  This is like the university in <u>Does 1–11</u> making hostile

statements and crafting hostile policies in the months leading up to its violative

enforcement action, objectively targeting a particular set of religious beliefs.  As we

found in <u>Does 1–11</u>, these objective facts show Defendant's hostile motivation and the

OSI's intolerance for Plaintiffs' religious motivations.

In March 2021, the OSI issued an advisory in which it described Sharing

Ministries as likely to be "scammers trying to lure people into purchasing low-quality

health insurance" and offering "low-quality products" and "bad plans."  The warning

stated that a "red flag" of one of these "bad plans" was if it was "ACA-exempt."  Because

the ACA statutorily exempts Sharing Ministries, this statement expressly targeted Sharing

Ministries—including Gospel Light.  This is analogous to the commission member in

<u>Masterpiece</u> stating generically that "we can list hundreds of situations where freedom of

religion has been used to justify discrimination.  And to me it is one of the most

despicable pieces of rhetoric that people can use to—to use their religion to hurt others."

---

[6] IRC § 5000A(d)(2)(B) describes HCSM's religious exemptions to the ACA's individual mandate.  Gospel Light received an exemption letter to operate as a HCSM by HHS.  Gospel Light also received tax-exempt status from the IRS.  The OSI's press release painted all HCSMs as uncompliant with the ACA, even when they actually comply with the exemptions to the ACA.

[7] While the district court ultimately abstained from ruling on whether Gospel Light was in the business of insurance, these facts in the record demonstrate the level of blatant animus and disregard for the truth shown by the OSI in its attacks on HCSMs.

584 U.S. at 635. Although the commission member did not specifically ascribe this "rhetoric" or hurtful practice to the plaintiff, the Supreme Court held that the comment did in fact refer to the plaintiff and disparage his religion. Id. Similarly, read fairly, the OSI's consumer warning—though veiled in neutral language—is directed toward Plaintiffs' religious beliefs.

And throughout this litigation neither the OSI nor its Superintendent has ever disavowed these statements. Instead, the Superintendent doubled down on her comments. Although during the OSI's enforcement process the agency stated that it did not question the sincerity of Plaintiffs' beliefs, Defendant's motion to dismiss argued that Plaintiffs' religious beliefs were not faith-based and merely a universally shared desire to be charitable. She opined that Plaintiffs could sufficiently exercise the same religious beliefs with alternate conduct such as donating to a GoFundMe page or to secular charities—disregarding Plaintiffs' conviction to share healthcare expenses with likeminded believers, and discounting the significant additional religious activities that Gospel Light facilitates. She also argued that Plaintiffs could practice their beliefs by buying ordinary health insurance plans—showing a lack of consideration for Plaintiffs' sincere religious beliefs that preclude them from contributing to contraceptives, abortions, and other procedures that ordinary New Mexico health insurance plans must cover.

The majority dismisses the Superintendent's official expressions of hostility as "not persuasive" and negates them because Gospel Light previously agreed that *some* fraudulent organizations that purport to be Sharing Ministries are illegitimate. But the

10

fact that Gospel Light distinguished other organizations as failing to meet the ACA requirements for Sharing Ministries is irrelevant to whether the OSI expressed hostility toward its religiously motivated conduct. This is especially true where the OSI strongly implied that *all* Sharing Ministries were suspect and likely to be fraudulent, urged consumers to avoid Sharing Ministries (including Gospel Light), and singled out religious beliefs as a reason for its warning. Tandon v. Newsom, 593 U.S. 61, 62 (2021) ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise.").

The majority also errs, in my view, by merely finding that the government did not show clear animus, and, on that basis, dismissing any thought of non-neutrality. That justification conflicts with our decision in Colorado Christian University, where we held that a plaintiff need not show the government acted with "bigotry," but can establish non-neutrality through a showing of "intent to discriminate." 534 F.3d at 1260.

Even if the OSI never made the statements about Gospel Light specifically, the Enforcement Action would still lack neutrality because the OSI has created a "religious gerrymander" around Plaintiffs' religious beliefs. The NMIC as administered by the OSI punishes Gospel Light, while allowing various secular organizations to escape the same level of regulation through various exemptions. Of particular note, labor unions and fraternal organizations may offer "health benefits plans," but OSI has not required them to register as insurance providers or pay the same fees and taxes imposed on Gospel Light. As interpreted by OSI, fraternal benefit organizations may discriminate freely

11

based on religious beliefs when they accept members. But Gospel Light's attempts to limit participation in its organization to only those sharing common religious beliefs places it in violation of the OSI's interpretation of the statutory regime. Likewise, labor organizations may reimburse members for health expenses without following *any* of the NMIC's requirements. But Defendants deprive Gospel Light of a similar avenue for its religiously motivated conduct.

The majority opinion notes—and everyone agrees—that some fraternal organizations in New Mexico have religious affiliations. But this fact has no bearing on this case. The religiously affiliated fraternal organizations did not receive their exemptions *because of* their religious ties. On the contrary, their qualification for the exemptions is based on items separate and apart from religion. And even assuming the fraternal groups' religious affiliations contributed to their exemptions, OSI still cannot treat them more favorably than Gospel Light.

It is well-settled that the First Amendment bars both discrimination against religion and discrimination among religions. Braunfeld v. Brown, 366 U.S. 599, 607 (1961) ("If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect."); see also Lukumi, 508 U.S. at 532 ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."). So the notion that some fraternal organizations are religious provides no safe harbor to the majority because

12

disparate treatment among religious organizations is as unconstitutional as disparate

treatment between secular and religious organizations.  And, as noted above, Tandon

requires strict scrutiny "whenever [government] treat[s] *any* comparable secular activity

more favorably than religious exercise."  593 U.S. at 62 (citing Roman Catholic Diocese,

592 U.S. at 19).[8]  Whether the secular or religious fraternal organizations receive more

favorable treatment through is irrelevant, then, because any amount of disparate treatment

is prohibited.

     The majority does not consider the possibility of a religious gerrymander, but rests

on its animus finding.  But this approach leaves the applicable neutrality analysis only

half-done.  The Supreme Court has admonished us to look beyond mere "facial

neutrality" and "survey meticulously the circumstances of governmental categories."

Lukumi, 508 U.S. at 534 (quoting Walz, 397 U.S. at 696 (Harlan, J. concurring)).  Here,

by making it impossible for Gospel Light to comply with both state and federal law, the

OSI impermissibly prohibited Gospel Light from putting its religious beliefs into

practice.

     So even without considering the hostility in statements by the Superintendent and

the OSI, the NMIC, as applied by the OSI, created a religious gerrymander by singling

out Plaintiffs' beliefs as not eligible for exemption.  As in Masterpiece, Does 1–11, and

Lukumi, I would infer that the OSI's enforcement of the NMIC lacked neutrality.  When

---

[8] The fact that some fraternal-benefit organizations are religious makes them an even more obvious comparator to Gospel Light.  Surely if we can compare religious fraternal organizations to Gospel Light, then we can compare secular fraternal organizations as well.

governmental enforcement is not neutral—even if it lacks animus—we must apply strict scrutiny.  Does 1–11, 100 F.4th at 1272 (quoting Colo. Christian Univ., 534 F.3d at 1260) (citing Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 525 (2022)).  As I discussed, Defendant fails to show her "course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  Id. (citing Lukumi, 508 U.S. at 546).  So I would alternatively hold that simply because Defendants acted in a non-neutral way, Plaintiffs would likely succeed on the merits of their Free Exercise claim.

B.

The OSI must also demonstrate that the statutes and regulations it seeks to impose on Gospel Light are generally applicable.  "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied."  Lukumi, 508 U.S. at 531.  Government enactments lack general application "and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."  Tandon, 593 U.S. at 62.  Put another way, a law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  Fulton, 593 U.S. at 534 (citing Lukumi, 508 U.S. at 542–46).

In Lukumi, the Supreme Court held city ordinances violated the principle of general application because the ordinances achieved the city's asserted ends only for conduct motivated by religious beliefs.  508 U.S. at 527–29.  The city council had outlawed certain types of animal killings—allegedly to protect public health and to

14

prevent cruel treatment of animals.  Id. at 534.  The ordinances provided broad

exemptions for many secular purposes—including for hunting, eradicating pests,

advancing medical science, and handling stray or excess animals.  Id. at 544.  But none of

the exemptions applied to the Santeria religion's practice of animal sacrifice.  Id. at 544.

The Supreme Court determined the ordinances were underinclusive—failing to achieve

the government's pretextual purpose—because the council provided no religious

exemptions even though secular and religious killings posed identical health risks.  Id. at

543–45.  This showed that the government "in a selective manner impose[d] burdens only

on conduct motivated by [the Santeria adherents'] religious belief."  Id. at 534, 543.  The

governmental action lacked general application, and the Supreme Court applied strict

scrutiny.  Id. at 545–46.

We followed the Supreme Court's directive in Does 1–11, holding that a public

university's policy requiring COVID-19 vaccinations lacked general application because

the university granted exemptions on more favorable terms for secular objectors than it

did for religious objectors.  100 F.4th at 1277.  Specifically, the policy denied medically

motivated exemptions only when the exemption did not pose a "direct threat" to others'

"health or safety"—but the policy set a lower bar for denying religious-based

exemptions.  Id.  Because of this disparate treatment, the policy made a "value judgment

in favor of secular motivations, but not religious motivations."  Id. at 1277–78 (quoting

Grace United Methodist Church v. Cheyenne, 451 F.3d 643, 654 (10th Cir. 2006)).

Because the policy lacked general application, we applied strict scrutiny.  Id. at 1278.

The OSI's method of enforcing the NMIC here lacks general application for largely the reasons expressed in Lukumi and Does 1–11.  The NMIC governs "health insurance carriers" that offer "health benefits plans."  N.M. Stat. Ann. § 59A-15-16, 59A-16-21.2(C).  Among many other provisions, these entities must (a) refrain from discrimination based on religious beliefs, id. § 59A-16-12; (b) provide contraceptive treatments, id. §§ 59A-22-42, 59A-23-7.14, 59A-46-44, 47-45.5; and (c) obtain a certificate of authority from the OSI and pay hefty fees and taxes for the privilege of existing and operating in New Mexico, id. § 59A-6-1.  Defendant contends Gospel Light is a "health insurance carrier" because it offers "health benefits plans" and thus it is subject to the NMIC.  But were Gospel Light to comply with these provisions, the organization would no longer provide a forum for Plaintiffs' religious conduct.  Indeed, compliance would require Plaintiffs share the burden of, among other things, contraceptive treatments (which are definitionally contrary to their religious beliefs) and generally share medical expenses with those who do not adhere to similar beliefs.  And if the Enforcement Action causes Gospel Light to cease operating in New Mexico, even temporarily, Plaintiffs lose the benefit of the other religious conduct that Gospel Light facilitates.  Defendants thus put Gospel Light to an impermissible choice: give up sincerely held religious beliefs or give up providing members with financial assistance for health-related costs and other religious services.  See Fulton, 593 U.S. at 625 (Gorsuch, J., concurring); see also Thomas v. Review Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 717 (1981) (holding employees may not be put to a "choice between fidelity to religious belief or cessation of work.").

Many categories of insurance-related providers enjoy significant exemptions from the NMIC.  N.M. Stat. Ann. §§ 59A-1-15, 59A-1-16.  For example, the NMIC allows fraternal benefit societies to provide "health benefit plans" but fully exempt the societies from the anti-discrimination requirement and provide them an enormously discounted fee schedule.[9]  Id. §§ 59A-44-23, 24, 36.  The NMIC also wholly exempts any labor organization that incidentally "maintains funds to assist members and their families in times of illness, injury or need, and is not for profit."  Id. § 59A-1-16(A).  But the NMIC fails to provide a similar exemption for organizations such as Gospel Light, whose members engage in similar health expense reimbursement activities for religious reasons.  This disparate treatment consists of a "value judgment in favor of secular motivations, but not religious motivations."  Does 1–11, 100 F.4th at 1277–78 (quoting Grace United, 451 F.3d at 654).

Defendant argues Gospel Light must comply with the NMIC scheme to protect the public.  Maybe that's fine, but Defendant may not protect the public from Gospel Light while not protecting the public from the same conduct attributable to secular organizations.  And, to be sure, Defendant has not—and cannot—demonstrate how

---

[9] In 1939, the New Mexico Supreme Court decided New Mexico ex rel Biel v. Royal Neighbors of Am., 96 P.2d 705 (N.M. 1939), which held that licensed fraternal benefit societies are exempt from insurance taxes, because they "are simply not members of that class of insurance companies or societies that are subject to the tax in question and are therefore exempt."  (citing Lutheran Mut. Aid. Soc. v. Murphy, 274 N.W. 907, 907 (Iowa, 1937)).  I find it instructional that for almost one hundred years fraternal benefit societies in New Mexico have not been subject to insurance regulations even though they provide insurance, yet here Gospel Light does not provide insurance and the majority presumes it is subject to insurance regulation.

unregulated (or less regulated) "health benefit plans" and medical expense sharing present a greater risk to the public when offered by a Sharing Ministry than by a labor organization or fraternal society. NMIC offers broad exemptions for the secular entities—but not, according to the OSI's interpretation—for Gospel Light. OSI's NMIC enforcement is thus "underinclusive" for the government's asserted goals, selectively imposing a burden only on faith-motivated conduct. In other words, the OSI treats some "comparable secular activity more favorably than religious exercise"—violating the general application principle. <u>Tandon</u>, 593 U.S. at 62.

The majority excuses the OSI's disparate treatment by holding that the insurance-related or healthcare expense-sharing activities of labor organizations and fraternal societies are not "comparable" to the similar activity of a Sharing Ministry. Specifically, the majority determines that the relevant activities are not "comparable" because the insurance activities of fraternal societies and labor organizations are ancillary to the entities' general purpose. The majority concedes the fraternal organizations and labor unions are receiving a better deal. And even without record evidence, this fact is plain: these organizations receive preferential treatment by operation of statute. <u>See e.g.</u>, N.M. Stat. Ann. §§ 59A-44-23, 24, 36. But the majority says the exemptions' impacts are smaller because unions and fraternal organizations' real focus is on activities unrelated to healthcare. No court has previously recognized this novel distinction.

The majority's "ancillary conduct" distinction rests on a misinterpretation of the <u>Tandon</u> rule. <u>Tandon</u> does not instruct us to ask about an organization's *purpose*. 503 U.S. at 62. Instead, <u>Tandon</u> says a law is not neutral when it treats more favorably any

comparable secular *activity*.  Id.  In fact, <u>Tandon</u> specifically decries the purpose-based inquiry, explaining that "comparability . . . is concerned with the risks various *activities* pose, not the reasons why people [engage in the activity]."  <u>Id.</u> at 62 (emphasis added) (citing <u>Roman Cath. Diocese</u>, 592 U.S. at 17).

The majority thus errs in focusing on whether insurance-like activity is "ancillary" to the mission of fraternal organizations or whether the exempted organizations still receive partial regulation.  What matters is whether any secular organization receives more favorable treatment when it engages in a similar *activity*—here, assisting members with medical expenses or providing "health benefits plans."  We must judge the similarity by whether the allegedly comparable activity objectively carries the same risk of which the government complains—here, public safety—not by the similarity of the organization or how many other activities the organization also conducts.

The majority opines on a lack of record evidence to establish that fraternal benefit societies help members pay medical bills.  But again, this argument does not need record evidence, because the preferential treatment for fraternal societies is plain on the face of the statutory text.  <u>See</u> N.M. Stat. Ann § 59A-44-40(A)(1), (2).

Plaintiffs show—and Defendant does not dispute—that Gospel Light exists as a nonprofit organization and maintains a fund to assist its members in their healthcare expenses.  This activity is nearly identical to the activities in which the NMIC permits labor organizations to engage.  <u>Id.</u>  Defendant asserts that these activities by Gospel Light consist of providing "health benefits plans"—just as fraternal benefit societies may do, unfettered.  <u>See</u> <u>id.</u> § 59A-1-15(A).  Gospel Light's activity is comparable to fraternal

19

societies' activity, and the activity itself poses the same risk, so the activities are comparable regardless of whether they are at the core of an organization's mission.[10] Thus the OSI's enforcement of the NMIC is not generally applicable, and we should apply strict scrutiny.

To pass strict scrutiny, Defendant must show that each statute and regulation she seeks to enforce against Gospel Light is narrowly tailored to meet her asserted interest and that the interest outweighs Plaintiffs' need to exercise their religious beliefs.  See Kennedy, 597 U.S. at 524.  Defendant asserts her interest is public safety, but she doesn't argue—nor could she reasonably contend—that the entire NMIC is narrowly tailored to

---

[10] Even comparing the *organizations* instead of their *activity*, I would still easily find comparability.  First, Gospel Light exists primarily for people with a commonality to join together; this is similar to the general purpose of fraternal benefit societies.  Second, the majority rests its holding on the fact that fraternal benefit societies' insurance-adjacent activities are ancillary to the organization's main activities.  But Gospel Light stands in a similar position: although it is a stand-alone entity, it began its healthcare-sharing activities and continues to function as an ancillary ministry of the Mennonite church.  Third, the OSI disputes comparability because fraternal societies receive a governmental certification, and the majority distinguishes labor organizations as having recognition in federal law.  But Sharing Ministries like Gospel Light are recognized in federal law.  The ACA recognizes Sharing Ministries, and the federal Department of Health and Human Services certified Gospel Light's status as a Sharing Ministry.  So Gospel Light is organizationally comparable to at least these two categories of the Regulations' exempted organizations.

And finally, I doubt whether the insurance-adjacent activities of fraternal benefit societies are truly as ancillary as the majority would have us think.  As far back as 1937, the New Mexico District Court found that the Modern Woodmen society's main operation had become insurance, and that other traditional fraternity benefits and hallmarks had been pushed aside.  Modern Woodmen of Am. v. Casados, 17 F. Supp. 763, 767 (D.N.M. 1937).  Even so, Modern Woodmen found the ancillary nature (or lack thereof) of the society's insurance activities didn't affect whether it could benefit from the tax benefits of the insurance code exemption.  This simply underscores that activities just being ancillary is not legally sufficient for purposes of this analysis.

meet this interest or that the interest is sufficiently compelling.  Because the OSI does not generally apply the NMIC and OSI fails its burden on strict scrutiny, I would hold Plaintiffs are substantially likely to succeed on the merits of their Free Exercise claim.

## II.

There is another issue present here that, in addition to the Free Exercise claim, is dispositive and worthy of discussion.  Separate from their First Amendment claims, Plaintiffs argue that the ACA preempts Defendant from enforcing the NMIC against Sharing Ministries, including Gospel Light.  Plaintiffs urge that their preemption claim is substantially likely to succeed on the merits, thus also supporting a preliminary injunction.  I agree.

Under the Supremacy Clause, U.S. CONST. art. VI, cl. 2, Congress has "power to enact statutes that preempt state law."  US Airways, Inc. v. O'Donnell, 627 F.3d 1318, 1324 (10th Cir. 2010) (citing Northwest Cent. Pipeline Corp. v. State Corp. Comm'n, 489 U.S. 493, 509 (1989)).  We recognize three brands of preemption: express, field, and conflict.  Id. (quoting Mount Olivet Cemetery Ass'n v. Salt Lake City, 164 F.3d 480, 486 (10th Cir. 1998).  Express preemption exists when a federal statute "reveals an express congressional intent to preempt state law."  Id. (quoting Mount Olivet, 164 F.3d at 486).  And field preemption exists when Congress legislates such a pervasive regulatory scheme that it must have intended to oust any supplemental state regulations in the same area.  Id. But nothing indicates Congress's express intent that the IRC preempt state law.[11]  And

---

[11] Congress expressly stated: "Nothing in this title [Title 42] shall be construed to preempt any State law that does not prevent the application of the provisions of this title."

although the ACA allows for and defines Sharing Ministries, it does not set forth an

express intent or pervasive regulatory scheme related to them. So the ACA as a whole

cannot establish express preemption or field preemption.

The doctrine of conflict preemption produces a different result. Conflict

preemption exists when either (a) "compliance with both federal and state regulations is a

physical impossibility" or (b) the state provision "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of" federal law. Id.

(quoting Mount Olivet, 164 F.3d at 486). Of course, as the OSI argues, an organization

may provide a means for individuals to share healthcare expenses and avoid violating

either federal law or state law. But this alone does not avoid conflict prevention.

The OSI interprets the NMIC to apply to Sharing Ministries; in the Enforcement

Action, it enforces the NMIC against Gospel Light, a Sharing Ministry. Under the

Internal Revenue Code, Gospel Light will lose its nonprofit status if it complies with the

NMIC's requirement to register as an insurance provider. IRC § 501(m)(1). And the

NMIC's anti-discrimination provision prevents Gospel Light from accepting as members

only those who share similar religious beliefs. N.M. Stat. Ann. § 59A-16-12. But to be a

Sharing Ministry under the ACA, an entity *must* exist as a nonprofit organization, and it

---

42 U.S.C. § 18041(d). The definition of Sharing Ministries isn't in Title 42, which sets
forth the ACA, but rather in in IRC § 5000A, the portion of the Internal Revenue Code
that details the individual mandate that is central to the ACA. But Title 42 §§ 18091 and
18092 reference the individual mandate and cite IRC § 5000A. So I consider it likely
that Congress intended § 18041(d) to apply generally to the ACA. If so, this provision
underscores both that no express or field preemption exists—but also that the ACA's
Sharing Ministry provision can and will preempt state law that conflicts with its purpose.

*must* consist of those who share similar beliefs.  IRC § 5000A(d)(2)(B).  Thus, if Gospel Light complies with the NMIC, it no longer qualifies as a Sharing Ministry under the ACA.  This shows the "physical impossibility" of "compliance with both federal and state regulations"—thus establishing conflict preemption.

Conflict preemption also exists because the NMIC, as applied, "stands as an obstacle" to the purposes of the religious exemptions within the ACA.  O'Donnell, 627 F.3d at 1324 (quoting Mount Olivet, 164 F.3d at 480).  We determine the purpose of the ACA by looking at the words of the statute.  See Ausmus v. Perdue, 908 F.3d 1248, 1253 (10th Cir. 2018) (quoting Sinclair Wyo. Ref. Co. v. EPA, 887 F.3d 986, 990 (10th Cir. 2017)) (holding we determine Congress's intent by looking at the statute's text); United States v. Am. Trucking Ass'ns, 310 U.S. 534, 543 (1940) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.").

The ACA generally requires all individuals buy ACA-approved insurance products—which necessarily include coverage for contraceptives and other procedures contrary to Plaintiffs' beliefs.  IRC § 5000A(a),(f); 42 U.S.C. §§ 18022(b)(1), 18091; 26 C.F.R. §§ 54.915-2713(a)(1)(iv); 45 C.F.R. § 147.130(a)(1)(iv), Department of Labor, et al., FAQs About Affordable Care Act Implementation Part 64 (Jan. 22, 2024), available at https://www.cms.gov/files/document/faqs-part-64.pdf [https://perma.cc/SN9H-J7CX] (last visited Feb. 25, 2025).  The ACA's religious-exemption provision exempts from this requirement individuals who are members of a Sharing Ministry—but requires that the Sharing Ministry be a nonprofit organization and all its members "share a common set of

23

ethical or religious beliefs and share medical expenses in accordance with those beliefs and without regard to the State in which a member resides or is employed." IRC § 5000A(d)(2)(B). This text clearly communicates Congress's statutory purpose to provide a nationwide, religious, conscience-based exemption to insurance regulations. Congress intended to guarantee that Sharing Ministries could exist in each state as a means for individuals who hold religious beliefs related to healthcare expenses to live out those beliefs with each other without being burdened by ordinary insurance regulations that could violate their consciences. IRC § 5000A(d).

The Enforcement Action conflicts with the purpose of the religious exemption provision of the ACA. The NMIC—as OSI enforces it against Gospel Light—prohibits Gospel Light from functioning as a non-profit organization and prohibits Gospel Light from accepting only members who share a common set of religious beliefs. Indeed, the OSI argues that the Superintendent can institute an "outright ban" on all Sharing Ministries within the State of New Mexico. This precludes Gospel Light from functioning as a Sharing Ministry and thus strips away Plaintiffs' ability to gain a religious conscience-based exemption to the ACA through membership in Gospel Light.

Respectfully, the majority makes two errors in analyzing Plaintiffs' preemption claim. First, the majority oversimplifies Plaintiffs' arguments and construes them as merely claiming that any organization has a right to exist as a nonprofit. Plaintiffs' argument is more nuanced: they contend that if Gospel Light were to comply with the NMIC—including by eliminating its nonprofit status in New Mexico—it would no longer constitute a Sharing Ministry for purposes of the ACA's religious exemption and thus the

24

NMIC impermissibly conflicts with the purpose of the ACA.  As counsel for Plaintiffs stated at oral argument: "There is under the Internal Revenue Code a statutory structure that [Sharing Ministries] must follow . . . [Gospel Light] cannot be a Healthcare Sharing Ministry if they need to comply with the non-discrimination [provision] and [other regulations] . . . New Mexico's insurance code directly conflicts with the national [Sharing Ministry] provisions that [Gospel Light] would have to follow."  [Oral Arg. at 11:20–13:14.]  The OSI's own press release acknowledged that one of the hallmarks of a "bad plan" was if it was "ACA-exempt," throwing the NMIC into direct conflict with the ACA's exemptions.  Addressing this argument as I do above, Plaintiffs show substantial likelihood of success on the merits on this issue.

The majority holds federal law does not preempt the NMIC as applied because all it does is force Gospel Light to "choose between functioning as a nonprofit or selling commercial insurance."  But this ignores the entire point of conflict preemption and, in my view, demonstrates the irreconcilable conflict between the state and federal laws at issue in this case.

The proper measure of conflict preemption is "whether the matter on which the State asserts the right to act is in any way regulated by the [f]ederal [a]ct."  Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 236 (1947) (holding that if the matter is in any way regulated by the federal government, "the federal scheme prevails though it is a more modest, less pervasive regulatory plan than that of the State").  When the federal government has provided a statutory exemption and state law makes it impossible to qualify for the federal exemption, the state and federal laws conflict.  In those situations,

25

principles of conflict preemption mandate the federal law supersedes the state law, because state law may not "stand[] as an obstacle to accomplishment and execution of the full purpose and objectives of Congress." Mount Olivet, 164 F.3d at 488. Otherwise, states could effectively veto federal law by enforcing their own laws over the federal law. But the Supremacy Clause of the Constitution does not permit this outcome—hence the doctrine of conflict preemption.

Second, the majority justifies its holding by concluding that the McCarran-Ferguson Act ("Act") precludes preemption here because it generally precludes federal preemption of state law regulating "the business of insurance." But the Defendant *conceded* this point on appeal, acknowledging that the Act *doesn't* preclude preemption in this situation and merely arguing that federal law does not actually preempt the NMIC as applied to Gospel Light. Appellee's Br. at 33 ("The issue is not whether the federal government *may* pre-empt state regulation of healthcare sharing, the question is whether it *does*.") (emphasis added).

The majority also holds that Gospel Light did not sufficiently allege preemption or that it does not provide insurance, so addressing the issue is constructing "an argument that was not made by [Gospel Light]." But this argument is contradicted by the record, as we have shown above. Even if Gospel Light inartfully pled the preemption issue, as long as the "issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991). Once a party has raised the issue, we may resolve it

26

in whatever manner best conforms to the law, even if neither party advocated for such a conclusion. United States v. Cortez-Nieto, 43 F.4th 1034, 1052 (10th Cir. 2022).

The majority also contends that because the district court abstained from ruling on whether Gospel Light engaged in the "business of insurance" that we cannot address those claims. In the same breath, however, the majority puts forward evidence that Gospel Light, is, in fact, engaged in the "business of insurance," and therefore presumes it is subject to regulations under the MFA and the NMIC. It applies rational basis review, and holds the state passes the test because "regulation and licensure of insurance producers," is an important state interest. Inherent in that determination is that Gospel Light is, in fact, an insurance provider—surely New Mexico does not have a rational interest in applying the insurance code to entities that do not provide insurance. But we cannot simultaneously abide by the district court's decision not to rule on an issue, and yet proceed as if it had reached our favored outcome. Either we must abide by the district court's decision to abstain, and so cannot conclude either way whether Gospel Light is in the "business of insurance," or we reject the district court's abstention and determine whether Gospel Light is in the "business of insurance." Instead, the majority "affirms" the district court, but assumes without stating that Gospel Light is in the "business of insurance," and so avoids the need to support its conclusions with any legal authority showing that Gospel Light's activities fit into the "business of insurance." At the very least, if a non-binding dissent cannot opine on an issue not determined by the district court, surely the majority cannot.

The Act provides that, generally, state legislatures and not Congress will regulate "[t]he business of insurance":

> **(a) State regulation**
>
> The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> **(b) Federal regulation**
>
> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . .

15 U.S.C. § 1012.  The Supreme Court listed three defining hallmarks of practices that fit within the "business of insurance" to determine whether such activities are susceptible to preemption by federal law under the Act: (1) whether it transfers or spreads a policyholder's risk; (2) whether it's essential to the policy relationship between insurer and insured; and (3) whether it's limited to entities within the insurance industry.  Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 743 (1985) (quoting Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982)).  Reimbursement arrangements or schemes that do not underwrite risk or guarantee payments do not constitute "insurance" under the Act. EagleMed LLC v. Cox, 868 F.3d 893, 904-05 (10th Cir. 2017) (holding that the Act did not preclude preemption because the state law at issue did not serve to underwrite or spread policyholders' risks); Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 366–371 (2002) (holding critical to its status as an insurer an HMO's assumption of risk and guarantee to its members); SEC v. Variable Annuity Life Ins. Co. of Am., 359 U.S. 65,

28

71 (1959) a contractual arrangement that did not guarantee payments did not underwrite risks and thus did not constitute insurance).

Gospel Light is a not-for-profit entity that operates on a reimbursement basis, doesn't guarantee payment, and expressly disclaims any assumption of risk.[12]  It doesn't purport to provide an insurance product; in fact, it prominently proclaims the opposite. Rather than focusing on ordinary insurance-policy matters, Gospel Light's membership materials focus on its members' shared beliefs, religious convictions, and faith-based purposes.  Gospel Light's core functions—living out religious beliefs and sharing financially to meet others' needs—are in no way limited to the insurance industry but are implemented primarily by religious and other nonprofit organizations.  Because of these characteristics, Gospel Light's practices—the same practices that Defendant seeks to regulate—are not activities within the "business of insurance."  This comports with the text of the ACA itself, which establishes that Sharing Ministries are not engaged in the

---

[12] OSI's position here seems particularly unjustifiable.  OSI found that Gospel Light's members understand and acknowledge that—although Gospel Light has a strong history of paying medical bills that they submit—Gospel Light need not do so, and its members are ultimately responsible to pay their own medical bills.  These statements strongly suggest that Gospel Light is not providing "insurance" and that, at least initially, the OSI did not believe Gospel Light was providing insurance.  But later, for whatever reason, OSI found that Gospel Light "undertakes to pay or indemnify its members as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies."  This shift in position by OSI seems arbitrary and, arguably, an after-the-fact attempt to shoehorn Gospel Light's activities into the text of the NMIC. OSI's motivations seem especially questionable where it is undisputed that even though Gospel Light takes on itself the goal of providing cost-sharing for all or much of its members' medical expenses, it does not expressly contract to do so, and expressly does not guarantee payment or contractually assume risk.

"business of insurance"—or in any "business" enterprise—because Ministries are not-for-profit organizations under IRC § 501(c)(3) and are *outside* the bucket of "minimum coverage" requirements for ordinary health insurance.  IRC § 5000A(d)(2).

Because Gospel Light isn't engaged in the "business of insurance" for the purpose of the Act, I would hold the Act does not preclude federal preemption.  The NMIC, as applied, impermissibly conflicts with the ACA's purpose.  Thus, I would conclude Plaintiffs are likely to succeed on the merits of their preemption claim.

We have held that, "[a]t the preliminary injunction stage . . . [i]f the moving party is likely to succeed on each of several theories, the party's argument for preliminary relief is stronger than if the party has only one claim that is likely to be viable."  Id. at 1267.  As Plaintiffs are likely to succeed both on their Free Exercise claim—based on three independent theories—and on their preemption claim, Plaintiffs' showing on the first prong for an injunction is particularly strong.

### III.

Because Plaintiffs established the first prong of a preliminary injunction based on their Free Exercise claims, the remaining prongs also weigh in their favor.  See Pryor v. Sch. Dist. No. 1, 99 F.4th 1243, 1254 (10th Cir. 2024) (citing Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014)).

"[O]ur precedent is clear that a First Amendment violation constitutes irreparable injury."  Id. (citing Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d 792, 797 (10th Cir. 2019)).  This is an ironclad rule in our Circuit; when we find likelihood of

success on a First Amendment claim, we must also find irreparable injury, and we need

not conduct any further analysis.[13]  Id.  "The Supreme Court has made clear that 'the loss

of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury.'"  Heideman v. South Salt Lake City, 348 F.3d 1182, 1190

(10th Cir. 2003) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality op.)) (first

citing Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1076 (10th Cir. 2001);

then Homans v. City of Albuquerque, 264 F.3d 1240, 1243 & n. 2 (10th Cir. 2001); then

ACLU v. Johnson, 194 F.3d 1149, 1163 (10th Cir. 1999); and then Community

Commc'ns Co. v. City of Boulder, 660 F.2d 1370, 1380 (10th Cir. 1981)).  So Plaintiffs

established irreparable harm—the second prong of a preliminary injunction.

Plaintiffs also established the third and fourth prongs, weighing of harms between

the parties and public interest—which merge in the case of a governmental defendant.  "A

governmental interest in upholding a mandate that is likely unconstitutional does not

outweigh a movant's interest in protecting his constitutional rights."  Pryor, 99 F.4th at

1254 (citing Hobby Lobby, 723 F.3d at 1145).  And "[i]t is always in the public interest to

prevent the violation of a party's constitutional rights."  Hobby Lobby, 723 F.3d at 1145

(quoting Awad v. Ziriax, 670 F.3d 1111, 1132 (10th Cir. 2012)).  Defendant lacks an

interest in enforcing the NMIC against Gospel Light because doing so violates Plaintiffs'

---

[13] To show irreparable harm, a plaintiff must establish a significant risk of
imminent harm.  New Mexico Dep't of Game and Fish v. United States Dep't of the
Interior, 854 F.3d 1236, 1250 (10th Cir. 2017) (quoting Heideman, 348 F.3d at 1189).
Plaintiffs show harm that is sufficiently imminent, because at time of the hearing for the
First Order, Defendant had asserted jurisdiction over Gospel Light's operations and,
under the full weight of the OSI, took its Enforcement Action.

31

rights; conversely, Plaintiffs—and the public in general—maintain a strong interest in protecting and exercising their First Amendment right to religious exercise.  Thus, all prongs favor Plaintiffs.

 For these reasons, I respectfully dissent.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

February 27, 2025

To Counsel of Record

**RE:**    **23-2123, Renteria, et al v. New Mexico Office of the Superintendent, et al**
Dist/Ag docket: 1:23-CV-00276-MLG-KK

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(d)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

CMW/klp